# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------------X
NAFEESA SYEED, and similarly situated employees,       Index No.:

                  Plaintiff(s),

                                 **SUMMONS**

          -against-

                                **The basis of venue is**
BLOOMBERG L.P., MATTHEW WINKLER         **Defendant's place**
JOHN MICKLETHWAIT, MARTY SCHENKER,    **of business.**
RETO GREGORI and "JOHN DOES" 1-10,

                  Defendants.
-------------------------------------------------------------------------X
To the above-named defendants:

      **YOU ARE HEREBY SUMMONED** to answer the Verified Complaint in this action

and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve

a notice of appearance, on the plaintiff's attorney within 20 days after the service of this

summons, exclusive of the day of service (or within 30 days after the service is complete if this

summons is not personally delivered to you within the State of New York); and in case of your

failure to appear or answer, judgment will be taken against you by default for the relief

demanded in the complaint.

Dated: New York, New York
      August 9, 2020

                          THE CLANCY LAW FIRM, P.C.

                          By:            /s/
                              Donna H. Clancy, Esq.
                              40 Wall Street, 61st Floor
                              New York, New York 10005
                              (212) 747-1744
                              *Attorneys for Plaintiff Nafeesa Syeed and*
                              *other similarly situated employees*

To:   BLOOMBERG, L.P.
731 Lexington Avenue
New York, New York 10022

Matthew Winkler
c/o Bloomberg L.P.
731 Lexington Avenue
New York, New York 10022

John Micklethwait
c/o Bloomberg L.P.
731 Lexington Avenue
New York, New York 10022

Marty Shencker
c/o Bloomberg L.P.
731 Lexington Avenue
New York, New York 10022

Reto Gregori
c/o Bloomberg L.P.
731 Lexington Avenue
New York, New York 10022

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------------X
NAFEESA SYEED, and similarly situated employees,                    Index No.:

                                    Plaintiff(s),

                                                            **VERIFIED COMPLAINT**

              -against-
                                                            **JURY TRIAL DEMANDED**

BLOOMBERG L.P., MATTHEW WINLKER
JOHN MICKLETHWAIT, MARTY SCHENKER,
RETO GREGORI and "JOHN DOES" 1-10,

                                    Defendants.
-------------------------------------------------------------------------X

  Plaintiff Nafeesa Syeed, and similarly situated employees and former employees, by their

attorneys, The Clancy Law Firm, P.C., complaining against Defendants Bloomberg L.P.,

Matthew Winkler, John Micklethwait, Marty Schenker, Reto Gregori and "John Does" 1-10,

upon information and belief, and at all relevant times, allege as follows:

## INTRODUCTION

  Plaintiff Nafeesa Syeed, a South Asian-American female Bloomberg L.P. News reporter

resigned from her employment because of its top-down systemic sex and racially biased

discriminatory practices for promotion and compensation against minority women. One of the

few female minority Bloomberg News[1] reporters, Bloomberg L.P. exploited Plaintiff as a

'diversity pawn' for its business and journalistic gain. Along with other minority women,

Plaintiff was undervalued, demeaned and denied advancement and career opportunities despite

having extensive news reporting experience covering foreign policy matters, particularly in the

---

[1] Bloomberg News delivers business and market news, data, analysis and video to the world, featuring stories from Business Week and Bloomberg News. https://www.bloomberg.com

3

Middle East.

While reporting news for Defendant Bloomberg L.P.'s News, which included the Dubai, Washington, D.C. and New York Bureaus, Plaintiff's hiring and promotion opportunities were controlled by its New York based all white male editorial management committee comprised of the individually named Defendants. Plaintiff's applications for foreign policy correspondent positions in the D.C. Bureau and requests for consideration for foreign policy correspondent positions at its New York Bureau were all denied.

Refusing to recognize her academic achievements and professional qualifications, and prior work at world renowned news outlets, Bloomberg L.P. and its male dominated news operation, controlled and supervised by its all white male management committee reporting directly to Michael Bloomberg, denied Plaintiff positions for which she was qualified, overlooked her and offered those same positions to her male colleagues, some of which were far less qualified.

When she complained, Plaintiff was informed by her male Editor that the New York Foreign Policy position was not a designated **"diversity slot"** and, therefore, she would not be considered. An additional foreign policy position, one which was never disclosed to her, was given to a male reporting fellow at the intern level, who Plaintiff had mentored and coached on reporting federal agencies. He is currently employed by Bloomberg L.P. as a staff reporter covering Congress focusing on foreign policy.

During her four years of employment and despite her acclaimed body of work, Defendant Bloomberg L.P. treated Plaintiff as an intern rather than an experienced news reporter. Subjecting her to an oppressive and degrading work environment, she and other minority female

4

employees were barely acknowledged by their proper names, let alone recognized for professional acumen.

By ignoring their abilities to perform in more senior positions and denying their requests for promotion, belittling them, embarrassing them and shaming them by treating the female reporters in a distinctly disrespectful and rude manner, Bloomberg L.P.'s practices perpetuated a sexist corporate culture on a global scale. Bloomberg, L.P., acting through its predominantly male management, devalued its female employees, and particularly, women of color. Bloomberg L.P.'s glass ceiling caused its female minority employees to doubt their own value. Through gaslighting,[2] Bloomberg L.P. expected its female minority employees to tolerate the unequal status quo and know and stay in their place - firmly beneath their male colleagues.

This action seeks the Court's intervention to upend Defendant Bloomberg L.P.'s disparate treatment of its female employees and cease relegating women and minorities to their designated "diversity slot[s]." Immediate intervention is warranted here to achieve equal treatment compared to their white male counterparts under the law.

Bloomberg L.P. deliberately utilized and continues to use abusive tactics to accomplish its goal of a caste system, to wit: white males at the top, everyone else permanently kept below them in rank, assignments and in permitting an atmosphere of devastating discrimination to take place. Bloomberg L.P's disregard for the truth in the reporting of these female employee complaints is shocking and imminently requires the Court's intervention.

---

[2] Gaslighting is defined by Merriam-Webster as "manipulate (someone) by psychological means into questioning their own sanity."
https://www.bing.com/search?q=merriam+webster+gaslighting&form=EDGTCT&qs=DA&cvid=2552d560be49402
1995a7c7a15078f5b&refig=fbf10d78112045a7be0ee1ab1d5974f8&cc=US&setlang=en-
US&DAF1=1&plvar=0&PC=HCTS

5

## NATURE OF THE ACTION

1.    This is an individual and collective action under C.P.L.R. §§ 901, 1002 for injunctive relief, declaratory judgment and money damages to remedy discrimination on the basis of sex and race in the terms, conditions and privileges of employment, harassment, hostile work environment and failure to promote under the New York Human Rights Law as contained in New York State Executive Law, § 296 *et seq.* ("NYHRL"), New York City Human Rights Law as contained in the Administrative Code of the City of New York, § 8-107 et seq. ("NYCHRL").

2.    Plaintiff Nafeesa Syeed contends that the terms, conditions and privileges of her employment and those female employees similarly situated with Defendant Bloomberg L.P. ("Bloomberg") were adversely affected because of their sex and race. Bloomberg, created a blatantly hostile work environment toward minority women, willfully refused to remedy discrimination, failed to promote them by denying them equal terms and conditions of employment and ultimately caused Plaintiff's constructive discharge in violation of State and City anti-discrimination remedial statutes.

## JURISDICTION AND VENUE

3.    A substantial part of the discriminatory practices, decision-making, acts and omissions giving rise to this action were committed within the State and City of New York, and venue is properly lodged in this Court.

## PROCEDURAL REQUIREMENTS

4.    Upon commencement of this action, Plaintiff will serve a copy of the Complaint upon the New York City Commission of Human Rights and the Corporation Counsel of the City of New

6

York in accordance with the notice requirements under New York City Administrative Code § 8-502(c).

## PARTIES

5.     Plaintiff Nafeesa Syeed is a South Asian-American 37-year-old female who currently resides in the State of New Jersey.

6.     In or about October 2014, Plaintiff Syeed began her employment with Defendant Bloomberg as a Gulf Politics and Economy Correspondent in Bloomberg's Dubai Bureau in the United Arab Emirates.

7.     In April 2016, Plaintiff Syeed was transferred to work in Defendant Bloomberg's Washington, D.C. Bureau as a National Security Correspondent.

8.     On or about June 8, 2018, Plaintiff Syeed was constructively discharged from her employment with Defendant Bloomberg. From on or about June 8, 2018, Plaintiff performed freelance work for Bloomberg until on or about August 10, 2018.

9.     Plaintiff Syeed was highly qualified for her position having earned her Bachelor of Arts, double majoring in Arabic and Government from Georgetown University, Magna Cum Laude, in 2004. In 2006, she earned her Master of Arts in Comparative Literature with distinction in Modern Arabic and South Asian languages from the School of Oriental and African Studies at the University of London and had worked for major news outlets before becoming employed by Bloomberg.

10.    At all relevant times during her employment, Plaintiff Syeed performed her duties in a satisfactory and/or exemplary manner.

11.    Defendant Bloomberg is a foreign limited partnership existing under and by virtue

7

of the laws of the State of Delaware.

12.     Founded in 1981 by majority shareholder, Michael Bloomberg is a privately held financial, software, data and mass media company with annual earnings of approximately $10 billion. It provides financial software tools and enterprise applications, such as analytics and equity trading platform, data, services and news to financial companies through the Bloomberg Terminal and its online platforms.

13.     Defendant Bloomberg has approximately 20,000 employees, 167 domestic and foreign locations including Washington, D.C., Dubai and London having its global headquarters located in the City of New York, County of New York, State of New York.

14.     Michael Bloomberg co-founded Bloomberg News with Defendant Matthew Winkler, his former Editor-in-Chief in or about 1990. Defendant Winkler ran Bloomberg News with Michael Bloomberg until December 2014. During this 24-year run, Defendant Winkler and Mr. Bloomberg implemented all policies that governed Bloomberg News, its News Bureaus and their employees out of its New York City Headquarters.

15.     In 2015, Michael Bloomberg, after 12 years as Mayor of New York City, resumed full time leadership of his namesake company to run the day-to-day operations and Defendant Winkler was named Bloomberg's Editor-in-Chief Emeritus. Working directly with Mr. Bloomberg on strategic initiatives, while conducting high-profile interviews of global newsmakers, Defendant Winkler continued to bring his insights and expertise to the most high-profile stories run by Bloomberg News.

8

16.    At all relevant times, Defendant Bloomberg manages its News Bureaus from its corporate headquarters located at 731 Lexington Avenue, New York, New York. At all relevant times, Bloomberg's News Bureau Chiefs report up to the New York Bureau and all white male executive editorial committee for news content and all employment related decision making.

17.    At all relevant times, Bloomberg's all-male editorial management committee managed and supervised Defendant Bloomberg's News operations and its employees from its offices in New York.

18.    At all relevant times, Michael Bloomberg and Defendant Matthew Winkler built a global news organization including more than 2,400 editors and reporters. Female news reporters are a minority among its Senior Editors and reporters. Female minority reporters comprise an even smaller segment of its workforce.

19.    At all relevant times, Bloomberg's all white male editorial management committee reported directly to Michael Bloomberg.

20.    At all relevant times, Defendant Bloomberg and its Founder, Michael Bloomberg and his Co-Founder of Bloomberg News, Defendant Matthew Winkler proclaimed to maintain a fire wall between its financial services business and platforms and journalistic aspects of its business side to avoid any actual or perceived conflicts of interest and to facilitate journalistic integrity.

21.    Defendant Bloomberg is an employer within the meaning of New York City Administrative Code §§ 8-102(5) and § 8-107.

22.    Defendant Matthew Winkler ("Winkler") is a white male employed by Defendant Bloomberg.

23.    Upon information and belief, Defendant Winkler currently resides in New Jersey.

9

24.     Defendant John Micklethwait ("Micklethwait") is a white male employed by Defendant Bloomberg.

25.     Upon information and belief, Defendant Micklethwait currently resides in the State of New York.

26.     At various relevant times, Defendant Winkler was the Editor-in-Chief in charge of supervising all news and journalism within Defendant Bloomberg's news operation centrally based out of its New York News Bureau and was a member of the three-person all male executive editorial management committee reporting to Michael Bloomberg.

27.     In 2015, Defendant Micklethwait replaced Defendant Winkler as Bloomberg's Editor-in-Chief in charge of supervising all journalism within Defendant Bloomberg's news operations centrally based out of the New York Bureau and was named a member of the three-person all male executive editorial management committee reporting to Michael Bloomberg.

28.     At various relevant times, as an executive management committee member and Editor-in-Chief, Defendant Winkler supervised Plaintiff Syeed and her work as a Bloomberg news reporter in accordance with the employment policies he assisted implementing.

29.     At all relevant times, as an executive management committee member and Editor-in-Chief, Defendant Micklethwait supervised Plaintiff Syeed and her work as a Bloomberg news reporter in accordance with the employment policies he assisted implementing.

30.     Defendant Winkler is a person within the meaning of the NYC Administrative Code Law § 8-102(1), and an employer within the meaning of NYC Administrative Code

10

§§ 8-102(5) and § 8-107 and is being sued here both in his personal and official capacities.

31.     Defendant Micklethwait is a person within the meaning of the NYC Administrative Code Law 8-102(1), and an employer within the meaning of NYC Administrative Code § 8-102(5) and § 8-107 and is being sued here both in his personal and official capacities.

32.     Defendant Marty Schenker "(Schenker") is a white male employed by Defendant Bloomberg.

33.     Upon information and belief, Defendant Schenker currently resides in the State of New York.

34.     As of September 2017, Defendant Schenker became the Chief Content Officer based out of the New York Bureau's centralized news operations and is a member of the all-male editorial management committee reporting to Michael Bloomberg. Before his promotion, Defendant Schenker was a Senior Executive Editor for Bloomberg's D.C. News Bureau.

35.     At all relevant times, Defendant Schenker supervised Plaintiff Syeed and her work as a Bloomberg news reporter in accordance with Bloomberg's employment policies.

36.     Defendant Schenker is a person within the meaning of the NYC Administrative Code Law § 8-102(1), and an employer within the meaning of NYC Administrative Code §§ 8-102(5) and 8-107 and is being sued here both in his personal and official capacities.

37.     Defendant Reto Gregori ("Gregori") is a white male employed by Defendant Bloomberg.

38.     Upon information and belief, Defendant Gregori currently resides in the State of New York.

39.     Defendant Gregori was Bloomberg News Deputy Editor-in-Chief, since October

11

2013 of the New York Bureau's centralized news operations and was promoted to a member of the all-male editorial management committee in March 2017.

40.     At all relevant times, Defendant Gregori supervised Plaintiff Syeed and her work as a Bloomberg news reporter in accordance with Bloomberg's employment policies.

41.     Defendant Gregori is a person within the meaning of the NYC Administrative Code Law § 8-102(1), and an employer within the meaning of NYC Administrative Code §§ 8-102(5) and 8-107 and is being sued here both in his personal and official capacities.

42.     Defendants John Does 1-10 are fictitious names of individuals, whose identities are not presently known, who are individuals responsible for the design, implementation, administration and/or enforcement of employment practices for all employees of Defendant Bloomberg L.P.

43.     At all relevant times, Defendants acted under color of the statutes, ordinances, regulations, customs and usages of the State of New York, and under the authority of their respective individual positions and/or corporate offices.

44.     Defendant Bloomberg is a company with a long history of a systemic top-down sexist culture created and condoned by its Founder, CEO and Owner, Michael Bloomberg and its male executives.

45.     At all relevant times, the discriminatory conduct complained of herein was directed toward Plaintiff Syeed and other similarly situated female Bloomberg employees and former employees.

12

## STATEMENT OF FACTS

### Plaintiff Syeed's Employment History and Exposure to Defendant Bloomberg's Hostile Work Environment Was Based on Sex and Race

46.     Defendant Bloomberg News' operation was originally led by Mr. Bloomberg and his Editor in Chief, Defendant Winkler. As of 2015, Micklethwait along with two other members of the all-white male executive editorial management committee, Defendants Schenker and Gregori, supervised and approved all journalistic articles and news reporting published by Bloomberg.

47.     Prior to Bloomberg's current Editor in Chief, Defendant Micklethwait's hiring, Laurie Hays, a Harvard graduate, former Wall Street Journal reporter and Senior Executive Editor at Bloomberg News since 2008[3], appeared to be the top contender for the Editor in Chief position but was passed over in favor of her male counterpart.[4] Mr. Bloomberg chose Defendant Micklethwait to replace his Bloomberg News Co-founder, Matthew Winkler after 24 years of collaboration.

48.     In February 2015, Bloomberg offered Defendant Micklethwait the prestigious role after his long-term employment at *The Economist*.

49.     Had Ms. Hays been chosen at that time; she would have been the only female executive leader and member of the editorial management committee for Bloomberg's news operations and of Defendant Bloomberg's rivals: Reuters, the Financial Times, the New York Times and the Wall Street Journal.

---

[3] Zeitlin, Matthew. *Bloomberg Passed Over Its Top Woman Editor In Hiring A New Boss*. December 10, 2014.
[4] "Once at Bloomberg News, Ms. Hays was promoted to be one of six senior executive Editors in 2013 under founder and former Editor in Chief, Matthew Winkler. Staffers told Buzzfeed that she has been a major player in the newsroom's success over the last few years."

50.     Shortly after commencing her employment and continuously through her separation Plaintiff Syeed was subjected to Bloomberg's sexist male dominated work culture where women were not treated equally in comparison to men in the terms and conditions of their employment including promotion, compensation, training and career opportunity. Nor were women, especially minority women, able to reach the top tiers of management because of Defendant Bloomberg's glass ceiling.

51.     Plaintiff Syeed is an award-winning writer, editor and multimedia producer with more than 16 years of full-time experience on four continents in spot news and enterprise reporting, editing and producing.

52.     After two years of consistently applying for a position, Defendant Bloomberg offered Plaintiff a position at its Dubai Bureau in October 2014.

53.     On December 11, 2012, Plaintiff Syeed applied to four positions through Defendant Bloomberg's online careers portal: she did not receive an offer from any of them. Bloomberg advertised the available positions as: "Reporter opportunities in the Middle East"; "Asia Reporter at Large"; "Economy & Government Reporter – Dubai"; "Economy & Government Reporter – Cairo."

54.     On December 17, 2012, Bloomberg advised Plaintiff she was not selected for the available Asia Reporter at Large position.

55.     On December 27, 2012, Plaintiff Syeed traveled from Yemen to visit Defendant Bloomberg's Dubai Bureau while enroute to Tunisia. While in Dubai, Plaintiff met with Inal Ersan, then-Gulf Bureau Chief; Andrew Barden, then-Team Leader for Middle East Economy and Government; and Riad Hamade, then-managing editor for Middle East and

14

North Africa ("MENA") News Operations, all male Senior Editors.

56.    On January 6, 2013, Plaintiff Syeed applied for Defendant Bloomberg's Transport Industry Reporter post in Dubai.

57.    On January 21, 2013, Plaintiff Syeed had a phone interview with Maher Chmaytelli, Dubai-based Defendant Bloomberg Editor regarding the Transport position, and Plaintiff Syeed was informed on January 29, 2013 by Defendant Bloomberg she was not selected for the "Reporter opportunities in the Middle East" position.

58.    On May 12, 2013, Plaintiff Syeed applied for Defendant Bloomberg Economy/Government Editor – Cairo post.

59.    On June 3, 2013, Plaintiff Syeed took the Bloomberg news test at the Istanbul Bureau.

60.    On August 15, 2013, Plaintiff Syeed corresponded with an HR employee at Defendant Bloomberg's corporate headquarters of 731 Lexington Avenue New York, New York regarding the open Economy/Government Editor position in Cairo, Egypt. Once again, Plaintiff was not offered the position.

61.    On August 23, 2013, Plaintiff Syeed continued communications with the Managing Editor in Dubai, Mr. Barden over several email threads. He disclosed Bloomberg filled the Cairo position internally and inquired about Plaintiff's career goals as a reporter. Mr. Barden responded to her: "loved the email."

62.    Although in September 2013, Mr. Barden emailed Plaintiff Syeed regarding an open position in Riyadh. After Plaintiff expressed interest, he did not respond further, and Plaintiff was not offered the position.

15

63.      Five months later, on February 24, 2014, Mr. Barden finally responded to Plaintiff Syeed: "stay in touch," leading her to believe Defendant was interested in employing her in her foreign policy area of interest.

64.      On June 16, 2014, Plaintiff Syeed applied for Defendant Bloomberg Economy/Government Reporter's post in Dubai and had a phone interview with Sarah Mann, a recruiter based in London. By that time, Andrew Barden had been promoted to Managing Editor for International Government in Europe, Middle East & Africa.

65.      Thereafter, on July 8, 2014, Plaintiff Syeed had a follow-up phone interview with Alaa Shahine, Bloomberg's Team Leader for Economy/Government of Middle East and North Africa in the Dubai Bureau. Plaintiff interviewed further for the position over the phone with John Fraher, Bloomberg's Executive Editor, Global Government and Economy, who was based in London.

66.      On August 27, 2014, Defendant Winkler, Bloomberg's then Editor-in-Chief of Bloomberg News, based in New York interviewed Plaintiff Syeed.

67.      The following day, on August 28, 2014, Plaintiff Syeed was finally offered a position as Economy/Government Reporter in Defendant Bloomberg's Dubai News Bureau.

68.      On October 19, 2014, Plaintiff Syeed began her employment with Defendant Bloomberg. As a Gulf Politics and Economy Correspondent with the Dubai Bureau, Plaintiff performed the duties of a staff reporter on political and economic news in Gulf Arab countries including producing breaking news and features from within the United Arab Emirates ("U.A.E."). She headed daily Yemen war spots and analysis reporting in coordination with the Stringer and Riyadh Bureau Chief, chronicled Gulf Cooperation Council ("GCC") security and foreign policy

16

beats amid multiple regional conflicts, covered the rise of the Islamic State and the Syrian war, reported on U.A.E./Gulf economic shift amid oil slumps, contributed to Iran deal and post-sanctions coverage from the GCC perspective as well as appeared on Bloomberg television for live hits, including during Indian Prime Minister Narendra Modi's U.A.E. visit and spoke on Bloomberg Radio programs.

69. On June 9, 2015 to June 20, 2015, Plaintiff Syeed traveled to Bloomberg's Washington, D.C. bureau to conduct interviews for a Middle East-centered story.

70. Within her first six months of employment with Defendant Bloomberg, Plaintiff Syeed was directed by the Dubai Bureau's office male managing Editors to contact sources of hers to invite them to the Future Cities Forum series event and private lunch Michael Bloomberg was attending on March 17, 2015 in Dubai. These same male Editors repeated to Plaintiff that a "Chinese Wall" existed between the reporters generating news content and Bloomberg's financial side tasked with selling Bloomberg Terminals and financial information. However, those same male Editors repeatedly impressed upon her that the U.A.E. was one of Bloomberg's top markets for Terminals in the MENA region.

71. On March 9, 2015, Defendant Bloomberg's Editors' pressure upon Plaintiff Syeed to extend invites to her sources to this event caused her to feel that the company was misusing her, a news reporter for her connections, as a sales representative by offering up access to Mr. Bloomberg.

72. Prior to the event, Plaintiff Syeed was instructed to compose a country and leader profile expressly for Michael Bloomberg's personal reference to acclimate him to the region and its government officials prior to his arrival in Dubai. The Forum took place at the Armani Hotel

17

from approximately 9 a.m. to 12 p.m. with panelists including Michael Bloomberg, Reem Al Hashimy, Mohamed Alabbar, Arif Naqvi and Marios Maratheftis. The Forum's focus was a discussion answering the question, "What's next for Dubai?" Various business leaders, investors, the financial community and the media were expected to be present.

73.    On March 17, 2015, Michael Bloomberg met with U.A.E. government officials, specifically, Vice President and Prime Minister of the U.A.E. and Ruler of Dubai, His Highness Sheikh Mohammed bin Rashid Al Maktoum. During her employment with Defendant Bloomberg, Plaintiff Syeed covered many of the U.A.E. government officials present at this event.[5]

74.    During Michael Bloomberg's 2017 Dubai trip, he met with Dubai Bureau News staff and commented on how he listens daily to Bloomberg Radio. He further commented that when he wakes up in the morning with his girlfriend, he turns on Bloomberg Radio as he likes to do "two things at once."

75.    During Plaintiff Syeed's employment from October 2014 to March 2016 at Defendant Bloomberg's Dubai Bureau, Alaa Shahine was Plaintiff's male supervisor as Team Leader of the MENA Economy/Government team.

76.    On nearly a daily basis, Mr. Shahine berated the female reporters at the Dubai Bureau. Mr. Shahine, who sat beside Plaintiff on the news desk, would waive his arms at her and the other female reporters as he raised his voice louder.

77.    After Mr. Shahine's daily harassing conduct of repeatedly berating her and her female colleagues, which went on for months and Plaintiff Syeed would break down into tears in the

---

[5] http://wam.ae/en/details/1395278072828

women's bathroom. She cried in the bathroom on several days because of Mr. Shahine's repeated berating and yelling at her. On one occasion, when Plaintiff returned to her desk teary eyed and clearly upset, he admonished her: "Don't take it like that."

78.     On one occasion, after Mr. Shahine yelled at Plaintiff Syeed, he ushered her into a conference room, furthest away from the newsroom down the hall, and demanded to know what she thought of him. Mr. Shahine moved closer to her as he continued to shout. In fear, Plaintiff Syeed remained silent. Mr. Shahine continued shouting, got up from his chair, and moved across the room toward the windows, closer to the corner where Plaintiff Syeed was seated. There was no way out for Plaintiff Syeed to exit the room without passing him. While standing up and waving his arms and shouting, he stated to her she should 'anonymously' write what she 'really wanted to' regarding his management in her manager evaluation, for which the deadline was approaching. Plaintiff, thoroughly intimidated and frightened, did not respond. Mr. Shahine exclaimed, "I'm leaving" and stormed out of the conference room.

79.     Managing male Editor for MENA, Riad Hamade, was known by Plaintiff Syeed and her colleagues in Defendant Bloomberg's Dubai Bureau to favor Mr. Shahine, which favoritism deterred Plaintiff from lodging any formal complaints against her male supervisor.

80.     Following this altercation, Mr. Shahine requested Plaintiff join him in a meeting with Claudia Maedler, Dubai Bureau Chief. Both repeatedly asked Plaintiff, "Is there anything else, anything you want to say?" Plaintiff, fearful of retaliation and loss of her job, did not offer any complaints.

81.     Mr. Shahine continued to make Plaintiff Syeed uncomfortable by directing her to provide details of Plaintiff's source meetings openly in the newsroom in front of other reporters or

19

forward notes to wider news groups including New York reporters. Plaintiff responded that she was uncomfortable broadcasting the identities of her sources with reporters across the newsroom and instead offered to write down the names on paper for him. Mr. Shahine responded, "Oh, we're not like that here."

82.     As a result of her experience in the Dubai's Bureau, Plaintiff Syeed began questioning Defendant Bloomberg's business priorities over journalistic ethics. In Dubai, the male Editors often reminded reporters the U.A.E. was one of the company's largest markets in the region, and that it was key to maintain good relations with the government to keep the company's operations running in the country. Plaintiff noticed stories appeared to be censored, or about which Bloomberg News reporting was overly deferential to the U.A.E. government.

83.     In 2015, Plaintiff Syeed also witnessed Inal Ersan, a Senior editor, make bullying remarks that demeaned her female colleagues while attempting to pass them off as "jokes." One of Plaintiff's younger female colleagues confided in Plaintiff that she repeatedly cried because of Mr. Ersan's harassment. When Mr. Ersan learned of Plaintiff Syeed's and her colleague's complaints, he taunted both women verbally and through writing in emails, "Go ahead…report me to HR."

84.     On one occasion, Mr. Ersan stated to Plaintiff Syeed, "You know all those Africans they brought on the boats? They should've just drowned them in the ocean." He then made a hand gesture dropping something down. He stated drowning would have been "better" for the Africans than what happened to them in America. Plaintiff's then fiancé, current husband, is African American. Plaintiff was appalled and her jaw-dropped in reaction to this comment. She implored him: "You can't say that." Mr. Ersan did not reply.

20

85.     Mr. Barden, fully aware of Mr. Ersan's racist and sexist behavior, commented to Plaintiff Syeed he allowed Mr. Ersan to "get away with this" because Mr. Ersan had to watch all the depressing Arabic news channels in addition to his relatives living in war-torn Syria.

86.     Besides the hostile work environment complaints, three female reporters of similar age and level of experience to Plaintiff, two of which were minorities, confided in her that their Bloomberg male Editors continuously undermined and bypassed them for promotion at the Dubai Bureau in favor of males.

87.     In or about October 2015, Plaintiff Syeed informed Defendant Bloomberg that she got married and needed time to relocate. Plaintiff Syeed made the decision to advise Head of MENA News Operations, Mr. Hamade and her managers that she was planning to apply to positions internally within Defendant Bloomberg's New York and/or Washington, D.C. Bureaus for personal reasons, due to her husband's job location. Plaintiff Syeed also sought to leave the Dubai Bureau's toxic work environment.

88.     During her employment with Bloomberg, Bill Grueskin, Bloomberg Executive Editor for Training in its New York Bureau featured Plaintiff Syeed in The Bloomberg Way, a company journalism and style handbook written by Defendant Winkler.

89.     Mr. Grueskin seemed impressed with Plaintiff Syeed's reporting methods on the U.A.E. Crown Prince's profile from Dubai and spoke at length with her on how she organized her sources.

90.     In September 2015, Defendant Bloomberg laid off the National Security Team due to it not being a "reporting priority." Editors in Dubai and later in D.C. confirmed to Plaintiff that "higher-ups" were planning to terminate a woman of color, Indira Lakshmanan, and the National

21

Security Team Leader John Walcott, and decided to lay off the entire team so as not to appear as though they were targeting specific individuals.

91. Plaintiff Syeed observed Defendant Bloomberg's male Editors complain specifically about Ms. Lakshmanan, who had been employed for several years and was a renowned correspondent. Male Editors in Dubai and D.C. Bureaus berated Ms. Lakshmanan in Plaintiff Syeed's presence for Ms. Lakshmanan's reporting style of deep sourcing, deep dives, expert insight and protection of her sources.

92. From November 27, 2015 to December 4, 2015, Plaintiff Syeed traveled to Defendant Bloomberg's New York and Washington, D.C. Bureaus for meetings in the hopes of furthering her career in foreign policy. Plaintiff met with Tom Giles, Executive Editor of the Tech Team, of Defendant Bloomberg's New York Bureau and met various New York Editors including, Flavia Krause-Jackson, Editor, European Government and Brexit, Bloomberg News.

93. While in New York, Plaintiff Syeed also met with Laura Zelenko, Senior Editor in Defendant Bloomberg's New York Bureau, and other Bloomberg Editors to discuss her interest in any open United Nations Foreign Policy Correspondent positions. Plaintiff Syeed had been advised there might be an opening to cover the United Nations, as the previous reporter had departed a few months prior.

94. While in D.C., Plaintiff Syeed met with Megan Murphy, D.C. Bureau Chief to discuss any open positions. Ms. Murphy disclosed there was known gender pay disparity in the News Bureaus and that requests for transparency were disfavored by the company.

95. Plaintiff Syeed and her female colleagues openly spoke about the gender pay disparity but felt powerless to effectuate change.

22

## Bloomberg's Failed to Promote Plaintiff Syeed
## to New York or Washington Bureaus' Foreign Policy Positions

96.     From January-February 2016, Plaintiff Syeed applied for the Washington

Bureau's Foreign Policy reporting position. It was posted internally and then publicly

listed online on February 2, 2016.

97.     On March 8, 2016, Plaintiff Syeed interviewed with Thomas Houston, Deputy

Editor overseeing digital innovation for Digital Features/Longform Editor post, a position

for which she was fully qualified and applied. Plaintiff highlighted her multimedia

experience and background in longform journalism both in documentary and narrative

nonfiction during her interview. She was not offered the New York position.

98.     However, on March 11, 2016, Plaintiff Syeed interviewed with Craig Gordon,

then Washington, D.C. Managing Editor.

99.     On March 20, 2016, Plaintiff Syeed began working at Defendant Bloomberg's

Washington, D.C. Bureau and had in person meetings with Bill Faries, Defendant's new

National Security Team Leader (for the reconstituted Team that seven months prior had been

dissolved due to not being a priority and wanting to terminate certain Team Members), Megan

Murphy, D.C. Bureau Chief and Craig Gordon, D.C. Managing Editor.

100.    During her meeting with National Security Team Leader, Mr. Faries, he informed

Plaintiff Syeed she was among the top five finalist for the Foreign Policy reporting position.

101.    During what Plaintiff Syeed understood was a follow up interview for the Foreign Policy

position with Managing Editor, Craig Gordon, Mr. Gordon asked Plaintiff Syeed her opinion on

cybersecurity reporting. Plaintiff was confused by the possible shift in her reporting beat as she

was told she was still being considered as a top finalist for the Foreign Policy position.

23

102.    During another follow up meeting with Ms. Murphy and Mr. Faries, Ms. Murphy confirmed to Plaintiff she was not given the Foreign Policy position. Ms. Murphy went on to explain that a male reporter, Chris Strohm, "did a great job" covering cybersecurity and was now promoted to cover the Department of Justice as the National Security Reporter. As a result, Plaintiff was directed to take over Mr. Strohm's old beat.

103.    On April 7, 2016, Ms. Murphy announced in a memorandum to the D.C. Bureau that Plaintiff officially transferred to the D.C. Bureau as a cybersecurity reporter.

104.    In addition, Plaintiff regularly appeared on Bloomberg Television and Bloomberg Radio for live, on-air hits as well as participated in other TV networks' shows, including MSNBC and ABC. Plaintiff moderated panels at Bloomberg Government events, including a televised one-on-one discussion with former Homeland Security Secretary, Jeh Johnson, as well as at Washington think tanks and policy forums.

105.    Later in 2016, after Megan Murphy departed D.C. to become Senior Editor of Bloomberg Businessweek in New York, Bloomberg's National Security Team was composed of all men except Plaintiff Syeed: Bill Faries, Team Leader, Larry Liebert, Senior Editor, Nick Wadhams, State Department reporter, Chris Strohm, Department of Justice reporter, Kambiz Foroohar, UN reporter and Tony Capaccio, Pentagon reporter.

106.    Nick Wadhams, who joined the D.C. Bureau in July 2016 was given the Foreign Policy reporting position instead of Plaintiff. Prior to his start of the position, Plaintiff generously shared her Middle East contacts with him.

107.    Given Plaintiff Syeed's lateral move to Defendant Bloomberg's D.C. Bureau, HR representative, Tamika Alexander informed Plaintiff Syeed she would attempt to make her

24

current salary "more in line" with salaries in the D.C. Bureau. Ms. Alexander, a woman of color herself, was aware of the unfair pay discrepancies within Defendant Bloomberg as she previously complained to the E.E.O.C.[6] However, Plaintiff came to learn that on average male reporters were earning at least 20% higher salaries than women and especially, than women of color.

108.    During the early weeks of her employment at the D.C. Bureau, male Editors commented that "people coming from overseas" forget their English grammar in their articles. In response to this racially biased comment, Plaintiff reminded these Editors she was born in the United States. This was an example of racially based comments well accepted within the company.

109.    In the D.C. Bureau, Plaintiff was assigned a desk beside fellow female reporter, Saleha Mohsin. Defendant Bloomberg male team members often confused Plaintiff Syeed with Ms. Mohsin, who was also of South Asian descent.[7] The two women were of the same race but look nothing alike. Plaintiff has long black curly hair, while Ms. Mohsin has shorter straight brown hair. The two women also covered two different areas of news.

110.    During Defendant Bloomberg's coverage of the Russia and Mueller investigations in or about Spring/Summer of 2017, multiple Bloomberg News teams met with Craig Gordon in a conference room on the main newsroom floor. Female reporter, Saleha Mohsin, of South Asian descent, was present via speakerphone during the meeting while Plaintiff was physically present in the room. A male colleague sitting beside Plaintiff, a Congressional Correspondent, began

---

[6] E.E.O.C. v. Bloomberg L.P. *et al.*, 967 F.Supp.2d 802 (2013)
https://www.leagle.com/decision/infdco20130910e20
[7] The term "South Asian" refers to peoples in the United States whose ancestry derives from the Indian subcontinent. See Vinay Harpalani, *DesiCrit: Theorizing the Racial Ambiguity of South Asian Americans*, 69 N.Y.U. ANN. SURV. OF AM. L. 77 (2013-4). "South Asian" refers to ancestry from the Indian subcontinent including the countries of India, Bangladesh, Sri Lanka, Nepal, Bhutan, the Maldives Islands and sometimes Afghanistan.

25

asking her what she was "hearing about the Treasury." Ms. Mohsin, in fact, covered the Treasury. It was obvious to Plaintiff that her male colleague was confusing her with Ms. Mohsin. This behavior constituted microaggression by a white male colleague.

111.    Moments later, D.C. Bureau Chief, Mr. Gordon referred to Plaintiff as "Saleha" and inquired what she was working on. Plaintiff was stunned and humiliated that her boss interchanged her with Ms. Mohsin, the only other female of South Asian Muslim descent in Bloomberg's D.C. newsroom. Although he corrected himself by stating, "I mean Nafeesa", Plaintiff felt completely invisible[8] and disposable, another instance of microaggression.[9]

112.    Another example of implicit microaggression involved a male Pentagon reporter refusing to correctly pronounce Plaintiff Syeed's name. After several months of this slight, Plaintiff slowly pronounced her name for him. Exacerbated, he put his hands out and said, "I'm doing the best I can." However, he continued to mispronounce her name.

113.    Despite Bloomberg's minimal efforts to afford its news reporters implicit bias training, including not confusing individuals of the same race, a male news reporter, who could not pronounce her name, openly complained throughout the training making it clear to his colleagues he felt it was a waste of his time.

---

[8] *Id*. While there are cognitive explanations for a co-worker confusing one Asian American for another by referring to him/her by the incorrect name, "these kinds of common subtle slights, known as microaggressions, cause undue stress over time. Microaggressions – such as asking Asian Americans where they're from or repeatedly mispronouncing a person's name – make people of color permanent outsiders and create constant discomfort in offices, schools and other places where they have to be." Mr. Gordon's referring to Plaintiff Syeed as "Saleha" is a prime example of microaggression.

[9] In the American corporate workplace, there is an implication "while white people are seen as individuals, other groups are often viewed as a monolith, with their race or ethnicity becoming the defining characteristic of who they are." Kareem Johnson, an associate professor of psychology at Temple University clarified this not merely everyday racism [to confuse a person of Asian heritage with another person of Asian heritage] indicating negative racial attitudes, but rather, "part of a larger cognitive problem called the cross-race effect – essentially, the impression that people of a race other than your own 'all look the same.'" Hatzipanagos, Rachel. It 'makes you feel invisible' When people can't tell their co-workers of color apart, it's a constant reminder that you're an outsider. Washington Post. May 2, 2019.

114. For Plaintiff Syeed's appearances on Bloomberg Television, Bloomberg's Chief New York Makeup Artist directed her to wear heavy makeup and not to wear her thick black curly hair down but to wear it slicked back in a bun. Plaintiff felt her natural hair was unwelcome in Defendant's aesthetic as it appeared "too ethnic."

115. After Plaintiff Syeed appeared on camera and returned to the newsroom still wearing her heavy makeup, Team Leader, Bill Faries commented that his wife wanted to undergo a similar "makeover" while another male editor remarked to Plaintiff that she looked "nice." Plaintiff's male colleagues' purported compliments on this and other occasions were unwelcome because they underscore that she should conform her ethnic looks to what the Bloomberg male culture deems attractive.

116. To worsen matters, Plaintiff Syeed overheard male Editors make derogatory remarks against female minority employees and their professional acumen, specifically, Indira Lakshmanan, of Asian-American descent, and other Asian and Asian-American women. For example, two male White House Editors stated Ms. Mohsin "only writes stories to ingratiate her sources" and one of Plaintiff's male Editors commented that Sangwon Yoon, a female Asian reporter who had recently left Defendant Bloomberg's employ, was "a terrible writer."

117. While working at Defendant Bloomberg's D.C. Bureau, Plaintiff Syeed received a request for an evaluation of her former manager, Alaa Shahine from the Dubai Bureau. As she was no longer working in Dubai, she critiqued his tendency to shout at and berate female employees and suggested he work on his anger management. She submitted the evaluation through Defendant Bloomberg's HR portal. HR never contacted her to investigate her complaint.

27

118.    In November 2016, Wes Kosova, a white male, was appointed Washington, D.C. Bureau Chief, replacing Megan Murphy.

119.    In 2017, Plaintiff Syeed continued to advocate for her foreign policy career interests and collaborated with New York based Editor, Ethan Bronner on a high-profile, critically sensitive story involving an Arab-Israeli topic Plaintiff had been wanting to write about since working in the Dubai Bureau.

120.    Defendant Bloomberg's Editor with Businessweek, Peter Waldman met with Plaintiff during a visit to D.C. Bureau, about doing a story he was working on about an Arab-Israeli lawmaker and was interested in the angle she had been working on. Plaintiff met with Mr. Waldman and shared the information she gathered from her sources. Waldman commented that Plaintiff Syeed was "over-qualified" for her job.

121.    Shortly thereafter, in February 2017, Plaintiff Syeed read Mr. Waldman's article which contained nearly the same theme as she had been covering. Plaintiff wrote to Mr. Bronner who confirmed that he and Mr. Waldman had been working on that story for some time. As a result, Plaintiff felt undervalued, discredited and marginalized.

122.    In or about April 2018, Matt Philips, D.C. Bureau Businessweek Editor insisted he accompany Plaintiff Syeed to a high-profile interview Plaintiff arranged with the No. 3 ranked individual within the CIA at that time. Mr. Philips and Plaintiff had agreed prior to the meeting that she would lead the interview since the CIA was within her beat, and she had originally secured the interview. However, Mr. Philips commandeered Plaintiff's interview only allowing her to ask a few questions. After the interview, Plaintiff composed a long piece demonstrating the curious and critical relationship this individual had within the Trump administration. Mr.

28

Philips expressed he thought the draft was "great," but the story was ultimately cut in such a way that it became a puff piece, which it was never meant to be. Bloomberg Businessweek ran the story in April 2018.

123.    Plaintiff Syeed was often excluded from Defendant's news roundtables, even if Plaintiff was covering the individual or story. On one occasion, when Plaintiff was included at her request, James Clapper, former Director of National Intelligence, joined Bloomberg's roundtable discussion with Plaintiff's Team. Plaintiff attempted to ask questions, however, each time she tried to speak, she was spoken over by Senior male Editors, in particular, Mike Shepard, Managing Editor.

124.    In March 2017, Defendant Schenker, Chief Content Officer instructed Team Leader, Bill Faries to specifically send Plaintiff Syeed to meet with a Public Relations friend of his in New York with an agenda to introduce Plaintiff Syeed to the CEO of a cybersecurity firm at Bloomberg's corporate headquarters. The CEO specifically mentioned he would not meet with Michael Riley, one of Bloomberg's Senior male lead reporters. This resulted in Plaintiff Syeed being pawned to attend a pitch meeting with this cybersecurity CEO and Defendant Schenker's PR contact.

125.    During the meeting, Defendant Schenker repeatedly pitched the CEO to agree to a meeting with his male cybersecurity reporter, Michael Riley. Schenker stated he envisioned Bloomberg reporting a story about the CEO's company's control center and offered to put the CEO in touch with Bloomberg's security wing, which could procure his cybersecurity services.

29

Plaintiff Syeed became extremely uncomfortable as such an offer was a perceived conflict of interest of journalistic ethics and a *quid pro quo*[10]

126. In May 2017, Plaintiff Syeed's Team Leader, Mr. Faries informed her Nick Wadhams, the State Department (Foreign Policy) reporter needed a "break" due to his extensive traveling. Mr. Faries explained he did not want Mr. Wadhams to be "burned out" so he assigned Plaintiff to cover a climate change summit with then Secretary of State Rex Tillerson in Fairbanks, Alaska. Plaintiff did as requested.

127. In October 2017, Plaintiff Syeed traveled to Amman, Jordan and Djibouti for a three-week reporting trip as part of a fellowship offered to her originally by Columbia University in March 2017. Although Plaintiff's managers, Mr. Faries and Mr. Shepard approved her acceptance into the Fellowship, they delayed their approval until June, beyond the fellowship's deadline of April 20, 2017.

128. During her 2017 mid-year review, her manager, Mr. Faries informed Plaintiff Syeed she could ask for a 5% raise during her year-end review. He also revealed he was not supposed to invite that ask, but he felt she was doing a good job and 5% would be a reasonable increase. He did not indicate whether he would formally recommend her for a raise.

129. During Plaintiff Syeed's 2017 year-end review, she requested the raise, but Mr. Faries stated it was now "too late" to ask for a raise. Plaintiff expressed confusion given his statements

---

[10] After Mr. Bloomberg announced his decision to participate in the Democratic race, The Washington Post published the article, "Mike Bloomberg just stabbed the journalistic heart of his news organization," reported on how Defendants Bloomberg and Micklethwait put the company's 2,700 journalists in a compromised position. In or about November 2019, Defendant Micklethwait, the company's top Editor, detailed a policy regarding coverage of the 2020 election and distributed it to all Defendant Bloomberg journalists: "Journalists will not dig into Bloomberg himself (or his charitable endeavors, business practices, family, etc.) or into his Democratic rivals. They will cover developments in the campaign on a more superficial level." Kathy Kiely, Bloomberg News's former politics director, commented, "[these plans] relegate his political writers to stenography journalism." See Sullivan, Margaret. *Mike Bloomberg Just Stabbed the Journalistic Heart of his News Organization*. The Washington Post. November 25, 2019.

during her mid-year review. Mr. Faries responded that she should have specifically asked for the raise in her written self-evaluation, she shared with HR and her manager before the manager completed his review.

130. In late January 2018 to early February 2018, Mr. Faries met with Plaintiff Syeed to discuss her future career at Bloomberg and requested she think about what she wanted to do. He mentioned Defendant Bloomberg's managers were considering "rais[ing] [her] profile" and asked specifically, what area did Plaintiff wanted to cover? He acknowledged that over the previous year she had covered so many topics and the Bureau had put so much on her plate, affirming Plaintiff's expressed feeling that she had become a "jack of all trades, master of none."

131. Despite Plaintiff Syeed's stated cybersecurity beat, editors constantly shifted their reporting expectations, changing her coverage area again and again, and provided conflicting expectations of the D.C. Bureau's news priorities. From campaign security, military cybersecurity, company cybersecurity, the Pentagon, intelligence, State Department, Department of Homeland Security, Justice Department, FBI, CIA, National Security Agency, Director of National Intelligence, U.S. Cyber Command, Defense Intelligence Agency, IMF/World Bank meetings, Congressional hearings on multiple topics, social media companies, federal contractors, Russia investigations, and immigration, among others.

132. Defendant Bloomberg's News executives prevented Plaintiff Syeed from developing expertise within one beat, yet when breaking news hit with any of these agencies, and topics, Craig Gordon would say, "Check with your sources." This impeded her promotion, as male executives judged reporters based on scoops and depth of sourcing within institutions.

31

133. Plaintiff Syeed further complained that she was disadvantaged by not being permitted to fully focus on one area like her male colleagues. Anything that was leftover or undesired by male employees or if something had to be done suddenly, Plaintiff was directed to cover. Mr. Faries reminded Plaintiff this was a *rare opportunity* Bloomberg was offering her as seldom does Bloomberg ask reporters what they want to cover.[11] Mr. Faries asked whether it was "Middle East" or election security beats that she wanted to cover.

134. After consideration, Plaintiff Syeed met again with Mr. Faries and informed him that she would like to cover Middle East and Foreign Policy from the D.C. Bureau.

135. Believing Defendant Bloomberg intended to support her career aspirations, Plaintiff Syeed began developing pitches on Middle East topics out of Washington, D.C. and composing stories.

136. Suddenly, however, Mr. Faries retracted his support and advised Plaintiff Syeed that Craig Gordon, D.C. Bureau Chief wanted her to only cover election security between Spring and the Midterm elections and not to do work on anything Middle East-related. Ben Holland, male Editor who Plaintiff often worked on Middle East-related stories, confided that he was instructed to stop talking to Plaintiff and that if he were seen speaking with Plaintiff, he would be reprimanded by senior management.

137. Plaintiff Syeed was also informed by Editors in the Dubai Bureau that they were instructed to no longer contact her about anything Middle East-related.

138. Plaintiff Syeed followed the strict instruction to only cover election security, even when she overheard her co-worker, Shannon Pettypiece, a White House reporter complain that all

---

[11] This tactic is an example of gaslighting a female employee in discussions of her self-worth.

32

these U.A.E. and Saudi Arabia-related stories were coming up on her beat and she had no knowledge of the region.

139. At that time, Plaintiff Syeed's managers also took her off most other beats that had previously been thrown her way.

140. In March 2018, Defendant Bloomberg UN reporter, Kambiz Foroohar abruptly left his position. Mr. Faries broke the story to Plaintiff Syeed. She then asked him if he was filling the position. He responded surprised, "Why, are you interested?" This comment constituted a microaggression as Mr. Faries was aware of her foreign policy aspirations.[12]

141. For years, Plaintiff Syeed made it expressly clear to her Bloomberg managers and Editors that she was interested in covering foreign policy. However, none of her male managers listened or sincerely cared about her career interests or that of her female colleagues.

142. Plaintiff Syeed came to accept that Defendant Bloomberg was actively hindering her ability to reach her career goals and merely utilize her, a South Asian female as a diversity hire and pawn to meet its quota.

143. Plaintiff Syeed was further disadvantaged by Defendant Bloomberg's ignoring of her repeated technology requests for secure communication tools. Plaintiff requested PGP keys and other software allowing encryption from Mike Shepard and Bill Faries to properly cover increasingly sensitive topics and maintain confidentiality and trust with her sources. After speaking with Bloomberg's Technology Support Team, Plaintiff was told she was only allowed to use one PGP program on her desktop computer. Plaintiff complained to her managers that it was standard procedure to equip reporters with PGP and encrypted communications tools.

---

[12] This "management style" implemented by Defendant Bloomberg is meant to inspire insecurity in manipulating her into thinking she was not capable of competently performing in the more prestigious position she applied for and stifles any upward mobility for minority female employees in the company.

33

144.    However, Plaintiff Syeed quickly discovered that only certain favored male members of the newsroom were granted access to Defendant Bloomberg's secure communications equipment.

145.    Defendant Bloomberg also placed male reporters specifically, Jordan Robertson and Michael Riley on a pedestal as a star duo covering cybersecurity. The two men were treated as the 'real' reporters in her coverage area, often promoted and lauded, who were exempt from reporting breaking news stories. In contrast, Plaintiff was assigned to cover breaking news stories last minute across a variety of beats, without the opportunity to develop deep sourcing, instilling in Plaintiff that she was below her male colleagues and not taken seriously as an accomplished journalist. Mr. Faries also informed Plaintiff Syeed of a "rivalry" between Mr. Robertson's and Mr. Riley's editor Winnie O'Kelley, a female Executive Editor in the New York Bureau, and Craig Gordon, D.C. Bureau Chief, leading to lack of communication about cyber coverage between the National Security Team and Mr. Robertson's and Mr. Riley's stories.

146.    From April 2018 to in June 2018, Plaintiff Syeed was immersed in the election security beat, completely shut out of Middle East coverage. She realized there was no career path for her in the D.C. Bureau after the November elections and continued to apply for various positions within Defendant Bloomberg's New York Bureau, which her Team Leader, Mr. Faries was notified.

147.    In April 2018, Plaintiff Syeed applied for the New Economy Forum Editor position in New York, among other positions as she sought to transfer to New York. When she inquired about the UN reporting position during this time, Mr. Faries continued to be evasive, saying it was unclear if the company would refill the post, or close the UN bureau.

34

148.    Shortly thereafter, Plaintiff Syeed learned that the UN reporting position she discussed with Mr. Faries had been filled. Plaintiff met with Mr. Faries to question why she was not considered for the UN reporting position. Incredibly, Mr. Faries responded, "You never expressed you wanted to cover foreign policy" - another instance of gaslighting. Mr. Faries confirmed that a male reporter was given the position, and that the decision was based upon the reporter's need to reside in the United States.[13]

149.    During this meeting, Plaintiff Syeed became upset and frustrated. She pressed Mr. Faries again as to why he did not consider her for the UN position when it was clear foreign policy was her chosen area of expertise.

150.    Mr. Faries replied to Plaintiff Syeed that the only way to get things done at Bloomberg is to "advocate" for yourself and push. In an accusatory tone, he told Plaintiff she needed to learn how to advocate for herself better, implying it was her fault she did not secure the position she wanted, again gaslighting Plaintiff. Mr. Faries asked Plaintiff Syeed what her ambitions were. Plaintiff Syeed reiterated to Mr. Faries her ambition to cover foreign policy and to become an investigative reporter or Editor. In response, Mr. Faries stated that those career aspirations were totally inapposite.

151.    Plaintiff Syeed watched as her male co-workers, Mike Shepard, Wes Kosova, Craig Gordon and Bill Faries were all promoted after being employed by Defendant Bloomberg for the same amount of time as Plaintiff without having to go above and beyond and "advocate" for

[13] According to David Rivera, an associate professor at Queens College, City University of New York, studying microaggressions for over a decade, Prolonged exposure to microaggression can lead to "mental health issues such as depression, traumatic stress symptoms and suicidal ideation. It's a particular problem in workplace hierarchies, which make it difficult to raise grievances over these slights." Rivera mentioned employees who "receive a microaggression from someone who is higher status…likely have more to risk. People tend to keep those microaggressions to themselves because they don't want to be labeled as the troublemaker." Hatzipanagos, Rachel. It 'makes you feel invisible' When people can't tell their co-workers of color apart, it's a constant reminder that you're an outsider. Washington Post. May 2, 2019.

35

herself in the manner Defendant Bloomberg imposed upon its female employees and work harder than her male co-workers to be considered for the same promotion or opportunity.

152.    David Wainer, a White male reporter, was given Defendant Bloomberg's UN reporting position that Plaintiff Syeed had been striving to attain since 2016. Mr. Wainer had two years less experience than Plaintiff in the field of journalism and was without a master's degree. Plaintiff earned her Master of Arts in Comparative Literature with distinction in Modern Arabic and South Asian languages from the School of Oriental and African Studies at the University of London in 2006 while Mr. Wainer had a bachelor's degree from Boston University in 2006.

153.    On June 5, 2018, Plaintiff Syeed met with Mike Shepard and complained that she was not considered for the UN position. To deflect, Mr. Shepard asked Plaintiff about her ambitions and mentioned the same Bloomberg standard Mr. Faries referred to that it was on her to take initiative. Mr. Shepard repeated Mr. Faries' urging that Plaintiff Syeed take Sara Forden, a white female editor in D.C., as an example to follow. Mr. Shepard and Mr. Faries said Ms. Forden wrote a long memo on why the company should cover corporate influence. As a result, Ms. Forden was promoted to a new position. Ms. Forden is among the employees in Washington who confused Plaintiff Syeed for Ms. Mohsin.

154.    Mr. Shepard explained to Plaintiff Syeed that Mr. Wainer was given the UN position to accommodate his need to move back to the United States, and that Plaintiff Syeed should have shown more "initiative" if she wanted to be considered. Plaintiff brought up the discriminatory comments she heard by male colleagues while employed by Defendant Bloomberg, including a joke Mr. Shepard told regarding microaggression. On one occasion, Plaintiff Syeed walked by Mr. Shepard while he was standing with Mr. Faries near the White House editors. Mr. Shepard

36

was laughing and said, "That's a microaggression." Then, Mr. Faries replied, "What's that?" and Mr. Shepard said, "You'll learn about it in training." When Plaintiff Syeed looked at them in astonishment, Mr. Shepard ceased laughing.

155. Mr. Shepard's proposed solution to Defendant Bloomberg male employees' making derogatory comments in the workplace was for Plaintiff Syeed to simply tell them to "cut it out." Plaintiff explained she felt uncomfortable, and it was inappropriate for her as an employee and as a minority to educate her colleagues.

156. Plaintiff Syeed also raised the issue that Defendant Bloomberg did not employ any women of color in senior roles at the D.C. Bureau. Mr. Shepard conceded that fact and commented that during his employment with the Washington Post, the media outlet did a better job in building diversity than Bloomberg. Mr. Shepard explained that Defendant Bloomberg considered making the New York UN job a "**diversity slot**", but it "didn't work out that way".

157. Plaintiff Syeed then pressed Mr. Shepard, "What is a diversity slot?" He responded that it was Defendant Bloomberg's attempt at having diversity in the newsroom.

158. Plaintiff Syeed explained to Mr. Shepard she, as a minority, did not want to be treated as a "token" employee by Defendant Bloomberg and recounted racist and sexist comments and the hostile work environment she endured during her employment with Bloomberg. Plaintiff specifically mentioned Mr. Gordon's humiliation of her in front of colleagues by referring to her by Ms. Mohsin's first name, "Saleha" during the newsroom conference in 2017 confusing two women of the same race.

159. Mr. Shepard's admission that Defendant Bloomberg was considering categorizing the New York UN position as a "diversity slot" caused Plaintiff Syeed to finally accept that

37

Bloomberg would only consider her for a position if it decides to designate it a "diversity slot" and not based on her qualifications because she was merely a diversity hire. Plaintiff had completely lost trust in her employer and questioned her own self-worth.

### Defendant Bloomberg's Demonstrated ongoing Tolerance for Discrimination and Sexism Towards Women Employees

160.    Following the example and leadership of Mr. Bloomberg, Defendant Bloomberg's dominant male culture allows sex to permeate the company's work environment.  At   Defendant Bloomberg, men are promoted to higher levels at a faster rate, compensation is significantly higher in terms of salary, commission and bonus and men are assigned to more lucrative and/or desirable subjects, territories and/or leads to cover news stories.

161.    Most of Defendant Bloomberg's executives are male, hold executive positions and are paid significantly higher compensation than women.

162.    Most of Defendant Bloomberg's female employees are in sales, administrative and/or support roles.

163.    Most of Defendant Bloomberg news correspondents are white males and are promoted to Editor positions. In comparison, the female minority news correspondents are denied promotions and paid less compensation than their male counterparts.

164.    Based upon a U.K. study of employee compensation practices, within Defendant Bloomberg, women earn 79p for every £1 that men earn in terms of median hourly wages. "Women's median hourly wage is 20.9% lower than men's."[14]

---

[14] GOV.UK. *Bloomberg L.P. Gender Pay Gap Report*. April 5, 2018. https://gender-pay-gap-service.gov.uk/Employer/QOslQ2Dy/2018

165.    As of April 5, 2018, the highest paid jobs within Defendant Bloomberg were occupied 78.5% by men while women occupied 21.5% of the highest paid jobs.[15]

166.    Within the company, women earn 68p for every £1 than men earn in terms of median bonus pay while women's median bonus pay is 32.4% lower than men's bonus.[16]

167.    At all relevant times, Defendant Bloomberg's statistics and algorithms reflect a significant disparity in their pay practices between male and female employees' compensation throughout its company and is not limited to the statistics in this United Kingdom based study.

168.    In a 2015 New York Magazine article, the author, Michael Wolff described the environment Mr. Bloomberg has created at his company as "a truly weird one. This isn't Clintonesque lunging on Bloomberg's part, but rather, what is alleged here is a broader, more juvenile kind of control. Bloomberg's company is a playground, or clubhouse, or frat house, with Bloomberg himself as the strangely removed but obviously volatile bully or grand master or BMOC. That Mr. Bloomberg is the boss may be much more the point than the sex - insults, and the power to get away with insults, are more important than gratification."[17]

169.    Michael Bloomberg, Defendant Bloomberg Owner and CEO, assigned demeaning nicknames to woman employees he found unattractive, including "dogface" and "Stopatruckski" about her weight and rhyming with her last name.[18]

170.    Former Defendant Bloomberg employee, Maggie Berry, was proposed as a

---

[15] *Id.*

[16] *Id.*

[17] Wolff, Michael. Full Bloom. New York Magazine (2015).
http://nymag.com/nymetro/news/media/columns/medialife/5349/
[18] *Id.*

39

candidate for a promotion into a job that required interacting with clients. Mr. Bloomberg

dismissed the opportunity based on Ms. Berry's physical appearance saying, "I will not have that

fat woman representing my company." He ultimately hired a man for the job.[19]

171.    Bloomberg News' former Washington Editor, Al Hunt, was reportedly accused over the

course of recent years by multiple women of walking around the News Bureau and giving

unsolicited massages and verbally berating employees for minor infractions until his exit in

2018. Despite at least two financial settlements with women who complained about the male

editor, he continued in his position for years.[20]

### Defendant Bloomberg's Use of Intimidating Confidential
### Non-Disclosure Agreements to Insulate Itself from Liability and Bad Press

172.    A former female Defendant Bloomberg employee stated, "The full force of the

Bloomberg machine, when it's directed at you, is pretty intense. Never underestimate how scary

it has been for so many women."[21]

**173.**    Defendant Bloomberg's methodical use of Nondisclosure Agreements (NDAs) has

served to silence its employees from publicly speaking out of fear. In 2019 and continuing in

2020, former and current employees are disclosing information under anonymity. For example,

"NDAs are never signed by 'two parties who wanted to keep it quiet,'" said one woman who

signed an NDA with Defendant Bloomberg. "They are signed by women who are often broke

and unemployed and lack the resources to press a case against a billionaire. We agree to stay

silent not because we don't want our side heard, but because we often need the money to help

---

[19] *Id.*

[20] Einbinder, Nicole and Campbell, Dakin. *Bloomberg News' former Washington editor Al Hunt was accused over the course of years of multiple women of giving unsolicited massages and verbally berating employees for minor infractions.* Business Insider. March 2, 2020.
[21] *Id.*

repair the massive financial damage incurred after unexpectedly losing a job and spending thousands on lawyers in hopes of winning some of it back."[22]

174.     In 2019, a former female employee, Laurie Evans, filed suit to invalidate a confidential Separation Agreement and General Release signed under duress for fraudulent reasons that Bloomberg misrepresented its decision to terminate older female employees as part of a purported layoff while subsequently hiring younger and/or male employees in their place.[23]

175.     Another former Defendant Bloomberg employee described working at the company as a "cult-like experience of people screaming if you made a mistake, and this zero-tolerance expectation of something that's not even human, and this two-tiered society where some people get a pass and others were screamed at — it was just a bizarre climate and I think it was absolutely deliberately done…I have been in a lot of jobs and I have never seen anything like that."[24]

176.     In 2019, three young women of color who worked at Defendant Bloomberg found their overall experience at the company so demeaning that they helped draft a letter to their alma mater, a well-known historically black college, urging it to cease cooperating in Defendant Bloomberg's recruitment efforts. The letter sent in 2019 to the college's President and to its Director of Career Planning and Development described Defendant Bloomberg as a "toxic and demoralizing system."[25]

---

[22] *Id.*

[23] Laurie Evans v. Bloomberg, L.P., et al., Index No.: 160707/2019, Supreme County New York.  On July 31, 2020, Honorable Lucy Billings issued a Decision and Order
denying Defendant Bloomberg's motion to dismiss plaintiff Laurie Evans's claim she was fraudulently induced to sign a release upon separation of her employment and refused to bar Ms. Evans's discrimination and retaliation claims against Defendant Bloomberg. See Docket No. 57.

[24] Einbinder, Nicole and Campbell, Dakin. *Business Insider*. March 2, 2020.

[25] *Id.*

41

177.     The letter was signed by a graduate of the college, who helped recruit for Defendant

Bloomberg before leaving the company. "This organization does not have people of color sitting

on their management committee, or in visible senior leadership roles, and the ones that do have

direct reports have acted in irrepressible ways towards young women of color," the letter reads.

"The experiences shared with me range from being solicited for sexual favors to get ahead, to

young women in their first year of work taking medical leave based on their severe emotional

and mental stress experienced at the organization. Bloomberg L.P. will spend money investing in

unconscious bias conversations but fail to acknowledge the conscious decision-making made by

a select few that continue to marginalize people at the company."[26]

178.     Despite the vast nature and number of reported discriminatory internal complaints,

Defendant Bloomberg has consistently denied receiving any harassment internal complaints and

therefore absolves itself of changing its culture through effective supervision and training from

its top, down.[27]

### Defendant Bloomberg's Documented Systemic Practice of Gender Oppression, Pattern of Disparate Treatment and Unequal Employment Opportunity for Women Has Continued Long Before Plaintiff Began Her Employment at Bloomberg

179.     Despite the existence of Defendant Bloomberg's NDAs, some fearless female

employees have sued Defendant Bloomberg and/or Mr. Bloomberg for sex discrimination

beginning in 1996 and continuing to the present.

180.     Before becoming Mayor of the City of New York, Mr. Bloomberg was sued by a class

of female employees led by a female sales executive who accused him of sexual harassment and

---

[26] *Id.*

[27] *Id.*

42

creating a hostile work environment for female employees while he was the Chief Executive

Officer of Defendant Bloomberg.[28]

181.    The E.E.O.C. filed a gender discrimination and sexual harassment lawsuit on behalf of

58 women claiming that Mr. Bloomberg and other male managers at the company made

"repeated and unwelcome" sexual comments, overtures and gestures, which contributed to an

offensive, locker-room culture.[29] The harassment lawsuit alleged that Mr. Bloomberg displayed a

discriminatory attitude toward pregnant women and new mothers, and that this culture was

fostered at the company.[30] The harassment lawsuit accused Mr. Bloomberg of engaging in a

pattern of demoting women, diminishing their duties and excluding them from other job

opportunities after they disclosed that they were pregnant and/or for discriminatory reasons

based upon their sex.

182.    The E.E.O.C. complaint alleged that "[t]his systemic top-down discrimination against

female employees is fostered, condoned and perpetrated by the highest levels of management

within Bloomberg and by ownership of Bloomberg, to wit Michael Bloomberg...."[31]

### Defendant Bloomberg's Grossly Ineffective Human Resources and Exit Interview Policies, Practices and Procedures Further Fail to Address and Remediate the Ongoing Discriminatory Behavior

183.    As it currently exists, Defendant Bloomberg employees are not afforded an effective

means of complaining and/or reporting discrimination, harassment and/or retaliation. Male

---

[28] The Associated Press. *58 Women Now Suing Bloomberg LP for Sex Discrimination*. Daily News (2008). http://www.nydailynews.com/news/58-women-suing-bloomberg-p-sex-discrimination-article-1.331323. Twelve years later, the same complaints of a similar sexist culture still exist at Bloomberg.
[29] *Id*.
[30] *Id*.

[31] Kugler, Sara. *Suit: Bloomberg Condoned Discrimination*. USA Today (2007). http://usatoday30.usatoday.com/money/economy/2007-10-03-2247216259_x.htm

43

management placates, ignores or gaslights the female employees while blatantly promoting males and paying them higher salaries.

184.    Defendant Bloomberg's Human Resources ("HR") department is stripped of any authority to investigate, remediate and/or take appropriate action against male employees charged by female employees of discrimination, harassment or retaliation.

185.    Defendant Bloomberg's HR representatives and management are trained to discourage employees from complaining and to "work it out" with the male supervisor or otherwise face termination.

186.    Plaintiff Syeed was yet another female victim of color who suffered the demoralizing hostile work environment fostered and condoned by Defendant Bloomberg and its senior male management without fear of reprisal.

187.    On June 6, 2018, Plaintiff Syeed met with the Head of D.C. HR, Tamika Alexander and went over the racist and sexist culture of Defendant Bloomberg's newsroom she endured during her employment, specifically mentioning the "diversity slot" conversation with Mike Shepard. Ms. Alexander said there was "no such thing" as "diversity slots" at the company.

188.    During her meeting with Ms. Alexander, Plaintiff Syeed stated, "I am probably not telling you anything you do not already know." Ms. Alexander put her head down and responded, "Sadly, yes." Ms. Alexander explained that Defendant Bloomberg's management was likely attempting to cover themselves by asking Plaintiff what her ambitions were and remedy the situation with Plaintiff after failing to consider her for the New York UN position. Ms. Alexander stated she would speak with Mr. Gordon and see what can be done and instructed

44

Plaintiff to inform Laura Zelenko, recently named Senior Executive Editor for Diversity, Talent, Standards and Training at Bloomberg News in the New York office.[32]

### **Plaintiff Syeed was Constructively Discharged**

189. Two days later, on June 8, 2018, Plaintiff Syeed informed Mr. Faries she could no longer work at Defendant Bloomberg due to the disparate treatment she had experienced. During this conversation, Mr. Faries referred to Plaintiff as a "young reporter," despite Plaintiff's news reporting experience and being close to 40-years-old. Mr. Faries had made a similar statement in the newsroom prior, saying "We all think you're 25, Nafeesa," when Plaintiff was a decade older.

190. Next, Plaintiff Syeed met with Mr. Shepard to inform him of her departure from the company, and he responded that her news was unexpected. He stated Defendant Bloomberg was looking into relocating Plaintiff to New York "post-election" in approximately six months.

191. Mr. Shepard inquired if he could have done anything differently during Plaintiff Syeed's employment and was adamant about knowing where Plaintiff would be working next and whether it was for a competitor.

192. Mr. Gordon emailed Plaintiff Syeed reiterating his stance on her remaining on the cybersecurity beat. Yet, Ms. Alexander called Plaintiff to advise her she spoke to Mr. Gordon, and that Bloomberg was now considering allowing Plaintiff to perform her current job from New York. Ms. Alexander insisted Plaintiff take her cell phone contact information to keep in touch.

193. On June 8, 2018, Plaintiff Syeed was constructively discharged from Defendant.

---

[32] Tamika Alexander was one of the women involved in a federal lawsuit brought by the EEOC on behalf of Ms. Alexander and various other female former and at the time current Defendant Bloomberg employees who were discrimination against based upon sex and pregnancy and were retaliated against. E.E.O.C. v Bloomberg L.P., 967 F.Supp.2d 802 (2013).

194.     Plaintiff Syeed was required to sign a Confidentiality Agreement before leaving the office and participate in a video-conference exit interview with a female HR representative based out of New York. The HR representative badgered Plaintiff about where she would be employed next, as Mr. Faries and Mr. Shepard had done.

195.     Upon being informed Plaintiff Syeed was separating from the company, Wes Kosova, senior executive editor, telephoned to ask Plaintiff to tell him if there was anything Bloomberg could do to keep her employed. He stated, "anything, anything…just name it, just tell me." Plaintiff stated, "It's too late, Wes." Plaintiff Syeed was escorted out of the office by Mr. Faries.

196.     On June 15, 2018, Dimitra Kessenides, an Editor at Bloomberg Businessweek reached out to Plaintiff Syeed to discuss Plaintiff contributing a story about election security, which Plaintiff agreed to do on a freelance basis.

197.     From on or about June 15, 2018 to early August 2018, Plaintiff worked on the election security stories and submitted them to Bloomberg for publication.

198.     On or about August 10, 2018, Plaintiff Syeed's article on cyber security appeared in Defendant Bloomberg's Businessweek. Thereafter, Ms. Kessenides has reached out to Plaintiff requesting she contribute again.

199.     Defendant Bloomberg's hostile work environment stripped Plaintiff Syeed of her dignity, her self-esteem and her ability to properly care for herself and to act in her own best interest, physically, emotionally and professionally.

200.     Defendants' intentional, willful, reckless, and/or indifferent disregard of Plaintiff Syeed's protected human rights, entitles Plaintiff to compensatory and punitive damages.

46

### FIRST CAUSE OF ACTION
### <u>Sex Discrimination – Disparate Treatment (NYHRL)</u>

201.    Plaintiff Syeed realleges and incorporates all facts alleged in the above paragraphs.

202.    By the acts complained of and as alleged herein, Defendants were on notice of their practices and procedures that caused and/or permitted discriminatory treatment of Plaintiff(s) with respect to their terms and conditions of employment at Defendant Bloomberg.

203.    At all relevant times, Defendants maintained a pattern and practice of unlawful discrimination based on sex.

204.    As a result of Defendants' aforesaid acts, Defendants discriminated against Plaintiff and other female employees similarly situated on account of their sex in violation of the New York State Executive Law § 296 during Defendants' employment.

205.    As a result of Defendants' discriminatory and adverse acts, Plaintiff(s) have suffered damages, including without limitation, deprivation of income and benefits, loss of employment opportunities, severe emotional distress, personal injuries, pain, suffering, mental anguish, humiliation, loss of enjoyment of life and damage to reputation and career.

### SECOND CAUSE OF ACTION
### <u>Race Discrimination - Disparate Treatment (NYHRL)</u>

206.    Plaintiff Syeed incorporates below all facts alleged in the above paragraphs.

207.    By the acts complained of and as alleged herein, Defendants were on notice of their practices and procedures that caused and/or permitted discriminatory treatment of Plaintiff and other female employees similarly situated with respect to their terms and conditions of employment at Defendant Bloomberg.

208.    At all relevant times, Defendants maintained a pattern and practice of unlawful discrimination based on race.

47

209.    As a result of Defendants' aforesaid acts, Defendants discriminated against Plaintiff(s) on account of their race in violation of the New York State Executive Law § 296 during Defendants' employment.

210.    As a result of Defendants' discriminatory and adverse acts, Plaintiff(s) have suffered damages, including without limitation, deprivation of income and benefits, loss of employment opportunities, severe emotional distress, personal injuries, pain, suffering, mental anguish, humiliation, loss of enjoyment of life and damage to reputation and career.

### THIRD CAUSE OF ACTION
### Sex Discrimination – Disparate Treatment (NYCHRL)

211.    Plaintiff Syeed realleges and incorporates all facts alleged in the above paragraphs.

212.    By the acts complained of and as alleged further herein, Defendants were on notice of their practices and procedures that caused and/or permitted discriminatory treatment of Plaintiff with respect to her terms and conditions of employment at Defendant Bloomberg.

213.    At all relevant times, Defendants maintained a pattern and practice of unlawful discrimination based on sex.

214.    As a result of Defendants' aforesaid acts, Defendants discriminated against Plaintiff(s) on account of their sex in violation of the New York City Administrative Code § 8-107 during Defendants' employment.

215.    As a result of Defendants' discriminatory and adverse acts, Plaintiff(s) have suffered damages, including without limitation, deprivation of income and benefits, loss of employment opportunities, severe emotional distress, personal injuries, pain, suffering, mental anguish, humiliation, loss of enjoyment of life, damage to reputation and career.

48

## FOURTH CAUSE OF ACTION
### Race Discrimination – Disparate Treatment (NYCHRL)

216. Plaintiff Syeed realleges and incorporates all facts alleged in the above paragraphs.

217. By the acts complained of and as alleged further herein, Defendants were on notice of their practices and procedures that caused and/or permitted discriminatory treatment of Plaintiff(s) with respect to their terms and conditions of employment at Defendant Bloomberg. At all relevant times, Defendants maintained a pattern and practice of unlawful discrimination based on race.

218. As a result of Defendants' aforesaid acts, Defendants discriminated against Plaintiff(s) and other females similarly situated on account of their race in violation of the New York City Administrative Code § 8-107 during Defendants' employment.

219. As a result of Defendants' discriminatory and adverse acts, Plaintiff(s) have suffered damages, including without limitation, deprivation of income and benefits, loss of employment opportunities, severe emotional distress, personal injuries, pain, suffering, mental anguish, humiliation, loss of enjoyment of life and damage to reputation and career.

## FIFTH CAUSE OF ACTION
### Hostile Work Environment Based on Sex and Race

220. Plaintiff Syeed realleges and incorporates all facts alleged in the above paragraphs.

221. Defendants' persistent, frequent and pervasive conduct created an atmosphere at Defendant Bloomberg, by the individual Defendants and their managers, supervisors and employees, that was hostile, abusive, humiliating and degrading to their female minority employees including Plaintiff and those employees similarly situated.

222. Defendants subjected Plaintiff Syeed and other female minority employees similarly situated to a hostile work environment permeated with harassment based on race and sex

49

sufficiently severe and pervasive to alter the conditions of Plaintiffs' employment, in violation of New York State Executive Law § 296 and New York City Administrative Code § 8-101, *et seq*.

223.    As a result of Defendants' creation of a hostile work environment, Plaintiffs have suffered damages including, without limitation, deprivation of income and benefits, termination of employment, loss of opportunity for advancement and promotion, severe emotional distress, personal injuries, pain, suffering, inconvenience, mental anguish, humiliation and damage to reputation and career.

### SIXTH CAUSE OF ACTION
### Disparate Impact Based on Sex under NYHRL and NYCHRL

224.    Plaintiff Syeed realleges and incorporates all facts alleged in the above paragraphs.

225.    Defendants discriminated against Plaintiff and other female employees similarly situated based on their sex through their practices of hiring, promotion, training, compensation and termination.

226.    Defendants' facially neutral employment policies and practices relating to Bloomberg News' internal hiring, performance ratings, assignments to its reporters, promotions tracks, career trajectories and compensation were ineffectually designed, implemented, supervised and reviewed to ensure that discriminatory practices in hiring, training, promoting, compensating, fielding complaints and terminating employees did not occur.

227.    More specifically, Defendants created an ill designed diversity hire and promotion system within the Company that was described as facially neutral but was an ineffectually implemented employment policy that allowed for gender bias on the part of Defendants' male management decision-makers and HR representatives, whether intentional or unconscious, which

50

was further enabled by the lack of any system or structure of meaningful oversight or accountability to field, investigate and remediate complaints and protect against such bias.

228.    By creating and implementing a diversity hire, promotion and compensation system that did not consider all similarly situated qualified candidates, such qualified candidates who were minority females were excluded from consideration in hiring and/or promotion decision making for desirable opportunities that their male counterparts to which were not subjected. The existence of the foregoing practices, standards and/or policies has produced an unjustified disparate impact on Plaintiff and other similarly situated employees with respect to the terms and conditions of their employment. As a result, Plaintiff(s) were treated differently from and less favorably than their male colleagues.

229.    Because of the continuous nature of Defendants' discriminatory conduct, which persisted throughout the employment of Plaintiff and other similarly situated female employees are entitled to application of the continuing violations doctrine to all violations alleged herein.

230.    As a result of the above described disparate impact discrimination, Defendants have treated Plaintiff(s) and other female employees similarly situated, less preferentially than similarly situated male employees.

231.    As a result of Defendants' discriminatory policies, practices and procedures and adverse acts, Plaintiff and other female employees similarly situated have suffered and are entitled to damages including, without limitation, deprivation of income and benefits, loss of opportunity for advancement and promotion, severe emotional distress, pain, suffering, inconvenience, mental anguish, humiliation and damage to reputation. Defendants' reckless

51

indifference to the protections afforded to Plaintiff(s) and Defendants' continuing violations

occurred under the described circumstances warrant imposition of punitive damages.

### SEVENTH CAUSE OF ACTION
### Disparate Impact Based on Race under NYSHRL and NYCHRL

232.    Plaintiff Syeed realleges and incorporates all facts alleged in the above

paragraphs.

233.    Defendants discriminated against Plaintiff and other female employees similarly

situated employees based on their race through their practices of hiring, promotion,

training, compensation and termination.

234.    Defendants' facially neutral employment policies and practices were ineffectually

implemented to enable and compound the rampant discriminatory practices in hiring, training,

promoting, compensating, fielding complaints and terminating employees. By creating and

implementing a diversity hire, promotion and compensation system that did not consider all

similarly situated qualified candidates, such qualified candidates who were minority females

were excluded from consideration in hiring and/or promotion decision making for desirable

opportunities that their male counterparts to which were not subjected. The existence of the

foregoing practices, standards and/or policies has produced an unjustified disparate impact on

Plaintiff and other similarly situated employees with respect to the terms and conditions of their

employment. As a result, Plaintiff(s) were treated differently from and less favorably than their

white male colleagues.

235.    The above described policy on its face was facially neutral but ineffectually implemented

employment policies which allowed for racial bias on the part of Defendants' white male

decision makers and HR representatives, whether intentional or unconscious, which was further

52

enabled by the lack of any system or structure of meaningful oversight or accountability to field, investigate and remediate complaints and protect against such bias.

236.    The existence of the foregoing practices, standards, and/or policies has produced an unjustified disparate impact on Plaintiff(s) with respect to the terms and conditions of their employment. As a result, Plaintiff and other female minority employees similarly situated were treated differently from and less favorably than their male colleagues.

237.    Because of the continuous nature of Defendants' discriminatory conduct, which persisted throughout the employment of Plaintiff and similarly situated employees, Plaintiff and other minority female employees similarly situated are entitled to application of the continuing violations doctrine to all violations alleged herein.

238.    As a result of the above described disparate impact discrimination, Defendants have treated Plaintiff and other minority female employees similarly situated, less preferentially than similarly situated white male employees.

239.    As a result of Defendants' discriminatory policies, practices and procedures and adverse acts, Plaintiff and other minority female employees similarly situated have suffered and are entitled to damages including, without limitation, deprivation of income and benefits, loss of opportunity for advancement and promotion, severe emotional distress, pain, suffering, inconvenience, mental anguish, humiliation and damage to reputation reckless indifference to the protections afforded to Plaintiff(s). Defendants' violations occurring under the aforementioned circumstances warrant imposition of punitive damages.

53

## EIGHTH CAUSE OF ACTION

### Aiding and Abetting Against Individual Defendants

240. Plaintiff Nafeesa Syeed incorporates below all facts alleged in the above paragraphs.

241. As a result of the foregoing, the individual Defendants aided, abetted, incited, compelled and coerced acts forbidden under the NYC Administrative Code, § 8- *101 et seq.,* in violation of the NYC Administrative Code § 8-107(6).

242. As a result of Defendants' illegal conduct against her, Plaintiff has suffered damages, including, without limitation, deprivation of income and benefits, loss of opportunity for advancement and promotion, severe emotional **distress, personal injuries, pain**, suffering, mental anguish, humiliation and damage to reputation and career.

**WHEREFORE**, Plaintiff Nafeesa Syeed, and other similarly situated minority female employees, respectfully request that this Court grant judgment for them and that it order and award them the following relief against Defendants:

(1) Compensatory damages for emotional pain and suffering, mental anguish, humiliation, loss of reputation and career opportunity in an amount to be proved at trial;

(2) Liquidated damages in an amount to be awarded at trial;

(3) Punitive damages in an amount to be awarded at trial;

(4) Attorneys' fees, costs and disbursements;

(5) Interest; and

(6) Such other just relief and incidental award pursuant to a jury verdict holding that the Defendants' acts, policies, practices, and procedures complained of herein violated Plaintiffs'

54

rights as secured by the New York State Executive Law § 296, New York City Administrative

Code, § 8-101 and any other applicable statutes as the Court deems just and proper.


Dated:  New York, New York
       August 9, 2020

                              THE CLANCY LAW FIRM, P.C.
                              *Attorneys for Plaintiff Nafeesa Syeed and other*
                              *similarly situated employees*


                     By:           /s/_____
                            Donna H. Clancy, Esq.
                            40 Wall Street, 61st Floor
                            New York, New York 10005
                            (t) (212) 747-1744
                            (f) (646) 693-7229

55

## INDIVIDUAL VERIFICATION

Nafeesa Syeed, swears and affirms under penalty of perjury, that:

I am the Plaintiff of record. I have read the foregoing Verified Complaint, know the contents thereof, and upon information and belief, believe the matters alleged therein to be true.

The source of my information and the grounds of belief are based on my personal knowledge, my communications, papers, reports and investigations contained in my file.

Affirmed the 9th day
of August 2020

*Nafeesa Syeed*
Nafeesa Syeed