UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X

NAFEESA SYEED AND NAULA
NDUGGA, ON BEHALF OF
THEMSELVES AND SIMILARLY            Case No 20-cv-07464 (GHW)
SITUATED WOMEN,

          Plaintiffs,            **SECOND AMENDED COMPLAINT**

    -against-                              **JURY TRIAL DEMANDED**

BLOOMBERG L.P.,

       Defendant.
------------------------------------- X

    Plaintiffs Nafeesa Syeed and Naula Ndugga, on behalf of themselves and similarly

situated women employees and former employees, by their attorneys, The Clancy Law Firm,

P.C. and Cohen Milstein Sellers & Toll PLLC, complaining against Defendant Bloomberg L.P.,

upon information and belief, and at all relevant times, allege as follows:

## <u>INTRODUCTION</u>

    1.    Plaintiffs, both former or current Bloomberg L.P. News reporters or producers,

bring this case to challenge systemic sex discrimination in compensation and promotions, which

was directed from the highest levels at Bloomberg Media and adversely affected their own

careers, as well as those of hundreds of other women who work or worked at Bloomberg Media

as Reporters, Producers, or Editors.  Plaintiffs and the proposed class were subject to promotion

decisions that were intended to, and had the effect of, adversely affecting women, which were

made by the Editorial Management Committee, a small group consisting solely of white men,

based in New York, which systematically favored white men like the committee members over

women such as Plaintiffs and the proposed class.  The Editorial Management Committee

exercised similar power over compensation and performance evaluation decisions, with the intention, and having the effect, of disfavoring women.  In particular, the Editorial Management Committee set new hire pay rates – which set the basis of salary for those individuals as they progress in Defendant's workforce – by relying significantly on their prior compensation before working at Bloomberg, notwithstanding that this factor has had a significant adverse impact on women.

## **JURISDICTION AND VENUE**

2.      Jurisdiction is proper in this Court, as the claims arise under Title VII and therefore present federal questions.

3.      This Court also has jurisdiction over the class-action claims against Defendants pursuant to 28 U.S.C. § 1332(d) because the amount in controversy for those claims exceeds the sum or value of $5 million, exclusive of interest and costs, and at least one member of the plaintiff class is a citizen of a foreign state or a state different from any defendant.

4.      This Court also has supplemental jurisdiction over state-law claims under 28 U.S.C. § 1367.

5.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b)-(c) and 42 U.S.C. § 2000e-5(f)(3), because Defendant's headquarters is located in this district, the personnel records relevant to this case are in this district, and the personnel practices challenged herein were directed or supervised by Defendant in this district.

6.      Plaintiffs will have exhausted their administrative remedies as required by Title VII, as Plaintiff Naula Ndugga has, as of the date of filing this Second Amended Complaint, filed a timely charge of discrimination, and will request a notice of right to sue as soon as she is permitted to do so.

## PARTIES

7.      Plaintiff Nafeesa Syeed is a South Asian-American female citizen of the United States, who currently resides in the State of California.  Plaintiff Syeed worked for Defendant Bloomberg from October 2014 until June 8, 2018.  Plaintiff Syeed brings sex discrimination claims on behalf of herself and all female Reporters, Producers, and Editors.  She also brings individual claims of race discrimination.

8.      Plaintiff Naula Ndugga is a Black, female citizen of the United States who currently resides in the State of New York.  Plaintiff Ndugga has worked for Defendant Bloomberg since September, 2017, when she began as a paid intern.  She has been a fulltime employee since January 29, 2018.  Plaintiff Ndugga brings sex discrimination claims on behalf of herself and all female Reporters, Producers, and Editors.  She also brings individual claims of race discrimination and retaliation.

9.      Defendant Bloomberg L.P. is a foreign limited partnership existing under and by virtue of the laws of the State of Delaware.  Bloomberg's global headquarters is in the City of New York, County of New York, State of New York.

10.      Defendant Bloomberg is an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b), and within the meaning of New York City Administrative Code §§ 8-102(5) and 8-107.

## FACTUAL BACKGROUND

### Organization of Defendant's Business

11.      Defendant Bloomberg was founded in 1981 by majority shareholder Michael Bloomberg.  It is a privately held financial, software, data, and mass media company with annual earnings of approximately $10 billion, and approximately 20,000 employees.  It provides financial software tools and enterprise applications, such as analytics and equity trading

platforms, data, services and news to financial companies through the Bloomberg Terminal and its online platforms.

12.     Bloomberg includes Bloomberg Media, which employs approximately 2,700 people engaged in work as reporters and editors,[1] located in more than 120 News Bureaus worldwide,[2] including 31 Bureaus located in the United States.  All Bureaus are managed and supervised from Bloomberg Media headquarters in New York.

13.     Bloomberg Media was co-founded in 1990 by Michael Bloomberg and Matthew Winkler, who served as Editor-in-Chief until December 2014.

14.     At all relevant times, Defendant Bloomberg manages its News division from its headquarters at 731 Lexington Ave., New York, NY.  An all-male Editorial Management Committee controls decisions on both news content and all employment decisions.  The Editorial Management Committee manages the Bloomberg Media operations from its offices in New York.

15.     Content produced by Bloomberg Media is disseminated through the Bloomberg terminal, Bloomberg Television, Bloomberg Radio, Bloomberg Businessweek, Bloomberg Markets, Bloomberg Podcasts, Bloomberg QuickTake, Bloomberg Apps, and Bloomberg.com.

16.     Bloomberg Media employs approximately 2,700 Reporters, Producers, and Editors.  Approximately 1000 of the Reporters, Producers, and Editors are women.  Reporters, Producers, and Editors are organized into Teams covering different subject areas, with a senior

---

[1] For those portions of Bloomberg Media that share their content via video or radio, the title used for individuals performing work comparable to reporters and editors is "producer." Where the Complaint refers to "Reporters, Producers, and Editors," Plaintiffs intend to include all employees performing such substantively similar work, including those with varying titles such as "senior reporter" or "correspondent."

[2] Pursuant to 42 U.S.C. § 2000e(f), US citizens employed in foreign countries by US employers such as Bloomberg, are "employees" under the protection of Title VII.

Editor as a Team Leader for purposes of day-to-day supervision. Team Leaders do not make hiring, promotion, or compensation decisions. Each News Bureau is led by a Bureau Chief. The Bureau Chiefs report to the Editorial Management Committee in New York. As set forth in detail below, all of the employment decisions regarding Reporters, Producers, and Editors challenged herein are made by the Editorial Management Committee.

17.     The Editorial Management Committee, during the relevant time period, consists of Editor-in-Chief John Micklethwait, Chief Content Officer Marty Schenker, and Deputy Editor-in-Chief Reto Gregori. The Committee reports to Michael Bloomberg.

**History of Sexism at Bloomberg LP**

18.     Defendant Bloomberg is a company with a long history of a systemic top-down sexist culture created and condoned by its Founder, CEO and Owner, Michael Bloomberg, and its male executives. The environment in which the pay and promotion decisions that are the subject of this action are made has been permeated by conduct demeaning to women, and evidencing that the discrimination in pay and promotions women have been subjected to has been intentional.

19.     In 2014, when Editor-in-Chief Winkler was preparing to transition to his current Emeritus role, the top candidate to fill the Editor-in-Chief position was reported to be Laurie Hays, a Harvard graduate, former Wall Street Journal reporter and Senior Executive Editor at Bloomberg Media since 2008. However, Michael Bloomberg passed her over in favor of Mr. Micklethwait, who came to Bloomberg from *The Economist*.[3] Had Ms. Hays been chosen, she

---

[3] Matthew Zeitlin, *Bloomberg Passed Over Its Top Woman Editor In Hiring A New Boss*, Buzzfeed News (Dec. 10, 2014, 4:36 PM), https://www.buzzfeednews.com/article/matthewzeitlin/bloomberg-passed-over-its-top-woman-editor-in-hiri. *See also* Luke O'Brien, *The mayor vs the mogul*, Politico (June 19, 2015, 12:31 PM), https://www.politico.eu/article/the-mayor-vs-the-mogul/.

would have been the only female executive leader for Bloomberg Media. Instead, Mr. Micklethwait became Editor-in-Chief, and quickly demonstrated his hostility to women in Bloomberg Media by demoting or firing the most senior women, including Ellen Pollock, former Businessweek editor; Christine Harper, Executive Editor of Finance; Laura Zelenko (who initially replaced Laurie Hays as Senior Executive Editor, but then got demoted to head of Talent, Diversity, Training and Standards); and Angela Sun, Global Head of Strategy and Corporate Development.

20. In 2008, the EEOC filed a gender discrimination lawsuit alleging a pattern or practice of discrimination against women who were or had been pregnant while working at Bloomberg L.P.[4] The lawsuit alleged that Mr. Bloomberg displayed a discriminatory attitude toward pregnant women and new mothers, and that this culture was fostered at the company.[5] The lawsuit accused Bloomberg of engaging in a pattern of demoting women, diminishing their duties, and excluding them from other job opportunities after they disclosed that they were pregnant and/or for discriminatory reasons based upon their sex.

21. The EEOC complaint alleged that "[t]his systemic top-down discrimination against female employees is fostered, condoned and perpetrated by the highest levels of management within Bloomberg and by ownership of Bloomberg, to wit Michael Bloomberg…."[6]

---

[4] The Associated Press, *58 Women Now Suing Bloomberg LP for Sex Discrimination*, N.Y. Daily News (May 1, 2008, 9:45 PM), http://www.nydailynews.com/news/58-women-suing-bloomberg-p-sex-discrimination-article-1.331323.

[5] *Id.*

[6] Sara Kugler, *Suit: Bloomberg Condoned Discrimination*, USA Today (Oct. 3, 2007), http://usatoday30.usatoday.com/money/economy/2007-10-03-2247216259_x.htm.

22.    An earlier sexual harassment suit alleged that Mr. Bloomberg and other male managers at the company made "repeated and unwelcome" sexual comments, overtures and gestures, which contributed to an offensive, locker-room culture.[7]  For example, Mr. Bloomberg was alleged to have said, after informing several female employees that a male colleague was getting married, "All of you girls line up to give him [oral sex] as a wedding present."[8]

23.    Michael Bloomberg, Defendant Bloomberg Owner and CEO, assigned demeaning nicknames to woman employees he found unattractive, including "dogface" and "Stopatruckski" (referencing her weight and rhyming with her last name).[9]  Former Defendant Bloomberg employee, Maggie Berry, was proposed as a candidate for a promotion into a job that required interacting with clients. Mr. Bloomberg dismissed the opportunity based on Ms. Berry's physical appearance saying, "I will not have that fat woman representing my company."  He ultimately hired a man for the job.[10]

24.    Bloomberg Media's former Washington Editor, Al Hunt, was reportedly accused over the course of recent years by multiple women of walking around the News Bureau and giving unsolicited massages and verbally berating employees for minor infractions until his exit in 2018.  Despite at least two financial settlements with women who complained about the male editor, he continued working in the D.C. Bureau for years, including during the time period when

---

[7] Associated Press, *58 Women Now Suing Bloomberg*, supra.

[8] Michael Kranish, *Mike Bloomberg for years has battled women's allegations of profane, sexist comments*, The Wash. Post (Feb. 15, 2020), https://www.washingtonpost.com/graphics/2020/politics/michael-bloomberg-women/.

[9] *Id.*

[10] *Id.*

Plaintiff Syeed worked in the D.C. Bureau.[11]

25.     The sexism that permeated Bloomberg's history was directly observed by Plaintiffs.  For example, in 2015, Plaintiff Syeed witnessed Inal Ersan, a Senior editor, make bullying remarks that demeaned her female colleagues while attempting to pass them off as "jokes." One of Plaintiff Syeed's younger female colleagues confided in Plaintiff Syeed that she repeatedly cried because of Mr. Ersan's harassment. When Mr. Ersan learned of Plaintiff Syeed's and her colleague's complaints, he taunted both women verbally and through writing in emails, "Go ahead…report me to HR," projecting confidence that HR would take no action against him. Managing Editor Barden was aware of Mr. Ersan's sexist behavior,[12] and told Plaintiff Syeed he allowed Mr. Ersan to "get away with this" because Mr. Ersan had to watch all the depressing Arabic news channels in addition to his family living in war-torn Syria.

26.      Plaintiff Ndugga also experienced Bloomberg's sexist culture first hand.  For example, as described in greater detail below, a male supervisor yelled at her in an aggressive, threatening manner, and when she complained, the male supervisor fabricated a defense of his behavior in which he depicted her as an "angry Black woman."  Following that episode, he ignored her and even omitted her from team emails that she needed to read.  He insulted her intelligence and worth as a Black female member of the team.

**Promotion Practices**

27.     Bloomberg Media posts vacancies on an internally accessible career portal for a

---

[11] Nicole Einbinder and Dakin Campbell, *Bloomberg News' former Washington editor Al Hunt was accused over the course of years of multiple women of giving unsolicited massages and verbally berating employees for minor infractions*, Bus. Insider (Mar. 2, 2020, 2:45 PM), https://www.businessinsider.com/bloomberg-news-al-hunt-accused-unsolicited-massages-verbally-berating-employees-2020-3.

[12] Mr. Ersan also made racist statements, detailed below at ¶ 60, in connection to Plaintiff Syeed's individual race discrimination claims.

period of time, only later posting positions on its external company website if it is unable to fill the position with an internal applicant, thus demonstrating a preference for promoting from within.

28.     While Bureau Chiefs and other Senior Editors are involved in interviewing prospective candidates for hiring or promotion, only the Editorial Management Committee has authority to make hiring or promotion decisions.  Indeed, Plaintiff Syeed, like all reporters, had to interview with then-Editor-in-Chief Winkler before she was hired.[13]

29.     In addition to a promotion progression from Reporter to Senior Reporter, then to Editor, to Senior Editor, and ultimately Bureau Chief, there are also gradations within Reporter positions.  Certain subject areas on which a Reporter might focus, such as Foreign Policy, are considered to be higher level positions, and are ones which are more likely to permit a Reporter to be promoted to Senior Reporter or Editor.

30.     Similarly, Producers progress to Senior Producer, then to Executive Producer.  As with Reporter positions, there are also gradations within Producer positions.  Certain subject areas on which a Producer might focus are considered to be higher level positions, and are ones which are more likely to permit a Producer to be promoted to Senior Producer or Executive Producer.

31.     Plaintiffs Syeed and Ndugga were both passed over for promotions for which they were each well qualified, as described in detail below.  In addition, numerous female reporters complained to Plaintiff Syeed that Bloomberg's male editors undermined them and bypassed them for promotion.

---

[13] *See* Julia La Roche, *If You Want A Job At Bloomberg, You Must Be Able To Answer These Three Questions*, Bus. Insider (Feb. 3, 2013, 10:58 AM), https://www.businessinsider.com/three-matt-winkler-interview-questions-2014-2.

32.     One practice that was used to limit the promotional opportunities for everyone other than white men was the designation of certain positions as "diversity slots."  As Managing Editor Mike Shepard revealed to Plaintiff Syeed, she was not considered for a promotion she sought because the position in question had not been designated a "diversity slot."  As Plaintiff Syeed understood, the Editorial Management Committee decided which positions were "diversity slots" which effectively limited positions not designated as "diversity slots" to white men, significantly reducing the opportunities for women and people of color.

### Compensation and Evaluation

33.     Successful job applicants are asked what their current or most recent salary is ("prior pay").  The Editorial Management Committee decides what salary is authorized when deciding to extend job offers, and does so largely based upon prior pay.

34.     The Editorial Management Committee often agrees to offer more money to male reporters or editors seeking a better salary, but declines to do so for female new hires.

35.     Male reporters are frequently hired at salaries that are $20,000 or more above the salaries of their female peers.

36.     Starting pay continues to impact compensation throughout employees' careers at Bloomberg Media, as even if pay raises were given equally to male and female employees, the disparities created with starting pay would continue, in a phenomenon recognized as "start low, stay low."

37.     For example, Plaintiff Ndugga's pay as an intern was lower than the pay of other male interns. When she was hired as a producer, her starting salary was $65,000, which was $10,000 lower than the starting salary of male producers who were hired out of the same internship program. In three years, she received only one raise, and her current salary is $66,500, still less than the *starting* salary of male producers.

38.     Plaintiff Syeed met with Megan Murphy, then D.C. Bureau Chief, in 2015 to discuss any open positions.  Ms. Murphy disclosed there was a known gender pay disparity in the News Bureaus and that requests for transparency were disfavored by the company.  Many female colleagues spoke openly with Plaintiff Syeed about the gender pay disparity they observed, in which men were frequently paid 20% more than their female peers, and sometimes 50% more.

39.     Based upon employee compensation data and analysis published by the U.K.'s Government Equalities Office, within Defendant Bloomberg, women earn 79p for every £1 that men earn in terms of median hourly wages.  "Women's median hourly wage is 20.9% lower than men's."[14]

40.     At mid-year and year-end, every Reporter, Producer, and Editor receives a rating on a five-point scale, where 1 is the best rating, and 5 is the worst rating.  Team Leaders prepare draft evaluations for Reporters, Producers, and Editors, and those drafts are submitted to the Bureau Chief.  Bureau Chiefs then forward these ratings to the Editorial Management Committee in New York.  The Editorial Management Committee routinely directs Bureau Chiefs to change the individual ratings proposed by Team Leaders, and Bureau Chiefs pass on these instructions to the Team Leaders to carry out.  The Editorial Management Committee does not merely seek to reduce the number of higher ratings, but itself dictates which employees should have their ratings reduced.

41.     Lower ratings are then used to deny or reduce bonus awards, pay increases, and promotions.

42.     Pay raises may be considered during employee reviews, or when moving to a

---

[14] *Bloomberg L.P. Gender Pay Gap Report,* Gender Pay Gap Service (Apr. 5, 2018), https://gender-pay-gap-service.gov.uk/Employer/QOslQ2Dy/2018.

different position within the company.  While employees may discuss pay raises or bonuses with

their Team Leader, Bureau Chief, or Human Resources, the decisions on compensation,

including pay raises and bonuses, are made by the Editorial Management Committee.  Indeed,

when Plaintiff Syeed made a lateral move to a position with the Washington Bureau, she

discussed the compensation with HR who told her that the pay decision was coming from New

York, indicating the Editorial Management Committee.  The decision on whether Plaintiff Syeed

would be reimbursed for her move from Dubai to D.C. was made personally by Reto Gregori of

the Editorial Management Committee, which he denied.

### CLASS ALLEGATIONS

43.     Plaintiffs Syeed and Ndugga seek certification of a class pursuant to Rule 23, Fed.

R. Civ. P., comprised of all female Reporters, Producers, and Editors (as well

as female employees doing functionally similar work under other titles), who were not Team

Leaders or in other supervisory positions, who were, are, or will be subjected to Defendant's

promotion and compensation systems at any time from January 18, 2020 through the date of

trial, and who were based in a News Bureau located within the United States, or were US

Citizens based in a News Bureau located outside the United States.

44.     Plaintiffs Syeed and Ndugga seek certification of a New York subclass pursuant

to Rule 23, Fed. Civ. P., comprised of all female Reporters, Producers, and Editors (as well

as female employees doing functionally similar work under other titles), who were not Team

Leaders or in other supervisory positions, who were, are, or will be subjected to Defendant's

promotion and compensation systems at any time from August 9, 2017 through the date of trial,

and who resided or reside in the state of New York, or who work, sought to work, or worked for

Bloomberg Media within the State of New York, regardless of their residence.

45.     Plaintiffs reserve the right to revise the definition of the classes based upon information learned after the filing of this action.

46.     Plaintiffs bring these claims on behalf of themselves and the proposed classes under Federal Rules of Civil Procedure 23(a), (b)(2) for their requests for declaratory and injunctive relief only, and (b)(3) for their requests for damages.  The proposed classes satisfy the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those rules.

47.     **Numerosity**: The proposed classes are so numerous that the joinder of all such persons is impracticable, and the disposition of their claims as a class will benefit the parties and the Court.  Upon information and belief, approximately 1000 women would qualify as members of the proposed class, and approximately 300 women would qualify as members of the proposed New York subclass.  Membership in the class is ascertainable from Defendant's HR records.

48.     **Commonality**: Plaintiffs and all members of the classes have been subjected to promotion, evaluation, and compensation decisions using the unlawful practices alleged herein and, therefore, one or more questions of law or fact are common to the class.  These common questions include, but are not limited to, the following:

   a.     whether Defendant's Editorial Management Committee discriminated against female Reporters, Producers, and Editors;

   b.     whether Defendant's common policies, including its reliance on prior salary in setting starting pay, have had an adverse impact on the class, and if so, whether such impact can be justified by business necessity;

   c.     whether the class may obtain injunctive and other equitable remedies, as well as an award of damages.

   d.     whether Defendant has acted with malice or reckless indifference to the protected rights of Plaintiffs and class members, such that punitive damages should be awarded.

49.     **Typicality**: Plaintiffs and members of the classes were subjected to the same unlawful policies, practices, and procedures and sustained similar losses, injuries, and damages.

All class members were subjected to the same compensation practices by Defendant, as alleged herein, that resulted in their being paid less than similarly situated male Reporters, Producers, and Editors.  All class members were subjected to the same promotion, and evaluation practices by Defendant, as alleged herein, that result in their being placed in lower ranked positions and denied promotions, when compared to similarly situated male Reporters, Producers, and Editors. Plaintiffs' claims are therefore typical of the claims that could be brought by any member of the class, and the relief sought is typical of the relief that could be sought by each member of the class in separate actions.

50.    **Adequacy of Representation**: Plaintiffs are able to fairly and adequately protect the interests of all members of the classes, as they are challenging the same practices as the class as a whole, and there are no known conflicts of interest between Plaintiffs and the members of the class.  Plaintiffs have retained counsel who have extensive experience with the prosecution of discrimination claims and complex class-action litigation.

51.    This action is properly maintainable as a class action under Rule 23(b)(2), Fed. R. Civ. P., because the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

52.    The class action is also properly maintainable pursuant to Rule 23(b)(3) because the questions of law and fact common to members of the class predominate over questions affecting only individual members and a class action is superior to other available methods for the fair and efficient resolution of this controversy.

53.    Pursuit of this action as a class would provide the most efficient mechanism for adjudicating the claims of Plaintiffs and the members of the class.

## NAMED PLAINTIFF ALLEGATIONS

### Nafeesa Syeed

54.     Plaintiff Syeed was highly qualified for reporter and editor positions at Bloomberg Media, having earned her Bachelor of Arts, double majoring in Arabic and Government from Georgetown University, Magna Cum Laude, in 2004.  In 2006, she earned her Master of Arts in Comparative Literature with distinction in Modern Arabic and South Asian languages from the School of Oriental and African Studies at the University of London and had worked for major news outlets before becoming employed by Bloomberg.  Plaintiff Syeed is an award-winning writer, editor and multimedia producer with more than 16 years of full-time experience on four continents in spot news and enterprise reporting, editing and producing.

55.     At all relevant times during her employment, Plaintiff Syeed performed her duties in a satisfactory and/or exemplary manner.

56.     Plaintiff Syeed began applying for positions at Bloomberg Media in 2012.  She was hired effective October 19, 2014, as a Gulf Economy and Government Reporter in Defendant Bloomberg's Dubai News Bureau.

57.     Plaintiff Syeed produced breaking news and features from within the United Arab Emirates ("U.A.E."), including daily Yemen war spots and analysis reporting, chronicling Gulf Cooperation Council security and foreign policy beats amid multiple regional conflicts, coverage of the rise of the Islamic State and the Syrian war, and more.  She appeared on Bloomberg television and spoke on Bloomberg Radio programs.

58.     In the Dubai Bureau, Plaintiff Syeed reported to Team Leader Alaa Shahine.  On nearly a daily basis, Mr. Shahine berated the female reporters at the Dubai Bureau. Mr. Shahine, who sat beside Plaintiff on the news desk, would waive his arms at her and the other female reporters as he raised his voice louder.  He did not raise his voice or speak in such a hostile

manner towards male reporters and editors.  Mr. Shahine was so abusive, that on several

occasions Ms. Syeed ended up crying in the bathroom, and when she returned to her desk teary

eyed and clearly upset, he admonished her: "Don't take it like that."  However, he never

modified his behavior.

59.     Managing Editor Riad Hamade, the man to whom Mr. Shaine reported, was

known by Plaintiff Syeed to favor Mr. Shahine, and this favoritism deterred Plaintiff from

lodging any formal complaint against Mr. Shahine.  However, after she obtained a position in

another News Bureau, Plaintiff Syeed received a request to provide a manager evaluation of Mr.

Shahine. As she was then out of reach of his retaliation, she submitted a manager evaluation in

which she critiqued his tendency to shout at and berate female employees and suggested he work

on his anger management.  While she submitted this review through Defendant Bloomberg's HR

portal, HR never contacted Plaintiff Syeed to investigate her complaint.

60.     Another member of the team, Senior Editor Inal Ersan, in addition to making

demeaning remarks to several women on the team, as noted above at ¶ 25, also made racist

comments.  On one occasion, Mr. Ersan stated to Plaintiff Syeed, "You know all those Africans

they brought on the boats? They should've just drowned them in the ocean." He then made a

hand gesture as if dropping something down. He stated drowning would have been "better" for

the Africans than what happened to them in America. Plaintiff's then fiancé, current husband, is

African American. Plaintiff was appalled and her jaw dropped in reaction to this comment.  She

implored him: "You can't say that." Mr. Ersan did not reply.

61.     In or about October 2015, Plaintiff Syeed informed Defendant Bloomberg that she

had gotten married and needed to relocate.  She advised Bloomberg management that she was

planning to apply to positions within Defendant Bloomberg's New York and/or Washington,

D.C. Bureaus due to her husband's job location, but she also sought to leave the Dubai Bureau's toxic work environment.

62.     From November 27, 2015 to December 4, 2015, Plaintiff Syeed traveled to Defendant Bloomberg's New York and Washington, D.C. Bureaus for meetings in the hopes of furthering her career in foreign policy. Plaintiff met with Tom Giles, Executive Editor of the Tech Team, of Defendant Bloomberg's New York Bureau and met various New York Editors including, Flavia Krause-Jackson, Editor, European Government and Brexit, Bloomberg Media.

63.     While in New York, Plaintiff Syeed also met with Laura Zelenko, Senior Editor in Defendant Bloomberg's New York Bureau, and other Bloomberg Editors to discuss her interest in any open positions, including covering Foreign Policy or the United Nations.  Plaintiff Syeed had been advised there might be an opening to cover the United Nations, as the previous reporter had departed a few months prior.

64.     From January-February 2016, Plaintiff Syeed applied for the Washington Bureau's Foreign Policy reporting position, which was viewed as a promotion.  It was posted internally and then publicly listed online on February 2, 2016.  She did not receive this position, instead a man, Nick Wadhams, was selected.

65.     Plaintiff Syeed also applied for a Digital Features/Longform Editor position, and was interviewed on March 8, 2016, by Thomas Houston, Deputy Editor overseeing digital innovation. Plaintiff highlighted her multimedia experience and background in longform journalism both in documentary and narrative nonfiction during her interview. She was not offered this position, which would have been in New York.  She interviewed for many other positions in New York, without success.

66.     However, on March 11, 2016, Plaintiff Syeed interviewed with Craig Gordon,

then Washington, D.C. Managing Editor, and ultimately obtained a position in the DC Bureau, where she began working on March 20, 2016.  Her exact position there was initially very broadly defined to include technology, national security, and foreign policy.  Shortly after her transfer to DC, she met with Bill Faries, the Team Leader for the new National Security Team, who told her she was among the top five finalists for the Foreign Policy reporting position she was interested in.  However, when she had further interviews she understood were follow up for the Foreign Policy position, Managing Editor Craig Gordon asked Plaintiff Syeed her opinion on cybersecurity reporting, confusing Ms. Syeed as this was inconsistent with her understanding she was being evaluated for the Foreign Policy position.  In a subsequent meeting with Mr. Faries and Bureau Chief Murphy, they confirmed to Plaintiff Syeed that she was not given the Foreign Policy position, but instead was being asked to cover cybersecurity, as the man who had covered that beat has been promoted to a National Security reporter position covering the Department of Justice.

67.     As she had in Dubai, Plaintiff Syeed appeared regularly on Bloomberg Television and Bloomberg Radio for live, on-air hits as well as participated in other TV networks' shows. She also moderated panels at Bloomberg Government events and Washington think tanks.

68.     Later in 2016, after Ms. Murphy moved to a position in New York, Bloomberg's National Security Team in DC was comprised entirely of men, except Plaintiff Syeed: Bill Faries, Team Leader, Larry Liebert, Senior Editor, Nick Wadhams, State Department reporter, Chris Strohm, Department of Justice reporter, Kambiz Foroohar, UN reporter and Tony Capaccio, Pentagon reporter.  Nick Wadhams, assigned to the State Department, received the Foreign Policy position that Plaintiff had applied for.  In November 2016, Wes Kosova, a white male, was appointed to the Washington, D.C. Bureau Chief position that Ms. Murphy had

vacated.

69.     Plaintiff Syeed regularly worked on foreign policy stories, including many with Kambiz Foroohar, who was based in New York, covering the UN.

70.     Given Plaintiff Syeed's lateral move to Defendant Bloomberg's D.C. Bureau, HR representative Tamika Alexander informed Plaintiff Syeed she would attempt to make her current salary "more in line" with salaries in the D.C. Bureau.  However, Plaintiff learned that her pay still lagged far behind male reporters, and that, on average, male reporters were earning at least 20% higher salaries than women.

71.     In the D.C. Bureau, Plaintiff Syeed was assigned a desk beside fellow female reporter, Saleha Mohsin. Defendant Bloomberg male team members and supervisors – including Bureau Chief Craig Gordon – often confused Plaintiff Syeed with Ms. Mohsin, who was also of South Asian descent.  The two women were of the same race but look nothing alike.  Plaintiff Syeed  has long black curly hair, while Ms. Mohsin has shorter brown hair. The two women also covered two different areas of news. Nonetheless, Plaintiff Syeed was often addressed as "Saleha," was asked about stories Ms. Mohsin was working on, when they were not even on the same team, and New York TV producers sent notes to Plaintiff Syeed's supervisor asking for Saleha for a live spot, when they meant Ms. Syeed.

72.     Plaintiff Syeed overheard male Editors make derogatory remarks against female minority employees, deriding their professional acumen and skill.  Similarly, Plaintiff Syeed's work was routinely overlooked and undervalued, and she was marginalized in favor of male reporters and editors.

73.     For example, she met with a Bloomberg Businessweek editor, Peter Waldman, who was working on an article about an Arab-Israeli lawmaker and was interested in an angle

related to a story she had been reporting under Senior Editor Ethan Bronner in New York. She shared the information she had gathered with Waldman.  Later, she saw Mr. Waldman's article that solely focused on the angle she had been reporting, not what he had originally represented he was writing about.  Indeed, that publication of the Waldman article made her own project duplicative, and it was not published.

74.     On another occasion, in or about April 2018, Matt Philips, D.C. Bureau Businessweek Editor, insisted he accompany Plaintiff Syeed to a high-profile interview Plaintiff Syeed had arranged with the No. 3 ranked individual within the CIA at that time.  Mr. Philips and Plaintiff Syeed had agreed prior to the meeting that she would lead the interview since the CIA was within her beat, and she had secured the interview.  However, Mr. Philips commandeered Plaintiff Syeed's interview only allowing her to ask a few questions. After the interview, Plaintiff Syeed composed a long piece demonstrating the curious and critical relationship this individual had within the Trump administration. Mr. Philips expressed he thought the draft was "great," but the story was ultimately cut in such a way that it became a puff piece, which it was never meant to be.  This deprived Plaintiff Syeed of the opportunity to demonstrate the full range of her skill in her published work.

75.     Further, Plaintiff Syeed was often excluded from Defendant's news roundtables with high-profile sources, even if Plaintiff Syeed was covering the individual or story.  And on occasions when she was included, men would speak over her when she tried to ask questions.

76.     Plaintiff Syeed continued to be paid well below the level of her male peers. During her 2017 mid-year review, her manager, Mr. Faries informed Plaintiff Syeed she could ask for a 5% raise during her year-end review.  He revealed he was not supposed to invite such requests, but he felt she was doing a good job and a 5% increase would be a reasonable request.

However, when Plaintiff Syeed met with him for her 2017 year-end review and requested the raise, Mr. Faries stated it was now "too late" to ask for a raise, and thus he would not even pass on the request.  Plaintiff reminded him of his prior statements, and he said that she should have specifically asked for the raise in her written self-evaluation that went to HR and her manager before the manager completed his review.  Plaintiff Syeed had never previously been informed that self-evaluations were the method of requesting salary raises.

77.     In late January 2018 to early February 2018, Mr. Faries met with Plaintiff Syeed to discuss her future career at Bloomberg and asked her if there were a specific area she wanted to cover, which ignored that she had consistently expressed her interest in Foreign Policy.  He acknowledged that over the previous year she had been assigned to cover so many different topics outside of her specific beat and affirmed Plaintiff's expressed feeling that she was being asked to serve as a "jack of all trades, master of none."  These constantly shifting assignments to cover breaking news prevented Plaintiff Syeed from developing deeper expertise within a beat. This impeded her promotion, as male executives judged reporters based on scoops and depth of sourcing within institutions, rather than coverage of breaking news.

78.     While Mr. Faries suggested to Plaintiff that Bloomberg was offering her a rare opportunity, as it seldom asked reporters what they want to cover, but in fact Plaintiff Syeed regularly saw male reporters having their preferred beats assigned to them.  Mr. Faries suggested Ms. Syeed choose between "Middle East" or election security beats. Plaintiff Syeed informed him that she would like to cover Middle East and Foreign Policy from the D.C. Bureau, and she began conducting interviews and developing story ideas on this beat.  Suddenly, however, Mr. Faries retracted his support and advised Plaintiff Syeed that Craig Gordon, D.C. Bureau Chief wanted her to only cover election security between Spring and the Midterm elections and not to

do work on anything Middle East-related.  Ben Holland, a male Editor who Plaintiff Syeed often worked with on Middle East-related stories, confided that he was instructed to stop talking to Plaintiff Syeed and that if he were seen speaking with Plaintiff Syeed, he would be reprimanded by senior management.  Plaintiff Syeed was also informed by Editors in the Dubai Bureau that they were instructed to no longer contact her about anything Middle East-related, which is Plaintiff Syeed's area of expertise.

79.     In March 2018, Defendant Bloomberg UN reporter, Kambiz Foroohar abruptly left his position.  When Mr. Faries shared this information directly with Plaintiff Syeed, she asked him if he was filling the position.  He expressed surprise, asking "Why, are you interested?" which ignored her regularly expressed interest in foreign policy, which they had discussed just a couple months before.  Plaintiff Syeed affirmed her interest in the New York-based UN reporter job.

80.     Plaintiff Syeed's work was also hindered because Defendant ignored her repeated technology requests for secure communication tools that were needed to maintain confidentiality and trust with her sources.  Favored male members of the newsroom were granted access to Defendant Bloomberg's secure communications equipment, but she was denied.

81.     From April 2018 to in June 2018, Plaintiff Syeed was immersed in the election security beat, and completely shut out of Middle East coverage. She realized there was no career path for her in the D.C. Bureau after the November elections and continued to apply for various positions within Defendant Bloomberg's New York Bureau, which her Team Leader, Mr. Faries was notified about.

82.     In April 2018, Plaintiff Syeed applied for the New Economy Forum Editor position, among others, in New York. She also inquired multiple times about the UN reporting

position that had been vacated in March.  Mr. Faries repeatedly said it was unclear if the Editorial Management Committee would refill the post, or close the UN bureau.  However, soon thereafter, the position was filled by a male reporter, David Wainer, who had two years less experience than Plaintiff in the field of journalism and lacked a master's degree that she possessed.  Plaintiff Syeed asked Mr. Faries why she was not considered for the UN reporting position. Incredibly, he claimed that "You never expressed you wanted to cover foreign policy." This was plainly false, as Plaintiff Syeed and Mr. Faries had multiple discussions over the past several months about her interest in foreign policy in general, and the UN reporting position in particular.[15]  Mr. Faries reprimanded Plaintiff Syeed, claiming she had not advocated for herself, as was necessary to advance at Bloomberg – a statement entirely at odds with her numerous conversations with him and other managers regarding her interest in foreign policy.  Moreover, when Plaintiff Syeed went on to advocate for herself, expressing her ambition to cover foreign policy, Mr. Faries discouraged her.

83.    Plaintiff Syeed had a similar conversation with Mike Shepard, Managing Editor, in June 2018.  She complained about not being considered for the UN position, and asked why she had not been; Mr. Shepard had no explanation, but asked her about her ambitions and, like Mr. Faries, extolled the need to advocate for herself, speaking dismissively to her, yet also getting upset with her in response to her advocacy for herself in that conversation.  However, Plaintiff Syeed observed that her male co-workers, including Mike Shepard, Wes Kosova, Craig Gordon and Bill Faries, all were promoted after being employed by Defendant Bloomberg for

---

[15] Moreover, the reason given for selecting the male reporter was his need to move to a position based in the United States.  However, when Plaintiff Syeed had to relocate to the US because of her husband's job location, she was not given similar priority to fill whatever position she wanted.

the same amount of time as Plaintiff, without having to "advocate" for themselves in the manner Defendant Bloomberg imposed upon its female employees.  Plaintiff Syeed, like other women at Bloomberg Media, was expected to work harder than her male co-workers to be considered for the same promotion or opportunity.

84.     During this same conversation, Plaintiff Syeed also raised the issue that Defendant Bloomberg did not employ any women of color in senior roles at the D.C. Bureau. Mr. Shepard conceded that fact and commented that during his employment with the Washington Post, the media outlet did a better job in building diversity than Bloomberg.  Mr. Shepard explained that Defendant Bloomberg considered making the New York UN job a "diversity slot," but it "didn't work out that way."  Plaintiff Syeed asked Mr. Shepard what was meant by a "diversity slot," and expressed her understanding that rather than being considered for any vacant positions she applied for, she was effectively limited to the positions designated as "diversity slots," which limited her opportunity for advancement.  Mr. Shepard claimed that "diversity slots" were Defendant Bloomberg's attempt to have diversity in the newsroom, but did not explain how limiting diverse candidates to certain slots promoted real diversity.  Ms. Syeed explained that she did not want to be treated as a "token" employee, and recounted racist and sexist comments and the hostile work environment she endured during her employment with Bloomberg.  She pointed out that there were no minority women in leadership roles, and said she felt like she had no future in the bureau or Bloomberg Media overall.

85.     Plaintiff Syeed's experience was similar to that of other women of color.  For example, in 2019, Shayla Gibson, a Spelman College graduate and former Bloomberg employee, wrote a letter to the president of the historically Black college, urging the college to cease cooperating in Defendant Bloomberg's recruitment efforts, describing Defendant Bloomberg as a

"toxic and demoralizing system," and stating, "The experiences shared with me range from being solicited for sexual favors to get ahead, to  young women in their first year of work taking medical leave based on their severe emotional and mental stress experienced at the organization. Bloomberg LP will spend money investing in unconscious bias conversations but fail to acknowledge the conscious decision-making had by a select few that continue to marginalize people of color at the company."[16]

86.     Despite the vast nature and number of reported discriminatory internal complaints, Defendant Bloomberg has consistently denied receiving any harassment internal complaints and therefore absolves itself of changing its culture through effective supervision and training from its top, down.[17]

87.     On June 6, 2018, Plaintiff Syeed met with the Head of D.C. HR, Tamika Alexander, and went over the racist and sexist culture of Defendant Bloomberg Media, including Mr. Shepard's reference to "diversity slots."  During her meeting with Ms. Alexander, Plaintiff Syeed stated, "I am probably not telling you anything you do not already know."  Ms. Alexander put her head down and responded, "Sadly, yes."  Ms. Alexander was all too aware of Bloomberg's history of discrimination, as she previously complained to the EEOC about sex discrimination she suffered following her return from pregnancy leave.  Ms. Alexander explained that Defendant Bloomberg's management was likely attempting to cover themselves by asking Plaintiff what her ambitions were after failing to consider her for the New York UN position. Ms. Alexander stated she would speak with Mr. Gordon, DC Bureau Chief, to see what could be done, and instructed Plaintiff to inform Laura Zelenko, recently named Senior Executive Editor

---

[16] Einbinder and Campbell, *Bloomberg News' former Washington editor*, supra.

[17] *Id.*

for Diversity, Talent, Standards and Training at Bloomberg Media in the New York office, of her concerns.

88.     Two days later, on June 8, 2018, Plaintiff Syeed informed Mr. Faries she could no longer work at Defendant Bloomberg due to the disparate treatment she had experienced. During this conversation, Mr. Faries referred to Plaintiff as a "young reporter," despite Plaintiff's news reporting experience and being close to 40-years-old.  Plaintiff Syeed next met with Mr. Shepard to inform him of her departure from the company, and he responded that her news was unexpected.  Mr. Shepard inquired if he could have done anything differently during Plaintiff Syeed's employment.  But he quickly turned to pressing Plaintiff Syeed about where she would be working next, and whether it was for a competitor.

89.     Mr. Gordon emailed Plaintiff Syeed reiterating that he wanted her to remain on the cybersecurity beat, although Ms. Alexander called Plaintiff to advise her that she had spoken to Mr. Gordon, and that Bloomberg was now considering allowing Plaintiff to perform her current job from New York.

90.      On June 8, 2018, Plaintiff Syeed was constructively discharged from Defendant.

91.     While Plaintiff Syeed performed her work in an exemplary fashion, as evidenced, among other things, by Senior Executive Editor Wes Kosova calling Plaintiff to ask if there was anything Bloomberg could do to keep her employed, and other editors reaching out to Plaintiff after her departure to ask her to work on a freelance basis.  However, given the hostile environment, consistent demeaning treatment, denial of every promotion she had sought, denial of equal pay, and consistent elevation of white men, Ms. Syeed was left with no other choice.

### Naula Ndugga

92.     Plaintiff Ndugga graduated in 2017 from Appalachian State University, where she double majored in Journalism and Political Science with a concentration in International and

Comparative Politics. She received a minor in French and Francophone Studies.

93.     Plaintiff Ndugga began working for Bloomberg L.P. in September 2017 as an intern. On January 29, 2018, she was hired as a News Producer and accepted a full-time offer of employment in Bloomberg L.P.'s Media Division, Quicktake department (formerly TicToc), which remains her current position. Her duties included organizing live conversations on market moving news for Bloomberg's Terminal TOP Live Desk.

94.     When Plaintiff Ndugga was hired in October 2017 as a paid intern, she earned $25 per hour.  Upon becoming hired as a full-time employee, she was paid an annual salary of $65,000.  However, male producers who were hired out of the same internship program as Ms. Ndugga were paid a starting salary of $75,000 – a $10,000 difference.

95.     The following male team members received increased compensation for performing similar job duties: David Meyers, Will Shaker, Andrew Mach, Angelo Spagnolo, Brian Wall, Henry Seltzer, Alexander Gittleson, Andrew Barden, Baldwin Tang, Brandon Smith, James Bullock, John Jones, Kyle Rollins, Marc Daniel Davies, Matthew Albani, Owen Franks, Tim Stenovec and Ryan Cavataro.

96.     Despite receiving positive feedback from her Manager, Andre Pierre du Plessis, Plaintiff Ndugga has repeatedly been overlooked for raises, promotions, favorable assignments, professional growth, and opportunities that were given to her male peers.

97.     Plaintiff Ndugga received one raise in three years in 2018, when her salary was increased to $66,500 annually, still far less than the *starting* salary of her male peers and even more so compared to their contemporaneous pay rates after their subsequent raises and bonuses.

98.     In 2018, Ms. Ndugga was denied a bonus and only given half her bonus in 2019 despite receiving positive performance evaluations.

99.     In 2019, Ms. Ndugga did not receive any raise in salary despite receiving positive feedback from her Manager, Mr. du Plessis, Senior Producer, a South African male who recommended her for a raise and bonus. However, the ultimate decisionmakers on the Editorial Management Committee denied Ms. Ndugga equity in her compensation compared to her male peers.

100.     In addition to compensation, Plaintiff Ndugga did not receive benefits made available to her male peers.  For example, male employees were permitted to use certain technology at home for work assignments, but when Ms. Ndugga requested remote-work resources, they were not afforded to her. Her request to attend French and Arabic language classes to maintain her fluency in multiple language was refused, even though such language skills could benefit Bloomberg Media, and the company supported other employees in such pursuits.

101.     Plaintiff Ndugga reported these disparities in treatment to Human Resources, who merely defended management's decisions.

102.     In the Fall of 2019, Team Leaders, including Mindy Massucci, Head of Global, and Andrew Barden, Executive Producer, assigned each of the reporters to cover thematic areas. Although her male peers were consulted about which topics they wanted to cover, Plaintiff Ndugga was not consulted.  Instead, Ms. Ndugga was assigned to cover "scraps" – subjects no one else wanted, which were generally considered less desirable assignments that provided fewer opportunities for career advancement. Ms. Ndugga's differential treatment garnered the attention of several colleagues, who raised concerns about the assignments with Mindy Massucci, Head of Global Content at Bloomberg Quicktake.  However, Ms. Ndugga continued to receive less favorable assignments than her male peers.

103.    In February 2020, Plaintiff Ndugga was again denied a raise in salary. Her manager, Mr. du Plessis had given her positive feedback on her work and told her that he recommended that she receive a raise.  When she learned that she would not receive a raise, Ms. Ndugga asked for a reason from Ms. Massucci, who responded that Bloomberg L.P. could not afford raises for her news division. However, several of Ms. Ndugga's male peers informed her that they had received raises. One man who received a raise and promotion was Brian Wall, a producer who began his employment at the same time as Ms. Ndugga for the same position, with similar education, who was promoted to senior producer.

104.    In March 2020, Plaintiff Ndugga discussed with Ms. Massucci her interest in promotion to fill a position specifically focusing on race and identity to guide the team. Other team members voiced their support for the creation of the position and suggested Ms. Ndugga be selected.  Ms. Massucci responded that she would think about it.  However, Mr. Meyers, Executive Producer and Alexander Gittleson, Senior Producer reporting to Ms. Massucci on separate occasions expressed to Ms. Ndugga there was no point in creating that role and promoting her if she already filled that role by being a Black woman on the team.  The position was not created.

105.    Plaintiff Ndugga was also subjected to a hostile work environment based upon her sex and race. For example, two White senior team members, David Meyers, Executive Producer and Claire Obusan, Senior Editor would opine regularly on Black culture and issues, making pronouncements such as that Black people should not criticize Bruno Mars or asking Black team members whether it was appropriate for them to refer to February as Black history month. Ms. Ndugga and her female Black colleagues were particularly offended by their racially derogatory and insensitive comments.

106.    For example, Ms. Ndugga noticed a news video produced by her team on marathons around the world which showed clips of actual marathons from various countries depicting coverage of images of White people in a positive light. However, the coverage of Uganda depicted an image of a young White woman holding seemingly impoverished Black Ugandan children. Ms. Ndugga asked Mr. Meyers why that image was chosen, hoping to discuss the issue, but he instead got really angry and yelled at Ms. Ndugga, throwing his headphones in her direction, standing over her and demanding that she step outside the room and talk to him privately. Shocked by his aggression, Ms. Ndugga calmly responded that she was not feeling safe enough to have a conversation with him in his state. He kept pushing her to leave the room with him and eventually stormed out of the room.  Two other peers, Marina Stanley and Andrew Mach, were in the room to witness this verbal altercation and corroborated her account. Ms. Ndugga left the room in fear of her male supervisor. However, when she reported this altercation to the Division Head, Ms. Massucci, Ms. Massucci refused to acknowledge any wrongdoing by Mr. Meyers.

107.    The following morning after Mr. Meyers' explosion at Ms. Ndugga, he emailed her stating she could report him to HR and his manager if she felt so inclined. Mr. Meyers also conveyed a fabrication to his direct supervisor, Ms. Massucci, Ms. Obusan and Ms. Ndugga's peers that Ms. Ndugga had raised her voice, was aggressive towards him and depicted her as an "angry Black woman."

108.    After this incident, Mr. Meyers ignored Ms. Ndugga, isolated her from meetings and left her off team emails resulting in other team members having to forward emails to Ms. Ndugga so she would be aware of information needed for her job. When Mr. Meyers did acknowledge her, it would be to berate her intelligence and worth as a Black female member of

the team. She repeatedly complained to Ms. Massucci about the retaliation she experienced after reporting this incident with Mr. Meyers, but Ms. Massucci again refused to do anything to protect her.

109.    On May 29, 2020, Plaintiff Ndugga was scheduled to host an on-camera interview with one of her sources to discuss the death of George Floyd. Ms. Ndugga had booked her guest speaker and had undergone the training required for the live interview. However, without explanation, Ms. Ndugga was denied this opportunity, and the interview was canceled. When she complained to Ms. Massucci about the denial of opportunity and explained that this had become a pattern of mistreatment, Ms. Massucci responded that she supported the decision by the male Executive Producer, Andrew Barden, that only "certain people" were qualified to conduct live interviews. However, Ms. Ndugga was aware that this was an untrue statement since other male producers had not gone through any training, yet were permitted to conduct live interviews. Ms. Ndugga also complained, along with her Black female colleagues, about the lack of coverage regarding George Floyd's death. Despite their complaints, Executive Producer Mr. Barden declined to provide coverage on the topic.

110.    In 2020, Bloomberg's Editorial Management Committee has repeatedly refused to cover racial topics – despite many being top news stories over the year– saying they didn't want to "become the race channel."  Nonetheless, Ms. Ndugga was asked many times by the Global Head, Ms. Massucci, who reported directly to the all-White male Editorial Management Committee, to recount her own  trauma, as a Black female to "help guide the team," only to be trivialized and mislabeled.  Indeed, the term "colored" has been used to refer to Black people in news scripts, even after review by Executive and Senior Editors and Ms. Ndugga's repeated warning that such usage is inappropriate and offensive. On July 14, 2020, Ms. Ndugga's team

had a conference call with the Editorial Management Committee, Mr. Micklethwait and Mr. Schenker, about coverage topics. Ms. Ndugga asked about Bloomberg L.P.'s efforts to diversify coverage and brought up the internal pay gap and holding managers responsible for discriminatory acts. Mr. Micklethwait denied the pay gap existed and dismissed her by talking over her and changing the subject.

## CAUSES OF ACTION

### COUNT ONE
**Violation of Title VII, 42 U.S.C. § 2000e, *et seq*.**
**(Disparate Treatment on behalf of class)**

111.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 110.

112.    This claim is brought by Plaintiffs on behalf of the proposed class.

113.    The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, and constitutes a continuing violation of that Act. Defendant has engaged in a pattern or practice of intentional discrimination against its female Reporters, Producers, and Editors in promotions, evaluations, and compensation.

114.    The promotion, evaluation and compensation decisions were made by a small group of decisionmakers, the Editorial Management Committee.

115.    Defendant's discriminatory practices described above have denied members of the class promotions into positions for which they were well qualified and compensation to which they are entitled, which has resulted in the loss of past and future wages and other job benefits.

116.    The conduct described above caused the members of the class emotional harm and other forms of harm proximately caused by Defendant's discriminatory conduct.

117.    Defendant acted or failed to act as herein alleged with malice or reckless indifference to the protected rights of Plaintiffs and class members. Plaintiffs and class members are thus entitled to recover punitive damages in an amount to be determined according to proof.

118.    Plaintiffs request relief as provided in the Prayer for Relief below.

**COUNT TWO**
**Violation of Title VII, 42 U.S.C. § 2000e, *et seq.***
**(Disparate Impact on behalf of class)**

119.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 110.

120.    This claim is brought by Plaintiffs on behalf of the proposed class.

121.    The conduct described above violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, and constitutes a continuing violation of that Act.

122.    Defendant has maintained a system for promoting, evaluating, and compensating Reporters, Producers, and Editors that has had an adverse impact on the class.  A small group of decisionmakers, the Editorial Management Committee, working closely together, and steeped in a common culture, exercise discretion over promotions, evaluations, and compensation.  Further, Defendant bases starting salary on the salary received by new hires at their prior jobs.

123.    Defendant has failed to create or maintain the data that would allow analysis of the impact of each of these policies and practices separately.  For example, the prior pay and any other factors considered in setting starting pay are not maintained in HR data, which reflects only the actual starting pay rate.  Accordingly, the entire decision-making process for the challenged decisions may be analyzed as one employment practice.  42 U.S.C. § 2000e-2(k)(1)(B)(i).

124.    The reliance on prior pay to establish salary is not job related or consistent with business necessity.  Permitting the Editorial Management Committee to alter the evaluation ratings of class members is not job related or consistent with business necessity, as the Editorial

33

Management Committee is not familiar with the performance of the employees whose ratings they direct be changed. Vesting the Editorial Management Committee with unfettered discretion to make promotion, and compensation decisions is not job related or consistent with business necessity. There are less discriminatory alternatives which would address Defendant's business needs more effectively than its current practices.

125.     Defendant's discriminatory practices described above have denied the class members promotions into positions for which they were well qualified and compensation to which they are entitled, which has resulted in the loss of past and future wages and other job benefits.

126.     The Plaintiff class requests relief as provided in the Prayer for Relief below.

## COUNT THREE
### Violation of New York Human Rights Law
### (Disparate Treatment on behalf of New York subclass)

127.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 110.

128.     This claim is brought by Plaintiffs on behalf of the proposed New York subclass.

129.     The foregoing conduct violates the New York Human Rights Law, N.Y. Exec. Law §§ 290-301 (Consol. 2020). Defendant has engaged in a pattern or practice of intentional discrimination against its female Reporters, Producers, and Editors in promotions, evaluations, and compensation.

130.     The promotion, evaluation and compensation decisions were made by a small group of decisionmakers, the Editorial Management Committee.

131.     Defendant's discriminatory practices described above have denied members of the class promotions into positions for which they were well qualified and compensation to

which they are entitled, which has resulted in the loss of past and future wages and other job benefits.

132.   The conduct described above caused the members of the class emotional harm and other forms of harm proximately caused by Defendant's discriminatory conduct.

133.   Defendant acted or failed to act as herein alleged with malice or reckless indifference to the protected rights of Plaintiffs and class members. Plaintiffs and class members are thus entitled to recover punitive damages in an amount to be determined according to proof.

134.   Plaintiffs request relief as provided in the Prayer for Relief below.

**<u>COUNT FOUR</u>**
**Violation of New York Human Rights Law**
**(Disparate Impact on behalf of New York subclass)**

135.   Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 110.

136.   This claim is brought by Plaintiffs on behalf of the proposed New York subclass.

137.   The conduct described above violates the New York Human Rights Law, N.Y. Exec. §§ 290-301.

138.   Defendant has maintained a system for promoting, evaluating, and compensating Reporters, Producers, and Editors that has had an adverse impact on the class.  A small group of decisionmakers, the Editorial Management Committee, working closely together, and steeped in a common culture, exercise discretion over promotions, evaluations, and compensation.  Further, Defendant bases starting salary on the salary received by new hires at their prior jobs.

139.   Defendant has failed to create or maintain the data that would allow analysis of the impact of each of these policies and practices separately.  For example, the prior pay and any other factors considered in setting starting pay are not maintained in HR data, which reflects only

the actual starting pay rate.  Accordingly, the entire decision-making process for the challenged decisions may be analyzed as one employment practice.  42 U.S.C. § 2000e-2(k)(1)(B)(i).

140.    The reliance on prior pay to establish salary is not job related or consistent with business necessity.  Permitting the Editorial Management Committee to alter the evaluation ratings of class members is not job related or consistent with business necessity, as the Editorial Management Committee is not familiar with the performance of the employees whose ratings they direct be changed.  Vesting the Editorial Management Committee with unfettered discretion to make promotion and compensation decisions is not job related or consistent with business necessity.  There are less discriminatory alternatives which would address Defendant's business needs more effectively than its current practices.

141.    Defendant's discriminatory practices described above have denied the class members promotions into positions for which they were well qualified and compensation to which they are entitled, which has resulted in the loss of past and future wages and other job benefits.

142.    The Plaintiff class requests relief as provided in the Prayer for Relief below.

**COUNT FIVE**
**Violation of New York Human Rights Law**
**(Disparate Treatment)**
**Brought by Plaintiff Nafeesa Syeed and Naula Ndugga on behalf of themselves**

143.    Plaintiffs Syeed and Ndugga repeat and reallege the allegations contained in paragraphs 1 through 110.

144.    This claim is brought by Plaintiff Syeed and Plaintiff Ndugga on behalf of themselves only.

145.    The foregoing conduct violates the New York Human Rights Law, N.Y. Exec. §§ 290-301.

146.    Defendant discriminated against Plaintiffs Syeed and Ndugga on the basis of race and on the basis of sex in denying them promotions, setting their compensation, and creating a hostile work environment.

147.    As a result of Defendant's discriminatory actions, Plaintiffs Syeed and Ndugga have suffered damages, including both economic losses and emotional distress, and each seeks relief as set forth in the Prayer for Relief.

**COUNT SIX**
**Violation of New York City Human Rights Law**
**(Disparate Treatment)**
**Brought by Plaintiff Nafeesa Syeed and Naula Ndugga on behalf of themselves**

148.    Plaintiffs Syeed and Ndugga repeat and reallege the allegations contained in paragraphs 1 through 110.

149.    This claim is brought by Plaintiff Syeed and Plaintiff Ndugga on behalf of themselves only.

150.    The foregoing conduct violates the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107, *et seq.*

151.    Defendant discriminated against Plaintiffs Syeed and Ndugga on the basis of race and on the basis of sex in denying them promotions, setting their compensation, and creating a hostile work environment.

152.    As a result of Defendant's discriminatory actions, Plaintiffs Syeed and Ndugga have suffered damages, including both economic losses and emotional distress, and each seeks relief as set forth in the Prayer for Relief.

## COUNT SEVEN
### Constructive Discharge Claim
### Brought by Plaintiff Nafeesa Syeed on behalf of herself

153.    Plaintiff Nafeesa Syeed repeats and realleges the allegations contained in paragraphs 1 through 91.

154.    Plaintiff was subjected to a gender and race based discriminatory work environment where women were unable to advance their careers based upon a "glass ceiling" which has been perpetuated, condoned, ratified and sanctioned by the Defendant in this action.

155.    A reasonable person in the Plaintiff's position, given the totality of the circumstances, would have felt compelled to resign her position at Bloomberg. Thus, Defendant deliberately and intentionally created working conditions so intolerable, difficult or unpleasant for Plaintiff that a reasonable person in her position would have felt compelled to leave her employment.

156.    As a result of Defendant's illegal conduct against her, Plaintiff has suffered damages, including, without limitation, deprivation of income and benefits, loss of opportunity for advancement and promotion, severe emotional distress, personal injuries, pain, suffering, mental anguish, humiliation and damage to reputation and career.

## COUNT EIGHT
### Retaliation Claim
### Brought by Naula Ndugga on behalf of herself

157.    Plaintiff Naula Ndugga repeats and realleges the allegations contained in paragraphs 1 through 110.

158.    Plaintiff Ndugga opposed unlawful employment practices by objecting to sex discrimination and race discrimination with respect to her pay, her assignments, other terms and conditions of her employment, and the hostile manner in which certain supervisors spoke to her.

She brought her complaints to human resources, her managers, and to the Editor-in-Chief of Bloomberg Media.  She filed a charge with the EEOC.  Such activities are protected under § 704(a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3.  Such activities were known to her management at Bloomberg.

159.    Following such actions, Ms. Ndugga faced harassing actions such as refusing to speak with her, excluding her from team emails that she needed to see, denying her the opportunity to do a live interview, denying her other opportunities for advancement, and paying her less than her peers.  These actions constitute retaliation in violation of § 704(a) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3.

160.    Supervisors were acting within the scope of their employment when they retaliated against Ms. Ndugga.

161.    Defendant had actual and constructive knowledge of the retaliation perpetrated against Plaintiff Ndugga and refused to take remedial action of any kind.

162.    Defendant's retaliatory practices described above have caused Plaintiff Ndugga harm, including emotional distress and loss of pay.

163.    Accordingly, Defendant violated Plaintiff's rights protected by § 704(a) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

164.    Certify the proposed class and subclass, with Plaintiffs as class representatives, and The Clancy Law Firm, P.C. and Cohen Milstein Sellers & Toll PLLC as class counsel;

165.    Enter a declaratory judgment that the practices complained of in the First and Second Causes of Action are unlawful and violate Title VII of the Civil Rights Act of 1964, 42

U.S.C. §§ 2000e, *et seq.*, and that the practices complained of in the Third and Fourth Causes of Action are unlawful and violate the New York Human Rights Law;

166.    Enter a permanent injunction prohibiting Defendant, its officers, agents, employees and successors, from engaging in the discriminatory employment practices complained of herein in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e), *et seq.*, as amended and the New York Human Rights Law, N.Y. Exec. §§ 290-301;

167.    Enter a permanent mandatory injunction requiring Defendant adopt employment practices in conformity with the requirements of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the New York Human Rights Law;

168.    An award of all damages that Plaintiffs, including the plaintiff classes, have sustained as a result of Defendant's conduct, including back pay, front pay, general and special damages for lost compensation and job benefits that they would have received but for the discriminatory practices of Defendant;

169.    An award of compensatory damages for emotional distress that Plaintiffs, including the plaintiff classes, have sustained;

170.    Exemplary and punitive damages in an amount commensurate with Bloomberg's ability to pay and to deter future conduct.

171.    Costs incurred, including reasonable attorneys' fees, to the extent allowable by law;

172.    Pre-Judgment and Post-Judgment interest, as provided by law; and

173.    Such other and further legal and equitable relief as this Court deems necessary, just and proper.

As to Plaintiffs Syeed's and Ndugga's individual claims:

174.    An award of all damages that Plaintiff Syeed and Plaintiff Ndugga have sustained as a result of the Defendant's conduct, including back pay, front pay, general and special damages for lost compensation and job benefits that each would have received but for the discriminatory practices of Defendant.

175.    An award of compensatory and punitive damages and injunctive relief, appropriate to the proof at trial;

176.    Costs incurred, including reasonable attorneys' fees, to the extent allowable by law;

177.    Pre-Judgment and Post-Judgment interest, as provided by law; and

178.    Such other and further legal and equitable relief as this Court deems necessary, just and proper.

## JURY DEMAND

179.    Plaintiffs hereby demand a trial on the merits by jury pursuant to Federal Rule of Civil Procedure 38.

Dated:  November 13, 2020                    Respectfully submitted,

                                             */s/Donna H. Clancy*
                                             Donna H. Clancy
                                             The Clancy Law Firm, P.C.
                                             40 Wall Street, 61st Floor
                                             New York, New York 10005
                                             (t) (212) 747-1744
                                             (f) (646) 693-7229
                                             dhc@dhclancylaw.com

                                             Christine E. Webber (*motion for admisison
                                             pro hac vice forthcoming*)
                                             Stacy N. Cammarano (*motion for admission
                                             forthcoming*)
                                             Cohen Milstein Sellers & Toll PLLC
                                             1100 New York Ave. NW ● Fifth Floor
                                             Washington, DC 20005
                                             (t) (202) 408-4600
                                             (f) (202) 408-4699
                                             cwebber@cohenmilstein.com


                                             *Attorneys for Plaintiff Nafeesa Syeed, Naula
                                             Ndugga, and other similarly situated women*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 13, 2020, I electronically filed the *Second Amended*

*Complaint* with the Clerk of the Court using the ECF, who in turn sent notice to the following:

Elise M. Bloom
Rachel S. Philion
Allison L. Martin
Eleven Times Square
New York, New York 10036
(t) 212-969-3000
(f) 212-969-2900
ebloom@proskauer.com
rphilion@proskauer.com
amartin@proskauer.com

Mark W. Batten (admitted *pro hac vice*)
One International Place
Boston, Massachusetts 02110
(t) 617-526-9850
(f) 617-526-9899
mbatten@proskauer.com

*Counsel for Defendant Bloomberg L.P.*

Dated:     November 13, 2020                          */s/ Donna H. Clancy*
                                                                          Donna H. Clancy