UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/25/2021
```

-------------------------------------------------------------X

NAFEESA SYEED and NAULA NDUGGA, *on* :
*behalf of themselves and similarly situated women,*     :
                                                        :
                                      Plaintiff,        :
                    -against-                           :
                                                        :
BLOOMBERG L.P.,                                         :
                                                        :
                                      Defendant.        :

-------------------------------------------------------------X

1:20-cv-7464-GHW

MEMORANDUM OPINION &
ORDER

GREGORY H. WOODS, United States District Judge:

## I.    INTRODUCTION

Plaintiff Nafessa Syeed, who is a South Asian-American woman, worked as a reporter and
producer for Bloomberg's Dubai news bureau before relocating to the United States, at which time
she began reporting from Bloomberg's Washington D.C. bureau.  She claims that while working in
Washington D.C., she was denied promotions for which she was well-qualified, paid less than her
male counterparts, and regularly subjected to derogatory conduct and remarks targeting her race and
gender until she was allegedly constructively discharged in 2018.  Plaintiff Naula Ndugga, a Black
woman who works for Bloomberg's Media Division in New York, raises similar allegations, focused
on the allegedly discriminatory policies and practices imposed by the firm's three man "Editorial
Management Committee," which controls hiring and advancement at Bloomberg.

Ms. Syeed and Ms. Ndugga assert claims on behalf of themselves and a putative class of
similarly situated current and former women employees under Title VII, the New York State
Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL").
Defendant has moved under Rule 12(b)(6) to dismiss the complaint for failure to state a claim.
Because Ms. Syeed, who at all relevant times worked in Washington D.C., has not pleaded that felt
the impact of Bloomberg's discrimination in New York City or State, her claims under the NYSHRL

and NYCHRL must be dismissed.  Because Ms. Ndugga has plausibly pleaded that she is treated less well than comparable men at Bloomberg, the bulk of her discrimination claims against Bloomberg may proceed.  However, her Title VII claims, failure to promote claims under the NYCHRL and NYSHRL, and disparate impact claims under the NYSHRL are dismissed.

## II.     BACKGROUND AND PROCEDURAL HISTORY[1]

### A.  Defendant Bloomberg L.P.

Bloomberg L.P. ("Bloomberg") is a privately held media company.  SAC ¶ 11.  Its global headquarters are located in in New York City.  *Id.* ¶ 9.  Bloomberg operates Bloomberg Media, a news organization that employs approximately 2,700 reporters, producers, editors across over 120 news bureaus worldwide.  *Id.* ¶¶ 12, 16.  Approximately 1,000 of those 2,7000 reporters, producers and editors are women.  *Id.* ¶ 16.

Bloomberg Media's news content and employment decisions are controlled by its Editorial Management Committee, which operates from its New York headquarters and reports to Bloomberg founder and CEO Michael Bloomberg.  *Id.* ¶¶ 12, 14, 17–18.  All three members of the Editorial Management Committee are men.  *Id.* ¶¶ 14, 17.

### 1.  Promotion Practices

When Bloomberg Media has a job opening, it first posts the opening on an internal career portal.  *Id.* ¶ 27.  If it is unable to fill the opening internally, it advertises the opening publicly.  *Id.* Candidates for hiring or promotion are interviewed by bureau chiefs and senior editors.  *Id.* ¶ 28. However, only the Editorial Management Committee has the authority to hire or promote employees.  *Id.* ¶¶ 16, 28.

---

[1] The facts are drawn from Plaintiffs' second amended complaint ("SAC"), Dkt. No. 26, and are accepted as true for the purposes of this motion to dismiss.  *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  But "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Reporters at Bloomberg Media can be promoted from reporter to senior reporter, then to editor, to senior editor, and ultimately bureau chief. *Id.* ¶ 29. There are also gradations within reporter positions: reporters assigned to certain subject areas, such as foreign policy, are considered "higher level positions" and employees who hold those roles are more likely to be promoted to a position as a senior reporter or editor. *Id.* Producers at Bloomberg Media can be promoted from producer to a position as senior producer and subsequently, executive producer. *Id.* ¶ 30. Like reporters, producers assigned to certain subject areas are considered "higher level" and those who hold the positions are more likely to be promoted. *Id.*

Both Plaintiffs allege that they were passed over for promotions for which they were well qualified. *Id.* ¶ 31. They allege that Bloomberg Media engages in practices that limit the opportunities for promotion available to individuals who are not white men. For example, the Editorial Management Committee designated certain positions as "diversity slots." *Id.* ¶ 32. Ms. Syeed understood that while "diversity slot" positions might be filled by women or people of color, non-"diversity slot" positions would effectively be filled only by white men. *Id.* Ms. Syeed was once told by a managing editor that she had not been considered for a particular promotion because the position had not been designated a "diversity slot." *Id.*

### 2.  Compensation and Evaluation Practices

When an individual is hired by Bloomberg, they are asked what their current or most recent salary is or was. *Id.* at ¶ 33. The Editorial Management Committee then decides the starting salary that will be authorized for the individual, determining that salary largely based on the individual's prior pay. *Id.* The Editorial Management Committee often agrees to offer more money to male reporters or editors who "seek[] a better salary," but declines to do the same for new female hires; male reporters are frequently hired at salaries that are $20,000 or more above the salaries of their female peers. *Id.* ¶¶ 34–35. These starting salaries continue to impact compensation throughout an

3

employee's tenure at Bloomberg Media because, even if equal pay raises were given to men and women, the disparities created by this disparate starting pay would continue in a phenomenon called "start low, stay low." *Id.* ¶ 36.

Compensation for reporters, producers, and editors can be impacted by evaluations that take place every six months, but the ultimate decisions on compensation, including bonuses and pay raises, are made by the Editorial Management Committee. *Id.* ¶¶ 40–42.  At mid-year and year-end, reporters, producers, and editors are evaluated by their team leaders, who rate each employee on a scale from one to five, with five being the best rating. *Id.* ¶¶ 40.  Those draft evaluations are then approved by bureau chiefs and forwarded to the Editorial Management Committee. *Id.*  The Editorial Management Committee routinely directs bureau chiefs to change certain employees' ratings, and dictates which employees should have their ratings reduced. *Id.*  The Editorial Management Committee then uses the employees' low ratings to justify denying or limiting the employees' bonuses, raises, and promotions. *Id.* ¶ 41–42.

### B.  Plaintiff Nafeesa Syeed

Ms. Syeed is a South Asian-American woman who currently resides in California. *Id.* ¶ 7. Ms. Syeed worked for Bloomberg from October 19, 2014 to June 8, 2018. *Id.* ¶¶ 7, 56.  She began her work for Bloomberg as a Persian Gulf economy and government reporter in Bloomberg's Dubai news bureau. *Id.* ¶ 56.

#### 1.  Ms. Syeed Relocates to Washington D.C.

In or around October 2015, Ms. Syeed told Bloomberg that she had married and needed to relocate to the United States. *Id.* ¶ 61.  She told Bloomberg that she intended to apply for editorial positions in the company's New York and Washington, D.C. offices. *Id.*  She visited the New York and Washington D.C. offices and met with editors in both offices to express her interest in open positions relating to foreign policy, her preferred topic and area of expertise. *Id.* ¶¶ 62–63.

In early 2016, Ms. Syeed unsuccessfully applied for multiple reporting positions in New York and Washington, D.C.  *Id.* ¶¶ 64–66.  In January or February, she applied for a position as a foreign policy reporter in Bloomberg's Washington D.C. news bureau.  *Id.* ¶ 64.  The position was initially posted internally but later posted publicly.  *Id.*  It was ultimately filled by a man.  *Id.*

Ms. Syeed was hired for a position in Bloomberg's Washington D.C. news bureau on March 20, 2016.  *Id.* ¶¶ 64–66.  While initially hired for a broadly defined role that would have her report on technology, national security, and foreign policy, she learned after being hired that she was a finalist for a foreign policy reporting position.  *Id.* ¶ 66.  However, after further interviews, she was instead asked to cover cybersecurity to replace a man who had been promoted.  *Id.*

After Ms. Syeed moved to Washington, a representative from human resources told Ms. Syeed that her salary would be increased to be "more in line" with other D.C.-based reporters' salaries.  *Id.* ¶ 70.  Ms. Syeed learned that despite her raise, she still earned less than her male peers and that, on average, women reporters' salaries were 20% lower than male reporters' salaries.  *Id.* ¶¶ 70, 76.  In 2017, her manager told her that she could ask for a raise, but then denied her request for a five-percent raise because she had made it "too late."  *Id.* ¶ 76.

### 2. Ms. Syeed Faces Alleged Discrimination

While in Washington, Ms. Syeed encountered behavior by her male colleagues that she considered to be discriminatory.  For instance, Ms. Syeed's superiors at the Washington D.C. bureau frequently confused Ms. Syeed with another South Asian female colleague.  *Id.* ¶ 71.  She also overheard her superiors make negative comments about the professional acumen of female minority employees, and her work was marginalized in favor of male reporters and editors.  *Id.* ¶ 72.  She also found herself excluded from roundtables with high-profile sources, even where she was the reporter in charge of covering the story to whom the source was relevant.  *Id.* ¶ 75.  Ms. Syeed's superiors also declined her request for access to Bloomberg's secure communications equipment while

granting similar requests made by "[f]avored male members of the newsroom." *Id.* ¶ 80.  Moreover, throughout her time at Bloomberg. Ms. Syeed continued to be paid "well below the level of her male peers." *Id.* ¶ 76.

In addition, Ms. Syeed was denied the opportunity to report on topics that she wanted to cover, while she saw male reporters having their preferred beats assigned to them. *Id.* ¶ 78.  For instance, even though Ms. Syeed expressed an interest in covering the Middle East and foreign policy, she was told that the Washington D.C. bureau's chief wanted her to cover election security. *Id.*  After that, a male reporter who covered Middle East later confided to Ms. Syeed that he had been instructed to stop talking to her and that if he was seen talking to Ms. Syeed he would be reprimanded by senior management.  *Id.*  Editors in Bloomberg's Dubai bureau also informed Ms. Syeed that they had been instructed to longer contact her about anything related to the Middle East. *Id.*  Because Ms. Syeed was unable to work on her preferred topics, she was prevented from developing deeper expertise within a subject area.  *Id.* ¶ 77.  That, in turn impeded her chances at promotion because male executives judged reporters based on "scoops and depth of sourcing within institutions, rather than coverage of breaking news." *Id.*

In mid-2018, Ms. Syeed realized that there was no career path for her in Bloomberg's Washington D.C. bureau because she had been completely shut out of Middle East coverage.  *Id.* ¶ 81.  She then applied for several reporting jobs with Bloomberg in New York. *Id.* ¶¶ 81–82.  In particular, Ms. Syeed repeatedly told her team leader that she was interested in filling a particular vacancy in the United Nations bureau.  *Id.* ¶¶ 79, 82.  That vacancy was ultimately filled by a man. *Id.* ¶ 82.  When Ms. Syeed asked her team leader why she had not been considered for the position, he claimed that she had never said that she wanted to cover foreign policy and that she had to advocate for herself if she wanted to advance at Bloomberg.  *Id.* ¶ 82.  Another editor also told Ms. Syeed that she needed to advocate for herself to be promoted.  *Id.* ¶ 83.  However, Ms. Syeed had

watched several of her male co-workers receive promotions after working at Bloomberg for the same amount of time as she. *Id.* Moreover, Ms. Syeed had not observed them "advocating" for themselves in the manner that Bloomberg required from its female employees. *Id.*

During the same conversation, an editor told Ms. Syeed that one of the reasons she was not considered for the U.N. job was that the job had not been designated as a "diversity slot." *Id.* ¶ 84. Ms. Syeed explained her belief that she would only be considered for positions that had been designated as diversity slots, rather than any and all vacant positions. *Id.* She further explained that she did not want to be treated as a "token" employee, and pointed out that there were "no minority women in leadership roles," and that she felt like she had no future in Bloomberg Media overall. *Id.*

### 3. Ms. Syeed and Bloomberg Part Ways

Ms. Syeed met with Tamika Alexander, Head of Human Resources for the Washington, D.C. bureau on June 6, 2018, and told her about the editor's comments about "diversity slots" and about her belief that that Bloomberg had a "racist and sexist culture." *Id.* ¶ 87. Ms. Alexander, who had previously filed a complaint against Bloomberg with the Equal Employment Opportunity Commission (the "EEOC") after experiencing pregnancy discrimination, said that she was aware of the issues Ms. Syeed raised. *Id.* Ms. Alexander instructed Ms. Syeed to pass along her concerns to a recently named senior executive editor for diversity, talent, standards, and training at Bloomberg Media, who worked in Bloomberg's New York offices.

On June 8, 2016, Ms. Syeed informed her team leader that she could not continue working at Bloomberg because of the discrimination that she faced. *Id.* ¶ 88. She then met with her managing editor to tell him that she was leaving Bloomberg, an interaction that ended with him "pressing [her] about where she would be working next, and if it was for a competitor." *Id.*

### C. Plaintiff Naula Ndugga

Ms. Ndugga is a Black woman who lives and works in New York. *Id.* ¶¶ 8–9. She began working at Bloomberg as a paid intern in September 2017 before obtaining a full-time position in January 2018 as a news producer for Bloomberg Media's "Quicktake" department, which remains her current position. *Id.* ¶¶ 8, 93.

#### 1. Ms. Ndugga's Salary

When she began her full-time role, Ms. Ndugga earned a salary of $65,000, while male producers also hired from her intern class earned a salary of $75,000. *Id.* ¶¶ 37, 94. Over the next three years, Ms. Ndugga received positive feedback from her supervisors but nevertheless received only one $1,500 raise. *Id.* ¶ 96–97, 99, 103. Ms. Ndugga did not receive a bonus in 2018. *Id.* ¶ 98. In 2019, although her team leader recommended that she receive a raise and bonus, the Editorial Management Committee ultimately denied Ms. Ndugga a raise and gave her only half of her bonus. *Id.* ¶¶ 98–99. Again in February 2020, Ms. Ndugga did not receive a raise, despite her manager's recommendation that she be given one. *Id.* ¶ 103. Although Ms. Ndugga was told that she had not received a raise because company could not afford raises for her division, she learned from some of her male colleagues that they had received raises. *Id.* In a July 2020 meeting with the Editorial Management Committee, Ms. Ndugga asked about the gender pay gap at the company. *Id.* ¶ 110. A member of the committee told her that no such pay gap existed. *Id.*

Ms. Ndugga received fewer resources from Bloomberg than her male colleagues. *Id.* ¶ 100. For example, Bloomberg denied Ms. Ndugga's request for technology to work remotely, while granting the same request when made by her male peers. *Id.* The company also denied her request to take courses to maintain language skills useful to her reporting, although Bloomberg supported other employees in similar endeavors. *Id.* When she reported the differences in the way that she was treated to Bloomberg's human resources department, they defended management. *Id.* ¶ 101.

### 2. Ms. Ndugga's Professional Opportunities

In fall 2019, Ms. Ndugga's male colleagues were assigned to cover their preferred topics, while Ms. Ndugga "was assigned to cover 'scraps'"—subjects no one else wanted, which were generally considered less desirable assignments that provided fewer opportunities for career advancement." *Id.* ¶ 102. Although some colleagues noticed that Ms. Ndugga was being treated differently and mentioned that fact to management, their concerns were ignored, and Ms. Ndugga continued to receive undesirable assignments. *Id.*

In March 2020, Ms. Ndugga approached her team leader about promoting her to a position "specifically focused on race and identity to guide the team." *Id.* ¶ 104. After making the request, two colleagues approached Ms. Ndugga and told her that "there was no point in creating that role and promoting her if she already filled that role by being a Black woman on the team." *Id.*

Bloomberg's Editorial Management Committee "repeatedly refused to cover racial topics" even when they were among the "top news stories." *Id.* ¶ 110. Ms. Ndugga's help was solicited to "help guide the team," on racial issues, which required her to "recount her own trauma," but the team did not defer to her when she advised them to stop using the word "colored" in news scripts. *Id.* On one occasion, Ms. Ndugga had prepared to conduct a live interview with one of her sources regarding the murder of George Floyd, including by participating in a required training for on-air interviews, but was prevented from doing so because her superiors said that only "certain people" were qualified to conduct on-air interviews. *Id.* ¶ 109. Her male colleagues, however, were allowed to conduct such interviews even though they had not received the required training. *Id.*

### 3. Colleagues' Conduct and Alleged Retaliation

Ms. Ndugga also faced regular derogatory comments from colleagues and pushback when she questioned racist behavior. *Id.* ¶¶ 105–06. Some of her more senior colleagues "would opine regularly on Black culture and issues, making pronouncements such as that Black people should not

criticize Bruno Mars or asking Black team members whether it was appropriate for them to refer to February as Black history month." *Id.* ¶ 105.

On one occasion, Ms. Ndugga questioned the choice to depict a "young white woman holding seemingly impoverished Black Ugandan children" in a piece on marathons. *Id.* ¶ 106. Ms. Ndugga's supervisor became angry, threw his headphones towards her, and yelled at her. *Id.* Ms. Ndugga reported the incident to her division head, who refused to acknowledge that her supervisor had done anything wrong. *Id.* Her supervisor told her division head and her coworkers that she had raised her voice and behaved aggressively towards him. *Id.* ¶ 107.

Following that altercation, Ms. Ndugga's supervisor excluded her from emails and meetings, which denied her information she required to do her job. *Id.* ¶ 108. Ms. Ndugga reported her supervisor's behavior to her division head, but her division head did nothing about it. *Id.*

### D. Procedural History

On August 9, 2020, Ms. Syeed commenced this action in New York state court against Bloomberg and several of its employees. Dkt. No. 1-1, Complaint. Ms. Syeed amended her complaint in the state court action on August 11, 2020. Dkt. No. 1-2, Amended Verified Complaint. On September 11, 2020, the defendants removed the case to this Court pursuant to the Class Action Fairness Act. Dkt. No. 1, Notice of Removal.

On October 9, 2020, the defendants moved to dismiss the amended complaint under Rule 12(b)(6) for failure to state a claim. Dkt. No. 20, Mem. in Supp. of Defs.' Mot. to Dismiss the Am. Verified Compl. Rather than oppose the defendants' motion to dismiss, on November 16, 2020, Ms. Syeed amended her complaint a second time. SAC. The second amended complaint added Ms. Ndugga as a plaintiff. *Id.* It also dropped all of the individual defendants, leaving Bloomberg as the sole defendant in the case. *Id.*

On January 15, 2021, Bloomberg moved to dismiss the second amended complaint or, in the alternative, to strike Plaintiffs' demand for a jury trial. Dkt. No. 43, Mem. of L. in Supp. of Def.'s Mot. to Dismiss ("Def.'s Br.") at 1. On February 12, 2021, Plaintiffs filed a brief in opposition. Dkt. No. 45, Mem. in Opp'n to Def.'s Mot. to Dismiss ("Pls.' Opp'n"). On February 26, 2021, Bloomberg filed a motion in reply. Dkt. No. 47, Reply Mem. of L. ("Def.'s Reply"). On March 4, 2021, Plaintiffs' surreply was filed. Dkt. Nos. 48–49 ("Surreply").

## III.   LEGAL STANDARD

A complaint need only contain "a short and plain statement . . . showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a claim that does not meet this pleading standard for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). On a motion filed under Rule 12(b)(6), the court accepts as true the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are inadequate. *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). And "[t]he tenet that a court must accept as true" a complaint's factual allegations does not apply "to legal conclusions." *Iqbal*, 556 U.S. at 678 (alterations omitted).

To survive dismissal, a complaint must allege sufficient facts to state a plausible claim. *Twombly*, 550 U.S. at 570. A claim is plausible when the plaintiff pleads facts to support the reasonable inference that the defendant has acted unlawfully. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The plaintiff's claim must be more than merely "speculative." *Twombly*, 550 U.S. at 545. And a reviewing court must "draw on its judicial experience and common sense" to determine plausibility. *Iqbal*, 556 U.S. at 679 (citation omitted).

On a motion to dismiss, a court must generally "limit itself to the facts stated in the complaint." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 192 (2d Cir. 2006) (quoting *Hayden v. County of Nassau*, 180 F.3d 42, 54 (2d Cir.1999)).  But a court may consider "any 'written instrument' . . . attached to [the complaint] as 'an exhibit' or . . . incorporated in it by reference." *Lynch v. City of New York*, 952 F.3d 67, 79 (2d Cir. 2020) (quoting Fed. R. Civ. P. 10(c) (other citations omitted)).  A court may also consider a document "solely relie[d] on by the plaintiff if it "is integral to the complaint." *Id.* (quotation and brackets omitted).  A document is "integral to the complaint" if the complaint "relies heavily" on the document's "terms and effect." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016); *see also Littlejohn v. City of N.Y.*, 795 F.3d 297, 305 n.3 (2d Cir. 2015) (holding that a court may "consider the plaintiff's relevant filings with the EEOC" on a motion to dismiss if the filings "are integral to and solely relied upon by the complaint" (quotation and brackets omitted)).  A plaintiff must "*rely* on the terms and effect of the document in drafting the complaint; mere notice or possession is not enough." *Nicosia*, 834 F.3d at 231 (emphasis added) (quoting *Glob. Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156 (2d Cir. 2006).

## IV.   ANALYSIS

### A.  The Court Treats the Second Amended Complaint as the Operative Complaint

The Court treats the SAC as the operative complaint in this action, even though Plaintiffs filed it without complying with Rule 15(a).  When a case is removed to federal court, "the federal court 'takes the case up where the State court left it off.'" *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 436 (1974) (quoting *Duncan v. Gegan*, 101 U.S. 810, 812 (1880)).  The federal court treats the case "as if it originally had been filed in the federal court." 14C Wright et al., Federal Practice and Procedure § 3738 (4th ed. 2012); *see also Carvalho v. Equifax Info. Servs.*, 629 F.3d 876, 887 (9th Cir. 2010) ("The federal court . . . treats everything that occurred in the state court as if it had taken

place in federal court." (alteration in original) (citation omitted)).  Therefore, a party's ability to amend its pleading after removal may be limited by amendments made in state court, even though the validity of those amendments was governed entirely by state procedure at the time.  Accordingly, a party that has already amended its pleading once as a matter of course in state court may not do so a second time in federal court without seeking the consent of the other parties or leave of the federal court as required by Rule 15(a)(2).  *See, e.g., Gibson v. N.Y. State Office of Mental Health*, No. 6:17-CV-0608 (GTS/TWD), 2018 WL 3850632, at *7 n.7 (N.D.N.Y. 2018); *accord Whitehead v. Viacom*, 233 F. Supp. 2d 715, 719 (D. Md. 2002), *aff'd* 63 F. App'x 175 (4th Cir. 2003); *Matemu v. Brienzi*, No. 5:19-cv-00380-M, 2020 WL 1963471, at *4 (E.D.N.C. April 23, 2020).  Because Ms. Syeed amended her complaint once in state court on her own initiative and without the consent of the defendants, and because that amendment would have exhausted her right to amend under Rule 15(a)(1) if it had been made in federal court, Plaintiffs failed to comply with Rule 15(a)(2) when they filed the SAC without the consent of Defendant or leave of the Court.

Nonetheless, the Court will treat the SAC as the operative complaint.  The Court has discretion to grant requests for leave to amend *nunc pro tunc* when parties file amended pleadings without complying with Rule 15(a)(2).  *See, e.g., Lewittes v. Cohen*, No. 03 Civ. 189 (CSH), 2004 WL 1171261, at *3 (S.D.N.Y. May 26, 2004) (granting leave to amend *nunc pro tunc* "in the interests of clarity, consistency, and justice"); *Bledsoe v. Saaqin*, No. 15-CV-0181 (JS) (ARL), 2017 WL 11511144, at *1 n.1. (E.D.N.Y. Jan. 10, 2017) (granting plaintiff leave to amend *nunc pro tunc* to add an additional defendant).  Granting such requests is particularly appropriate given the lenient standard applied to those requests when they are made at the appropriate time.  *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires.").

Here, a number of factors weigh in favor of treating the SAC as the operative complaint in this case.  First, the parties have already expended substantial time and effort on this motion to

dismiss the SAC, which adds claims that were not present in its former pleadings.  In addition,

Defendant has not suggested that the Court would have denied Plaintiffs leave to amend had it been

requested at the appropriate time.  Accordingly, the Court will exercise its discretion under Rule

15(a) to treat the SAC as the operative complaint.  *See Lewittes*, 2004 WL 1171261, at *3 (granting

leave to file an untimely amended Complaint where the amended complaint "provide[d] the most

complete and current account of the factual allegations, claims, and parties in this case"); *see also*

*Purchase Partners, LLC v. Carver Fed. Sav. Bank*, No. 09 CIV. 9687 JMF, 2013 WL 1499417, at *6

(S.D.N.Y. Apr. 10, 2013) (granting leave to amend an answer no pro tunc in part because

"inconvenience to the parties and the Court was minimal").

**B.  Ms. Syeed's Claims[2]**

**1.  Ms. Syeed Did Not Feel the Impact of Defendant's Discrimination in New York, so her NYCHRL and NYSHRL Claims are Dismissed**

Ms. Syeed does not adequately plead a cause of action under the NYSHRL or the NYCHRL

because Ms. Syeed did not experience the impact of the alleged discrimination in New York.  "The

New York Court of Appeals has adopted an "impact" test for nonresident plaintiffs seeking

recovery under the NYCHRL."  *Vangas v. Montefiore Med. Ctr.*, 823 F.3d 174, 182 (2d Cir. 2016)

(citing *Hoffman Hoffman v. Parade Publ'ns*, 15 N.Y.3d 285 (2010).  This test requires that a nonresident

plaintiff must "plead and prove that the alleged discriminatory conduct had an impact in [New

York]."  *Hoffman*, 15 N.Y. 3d at 289–91; *see also*, *Pakniat v. Moor*, 145 N.Y.S.3d 30, 31 (1st Dep't.

2021) ("To avail herself of these statutes, plaintiff must still satisfy the jurisdictional requirement that

the impact of the discrimination was felt in New York City and State.").  The impact test is not

satisfied where a plaintiff's contacts with NYC are merely "tangential."  *Vangas*, 823 F.3d at 182.

---

[2] Ms. Syeed concedes that she asserts claims only under the NYCHRL and the NYSHRL.  Opp'n at 17.

Rather, to state a claim, "the impact of the employment action must be felt *by the plaintiff in* NYC" or, with respect to the NYSHRL, New York State. *Id.* at 183.

Here, Ms. Syeed cannot establish that she felt the impact of Defendant's constructive discharge or their failure to promote her in New York as required by the NYCHRL and NYSHRL. To the extent Ms. Syeed makes a constructive discharge claim,[3] Ms. Syeed lived and worked in Washington D.C. at all relevant periods. SAC ¶¶ 66–91. Courts routinely hold that a plaintiff who lives and works outside of New York, but whose employment is terminated by a New York employer, does not feel the impact of that termination in New York. *See Vangas*, 823 F.3d at 182 (holding that a Plaintiff terminated by a New York company did not state a claim under the NYCHRL where she did not live or work in the city); *Pakniat*, 145 N.Y.S.3d at 30 (2021) ("The fact that the alleged discriminatory acts and unlawful decision to terminate plaintiff's employment occurred in New York is insufficient to plead impact in New York"); *Wolf v. Imus*, 96 N.Y.S. 3d 54, 55 (1st Dep't 2019) ("The Supreme Court properly dismissed plaintiff's age discrimination claims brought under the City and State Human Rights Laws, because the impact on plaintiff from the termination of his employment occurred in Florida, where he lived and worked."). Accordingly, Ms. Syeed's claims for constructive discharge under the NYCHRL and NYSHRL are dismissed.

As to Ms. Syeed's failure to promote claims, she similarly cannot show that Defendant's failure to promote her impacted her in New York. Ms. Syeed was living and working in Washington D.C. when Defendant determined not to promote her to certain positions based in New York—at

---

[3] In the Opposition, Ms. Syeed expressly states that she "agrees that her claims of pay discrimination and hostile work environment did not have a New York impact in the way that the promotion discrimination *and constructive discharge* she experience had a New York impact." Opp'n at 8 n.3 (emphasis added). However, Ms. Syeed entirely fails to respond to Bloomberg's arguments regarding her constructive discharge claim; instead, Syeed's allegations focus only on Bloomberg's arguments regarding failure to promote. See Opp'n at 5–8, *see also id.* at 6 (noting that Ms. Syeed "precisely" alleges that "she sought and was denied numerous positions with BLP in New York" without mentioning constructive discharge). Thus, it is unclear whether Ms. Syeed intends to argue that her constructive discharge claim falls under the NYCHRL or NYSHRL. However, to the extent she does, that claim fails for the reasons explained herein.

no point did she live or work in New York State or City.  SAC ¶¶ 66–91.  Indeed, Ms. Syeed does

not describe how Defendant's decision impacted her in New York; instead, she rests her claim solely

on her allegations that that she applied for, and was denied, certain New York-based positions.  SAC

¶ 82.  Without more, Ms. Syeed's allegations fall short of stating a claim under the NYCHRL or

NYSHRL.  *See Wang v. Gov't Employees Ins. Co.*, 2016 WL 11469653, at *7 (E.D.N.Y. Mar. 31, 2016)

(finding that Plaintiff could not assert claims under the NYCHRL where she did not live in New

York City and alleged that she was denied a supervisory position that would have allowed her to

"handle[] cases in New York City Civil Courts and District Courts").

Relying on three decisions from this district, Ms. Syeed argues that the alleged discrimination

she experienced by being denied a promotion to a position in New York is sufficient to state a claim

under the NYCHRL and NYSHRL.  *See* Opp'n at 7–8 (citing *Anderson v. HotelsAB, LLC*, 2015 WL

5008771, at *3 (S.D.N.Y. 2015); *Chau v. Donovan*, 357 F. Supp. 3d 276 (S.D.N.Y. 2019); and *Scalerio-*

*Isenberg v. Morgan Stanley Services Group, Inc.*, 2019 WL 6916099 (S.D.N.Y. Dec. 19, 2019)).  However,

as explained below, these decisions run contrary to the holdings in *Hoffman*, *Vargas*, and other

binding New York State precedent.  Accordingly, the Court respectfully declines to follow them.

In *Hoffman*, the New York Court of Appeals adopted an impact test for nonresident

plaintiffs seeking recovery under the NYCHRL.  The Court of Appeals explained that the NYCHRL

is intended "to protect 'inhabitants' and persons 'within' the state, meaning that those who work in

New York fall within the class of persons who may bring discrimination claims in New York."

*Hoffman*, 15 N.Y.3d at 291 (emphasis added).  Thus, the Court of Appeals determined that, to satisfy

the impact test, a plaintiff "must demonstrate that the alleged discriminatory conduct had an 'impact'

within the city."  *Id.* at 290.  According to *Hoffman*, that requirement would properly "confine[] the

protections of the NYCHRL to those who are meant to be protected—those *who work in the city*."  *Id.*

at 291 (emphasis added).  Turning to the NYSHRL, *Hoffman* reached a similar conclusion, explaining

that "[t]he obvious intent of the State Human Rights Law is to protect 'inhabitants' and persons 'within' the state, meaning that those who work in New York fall within the class of persons who may bring discrimination claims in New York." *Id.*

In *Vangas*, the Second Circuit examined *Hoffman* and reiterated that "[u]nder the NYCHRL the impact of the employment action must be felt by the plaintiff in NYC." 823 F.3d at 183. Accordingly, the Second Circuit held that a plaintiff terminated by a New York City-based company could not state a claim under the NYCHRL where she "worked in Yonkers, was supervised in Yonkers, was terminated in Yonkers, and d[id] not allege that she ever went to NYC for work." *Id.* at 183. Echoing *Hoffman's* focus on the nature by which the impact test confined the scope of the NYCHRL, *Vargas* explained, "to hold otherwise . . . would broaden the statute impermissibly beyond those 'who work in the city.'" *Id.*

New York State appellate courts have also consistently applied the impact test to ensure that the NYCHRL and NYSHRL are targeted to protect individuals who live or work in New York City and State. *See, e.g.*, *Pakniat*, 145 N.Y.S. 3d at 31 (holding that the plaintiff failed to state claims under the NYCHRL and NYRHL where the she was "living and working in Montreal, Canada, at the time of the alleged discriminatory conduct and she failed to allege that the conduct had any impact in either New York State or New York City")[4]; *Hardwick v. Auriemma*, 983 N.Y.S.2d 509, 512 (1st Dep't

---

[4] *Pakniat* also emphasized the enduring nature of the impact test in light of the COVID-19 pandemic and corresponding proliferation of remote work, explaining

> In arguing that that the statutes should reach discriminatory conduct that occurs in New York even if the impact is felt by an out of state worker, plaintiff points to the increase in remote working arrangements since the Court of Appeals decided *Hoffman*. The Covid 19 pandemic has only expanded the diaspora of remote workers, many of them laboring in other states for New York firms. Certainly, the electronic tools that enable this new expanded workplace can be conduits for discriminatory conduct. Additionally, plaintiff is correct that the State and City Human Rights Laws are meant to deter discriminatory behavior by New York employers, as well as to compensate the employees impacted by that behavior. While these arguments have force, the clear directive of

2014) (holding that the plaintiff failed to show defendant's actions had an impact in New York when the actions were committed while plaintiff was in London).  Indeed, some New York State courts have taken this analysis a step further, expressly holding that plaintiffs fail to satisfy *Hoffman*'s impact test where discriminatory "conduct occur[s] while [a] plaintiff [is] physically situated outside of New York."  *Benham v. eCommission Solutions, LLC*, 989 N.Y.S. 2d 20, 20 (1st Dep't 2014) ("[A] nonresident plaintiff's claims . . .  turn[] primarily on her [or his] physical location at the time of the alleged discriminatory acts."); *see also*, *Wolf*, 96 N.Y.S.3d at 55 (same).

Contrary to this binding case law, the cases upon which Ms. Syeed relies—*Anderson*, *Chau*, and *Scalerico-Isenberg*—find that being denied a promotion to a position in New York is sufficient to state a claim under the NYCHRL and NYSHRL even where the plaintiff does not live or work in New York City or State.  As an initial matter, *Anderson* progenerated all three cases; both of the subsequent decisions relied on its holding without substantial independent analysis  *See Chau*, 357 F. Supp. 3d at  283–84 (relying on *Anderson* to find that a plaintiff stated a claim where "[a]lthough Chau never worked in New York City . . . the job for which she alleges she was not hired in violation of the NYCHRL and NYSHRL would have offered her employment within New York City"); *Scalerio-Isenberg*, 2019 WL 6916099 (S.D.N.Y. Dec. 19, 2019) (relying on *Anderson* and *Chau* and explaining "when non-resident plaintiffs allege that that they were not hired for a job in New York City on a discriminatory basis, the impact requirement for both the NYSHRL and NYCHRL is met").  In other words, the later cases upon which Ms. Syeed relies rest on *Anderson*'s shaky foundation.

---

*Hoffman* bars this Court from expanding the jurisdictional breadth of either statute to encompass behavior such as that alleged in the complaint.

145 N.Y.S.3d. at 31.

In *Anderson*, the court considered failure to hire claims brought by a plaintiff who lived on Shelter Island, and was denied a position working for a New York company. *Anderson*, 2015 WL 5008771, at *2–3. In determining that the plaintiff had felt the impact of the defendant's alleged discrimination in New York, the court first rejected the defendant's argument that the impact of an allegedly discriminatory failure-to-hire occurs only at the time of the act—i.e., at the location "where the plaintiff was interviewed and where [the defendant] allegedly made the discriminatory statements and hiring decision." *Id.* at *3. According to the court, such a test would "would narrow the impact analysis of a NYCHRL violation to consideration solely of the physical locations where [the plaintiff] experienced 'the initial discriminatory act' and 'the original experience of the injury.'"[5] *Id.* Instead, the court determined that it would be better to engage in "a practical substantive consideration of how and where the injury actually affected the plaintiff with respect to her employment." *Id.*

Then, ostensibly relying on this "practical substantive consideration" but without citing any case law, the court determined that allegations that defendant's discrimination had an "impact with respect to [plaintiff's] *prospective* employment responsibilities in New York City" were sufficient to state an NYCHRL claim, even where a plaintiff did not live or work in New York City. *Id.* (emphasis added).

There are numerous issues with *Anderson's* analysis. First, in support of its "practical substantive consideration" test, *Anderson* cites *Regan v. Benchmark Co. LLC*, where the Court considered NYCHRL claims by a plaintiff who worked in New York City but was transferred to an office in New Jersey. No. 11 CIV. 4511 CM, 2012 WL 692056, at *4–5 (S.D.N.Y. Mar. 1, 2012). Notably, the only case that *Regan* cites in support of its impact finding, *Pouncy v. Danka Office Imaging*,

---

[5] Exactly the position taken by the First Department in *Benham*. *Benham*, 989 N.Y.S. 2d at 20 ( "[A] nonresident plaintiff's claims . . . turn[] primarily on her [or his] physical location at the time of the alleged discriminatory acts.").

No. 06-cv-4777, 2009 WL 10695792 (S.D.N.Y. May 19, 2009), *see id.* at \*14, was published nearly a year before *Hoffman* was decided. *See id.* at \*13–14. This lack of reliance on post-*Hoffman* decisions is grounds for concern as to the legitimacy of *Regan's* analysis.

But even then, *Regan's* analysis is grounded in the impact of discrimination that took place while the plaintiff worked in New York City: the court reasoned that the plaintiff's transfer to New Jersey was "the culmination of a number of alleged *discriminatory acts that took place at Benchmark's New York City office while Regan worked there.*" *Id.* at \*14. As such, it is still the case that the plaintiff in *Regan* experienced the impact of the discrimination while working in New York City.

More broadly, *Anderson's* purported application of the impact test undermines the central tenet proclaimed in *Hoffman*: the impact test is intended to limit the NYCHRL's and NYSHRL's scope to protect only individuals who work "in the city," and "within the state," and who feel the impact of the discrimination "in" the City or State. *Hoffman*, 15 N.Y.3d at 289–90. *Hoffman* expressly acknowledged that the test would "*narrow[]* the class of nonresident plaintiffs who may invoke [the NYCHRL's] protection" to individuals working in New York City. *Id.* at 290 (emphasis added). So too did *Vangas*—which was decided nearly a year after *Anderson*—provide clear Second Circuit authority that warned against "broaden[ing] the [NYCHRL] impermissibly beyond those 'who work in the city.'" *Vangas*, 823 F.3d at 183. But *Anderson's* misapplication of the impact test does exactly that: it expands the class of nonresident plaintiffs protected by the NYCHRL to include individuals who do not work in the city or state, but who merely speculate that they might have done so someday in the future. Accordingly, because this finding is inconsistent with binding authority, the Court declines to adopt the prospective impact test put forth in *Anderson* and its progeny. The Court is comfortable staying within the clear lines drawn by New York State's highest court in *Hoffman*, rather than drawing new ones based on "practical substantive considerations," as *Anderson* did.

To be sure, *Anderson* correctly pointed out that the NYCHRL "was amended in 2005 to broaden its protections because the provisions of the City HRL had been 'construed too narrowly to ensure protection of the civil rights of all persons covered by the law.'" *Anderson*, 2015 WL 5008771, at *4.  However, while we must broadly construe types of discrimination against which the statute is meant to protect, *Hoffman*, *Vangas*, and the aforementioned state court decisions leave no doubt that courts cannot expand the scope of the persons to whom those protections are afforded, namely, individuals who live and work in New York City and State.

Here, Ms. Syeed—who lived at worked at all relevant times in Washington D.C.— pleads only that defendant's discrimination had an impact with respect to her prospective employment in the city.  Because those allegations are insufficient to plead that Defendant's discrimination had an impact on Plaintiff in New York, Defendant's motion to dismiss is granted with respect to Ms. Syeed's claims.

## C.  Ms. Ndugga's Title VII Claims

### 1.  Because Ms. Ndugga Failed to Exhaust her Administrative Remedies Prior to Filing Suit, her Title VII Claims Are Dismissed

Ms. Ndugga's claims Title VII claims, including her claims for retaliation and disparate impact pleaded under Title VII, *see* SAC ¶¶ 143–47, 157–163, are dismissed because Ms. Ndugga did not exhaust her remedies before the EEOC prior to filing her Complaint.[6]  "As a precondition to filing a Title VII claim in Federal court, a plaintiff must first pursue available administrative remedies

---

[6] "The failure to exhaust administrative remedies is an affirmative defense, for which defendant bears the burden of proof." *Jordan v. Forfeiture Support Assocs.*, 928 F. Supp. 2d 588, 594 n.5 (E.D.N.Y. 2013).  While affirmative defenses are most typically asserted in an answer, they "may be raised on a motion to dismiss . . . where the complaint itself establishes the circumstances required as a predicate to a finding that the affirmative defense applies." *In re Sept. 11 Prop. Damage & Bus. Loss Litig.*, 481 F.Supp.2d 253, 258 (S.D.N.Y.2007) (alteration omitted) (quoting *McKenna v. Wright*, 386 F.3d 432, 435 (2d Cir. 2004)).  Here, Ms. Ndugga's failure to exhaust her remedies before the EEOC is clear from the face of her complaint and documents within the purview of judicial notice, and the Court will consider Defendant's exhaustion defense in considering the current motion to dismiss.  *See Jordan*, 928 F. Supp. 2d at 594 n.5 (considering the plaintiff's failure to exhaust their remedies before the EEOC in deciding the defendant's motion to dismiss).

and file a timely complaint with the EEOC." *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003); *see also* 42 U.S.C. § 2000e–5(e)-(f). "Exhaustion of administrative remedies through the EEOC is 'an essential element' of the Title VII . . . statutory scheme[] and, as such, a precondition to bringing such claims in federal court." *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001) (per curiam) (quoting *Francis v. City of New York*, 235 F.3d 763, 768 (2d Cir. 2000)). "The purpose of this exhaustion requirement is to give the administrative agency the opportunity to investigate, mediate, and take remedial action." *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 384 (2d Cir. 2015) (quoting *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 712 (2d Cir. 1998)). That purpose "would be defeated if a complainant could litigate a claim not previously presented to and investigated by the EEOC." *Miller v. Int'l Tel. & Tel. Corp.*, 755 F.2d 20, 26 (2d Cir. 1985).

Under Title VII's exhaustion requirements, a "right-to-sue letter is a necessary prerequisite to filing suit." *Newsome v. Berman*, 24 F. App'x 33, 34 (2d Cir. 2001) (citing 42 U.S.C. § 2000e–5(f)(3); 29 C.F.R. 1601.28(e)(1)). Title VII expressly provides that a plaintiff must receive a right-to-sue letter before filing a civil action asserting a Title VII claim:

> If a charge filed with the Commission . . . is dismissed by the Commission, or if within one hundred and eighty days from the filing of such charge . . . the Commission has not filed a civil action under this section . . . or the Commission has not entered into a conciliation agreement to which the person aggrieved is a party, the Commission . . . . *shall so notify the person aggrieved* and within ninety days after the giving of such notice *a civil action may be brought against the respondent named in the charge* . . . by the person claiming to be aggrieved . . . .

42 U.S.C. § 2000e–5(f)(1) (emphasis added). "[A] plaintiff's failure to obtain a notice-of-right-to-sue-letter is not a jurisdictional bar, but only a precondition to bringing a Title VII action that can be waived by the parties or the court," and accordingly, a failure to obtain a right-to-sue letter can be excused by the Court on equitable grounds. *Pietras v. Bd. of Fire Comm'rs of Farmingville Fire Dist.*, 180 F.3d 468, 474 (2d Cir. 1999). In addition, in certain circumstances, "[t]he EEOC has authorized itself to issue 'early' right-to-sue letters when a complainant requests a right-to-sue letter prior to the

running of 180 days." *Gibb v. Tapestry, Inc.*, No. 18-CV-6888, 2018 WL 6329403, at *4 (S.D.N.Y. Dec. 3, 2018) (citing C.F.R. § 1601.28(a)(2) (2004)).

Here, Ms. Ndugga filed her EEOC complaint on November 11, 2020, the same day as the Second Amended Complaint.  SAC ¶ 6.  Although she eventually received an early right-to-sue letter on February 2, 2021, there is no question that the Second Amended Complaint was filed prior to the receipt of this letter.  Pl's Opp'n at 9.  Thus, Ms. Ndugga unequivocally failed to exhaust her Title VII remedies, and her Title VII claims must be dismissed, unless Ms. Ndugga were to show that waiver should be permitted on equitable grounds.  *See Ali v. Bank of New York*, 934 F. Supp. 87, 93 (S.D.N.Y. 1996) (dismissing Title VII claims where plaintiff had not received right-to-sue letter from the EEOC); *Johnson v. Xylem Inc.*, No. 1:19-cv-130, 2020 WL 1963125, at *2 (W.D.N.Y. Apr. 16, 2020) (dismissing Title VII claims where plaintiff had not received a right-to-sue letter prior to initiating his lawsuit).

However, Plaintiffs do not argue that there are equitable grounds to excuse Ms. Ndugga's failure to obtain a right-to-sue letter prior to filing suit.  Instead, they argue only that the receipt of an early right-to-sue letter "after a Title VII suit beg[ins] satisfies the exhaustion requirements under Title VII."  Opp'n at 9–10.  But Plaintiffs' purported support for that proposition is inapposite because those courts excused the failure *on equitable grounds*.  For instance, Plaintiffs point to cases collected in *Brunson-Bedi v. New York* No. 15-cv-9790, 2018 WL 2084171 (S.D.N.Y. May 1, 2018) for support that courts may consider claims where a right-to-sue letter has not yet been filed.  Surreply at 1.  However, Plaintiff overlooks that the courts in those cases waived the requirement that plaintiff receive a right-to-sue letter "based on *equitable* principles."  *Brunson-Bedi*, 2018 WL 2084171 at *4.[7]  Ms. Ndugga has provided no justification for her failure to comply with the rule—she

---

[7] In addition, Plaintiffs cite, *Kounitz v. Slaatten*, 901 F. Supp. 650 (S.D.N.Y. 1995), Opp'n at 9, which relies on a footnote in *Spirt v. Tchrs. Ins. & Annuity Ass'n*, that cursorily states, without analysis, that the court retained jurisdiction where a

appears merely to have chosen not to follow it.  In any event, the Court has no equitable basis upon which to excuse her failure here.

The parties also squabble over whether Ms. Ndugga's receipt of an early right-to-sue letter—one issued prior to the expiration of the 180-day period for the EEOC's investigation prescribed by Title VII—sufficiently exhausted her administrative remedies, but those arguments are inapplicable to the facts at hand.  Reply at 7; Surreply at 1–4.  While there is some debate regarding whether early right-to-sue letters satisfy the statute's exhaustion requirements, *see Gibb v. Tapestry, Inc.*, No. 18-cv-6888, 2018 WL 6329403, at *4-5 (S.D.N.Y. Dec. 3, 2018) ("Courts are divided on whether the EEOC may issue a valid right-to-sue letter within the 180-day waiting period contemplated by section 2000e-5(f)(1)"), that debate concerns plaintiffs who received an early right-to-sue letter *before* filing their Title VII claims in district court.[8]  *See e.g., id.* (considering whether the receipt of an early right-to-sue letter sufficiently exhausted plaintiff's remedies where plaintiff filed the complaint *after* receiving the early right-to-sue letter);  *Stidhum v. 161-10 Hillside Auto Ave., LLC*, No. 19-cv-5458, 2021 WL 2634915, at *1 (E.D.N.Y. June 25, 2021) (noting that the plaintiff brought his claims in federal court after receiving an early right-to-sue letter); *Hernarndez v. Premium Merchant Funding One, LLC*, No. 19-cv-1727, 2020 WL 3962108, at *4 (S.D.N.Y. July 13, 2020) (same).  Here, the Court need not decide whether the receipt of a right-to-sue letter prior to the statutorily provided 180-day waiting period satisfies Title VII's exhaustion requirements because Ms. Ndugga did not receive *any*

plaintiff failed to file a complaint with the EEOC prior to initiating her lawsuit—leaving open the possibility that the Court found equitable principles on which to excuse the plaintiff's failure.  691 F.2d 1054, 1059 n.4 (2d Cir. 1982), cert. granted, judgment vacated sub nom. *Long Island Univ. v. Spirt*, 463 U.S. 1223 (1983).  *Spirt's* footnote, in turn, relies on *Egelston v. State Univ. College at Geneseo*, where the plaintiff, "after obtaining a right-to-sue notice from the Equal Employment Opportunity Commission . . . brought suit in the Western District of New York."  535 F.2d 752, 754 (2d Cir. 1976).  Indeed, in *Egelston*, it appears again that the court excused the plaintiffs failure to receive a right-to-sue letter on equitable principles.

[8] In some cases, a court has discussed the impact of early right-to-sue letters, but eventually excused the plaintiff's failure to obtain a right-to-sue letter on equitable grounds.  *See e.g., Commodari v. Long Island Univ.*, No. 99-cv-2581, 89 F. Supp. 2d 353, 383 (E.D.N.Y. 2000) (discussing the debate over early right-to-sue letters but finding it was "unnecessary to reach a decision whether the EEOC's practice of issuing right-to-sue letters before the expiration of the 180–day period contravenes the statute" because "the *balance of equities* supports excusing the 180–day waiting period") (emphasis added).

right-to-sue letter prior to filing her claims—rather, she received an early right-to-sue letter months after filing her claims before this Court.

There is an easy solution that would have allowed Ms. Ndugga to preserve her Title VII claims: "where a plaintiff has pleaded non-Title VII claims alongside a Title VII claim, he may file suit on the non-Title VII claims and then *amend the complaint* to include the Title VII claim after receiving a right-to-sue letter." *Sughrim v. New York*, 503 F. Supp. 3d at 68, 95 (emphasis added); *see also Woods v. Dunlop Tire Corp.*, 972 F.2d 36, 41 (2d Cir. 1992) (dismissing a Title VII claim and commenting that a plaintiff could have preserved the claims if she had brought an action, sought a right-to-sue letter, and then amended her complaint to include Title VII claims). Here, Plaintiffs included Ms. Ndugga's Title VII claims from the get-go. They did not file Ms. Ndugga's state claims, wait to receive a right-to-sue letter, and only then amend their complaint to add her Title VII claims. *See Sughrim*, 503 F. Supp. 3d at 95 (dismissing Title VII claims asserted before receiving right-to-sue letters, commenting that complaint could be amended should these right-to-sue letters be obtained). Accordingly, Defendant's motion to dismiss is granted with respect to Ms. Ndugga's Title VII claims, including her claims for retaliation and disparate impact under Title VII.

### D. Ms. Ndugga's NYCHRL Claims

#### 1. Legal Standard

"Section 8-107(1)(a) of the NYCHRL makes it 'an unlawful discriminatory practice for an employer or an employee or agent thereof, because of the [protected characteristic] of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.'" *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109–10 (2d Cir. 2013) (quoting N.Y.C. Admin. Code § 8-107(1)(a)) (brackets and ellipsis omitted). To plead a discrimination claim under the NYCHRL, a plaintiff must allege only that "she [was] treated 'less well' . . . because of a

discriminatory intent." *Id.*, 715 F.3d at 110 (citing *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 39 (1st Dep't 2009)). "[T]he challenged conduct need not even be 'tangible' (like hiring or firing)." *Id.* (quoting *Williams*, 872 N.Y.S.2d at 40); *see also Wolf v. Time Warner, Inc.*, 548 F. App'x 693, 696 (2d Cir. 2013) ("To state a claim for discrimination, a plaintiff must only show differential treatment of any degree based on a discriminatory motive."). Because the NYCHRL standard is more liberal than the corresponding federal and state law standards, courts must analyze NYCHRL claims "separately and independently from any federal and state law claims." *Mihalik*, 715 F.3d at 109.

"The NYCHRL must be construed 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible.'" *Nguedi v. Fed. Rsrv. Bank of New York*, No. 1:16-CV-636-GHW, 2019 WL 1083966, at *10 (S.D.N.Y. Mar. 7, 2019) (quoting *Mihalik*, 715 F.3d at 109), *aff'd*, 813 F. App'x 616 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 825 (2020). "The Court considers the totality of the circumstances, and while courts may dismiss truly insubstantial cases, even a single comment may be actionable in the proper context, for purposes of the NYCHRL." *Bacchus v. New York City Dep't of Educ.*, 137 F. Supp. 3d 214, 245 (E.D.N.Y. 2015) (cleaned up) (quoting *Williams*, 872 N.Y.S.2d at 41).

However, while the NYCHRL confers broad protections, it is "not a 'general civility code.'" *Mihalik*, 715 F.3d at 110 (quoting *Williams*, 872 N.Y.S.2d at 40–41). "The plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive. It is not enough that a plaintiff has an overbearing or obnoxious boss. She must show that she has been treated less well at least in part 'because of [her protected characteristic].'" *Id.* (citing *Williams*, 872 N.Y.S.2d at 39, 40 n.27). Under the NYCHRL, the plaintiff must allege "that "unlawful discrimination was one of the motivating factors, even if it was not the sole motivating factor, for" her unequal treatment. *Melman v. Montefiore Med. Ctr.*, 946 N.Y.S.2d at 40–41 (1st Dep't 2012) (citing *Williams*, 872 N.Y.S.2d at 27); *see also Bennett v. Health Mgmt. Sys., Inc.*, 936 N.Y.S.2d 112, 120 (1st Dep't 2011) ("It is not uncommon

for covered entities to have multiple or mixed motives for their action, and the [NYC]HRL proscribes such 'partial' discrimination." (quoted in *Velazco v. Columbus Citizens Found.*, 778 F.3d 409, 411 (2d Cir. 2015) (alterations omitted)).

Ms. Ndugga brings claims under the NYCHRL for disparate compensation, denial of promotions, and what she frames as a hostile work environment.  For each of those claims, she must show that she was treated "less well" on the basis of her race or gender due to Defendant's discriminatory intent.

### 2. Ms. Ndugga's Allegations that she is Paid Less than Similarly Situated Men State a NYCHRL Claim for Disparate Pay

Ms. Ndugga's allegations inch across the line to state a claim for disparate pay under the NYCHRL.  "[A] plaintiff can raise an inference of discrimination by demonstrating the disparate treatment of at least one similarly situated employee outside his protected group and sufficient facts from which it may reasonably be inferred that 'the plaintiff's and comparator's circumstances . . . bear a reasonably close resemblance.'"  *Sutter v. Dibello*, No. 18-cv-817, 2021 WL 930459, at *21 (E.D.N.Y. Mar. 10, 2021) (quoting *Hu v. City of New York*, 927 F.3d 81, 96-97 (2d Cir. 2019)).[9]  The

---

[9] Courts have come to disparate conclusions regarding the level of detail necessary to sufficiently show that a comparator is similarly situated to a plaintiff:  while it is undisputed that, at summary judgment, "[a] plaintiff relying on disparate treatment evidence must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself . . . whether a plaintiff must carry a similar burden at the motion to dismiss stage is hardly settled." *Ray v. New York State Ins. Fund*, No. 16-cv-2895, 2018 WL 3475467, at *16, (S.D.N.Y. July 18, 2018) (quoting *Raspardo v. Carlone*, 770 F.3d 97, 126 (2d Cir. 2014) (collecting cases).  Indeed

> [N]umerous courts within the Second Circuit have granted motions to dismiss disparate treatment claims where the complaint was entirely devoid of any details regarding the purported comparators, e.g., who they are, what their positions or responsibilities were at the company, how their conduct compared to plaintiffs' or how they were treated differently by defendants, . . . [.].  [T]he Second Circuit has also so required in a number of nonprecedential summary orders, other courts have held to the contrary.

*Id.* (quoting *Blige v. City Univ. of N.Y.*, No. 15-cv-8873, 2017 WL 498580, at *9 (S.D.N.Y. Jan. 19, 2017) (cleaned up) (collecting cases); *compare Solomon v. Fordham University*, No. 18-cv-4615, 2020 WL 7711697, at *9 (S.D.N.Y. Dec. 29, 2020) (dismissing claims where plaintiff did not provide sufficient details regarding her each of her comparators' "specific work duties") *and Torre v. Charter Commc'ns, Inc.*, 493 F. Supp. 3d 276, 285 (S.D.N.Y. 2020) (finding plaintiff's allegations sufficient where the plaintiff alleged that comparators were "paid more than she was, despite having similar responsibilities and equal or lesser credentials") (alterations and citation omitted).  Here, however, the Court need not

alleged comparator must be similar enough "to support at least a minimal inference that the difference of treatment may be attributable to discrimination." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001); *see also Johnson v. Schmid*, 750 F. App'x 12, 17 (2d Cir. 2018); *Cardwell v. Davis Polk & Wardwell LLP*, 2020 WL 6274826, at *22 (S.D.N.Y. Oct. 24, 2020). "Whether two employees are similarly situated ordinarily presents a question of fact for the jury." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).

Before turning to whether Ms. Ndugga is similarly situated to the men identified in her Complaint, the Court notes that Ms. Ndugga sufficiently alleges that she was compensated less than Bloomberg's male employees. Ms. Ndugga alleges, among other things, that male producers hired out of her internship program were paid a starting salary $10,000 more than hers, SAC ¶ 94; that eighteen male team members received increased compensation for performing similar job duties, *id.* ¶ 95; that she was denied raises and compensation compared to her male peers, *id.* ¶ 99, and that Brian Wall, "a producer who began his employment at the same time as Ms. Ndugga for the same position, with similar education" received increased compensation and a promotion, *id.* ¶ 103. These allegations are sufficient to state that Ms. Ndugga was treated less well with respect to compensation than male employees. *See Nguedi*, 2017 WL 5991757, at *8 (finding that plaintiff, a Black man, pleaded sufficient facts to suggest that his employer "gave preferential treatment to employees outside of Plaintiff's protected classes" where, among other things, he was surveilled while white employees were not, and that white employees were encouraged to share ideas whereas he was told "to display less leadership").

Then, construing all allegations in Ms. Ndugga's favor, she sufficiently alleges that the male Bloomberg employees she identified are similarly situated to her. For instance, Ms. Ndugga claims

---

establish the appropriate standard because, drawing all inferences in Ms. Ndugga's favor, she has adequately supported a minimal inference that the difference of treatment is attributable to discrimination.

that she and the higher-paid male producers were hired out of the same internship program.

Drawing all inferences in Ms. Ndugga's favor, one could reasonably infer that the members of the

internship class had a similar educational background and work history so as to be similarly situated.

Similarly, construing in Ms. Ndugga's favor her allegations that she and Brian Wall worked in the

"same position, with similar education," is it reasonable to infer that the two were similarly situated

in terms of experience and their respective job responsibilities.  *See id.*, 2017 WL 5991757, at *7–8

(determining that the plaintiff had alleged sufficient facts to suggest that plaintiff's membership in

protected classes were "at least motivating factors in his termination" where he alleged that

comparators "were subject to the same standards" because "they, like he, had obtained security

clearances," and that comparator employees worked in the "same area" as the plaintiff); *see also*,

*Torre*, 493 F. Supp. 3d at 285–86 (finding claims sufficiently pled where plaintiff alleged that

comparators were "paid more than she was, despite having similar responsibilities and equal or lesser

credentials") (alteration omitted) (quoting *Craven v. City of New York*, No. 19-CV-1486 (JMF), 2020

WL 2765694, at *4 (S.D.N.Y. May 28, 2020)).[10]

It is not the case, as Defendants suggest, that Ms. Ndugga's claims fail because she has not

pleaded sufficiently detailed facts concerning her comparators relevant experience, length of

employment, job titles, job responsibilities or annual review.  *See* Mot. at 17 (citing *Humphries v. City

Univ. of N.Y*, No. 13-cv-2641, 2013 WL 6196561 (S.D.N.Y. Nov. 23, 2013).)  To be sure, Ms.

---

[10] Ms. Ndugga's other allegations further support an inference of discrimination.  *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015) (commenting, in the Title VII context, that a plaintiff may show evidence of intentional discrimination by "creating a 'mosaic' of intentional discrimination by identifying 'bits and pieces of evidence' that together give rise to an inference of discrimination) (quoting *Gallagher v. Delaney*, 139 F.3d 338, 342 (2d Cir. 1998)). Such allegations include that that she was assigned to cover "scrap" assignments while men were assigned topics in which they had an interest, SAC ¶ 102; and that Defendants provided male colleagues raises, despite Defendant's telling Ms. Ndugga that Defendants could not afford raises for her news division, *id* ¶ 103.  These claims, though perhaps insufficient to state a claim in and of themselves, provide support for Ms. Ndugga's claims that her similarly situated comparators were compensated more because of Defendant's discrimination.  *Cf. Bonilla v. City of New York*, No. 18-cv-12142, 2019 WL 6050757, at *14 (S.D.N.Y. Nov. 15, 2019) (citing Vega and finding that a Black plaintiff "bolster[ed]" more expressly-pled race discrimination allegations through a number of more "vague" allegations that white coworkers were "given preferential treatment").

Ndugga's claims could be more detailed. However, the Court must "accept[] all factual allegations as true and draw[] all reasonable inferences in favor of [Ms. Ndugga]." *Sierra Club v. Con-Strux, LLC*, 911 F.3d 85, 88 (2d Cir. 2018) (quoting *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016)). Here, Ms. Ndugga's claims, construed in her favor, inch over the line to create a reasonable inference that men were similarly situated to her. *See Lenart v. Coach Inc.*, 131 F. Supp. 3d 61, 69 (S.D.N.Y. 2015) (finding, under the "broad and remedial purposes" of the NYCHRL, plaintiff's allegations of discrimination "[a]lthough thin, . . . [were] sufficient to state a claim").

Neither are Ms. Ndugga's claims defeated by the fact that three of the eighteen men identified by Ms. Ndugga occupied more senior positions at Bloomberg than she did. *See* Mot. at 17–18. Notably, even if the court declined to consider these three individuals as comparators, Ms. Ndugga alleges that the men were her "team members" and performed "similar job duties" to her. SAC ¶ 95. Drawing all inferences in her favor and viewing these allegations in light of the rest of Ms. Ndugga's complaint, it is at least reasonable to infer that at least some of these "team members" had the same level of seniority as Ms. Ndugga. Moreover, the Court must consider Ms. Ndugga's allegations she was systematically looked over for promotions and opportunities that were "given to her male peers," *id.* at ¶ 96, which suggests that Ms. Ndugga could have occupied a similarly senior position, but was denied the chance to do so because of Bloomberg's discrimination. And regardless, Ms. Ndugga's identification of these individuals provides contextual support for the remainder of her claims. *Cf. Bonilla*, 2019 WL 6050757, at *14 ("Besides providing a laundry list of white officers whom Bonilla alleges were treated more favorably than he, Bonilla fails in many ways to show that these officers were similarly situated to him. However, when combined with his allegations of direct racial animus, [the plaintiff] has done enough to nudge his claim of race discrimination over the line from conceivable to plausible.").

Accordingly, Defendant's motion to dismiss Ms. Ndugga's disparate pay claims under the NYCHRL is denied.

### 3. Ms. Ndugga Does Not Allege a Failure to Promote Because She Wanted to Be Promoted to a Non-Existent Position

Ms. Ndugga fails to allege a claim for failure to promote under the NYCHRL. "[C]ourts have yet to establish a test for analyzing failure to promote claims under the NYCHRL." *Campbell v. Cellco P'ship*, 860 F. Supp. 2d 284, 297 (S.D.N.Y. 2012). However, '[t]o establish a prima facie case of discrimination for failure to promote under Title VII a plaintiff must show that: "1) [he] 'is a member of a protected class;' 2) [his] job performance was satisfactory; 3) [he] applied for and was denied promotion to a position for which [he] was qualified; and 4) the position 'remained open and the employer continued to seek applicants.'" *Id.* (quoting *Campbell v. All. Nat'l, Inc.*, 107 F.Supp.2d 234, 242 (S.D.N.Y. 2000)). While the NYCHRL is subject to more liberal pleading standards than Title VII, Title VII's test still provides guidance for analysis of Ms. Ndugga's Title VII claims. *See id.* ("While bearing in mind the more liberal standards of the NYCHRL, I use [the Title VII] test as a guide in analyzing plaintiff's failure to promote claims.").

Here, Ms. Ndugga's claims for failure to promote fail because she has not identified a position for which she applied and was denied a promotion. Instead, she claims that she "discussed . . . her interest in promotion to fill a position specifically focusing on race and identity to guide the team" and that her supervisors told her that "there was no point in creating that role and promoting her if she already filled that role by being a Black woman on the team." SAC ¶ 104. However, she does not claim that Defendants refused to create new positions for employees who were not a member of Ms. Ndugga's protected classes. In essence, Ms. Ndugga claims that Defendant's treated her "less well" than others because it refused to create a new position especially for her—such an allegation is insufficient to state a claim even under the NYCHRL's liberal standard. Accordingly, her claims for failure to promote cannot withstand Defendant's motion to

dismiss.  *See Tulino v. City of New York*, No. 15-cv-7106, 2016 WL 2967847, at *6 (denying failure to

promote claims where the plaintiff conceded that "she did not formally apply for a known vacant

position"); *Bernstein v. MONY Grp., Inc.*, 228 F. Supp. 2d 415, 419 (S.D.N.Y. 2002) (denying failure to

promote claims because the plaintiff "ha[d] not alleged, among other things, that any position 'in

recruiting and marketing' was ever created or that she was rejected from such position").[11]

Plaintiffs cite to numerous cases to support their argument that "there are exceptions to the

general rule that a plaintiff must identify a specific position that she applied for," all of which are

inapposite.  *See* Opp'n at 16–17.  None of these cases involved instances where a defendant would

necessarily need to create a new position to satisfy plaintiff's request for a promotion, as is the case

here.  *See Woods-Early v. Corning Inc.*, 330 F.R.D. 117, 126 (W.D.N.Y. 2019) (regarding discrimination

that prevented employees from advancing to an already established "pay band"); *Williams v. R.H.

Donnelley, Corp.*, 368 F.3d 123, 129 (2d Cir. 2004) (commenting that the plaintiff had applied to an

"available position").

Accordingly, Defendant's motion to dismiss is granted with respect to Ms. Ndugga's failure

to promote claims under the NYCHRL and NYSHRL.

### 4. Ms. Ndugga Sufficiently Alleges that Bloomberg's Conduct Subjected Her to a "Hostile Work Environment" Under the NYCHRL

Ms. Ndugga adequately pleads a claim for" hostile work environment" under the NYCHRL.

"In order to succeed on a NYCHRL hostile work environment claim, a plaintiff must show that he

was treated 'less well than other employees' on the basis of a protected characteristic."  *Alvarado v.

Nordstrom, Inc.*, 685 F. App'x 4, 8 (2d Cir. 2017) (citing *Mihalik*, 715 F.3d at 110).  Thus, at a

---

[11] Ms. Ndugga also suggests, without expressly alleging, that discrimination played a role in Mr. Wall's receiving a promotion even after she received a positive performance evaluation and was recommended for a raise.  SAC ¶ 103. But this conclusory allegation is insufficient to state a claim.  *See Cardwell v. Davis Polk & Wardwell LLP*, 2020 WL 6274826, at *23 (S.D.N.Y. Oct. 24, 2020) (denying claims where plaintiff's "conclusory" allegations contained "no facts to support" the assertion that employment actions occurred "because of" plaintiff's membership in a protected class).

minimum, a plaintiff must "plead facts tending to show that actions that created the hostile work

environment were taken against him *because of* a prohibited factor." *Williams v. Metro-N. Commuter R.*

*R. Co.,* No. 11 CIV. 7835, 2012 WL 2367049, at *13 (S.D.N.Y. June 20, 2012) (emphasis added).[12]

Here, Ms. Ndugga has plausibly alleged that she was "treated less well" due to her gender.

In addition to Ms. Ndugga's claims that she was paid less for similar work than her male

comparators, Ms. Ndugga also alleges that she was denied resources, such as certain remote-work

technologies, that were provided to her male colleagues, SAC ¶ 100, and that male reporters were

consulted regarding thematic topic areas that they would cover, but Ms. Ndugga was assigned to

cover "scraps," *id.* ¶ 102.   Under the NYCHRL's broad pleading standards, Ms. Ndugga's

allegations, all of which suggest that she was treated less well than her male colleagues, are sufficient

to state a claim.  *See Lenart.,* 131 F. Supp. 3d at  69 (finding the plaintiff's "thin" allegations were

nonetheless sufficient to state a claim under the NYCHRL where the plaintiff alleged that he had to

"undergo extra interviews and psychological testing, whereas his female colleagues did not," and that

he had heard his supervisors expressed a preference for working with women);  *Encarnacion v. Isabella*

*Geriatric Ctr. Inc.,* No., No. 11-cv-3757, 2014 WL 7008946, at *11 (S.D.N.Y. Dec. 12, 2014) (finding

---

[12] In framing Ms. Ndugga's "hostile work environment" claims under the NYCHRL, the parties parrot language from the analysis of hostile work environment claims under Title VII.  *See e.g.,* Reply at 17 (citing *Cardwell,* 2020 WL 6274826, at *27 for the proposition that "[a]llegations of 'discrete, adverse employment decisions concerning promotions, discipline, and appraisal, and about employer criticism' are insufficient to state a claim for hostile work environment"—a standard for hostile work environment claims under Title VII).  But the NYCHRL does not require that a plaintiff show a "hostile" work environment—just one in which she is treated "less well" than others because of her protected characteristic.  Thus, claims under the NYCHRL differ significantly from a hostile work environment claim under Title VII.  Under Title VII, to state a hostile work environment claim, a plaintiff must allege that her "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Littlejohn,* 795 F.3d at 320–21 (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)); *see also Bentley v. AutoZoners, LLC,* 935 F.3d 76, 90 (2d Cir. 2019).   The NYCHRL is "more lenient," *McLeod v. Jewish Guild for the Blind,* 864 F.3d 154, 157 (2d Cir. 2017), and is not limited to Title VII's "severe and pervasive" analysis. *Mihalik.,* 715 F.3d at 109.  Under the NYCHRL, a plaintiff need only show that she was "treated less well" because of her membership in a protected group.  As a result, the phrase "hostile work environment" does not accurately reflect the nature of the standard applicable to a claim under the NYCHRL; a "less nice work environment" claim is not quite as gripping of a title.  Like the parties, the Court parrots Title VII's vocabulary, but believes that it is important to note that it is a bit of a misnomer when applied to a claim under the NYCHRL.

that plaintiff's hostile work environment claims under Title VII's more rigorous standard survived summary judgment where she showed, among other things, that her supervisors "confin[ed] plaintiff to the most difficult assignments" and "refused to meet with her"). Accordingly, Defendant's motion to dismiss Ms. Ndugga's NYCHRL resulting from an environment in which she was treated less well than others is denied.[13]

### E.  Ms. Ndugga's NYSHRL Claims

#### 1.  Because Ms. Ndugga's Claims Accrued Before and After the NYSHRL was Amended, Two Standards must Be Used to Analyze her Claims.

The NYSHRL "prohibits employers from 'discriminating against [an] individual in compensation or in terms, conditions or privileges of employment.'" *Tolbert v. Smith*, 790 F.3d 427, 436 (2d Cir. 2015) (quoting N.Y. Exec. Law § 296(1)(a)).  However, two different standards apply to Ms. Ndugga's NYSHRL claims.

Prior to August 19, 2019, the pleading standards were generally the same for Title VII, section 1981, and NYSHRL claims.  *See Awad v. City of New York.*, No. 13 civ. 5753 (BMC), 2014 WL 1814114, at *5 (E.D.N.Y. May 7, 2014) ("Discrimination claims under § 1981 . . . and [the] NYSHRL are analyzed under the same framework and pleading standard as Title VII claims.") (citing *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n.1 (2d Cir. 2000); *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 72 (2d Cir. 2006) (per curiam)). As a result, it was generally more difficult to state a claim under the NYSHRL than under the

---

[13] Because Ms. Ndugga has sufficiently alleged gender as a basis for her hostile work environment claim, the Court need not consider the alternatives bases for her claim, i.e., her race and identify as a black woman.  *Cf. Rodriguez v. City of Danbury*, No. 15-cv-1269, 2019 WL 4806032, *14 n.19 (D. Conn. Sept. 30, 2019) ("Though plaintiff has alleged conduct on the basis of both race and sex within the limitations period, even if he had alleged conduct related to only one protected characteristic during this period, it would be sufficient"); *see also Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 572 (2d Cir. 2000) ("Given the evidence of both race-based and sex-based hostility, a jury could find that Bloom's racial harassment exacerbated the effect of his sexually threatening behavior and vice versa."), *superseded by statute on other grounds as stated in Johnson v. IAC/Interactive Corp.*, 2 F. Supp. 3d 504, 516 (S.D.N.Y. 2014) .

NYCHRL.  *See, e.g.*, *Soloviev v. Goldstein*, 104 F. Supp. 3d 232, 250 (E.D.N.Y. 2015) ("[A] complaint may fail to state a claim under Title VII and NYSHRL but still be allowed to proceed under NYCHRL.")

However, the New York legislature amended the NYSHRL on August 19, 2019 to establish that its provisions should be construed liberally even if "federal civil rights law, including those laws with provisions worded comparably to the provisions of this article" have been construed narrowly. *Deveaux v. Skechers USA, Inc.*, No. 19-cv-9734 (DLC), 2020 WL 1812741, at *3 n.3 (S.D.N.Y. Apr. 9, 2020) (quoting NY Legis 160 (2019), 2019 Sess. Law News of N.Y. Ch. 160 (A. 8421)).[14]  "The effect of [that amendment] is to render the standard for claims closer to the standard under the NYCHRL."  *Wellner v. Montefiore Med. Ctr.*, No. 17 CIV. 3479 (KPF), 2019 WL 4081898, at *5 n.4 (S.D.N.Y. Aug. 29, 2019).  "However, these amendments only apply to claims that accrue on or after the effective date of October 11, 2019."  *Id.*  "[A] cause of action for discrimination under the NYSHRL accrues and the limitation period begins to run on the date of the alleged discriminatory act."  *Fair Hous. Just. Ctr., Inc. v. JDS Dev. LLC*, 443 F. Supp. 3d 494, 504 (S.D.N.Y. 2020) (alterations omitted) (quoting *Flaherty v. Massapequa Pub. Sch.*, 752 F. Supp. 2d 286, 293 (E.D.N.Y. 2010)).

Ms. Ndugga specifically alleges only two discrete acts that occurred prior to October 11, 2019, both of which relate to her claims of disparate pay:  first, she alleges that she was paid less than male producers hired out of her internship program, SAC ¶ 94; and second, she alleges that she was denied a bonus in 2018 despite receiving positive performance evaluations.  *Id.* ¶ 98.  Thus, under the NYSHRL, the Court must evaluate whether this conduct supports Ms. Ndugga's claims under the pre-October 11, 2019 standard.

---

[14] Specifically, the statute was amended "to eliminate the requirement that harassing or discriminatory conduct be "severe or pervasive" for it to be actionable and to adopt instead a more protective standard that prohibits conduct that results in "inferior terms, conditions or privileges of employment."  *Maiurano v. Cantor Fitzgerald Sec.*, No. 19 CIV. 10042 (KPF), 2021 WL 76410, at *3 n.2 (S.D.N.Y. Jan. 8, 2021) (citing N.Y. Exec. Law § 296(1)(h)).

For the remainder of her allegations, Ms. Ndugga either specifies that the conduct took place after October 11, 2019 or the SAC is ambiguous as to the date when the conduct took place. *See, e.g.*, *id.* ¶ 102 (allegations regarding discrimination that took place in the "Fall of 2019"); *id.* ¶ 106 (describing alleged discrimination by a male supervisor without providing any date). Construing these allegations in the light most favorable to Ms. Ndugga, the Court will assume that this conduct took place after October 11, 2019 and analyze this conduct under the amended and more lenient NYSHRL standard.

### 2. The Alleged Pre-October 11, 2019 Conduct Is Sufficient to State a Claim Under the NYSHRL

Ms. Ndugga states a claim under the NYSHRL with respect to the pre-October 11, 2019 conduct. Under the pre-October 11, 2019 NYSHRL standard, "a plaintiff must plausibly allege that (1) the employer took adverse action against him, and (2) his race, color, religion, sex, or national origin was a motivating factor in the employment decision." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015); *see also Menaker v. Hofstra Univ.*, 935 F.3d 20, 30 (2d Cir. 2019) ("To survive a motion to dismiss, a plaintiff need only [allege] a prima facie case of . . . discrimination by [alleging] that (1) he was within [a] protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." (alterations omitted) (quoting *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 75 (2d Cir. 2016)).

As to the first factor, the parties do not dispute that Ms. Ndugga is a member of a protected class or that she was qualified for her position. With respect to the second factor, "[s]ubjecting an employee to unequal pay can, of course, constitute a materially adverse employment action." *Humphries v. City Univ. of N.Y.*, No. 13 Civ. 2641 (PAE), 2013 WL 6196561, at *6 (S.D.N.Y. Nov. 26, 2013) (quoting *Butler v. N.Y. Health & Racquet Club*, 768 F. Supp. 2d 516, 532 (S.D.N.Y. 2011)). Thus, because Ms. Ndugga alleges that she was paid less than the men hired out of her internship

class, SAC ¶ 94, and that she was denied a bonus in 2018, *id.* ¶ 98, Ms. Ndugga sufficiently alleges

she was subject to an adverse employment action.  *See Humphries*, 2013 WL 6196561 at *6

("[S]ubjecting an employee to unequal pay can, of course, constitute a materially adverse

employment action.").

The NYSHRL's standard for determining whether the plaintiff's protected characteristic was

a motivating factor in an employment decision appears to be "equivalent to" the standard for

determining whether, under the NYCHRL, a plaintiff was treated less well than similarly situated

others because of their membership in a protected group.  *Cardwell*, 2020 WL 6274826, at *20

(commenting that the NYCHRL's standard for determining whether a plaintiff is treated less well

under the NYCHRL "seems to be equivalent to the 'motivating factor' standard of causation under

Title VII and the NYSHRL"); *see also*, *Bivens v. Inst. for Cmty. Living*, No. 14-cv-7173, 2016 WL

11701799, at *1 (S.D.N.Y. Feb. 3, 2016) (quoting *Weiss v. JPMorgan Chase & Co.*, No. 06-cv-4402

(DLC), 2010 WL 114248, at *3 (S.D.N.Y. Jan. 13, 2010) ("[T]he Second Circuit has continued to

apply the same 'motivating factor' causation standard to employment discrimination claims under

the NYCHRL that applies to equivalent claims under Title VII.").  As noted above, Ms. Ndugga

sufficiently alleges a minimal inference of discriminatory intent because she alleges that she was

treated "less well" than her male comparators for purposes of her NYCHRL claim:  *See supra* Part

D.2.  Thus, her allegations are similarly sufficient for purposes of her NYSHRL claim.  *See Ngeudi*,

2017 Wl 5991757, at *7–11 (finding plaintiff stated claims under the NYSHRL and NYCHRL on

the same basis); *see Torre*, 493 F. Supp. 3d at 285–86 (finding that plaintiff stated disparate pay claims

under the NYCHRL and NYSHRL on the same basis).  Accordingly, to the extent Defendant's

motion seeks to dismiss Ms. Ndugga's NYSHRL claims on the basis of conduct that occurred prior

to the amended NYSHRL's enactment on October 11, 2019, their motion is denied.

### 3. Allegations Regarding the Remaining, Post-October 2019 Conduct Sufficiently State a Claim under the NYSHRL.

As explained, the amended NYSHRL adopts the same standard as the NYCHRL. *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 68 (S.D.N.Y. 2020) ("[T]he NYSHRL was amended to direct courts to construe the NYSHRL, like the NYCHRL, 'liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws including those laws with provisions worded comparably to the provisions of [the NYSHRL] have been so construed.'") (quoting N.Y. Exec. Law § 300); *Wellner*, 2019 WL 4081898, at *5 n.4 ("The New York State Legislature passed several amendments to the NYSHRL in June 2019, the effect of which is to render the standard for claims closer to the standard under the NYCHRL."). Thus, Ms. Ndugga's remaining NYSHRL claims rise and fall with her NYCHRL claims. Accordingly, Ms. Ndugga has sufficiently stated claims under the NYSHRL for disparate pay and "hostile work environment" based on conduct occurring after October 11, 2019, but fails to state a claim for failure to promote. *See supra* Part D. Defendant's motion to dismiss Ms. Ndugga's NYSHRL claims based on conduct occurring after October 11, 2019 is thus granted in part and denied in part.

### F. Disparate Impact

#### 1. Legal Standard

Prior to the NYSHRL's 2019 amendment, plaintiffs were required to plead NYSHRL claims for disparate impact under the same pleading standard as applied to such claims under Title VII, which prohibits "discrimination resulting from employment practices that are facially neutral, but which have a 'disparate impact' because they fall more harshly on a protected group than on other groups and cannot otherwise be justified." *Waisome v. Port Auth. of New York & New Jersey*, 948 F.2d 1370, 1374 (2d Cir. 1991). To state a claim for disparate impact under Title VII, plaintiffs must "(1) identify a specific employment practice or policy; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two." *Chin v. Port Authority of N.Y. & N.J.*, 685 F.3d 135,

151 (2d Cir. 2012) (internal quotation marks omitted) (first quoting *Malave v. Potter*, 320 F.3d 321, 326 (2d Cir. 2003), and then quoting *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 160 (2d Cir. 2001); *see also Fitchett v. City of New York*, No. 18 CIV. 8144 (PAE), 2021 WL 964972, at *22 (S.D.N.Y. Mar. 15, 2021). A plaintiff "must at least set forth enough factual allegations to plausibly support each of the three basic elements of a disparate impact claim." *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 209 (2d Cir. 2020).

As explained previously, because the NYSHRL was amended to more closely mirror the NYCHRL than Title VII, the Court analyzes under the NYCHRL's standard Ms. Ndugga's NYSHRL claims for conduct occurring after October 11, 2019. *See Wellner*, 2019 WL 4081898, at *5 n.4. Under the NYCHRL, a plaintiff "must establish 'that a policy or practice of a covered entity or a group of policies or practices of a covered entity results in a disparate impact to the detriment of any group protected by the provisions of [the NYCHRL].'" *Fitchett*, 2021 WL 964972, at *24 (quoting N.Y.C. Admin. Code, § 8-107(17)). That analysis considers the same three factors analyzed under . . . Title VII, but the claims are "construed more liberally than their counterparts under Title VII" and the previous version of the NYSHRL. *Id.* at *24.

### 2. Plaintiffs Do Not Allege Any Disparities that Were Caused by Defendant's Employment Practices

Plaintiffs do not sufficiently allege a causal relationship between Defendant's employment policies and any alleged disparities.[15] "At the prima facie stage" under Title VII, statistical analysis put forth to support the existence of a disparity "'must [demonstrate] that the disparity is substantial or significant, and must be of a kind and degree sufficient to reveal a causal relationship between the

---

[15] As to the first element required to show a disparate impact claim, Bloomberg's alleged employment practices, Plaintiffs allege that Defendant's Editorial Management Committee holds the exclusive authority to make hiring or promotion decisions, as well as decisions related to employee pay and also that that the Editorial Management Committee often makes such salary decisions based on a new hire's "prior pay." SAC ¶¶ 14, 28, 33–36, 40, 42. Assuming without deciding that those allegations are sufficient to identify a specific employment practice, Plaintiffs' allegations nonetheless fail for the reasons stated herein.

challenged practice and the disparity.'" *Mandala*, 975 F. 3d at 209 (quoting *Chin*, 685 F.3d at 151. "[T]hat standard is relaxed at the pleading stage," *id.*, especially under the newly liberalized NYSHRL.  For instance, a "plaintiff is not required 'to prove in detail the methodological soundness of her statistical assessment' or to 'supplement [the complaint's] statistical analysis with corroborating evidence.'" *Cardwell v. Davis Polk & Wardwell LLP*, No. 19-cv-10256, 2021 WL 4434935, at *36 (S.D.N.Y. Sept. 23, 2021) (quoting *Mandala*, 975 F.3d at 209). "But even at this early juncture, the statistics must plausibly suggest that the challenged practice *actually* has a disparate impact." *Mandala*, 975 F.3d at 209 (emphasis in original).

Plaintiffs point to several alleged disparities between men and women at Bloomberg, including that "[m]ale reporters are frequently hired at salaries that are $20,000 or more above the salaries of their female peers," SAC ¶ 35; *see also id.* ¶ 38.  However, these allegations lack sufficient detail to support the existence of a disparity.  Even at the pleading stage, Plaintiffs must "set forth enough factual allegations to plausibly support" the existence of a disparity.  *Mandala*, 975 F.3d at 209.  Merely alleging that men are "frequently" hired at higher salaries than their female peers does not sufficiently demonstrate that a disparity between the starting salaries of male and female reporters exists; Plaintiffs do not allege, for instance, that "the majority" of men are provided higher starting salaries than their female peers or that "on average" men are paid $20,000 more than women.  Without more, the allegations related to male salaries are insufficient to show a disparity, let alone one caused by Defendant's employment practices.  *Cf. Richardson v. City of New York*, No. 17-CV-9447 (JPO), 2018 WL 4682224, at *8 (S.D.N.Y. Sept. 28, 2018) (finding "sparse and decontextualized data points" were insufficient to state a claim for disparate impact under the NYCHRL).[16]

---

[16] Plaintiffs' allegations that "numerous female reporters complained to Plaintiff Syeed that Bloomberg's male editors undermined them and bypassed them for promotion," SAC ¶ 31, that "many female colleagues spoke openly with

Second, while Plaintiffs allege that only 1,000 of Bloomberg's 2,700 reporters are women, SAC ¶ 16, they fail to allege a causal connection between that disparity and the Editorial Management Committee's unfettered hiring and promotion discretion.  As *Mandala* emphasized, allegations of a disparity—in that case, statistical allegations—must "plausibly suggest that the challenged practice *actually* has a disparate impact."  *Mandala*, 975 F.3d at 210.  To show that the challenged practice actually has a disparate impact, plaintiffs must "focus on the disparity between appropriate comparator groups."  *Id.*  The relevant comparison is between the alleged disparity at issue and the "composition of the qualified population in the relevant labor market.'"[17]  *Id.* at 210– 11 (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 650 (1989)).

Here, Plaintiffs fail to provide relevant comparisons to allege a sufficient causal connection between the Executive Management Committee's unfettered discretion over hiring and their allegation that only 1,000 of Defendant's 2,700 reporters are women.  Under *Mandala*, to allege that the Executive Management Committee's hiring discretion was the *cause* of the disparity—rather than, for instance, an existing gender disparity in qualified journalists—Plaintiffs must provide some allegation regarding the relative number of men and women eligible to be hired as reporters in the first place.  Plaintiffs do not do so; they do not allege, for instance, that the pool of qualified applicants for Defendant's reporter jobs has a 50/50 gender breakdown.[18]  Without more, their

---

Plaintiff Syeed about the gender pay disparity them observed" *id.* ¶ 38, that a D.C. bureau chief "disclosed that there was a known gender pay disparity in the News Bureaus," *id.*, that data collected from Bloomberg's offices in the United Kingdom confirmed a pay disparity. and that the head of human resources at Bloomberg's D.C. office agreed that there was a "racist and sexist" culture at Bloomberg, *id.* ¶ 87, are similarly too conclusory to support their claim.

[17] Plaintiffs misrepresent *Mandala*'s holding by arguing that *Mandala* requires only that they allege "disparities specific to [Bloomberg]."  Surreuply at 5.  *Mandala* instead holds that statistics must "reveal disparities between populations that are relevant to the claim the plaintiff seeks to prove."  *Mandala*, 975 F.3d at 210.

[18] Plaintiffs seem to ask the Court to assume that a 50/50 gender split represents the appropriate benchmark from which Bloomberg has deviated as a result of the identified policy.  But not only have they provided no data regarding the gender distribution in the relevant pool of qualified applicants for positions as Bloomberg reporters, they have provided no data regarding the gender breakdown in New York State—the geographic area relevant to Plaintiffs' disparate impact claims under the NYSHRL.  The data presented by Plaintiffs reflects Defendant's global work force.  As described above, Defendant's non-New York employees are not generally protected by the NYSHRL.  In the same way, its non-

allegations are insufficient to permit the court to infer a causal connection between the Executive Management Committee's discretion and the disparity between male and female reporters.  *See id.* (holding that plaintiffs failed to state a claim where Plaintiffs had not "offered [any] allegations to suggest that the general population statistic on which they rely 'might accurately reflect [the] pool of qualified job applicants'").

This is not to suggest that Plaintiffs must put forth "statistical analysis" to state a claim for disparate impact.  As *Mandala* notes, "plaintiffs *typically* rely on statistical evidence to show a disparity in outcome between groups."  *Mandala*, 975 F.3d at 209. (emphasis added).  Accordingly, Plaintiffs are free to rely on anecdotal or qualitative allegations, rather than statistical analysis, in alleging a disparate impact claim.  *See, e.g.*, *Gittens-Bridges v. City of New York*, No. 19cv-272, 2020 WL 3100213, at *15–16 (S.D.N.Y. June 11, 2020) (relying on anecdotal evidence, rather than statistics, to state a claim).  But even these allegations must be sufficient to "plausibly suggest that the challenged practice *actually* has a disparate impact."  *Mandala*, 975 F.3d at 210.  Without *any* allegations to regarding the relevant pool of qualified applicants, Plaintiffs claims are insufficient to show the requisite causal link.  Even under the liberalized standard applicable to the NYSHRL claims, a plaintiff must allege more than that their employer had discretion in hiring and that the current distribution of employees' gender does not match the assumed gender distribution in the U.S. population.  Accordingly, Defendant's motion to dismiss Plaintiffs' disparate impact claims under the NYSHRL is granted.

---

U.S. employees would not generally be protected by Title VII.  *See Boustany v. Xylem Inc. et al.*, 235 F. Supp. 3d 486, 498 (S.D.N.Y. 2017).

### G. Right to Jury Trial

#### 1. The Court Will Honor Plaintiffs' Demand for a Jury Trial

The Court will honor Plaintiffs' demand for a jury trial.  In cases which have been removed from state court to federal court, Federal Rule of Civil Procedure 81(c)(3) describes the process for demanding a jury trial in three different situations:  (1) when "all necessary pleadings have been served before removal"; (2) "where a party has, before removal, requested a jury in accordance with state law"; and (3) "state law does not require the parties to expressly claim trial by jury."  *Cascone v. Ortho Pharm. Corp.*, 702 F.2d 389, 391 (2d Cir. 1983).  Rule 81 also provides that in the third situation, a court may still order parties to request a jury trial, and "[a] party who fails to make a demand when so ordered waives a jury trial."  Fed. R. Civ. P. 81(c)(3).

At the time of removal, Plaintiffs had filed the First Amended Complaint, which includes the statement "JURY TRIAL DEMANDED" on its first page.  Dkt. No. 1, Ex. 2, at 2.  Plaintiffs had not filed a demand for jury trial in state court, however, because, under New York law, a jury demand cannot be accepted unless a note of issue has been served, and a note of issue cannot be served until discovery is complete.  *See Breedlove v. Cabou*, 296 F. Supp. 2d 254, 277–78 (N.D.N.Y. 2003) (citing N.Y. C.P.L.R. 4102) (explaining the New York process for issuing a jury demand).  Because this case is currently in its preliminary stages, discovery had not yet commenced in the state action, let alone been completed prior to the removal of this case, rendering Plaintiffs unable to file a demand for a jury trial.

Then, on September 14, 2020, following removal, this Court issued an order stating that "[p]ursuant to Fed. R. Civ. P. 81(c)(3), if any party wishes to demand a jury trial in this matter, the demand must be served and filed no later than September 25, 2020."  Dkt. No. 7.  Between September 14 and September 25, 2020, Plaintiffs did not serve or file a jury trial demand.  On

November 16, 2020, Plaintiffs filed the Second Amended Complaint which also included the statement "JURY TRIAL DEMANDED" in its caption. Dkt. No. 26, at 1.

Here, there can be no dispute that the parties failed to request a jury trial under the circumstances outlined in Rule 81(c)(3). Nonetheless, the Court will exercise its discretion to excuse the untimely jury demand. "The Second Circuit in *Higgins* identified three factors which would allow the district court on remand to allow a 'late' request for a jury trial" . . . (1) "whether the case is of a type 'traditionally triable by jury'"; (2) "the parties' assumptions as to whether the case would be tried to a jury;" and (3) "prejudice to the non-movant." *Turkenitz v. Metromotion, Inc.,* No. 97CIV.2513(AJP)(JGK), 1997 WL 773713, at *5 (S.D.N.Y. Dec. 12, 1997) (quoting *Higgins v. Boeing Co.,* 526 F.2d 1004, 1007 (2d Cir. 1975)). "In the absence of such prejudice, even an untimely jury demand usually will be permitted in removed cases." *Id.* at *7.

Here, all three factors weigh in favor of excusing Plaintiff's untimely jury demand. First, employment discrimination cases are frequently tried before juries. Second, there can be no question that Plaintiffs have expressed their desire that this case to be tried to a jury: Plaintiffs included "JURY TRIAL DEMANDED" in the captions both of the complaint filed in state court, Dkt. No. 1-1, as well as in the SAC, SAC at p. 1. The Court is reluctant to deprive Plaintiff of the opportunity to try this case before a jury given that their desire to do so has been evident throughout—even if it was not presented in the proper procedural manner. Moreover, Defendants have not relied to their detriment on Plaintiffs' failure to properly file their demand, given that this case has not yet proceeded past initial motion practice. As follows, Defendants have not demonstrated that they will suffer prejudice if this case is tried to a jury. *See Turkenitz,* 1997 WL 773713, at *6–7 (excusing untimely jury demand where defendants made showing of prejudice); *Breedlove,* 296 F. Supp. 2d at 278 (same); *Encarnacion v. Isabella Geriatric Ctr.,* No. 11-cv-3757, 2014 WL 4494160, at *4 (S.D.N.Y. Sept. 11, 2014 (excusing untimely jury demand where the defendants'

"representations lack[ed] the requisite specificity to demonstrate that [they] suffered any meaningful prejudice" from the untimely jury demand). Accordingly, the Court does not find that Plaintiffs have waived their right to a jury trial and will grant their demand for a jury trial on the remaining claims.

## V. LEAVE TO AMEND

Although Plaintiffs have already amended their complaint twice, Dkt. No. 26, the Court grants Plaintiffs leave to replead the dismissed claims with the exceptions noted below. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead."); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). While leave may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party[,]" those circumstances do not apply in this case with respect to the majority of the dismissed claims. *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)).

However, any attempt by Ms. Syeed to replead her claims under the NYSHRL and NYCHRL would necessarily be futile because she did not live or work in New York. Therefore, Plaintiffs may not amend Ms. Syeed's claims. *Cf. Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 18 (2d Cir. 1997) (noting that leave to amend need not be granted where the proposed amendment would be futile").

## VI. CONCLUSION

For the reasons stated above, Defendant's motion to dismiss the Second Amended Complaint is granted in part and denied in part. Specifically, Defendant's motion to dismiss Ms. Syeed's claims under the NYCHRL and NYSHRL is GRANTED. Defendant's motion to dismiss Ms. Ndugga's Title VII claims is GRANTED. Defendant's motion to dismiss Ms. Ndugga's

disparate pay and hostile work environment claims under the NYCHRL and NYSHRL is DENIED.

Defendant's motion to dismiss Ms. Ndugga's disparate impact claims under the NYSHRL is

GRANTED.  Defendant's motion to dismiss Ms. Ndugga's failure to promote claims under the

NYCHRL and NYSHRL is GRANTED.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 42.

SO ORDERED.

Dated:  October 25, 2021
New York, New York

_____
GREGORY H. WOODS
United States District Judge