UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NAULA NDUGGA, on behalf of herself and similarly situated women,

                Plaintiff,

    v.

BLOOMBERG L.P.,

                Defendant.

20 Civ. 7464 (GHW) (GWG)

**ORAL ARGUMENT REQUESTED**

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF DAVID NEUMARK**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

PROCEDURAL HISTORY....................................................................................... 2

RELEVANT FACTUAL BACKGROUND.................................................................. 4

    A.    Compensation Process In News................................................................ 4

    B.    Dr. Neumark's Opinion. .......................................................................... 6

ARGUMENT ........................................................................................................... 7

I.    The Court Should Conduct a Full *Daubert* Inquiry Before Relying On Expert Testimony At the Class Certification Stage. .................................. 7

II.    The Court Should Exclude Dr. Neumark's Opinion and Testimony Under Rule 702 and *Daubert*........................................................................ 8

    A.    Dr. Neumark's Opinion Is Inadmissible Because It Is Irrelevant. ............................................................................................... 12

        1.    Dr. Neumark's Analysis Depends On the Unfounded Assumption That "Cost Center" Affects Compensation. ................. 12

        2.    Dr. Neumark's Analysis Is Irrelevant Because It Fails To Evaluate the Degree To Which Compensation Decisions Across the Classes May Properly Be Aggregated. ....................................... 18

    B.    Dr. Neumark's Opinion Is Inadmissible Because It Is Unreliable................................................................................................ 23

        1.    Dr. Neumark's Analysis Fails To Account For Starting Pay. ........... 23

        2.    Dr. Neumark Has No Factual Basis For Excluding Employee-Years. ................................................................................. 25

        3.    Dr. Neumark's Proffered Class Damages Calculations Are Unreliable. ...................................................................................... 27

CONCLUSION..................................................................................................... 27

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002)................................................................................23

*Bolden v. Walsh Constr. Co.*,
    688 F.3d 893 (7th Cir. 2012) ......................................................................21, 22

*Bustamante v. KIND, LLC*,
    100 F.4th 419 (2d Cir. 2024) ..............................................................................10

*Campbell v. Nat'l R.R. Passenger Corp.*,
    311 F. Supp. 3d 281 (D.D.C. 2018)......................................................................7

*Daubert v. Merrell Dow Pharms., Inc.*,
    43 F.3d 1311 (9th Cir. 1995) ..............................................................................10

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)........................................................................................9, 10

*Dukes v. Wal-Mart Stores, Inc.*,
    964 F. Supp. 2d 1115 (N.D. Cal. 2013) ..............................................................21

*Floyd v. City of New York*,
    283 F.R.D. 153 (S.D.N.Y. 2012) ..........................................................................8

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)......................................................................................10, 11

*Hamrit v. Citigroup Glob. Mkts., Inc.*,
    2024 WL 4891889 (S.D.N.Y. Nov. 26, 2024)....................................................10

*In re Acetaminophen - ASD-ADHD Prods. Liab. Litig.*,
    2024 WL 3357608 (S.D.N.Y. July 10, 2024) ....................................................11

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
    407 F. Supp. 3d 422 (S.D.N.Y. 2019)................................................................18

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    299 F. Supp. 3d 430 (S.D.N.Y. 2018)..................................................11, 17, 18

*In re Lyman Good Dietary Supplements Litig.*,
    2019 WL 5682880 (S.D.N.Y. Oct. 31, 2019) ....................................................10

*In re Mirena IUD Prods. Liab. Litig.*,
    169 F. Supp. 3d 396 (S.D.N.Y. 2016)............................................................................11

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
    982 F.3d 113 (2d Cir. 2020)...........................................................................................9

*In re Terrorist Attacks on Sept. 11, 2001*,
    2024 WL 5077293 (S.D.N.Y. Dec. 11, 2024) .........................................................9, 11, 23

*In re U.S. Foodservice Inc. Pricing Litig.*,
    729 F.3d 108 (2d Cir. 2013)...........................................................................................8

*Jensen v. Cablevision Sys. Corp.*,
    372 F. Supp. 3d 95 (E.D.N.Y. 2019) ..............................................................................23

*Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*,
    103 F. Supp. 2d 268 (S.D.N.Y. 2000)............................................................................11

*Kassman v. KPMG LLP*,
    416 F. Supp. 3d 252 (S.D.N.Y. 2018)............................................................................22

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)......................................................................................................9

*Lamarr-Arruz v. CVS Pharmacy, Inc.*,
    2017 WL 4277188 (S.D.N.Y. Sept. 26, 2017).................................................................11

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
    209 F. Supp. 3d 612 (S.D.N.Y. 2016),
    *aff'd*, 720 F. App'x 24 (2d Cir. 2017)............................................................................10

*Manzo v. Stanley Black & Decker, Inc.*,
    2024 WL 5319230 (E.D.N.Y. Mar. 20, 2024) ..................................................................9

*Mia. Prods. & Chem. Co. v. Olin Corp.*,
    2024 WL 5116568 (W.D.N.Y. Dec. 16, 2024)..................................................................8

*Northway Med. Ctr. Condo v. Hartford Fin. Servs. Grp., Inc.*,
    2024 WL 3876380 (S.D.N.Y. Aug. 20, 2024) .................................................................16

*Richardson v. City of New York*,
    2021 WL 1910689 (S.D.N.Y. May 12, 2021) ..................................................................22

*Sardis v. Overhead Door Corp.*,
    10 F.4th 268 (4th Cir. 2021) ..........................................................................................9

*U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3, AFL-CIO*,
    313 F. Supp. 2d 213 (S.D.N.Y. 2004)............................................................................17

*Valelly v. Lynch*,
   2023 WL 2918982 (S.D.N.Y. Apr. 12, 2023)............................................................8

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011).........................................................................8, 12, 21

*Washington v. Kellwood Co.*,
   714 F. App'x 35 (2d Cir. 2017) ...............................................................23

**OTHER AUTHORITIES**

Fed. R. Evid. 702 .........................................................................................8, 9

1 MCLAUGHLIN ON CLASS ACTIONS § 3:14 (21st ed.) (Westlaw 2024) ..........................7

Defendant Bloomberg L.P. ("BLP") respectfully moves to exclude the opinions and testimony of Plaintiff's proffered expert witness David Neumark, Ph.D., from consideration in connection with Plaintiff's anticipated motion for class certification (as well as on summary judgment and at any trial).

## PRELIMINARY STATEMENT

As the Court has recognized, Plaintiff's forthcoming motion for class certification will "rely heavily" on the opinions of Dr. David Neumark in an attempt to establish that her claims of pay discrimination against two classes of female reporters, editors and producers can be resolved on an aggregated basis. Dkt. 343. The analyses performed by Dr. Neumark, however, are neither relevant nor reliable in deciding whether the requirements of Rule 23 have been met and therefore must be excluded.

Dr. Neumark's analyses are irrelevant because they rely on unfounded assumptions that find no support in the record. First, in finding a statistically significant gender-based pay disparity, Dr. Neumark's analysis is fully dependent on the inclusion of Cost Center, an accounting category, as a control to capture differences across jobs and ensure that he is comparing similarly situated employees. Indeed, Dr. Neumark concedes that *there is no statistically significant difference between the compensation of male and female employees in the putative classes if Cost Center is excluded from his model*, with all other variables held constant. Despite the crucial importance of Cost Center to his model, Dr. Neumark had no factual basis to conclude that Cost Center affects compensation, and had substantial evidence that it did not. Second, Dr. Neumark's opinion rests entirely on the assumption, made without any analysis, that he could aggregate hundreds of individual compensation determinations for all women in all relevant years across a set of jobs selected, not for their functional similarity, but unilaterally by Plaintiff's counsel. He testified that he aggregated these hundreds of

compensation decisions because that was the only way to generate a single result for the proposed classes, but he did not analyze, and has no basis to conclude, whether such aggregation was justified.

Dr. Neumark's analyses are also unreliable. He fails to account for starting pay (potentially influenced by pay at a new hire's previous job) as a confounding variable, even though Plaintiff alleges that pay disparities at BLP are a function of starting (and prior) pay and even though Dr. Neumark acknowledges, in his deposition and in his own scholarly work, that starting pay may be determined by a variety of non-discriminatory factors. He thus agrees that the gender-based pay disparities he observed may be attributable, to an unknown degree, to starting pay decisions, and that those consequential decisions may be influenced or determined by factors other than discrimination by BLP.

For these reasons, Dr. Neumark's opinions and testimony should be disregarded and excluded from evidence.

## **PROCEDURAL HISTORY**[1]

This case involves pay discrimination claims brought by one plaintiff[2] who worked for Bloomberg News ("News") only in New York and only as an entry-level producer on the TicToc/QuickTake team, which had only approximately 20 female producers. However, she alleges claims of disparate treatment and disparate impact discrimination in pay on the basis of sex under Title VII and the New York State Human Rights Law ("NYSHRL") on behalf of herself and other female reporters, editors and producers who worked in News in two classes

---

[1] As used herein, citations to "Ex. __" refer to the exhibits annexed to the Declaration of Elise M. Bloom, Esq. ("Bloom Decl.").

[2] On August 12, 2024, the Court granted BLP's motion to sever Nafeesa Syeed's claims from those of Plaintiff Naula Ndugga. *See* Dkt. 304.

encompassing 338 and 319 employees, respectively.[3]  *See* Dkt. 296, Fifth Amended Complaint ("FAC") ¶¶ 56, 57, 165-196.  She also alleges individual claims of race and sex discrimination in pay, among others.  *See* FAC ¶¶ 197-222.

On December 20, 2024, Plaintiff filed a motion for class certification.  Dkts. 329-333. She sought to certify a proposed class of female reporters, producers and editors who worked for BLP nationwide from February 3, 2021 through December 31, 2021 alleging sex discrimination claims under Title VII (the "U.S. Class"), as well as a putative class of female reporters, producers and editors who worked in New York from August 9, 2017 through December 31, 2020 alleging parallel claims under the NYSHRL (the "New York Class").  *See* Dkt. 330, Memorandum of Law in Support of Plaintiff's Motion for Class Certification ("Pl.'s Withdrawn Br.") at 25-26 (describing proposed class definitions).

On February 11, 2025, BLP filed a letter requesting leave to file this motion to exclude the opinions and testimony of Dr. Neumark.  Dkt. 340.  Plaintiff opposed this request.  Dkt. 342. On February 12, 2025, the Court issued an Order granting BLP's request to file this motion, and directed that it be filed on or before February 20, 2025.  Dkt. 343 (the "Order").  The Order further stated that Plaintiff's motion for class certification would be deemed withdrawn, explaining that "[b]ecause plaintiffs appear to rely heavily on Dr. Neumark's opinions in support of their motion for class certification, the Court believes it is best to resolve the admissibility of those opinions before the parties submit their arguments regarding class certification."  *Id.*

---

[3] Ex. A (Declaration of David Neumark and Expert Report of David Neumark, dated July 1, 2024 ("Neumark Rpt.")) ¶¶ 8(e) & 8(b).

## RELEVANT FACTUAL BACKGROUND

### A.    Compensation Process In News.

Hundreds of managers in News determined compensation on an individualized basis designed to link each employee's pay to their performance.[4]  This process began with each employee's immediate supervisor (typically, a team leader) using their discretion to make an initial determination about numerical performance ratings across a set of metrics based on that employee's performance and contributions.[5]  Team leaders then submitted their ratings up to their manager, who, in turn, used their discretion to either approve, reject or change them as they deemed appropriate before submitting them further up the management chain.[6]

Beginning in 2018 and continuing into 2019, News began to implement Peer Groups as a component of its evaluation and compensation processes.[7]  Peer Groups are not defined based on uniform criteria.[9]

---

[4] Ex. F (Deposition of Lisa Jennings ("Jennings Tr.")) 161:9-162:13; Ex. G (Deposition of Krista Sullivan ("Sullivan Tr.") 45:15-19; Ex. C (Expert Report of Denise Neuman Martin, Ph.D., dated August 30, 2024 ("Martin Rpt.")) ¶¶ 48, 48(a)-(d) & Figures 7-9.

[5] Ex. F (Jennings Tr.) 259:10-15, 301:21-302:3, 308:3-309:16*; see also* Ex. J (describing the ratings process as starting with the team leaders, *i.e.*, the "TLs").

[6] Ex. H (Deposition of Reto Gregori ("Gregori Tr.") 55:25-56:6; Ex. F (Jennings Tr.) 315:4-17; *see also* Ex. J (outlining process and deadlines for different levels of managers within the Breaking News & Markets Business Unit to submit their ratings); *see also* Ex. H (Gregori Tr.) 55:7-17 (explaining that, in the context of Ex. J, "TL" referred to team leaders, "ME" referred to managing editors, and "EE" referred to executive editors).

[7] Ex. F (Jennings Tr.) 63:20-64:21 (peer groups were initially formed for a subset of Job Profiles in News, ▉▉▉▉▉▉▉▉▉▉, in 2018), 99:23-100:7 (majority of employees in News were in peer groups by 2019); *see also, e.g.,* Ex. K at slides 2 & 3.

[8] Ex. L at BLP_Syeed_0014849; *see also, e.g.,* Exs. M at slides 1-2, and K at slides 2-3.

[9] Ex. F (Jennings Tr.) 80:13-25, 90:15-24, 109:22-110:18, 119:7-120:2; Ex. I (Deposition of Shelby Siegel ("Siegel Tr.") 14:9-16:2 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

After the performance ratings are finalized, a compensation algorithm tool calculated initial compensation figures based on a series of inputs and rules that varied from year-to-year.[11]

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████  ███████████████████████

█████████████  ███████████████████████████  ███████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████

Those preliminary values, however, did not determine final compensation.[16]  Hundreds of managers then assessed the values generated by the algorithm's calculations, and used their discretion to determine whether to increase, decrease, or proceed with the specific numbers for

---

[10] Ex. I (Siegel Tr.) 16:16-19, 36:11-37:7, 78:12-78:24 ████████████████████████████████████

[11] *See* Ex. N at pp. 8-9 (listings categories of inputs); Ex. G (Sullivan Tr.) 29:2-12, 31:7-15, 32:6-17.

[12] *Id.*

[13] *See id.*; Ex. H (Gregori Tr.) 103:18-104:16.

[14] *See* Ex. O ████████████████████████████████████████████████████████; *see also, e.g.,* Exs. P & Q.

[15] *Id.*

[16] *See, e.g.,* Ex. F (Jennings Tr.) 214:14-215:4 ██████████████████████████████████ █████████, 242:10-244:4; *see also, e.g.,* Ex. M at slides 3-5 ███████████████ ██████████████████████

each member of their team.[17]  By the time salary adjustments and bonuses were finally determined, they had been reviewed by multiple managers and, approximately 75% of the time, were not the same as the initial values calculated by the algorithm.[18]

### B.    Dr. Neumark's Opinion.

In an effort to satisfy her burden to establish the crucial "commonality" element of Rule 23(a), as well as predominance under Rule 23(b)(3), Plaintiff will proffer the analyses, opinions, and testimony of Dr. David Neumark.[19]  Using the results of a statistical technique known as a regression analysis, Dr. Neumark found no statistically significant disparity (using the widely-adopted rule of two standard deviations for statistical significance) in the total compensation for the proposed U.S. Class, and a 4% disparity in the proposed New York Class that was slightly over the two-standard-deviation threshold.  *See* Ex. A (Neumark Rpt.) ¶¶ 49, 50.[20]  Dr. Neumark also calculated purported class damages based on his statistical analyses.  *See id.* ¶¶ 57-60 and p. 31, Table 5.

BLP retained Dr. Denise Martin as a rebuttal expert to evaluate and opine on Dr. Neumark's analyses and conclusions.  Dr. Martin concluded, based on her review of the factual record in this case and her extensive experience, that Dr. Neumark's regression model was not aligned with the factors considered at BLP to determine employee compensation.  *See* Ex. C (Martin Rpt.) ¶ 2.  After making small changes to partially correct Dr. Neumark's unsupported

---

[17] Ex. F (Jennings Tr.) at 242:10-244:4; Ex. I (Siegel Tr.) 202:7-18; Ex. G (Sullivan Tr.) 48:11-16.

[18] Ex. C (Martin Rep.) ¶¶ 48(a)-(b), 49.

[19] *See* Pl.'s Withdrawn Br. at 19-23, 33-35, 39-40.  To the extent Plaintiff will attempt to rely on Dr. Neumark's report and/or opinions to establish any other Rule 23 prerequisite, that also will fail for the same reasons set forth herein.

[20] Specifically, for the U.S. Class, Dr. Neumark calculated that women were paid 3% less than men, with a difference of 1.64 standard deviations, and for the New York Class the difference was 4% at 2.12 standard deviations.  *Id.* ¶¶ 8(b), 8(e).

assumptions and otherwise taking his model as a given, Dr. Martin found that there is no statistically significant difference between the compensation of male and female employees in the putative classes. *Id.*

Acknowledging the validity of certain of Dr. Martin's criticisms, Dr. Neumark prepared "supplemental tables" in which he attempted to address some of the flaws in his analysis identified by Dr. Martin.[21]  However, as Dr. Martin described in a supplemental report, Dr. Neumark's attempted adjustments lacked any factual foundation and therefore failed to cure the deficiencies in his initial report.[22]  *These disagreements between the experts, however, are not the basis for this motion*, except to the extent that Dr. Neumark acknowledged errors pointed out by Dr. Martin.

## ARGUMENT

### I.    THE COURT SHOULD CONDUCT A FULL *DAUBERT* INQUIRY BEFORE RELYING ON EXPERT TESTIMONY AT THE CLASS CERTIFICATION STAGE.

"Most circuit courts that have addressed the issue have found that, where an expert's testimony is critical to class certification, a district court **must** conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion—*i.e.*, the district court must perform a full *Daubert* analysis before certifying the class." *Campbell v. Nat'l R.R. Passenger Corp.*, 311 F. Supp. 3d 281, 294-96 (D.D.C. 2018) (collecting cases discussing question and agreeing with "the heavy weight of authority" holding that a *Daubert* analysis is required at the class certification stage) (cleaned up and emphasis added); *see also* 1 MCLAUGHLIN ON CLASS ACTIONS § 3:14 (21st ed.) (Westlaw 2024) ("[A] majority of courts has

---

[21] Ex. B (Dr. Neumark's "Supplemental Tables" dated September 26, 2024 ("Neumark Supp. Tables")).

[22] Ex. D (Supplemental Expert Report of Denise Neumann Martin, Ph.D., dated October 25, 2024 ("Martin Supp. Rpt.")).

accepted that the requirements of *Daubert* and Rule 702 apply with full force at the class certification stage.").

Although the Second Circuit has not yet definitively addressed this question, it has noted that the Supreme Court has "offered limited dicta suggesting that a *Daubert* analysis may be required" at the class certification stage. *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 129 (2d Cir. 2013) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 354 (2011)); *see also Floyd v. City of New York*, 283 F.R.D. 153, 166-67 (S.D.N.Y. 2012) (noting that "[i]n *Wal-Mart*, the Supreme Court strongly suggested that *Daubert* … applies at the certification stage of a class action proceeding"). Accordingly, "courts in the Second Circuit regularly subject expert testimony to *Daubert*'s rigorous standards insofar as that testimony is relevant to the Rule 23 class certification analysis." *Valelly v. Lynch*, 2023 WL 2918982, at *4 (S.D.N.Y. Apr. 12, 2023) (citation omitted); *Mia. Prods. & Chem. Co. v. Olin Corp.*, 2024 WL 5116568, at *5 (W.D.N.Y. Dec. 16, 2024) (same).

Plaintiff's withdrawn motion for class certification confirms that her class theory does not merely rely upon Dr. Neumark's opinions, but is wholly dependent on them. *See* Pl.'s Withdrawn Br. at 19-23, 33-35, 39-40 (arguing that BLP's compensation process discriminated against women based entirely on Dr. Neumark's analyses). Accordingly, the Court should perform a full *Daubert* analysis before ruling on Plaintiff's motion for class certification.

## II.   THE COURT SHOULD EXCLUDE DR. NEUMARK'S OPINION AND TESTIMONY UNDER RULE 702 AND *DAUBERT*.

Under Rule 702, which governs the admissibility of expert testimony, a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" may offer expert opinion testimony if the proponent demonstrates to the court that it is more likely than not that: (i) the expert's opinions "will help the trier of fact to understand the evidence or to determine a

fact in issue"; (ii) "the testimony is based on sufficient facts or data"; (iii) "the testimony is the

product of reliable principles and methods"; and (iv) "the expert's opinion reflects a reliable

application of the principles and methods to the facts of the case." Fed. R. Evid. 702.

In performing its "gatekeeper" function, the court must ensure that any expert evidence

offered is both relevant and reliable. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579,

597 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *In re Mirena IUS

Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113, 122-23 (2d Cir. 2020). Recent

amendments to Rule 702 emphasize the importance of this gatekeeping function and clarify that

a court may not admit expert testimony unless (i) the proponent establishes its admissibility by a

preponderance of the evidence; and (ii) the expert's opinion follows from a reliable application

of the methodology to the facts at issue. *See* Fed. R. Evid. 702, Advisory Committee Note to

2023 Amendments; *see also, e.g.*, *Manzo v. Stanley Black & Decker, Inc.*, 2024 WL 5319230, at

*3 & n.11 (E.D.N.Y. Mar. 20, 2024). The amendments arose because the Advisory Committee

detected a "pervasive problem" of courts delegating to the jury the judicial responsibility of

critically screening expert testimony and repeatedly holding, inappropriately, that "the critical

questions of the sufficiency of an expert's basis, ... and the application of the expert's

methodology, are generally questions of weight and not admissibility." *Sardis v. Overhead Door

Corp.*, 10 F.4th 268, 283-84 (4th Cir. 2021); *see also, e.g., In re Terrorist Attacks on Sept. 11,

2001*, 2024 WL 5077293, at *3 (S.D.N.Y. Dec. 11, 2024) (recognizing that the amendments to

Rule 702 were in response to decisions admitting "expert testimony too liberally" and were

intended to "empower courts to take seriously their roles as gatekeepers of expert evidence").

Plaintiff repeats this error in her letter opposing BLP's request to file a *Daubert* motion, citing

only cases decided before the 2023 amendment to Rule 702 that rely on the outdated standard. *See* Dkt. 342 at 2.

Expert testimony is relevant if it assists in "understand[ing] the evidence" and resolving the primary issues in the case. *Hamrit v. Citigroup Glob. Mkts., Inc*., 2024 WL 4891889, at *5-6 (S.D.N.Y. Nov. 26, 2024). Relevance can be understood as a question of "fit" – that is, whether the expert testimony is "sufficiently tied to the facts of the case that it will aid . . . in resolving a factual dispute." *In re Lyman Good Dietary Supplements Litig*., 2019 WL 5682880, at *5 (S.D.N.Y. Oct. 31, 2019). As the Ninth Circuit explained in its reconsideration of *Daubert* on remand, "obviously," the Supreme Court "did not intend [this] prong of Rule 702 to be merely a reiteration of the general relevancy requirement of Rule 402." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1321 n.17 (9th Cir. 1995) ("*Daubert II*"). Rather, a heightened relevance standard is necessary, as "scientific expert testimony carries special dangers to the fact-finding process because it 'can be both powerful and quite misleading because of the difficulty in evaluating it.'" *Id.* (quoting *Daubert*, 509 U.S. at 595). Indeed, courts "***must***" exclude expert evidence "unless they are convinced that it speaks clearly and directly to an issue in dispute in the case[.]" *Daubert II*, 43 F.3d at 1321 n.17 (emphasis added).

If the court determines that the proffered expert testimony is relevant, then it must determine whether the testimony has a "sufficiently reliable foundation to permit it to be considered." *Bustamante v. KIND, LLC,* 100 F.4th 419, 427 (2d Cir. 2024) (citation omitted). "The 'fit' and 'reliability' requirements overlap: Testimony is neither helpful nor reliable where 'there is simply too great an analytical gap between the data [on which the expert relies] and the opinion proffered.'" *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 641 (S.D.N.Y. 2016), *aff'd*, 720 F. App'x 24 (2d Cir. 2017) (quoting *Gen. Elec. Co. v. Joiner*,

522 U.S. 136, 146 (1997)); *see also In re Acetaminophen - ASD-ADHD Prods. Liab. Litig.*, 2024 WL 3357608, at *15 (S.D.N.Y. July 10, 2024).

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146; *see also In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 431-32 (S.D.N.Y. 2016) (concluding that an expert opinion was inadmissible where "the conclusions [were] linked to [the] studies only by [the expert's] say-so"); *Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 283 (S.D.N.Y. 2000) ("[T]he expert must have some reliable basis for extrapolating from the available data...."); *In re Terrorist Attacks on Sept. 11, 2001,* 2024 WL 5077293, at *4, 28 (holding that expert's opinions "backed only by his say-so" were unreliable).

Where, as here, a party seeks to exclude expert testimony that is offered in connection with a motion for class certification, "the *Daubert* standard applies, but the inquiry is limited to whether or not the expert reports are admissible to establish the requirements of Rule 23." *Lamarr-Arruz v. CVS Pharmacy, Inc.*, 2017 WL 4277188, at *9 (S.D.N.Y. Sept. 26, 2017); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 471 (S.D.N.Y. 2018) ("[T]he question is not whether a jury at trial should be permitted to rely on the expert's report to find facts as to liability, but rather whether the Court may utilize it in deciding whether the requisites of Rule 23 have been met.").

As explained below, Dr. Neumark's opinion is inadmissible and should be excluded for two interrelated reasons: (i) it is irrelevant because it relies on unfounded assumptions and therefore does not "fit" the facts of this case, and (ii) it is unreliable because it fails to account for factors that are integral to BLP's compensation process.

**A.    Dr. Neumark's Opinion Is Inadmissible Because It Is Irrelevant.**

Plaintiff will offer Dr. Neumark's opinion to establish whether the "commonality" requirement for class certification has been met.  *See* Pl.'s Withdrawn Br. at 33-35.  Accordingly, the only relevant question is whether Dr. Neumark's opinion tends to show that a class-wide proceeding is capable of "generat[ing] common answers apt to drive the resolution of the litigation."  *Dukes*, 564 U.S. at 350 (emphasis omitted).  It does not because it relies on unfounded assumptions—that Cost Center affects compensation and that BLP's compensation and performance evaluation decisions may be analyzed on an aggregate basis—which find no support in the record or Dr. Neumark's analysis.  Dr. Neumark's opinion is therefore irrelevant to resolving any factual dispute necessary to the Rule 23 analysis and should be excluded.

1.    ***Dr. Neumark's Analysis Depends On the Unfounded Assumption That "Cost Center" Affects Compensation.***

*"[P]eople discover things in data and then it turns out we construct theories of why they . . . matter."*

– Dr. David Neumark[23]

Dr. Neumark's candid admission aptly describes his analysis here, which manifests a conclusion in search of a justification.  In finding a statistically significant gender-based pay disparity, Dr. Neumark's analysis relies on the inclusion of Cost Center, an accounting category, as a control to capture differences across jobs and ensure that he is comparing similarly situated employees.  *See* Ex. A (Neumark Rpt.) ¶¶ 30, 34; Ex. E (Neumark Tr.) 132:16-21.  The significance of this control to Dr. Neumark's analysis cannot be understated – he concedes that if just Cost Center is excluded from his model, with no other changes, ***there is no statistically significant difference between the compensation of male and female employees in either of the putative classes***.  *See* Ex. E (Neumark Tr.) 166:6-167:8; *see also* Ex. C (Martin Rpt.) ¶ 23.  The

---

[23] Ex E (Deposition of Dr. David Neumark ("Neumark Tr.")) 165:12-14.

dispositive role played by Cost Center in Dr. Neumark's analysis demands that he offer a solid theoretical justification for including it as a control.  Yet, as explained below, Dr. Neumark had no basis to assume that Cost Center affected employee compensation.

To begin with, Dr. Neumark himself acknowledges that "Cost Center does not play a role in compensation guidelines."  Ex. A (Neumark Rpt.) ¶ 30.  Despite that admission, he included it anyway based on the speculation that "raises and hence pay *may* differ by Cost Center since different Cost Centers *may* have different amounts available for raises."  *See id*. (emphasis added).  To support this assumption, Dr. Neumark relied entirely on references to Cost Center in two compensation guideline memos for 2017 and 2021, respectively, which address funding for year-end bonuses and salary increases.  *See id.* ¶ 30 n.77 (citing Jennings Ex. 18 and Sullivan Ex. 1).  But, as Dr. Neumark admitted in deposition, these documents do not support the conclusion that Cost Center had any impact on compensation during those two years, let alone during the entire putative class periods.

First, the 2021 compensation guidelines memo is entirely irrelevant because it provides compensation guidelines to be applied for 2022, which is outside the relevant time period for either putative class.  *See* Ex. R ███████████████████████████████

███████; *see also* Ex. E (Neumark Tr.) 153:13-154:4, 156:14-157:3 (acknowledging that raises referenced in memo would not go into effect until January 2022 and therefore were not included in his analysis).[24]

---

[24] ██████████████████████████████████████████████████████████
████████████████████  Ex. Q.

Second, ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████ *See* Ex. S. ██████████████████████████

█████████████████████████████████████████████ but this oblique reference does

not suggest that funding for compensation increases varied by Cost Center so as to justify

including Cost Center as a control. *See id.* Dr. Neumark ***expressly acknowledged that he had***

***no basis to draw such a conclusion.*** *See* Ex. E (Neumark Tr.) 161:2-5 ("whether … you can

map from cost center to business unit and that's what they're listing, you know, is beyond my …

ability to interpret from this document"); *id.* at 160:5-7 ("I cannot fully parse whether that's

about business units or cost centers"); *id.* at 162:4-5 ("to my mind it's not entirely clear what this

means"). █████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████ *See* Ex. A (Neumark Rpt.) Table A-4, pp. 37-38 (listing 89 separate Cost Centers

included as control variables).

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████. *See* Declaration of Stephanie Plancich, Ph.D. ¶¶ 2-4. Dr. Neumark's analysis

separately controls for Business Unit. Ex. A (Neumark Rpt.) ¶¶ 24, 29, 34, 37. Why, then, did

he rely on this memo to include Cost Center as well, especially when he did not even know

whether the memo "[was] about business units or cost centers"? Ex. E (Neumark Tr.) 160:5-7.

Dr. Neumark testified that he did so ***because it turned out that Cost Center generated***

---

[25] *See* Ex. A (Neumark Rpt.) Table A-4, pp. 38-39.

***statistically significant results***.  As to any variables that affect the outcome, he testified, "[if you're asking] should you leave them out because I'm not sure they should be in there, the answer is no."  *Id.* at 163:12-14.  In other words, Dr. Neumark contends that any variable that generates statistically significant results should be included in the analysis, even if there is no theoretical basis to include it.  He was asked whether he would include employee hair color, or the day of the month (1-31) on which an employee was hired, or whether the employee's address was a "road, a "street," or an "avenue," if those plainly irrelevant variables also produced significant results; he responded that he thought they would probably not turn out to be significant.  *Id*. at 163:21-165:5.[26]  And if, against his expectation, such irrelevant variables did turn out to be significant, they should be included, because "people discover things in data and then it turns out we construct theories of why they do matter."  *Id*. at 165:12-14.  That extraordinary endorsement of reasoning backwards from desired result to theoretical justification renders Dr. Neumark's analysis unsound and therefore inadmissible.

Dr. Neumark also could not account for the 2018, 2019, and 2020 versions of the same memos, ███████████████████████████████████████████████████████████████ ████████████████████████████████████.[27]  *See* Ex. E (Neumark Tr.) 148:9-149:25.  He nevertheless included Cost Center as a control variable in those years, without any

---

[26] That turned out to be wrong; as Dr. Martin's supplemental report showed, the day of the month on which an employee was hired passed the same statistical test of "joint significance" that Cost Center did (*see* Ex. D), even though, as Dr. Neumark concedes, it indisputably has no logical or actual bearing on compensation.  Ex. E (Neumark Tr.) 165:21-24.

[27] In her withdrawn motion for class certification, Plaintiff tried to assist Dr. Neumark by pointing to the 2019 compensation guidelines memo, on which he did not rely, and noting that ███████████████████████████ ██████████████████████████████████████████████████████████████████████████████████████ ██████  *See* Pl. Withdrawn Br. at 4, n.17. ███████████████████████████████████████████████ ████████████████████  Declaration of Krista Sullivan ("Sullivan Decl.") ¶¶ 2-5.  Plaintiff did not ask that question in Ms. Sullivan's deposition, or in any deposition for that matter, and Dr. Neumark apparently did not ask it either in preparing his report.

basis to do so.  When asked why, he confirmed the speculative nature of his analysis, explaining that "[y]ou know, the fact that I see this for two years"—one of which is outside the class period—"and no one says it didn't happen the other years doesn't give [] me any reason it doesn't happen in other years."  *See id.* at 150:2-15.  Actually, of course, someone ***did*** say it "didn't happen the other years": ███████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████[28]  Dr. Neumark's cavalier approach cannot withstand scrutiny because "Rule 702 requires that expert testimony rest on knowledge, a term that connotes more than subjective belief or unsupported speculation."  *Northway Med. Ctr. Condo v. Hartford Fin. Servs. Grp., Inc.*, 2024 WL 3876380, at *6 (S.D.N.Y. Aug. 20, 2024) (citation omitted).

Further, for several variables, Dr. Neumark conducted a sensitivity test—a method for evaluating whether a model's results are sensitive to small changes—to assess whether his decision to control for a certain variable skewed the results.  He testified that he typically conducts a sensitivity test to evaluate whether to include a certain control whenever he "[thinks] there was [] either ambiguity in the record or just kind of a good reason."  Ex. E (Neumark Tr.) 122:25-123:3.  He found such reason and conducted sensitivity tests to check the influence of *other* controls considered but not used in his model, including Peer Group, Position, and Leave of Absence.  *See* Ex. A (Neumark Rpt.) ¶¶ 38(a), (b), (f).  Yet, despite his uncertainty about ███████

███████████████████████████████████████████████████████████

█████████████████████, he failed to conduct a sensitivity test for Cost Center in his original report – the one variable that turned his results from statistically insignificant to significant.  *See*

---

[28] Sullivan Decl. Ex. A (2019 memo); Ex. H (Gregori Tr.) 99:25-101:4 ████████████████████████
████████████ ; *see also* Exs. T (2018 memo) & U (2020 memo).

Ex. E (Neumark Tr.) 206:9-207:5; *see, e.g., In re LIBOR*, 299 F. Supp. 3d at 468 ("Robustness testing and sensitivity testing that produces contradictory or otherwise implausible results strongly suggest that a methodology has been insufficiently tested and that the methodology has a high potential rate of error."); *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3, AFL-CIO*, 313 F. Supp. 2d 213, 235 (S.D.N.Y. 2004) (excluding expert where "no such sensitivity testing was conducted"). Dr. Neumark's selective use of sensitivity testing further demonstrates the unreliability and outcome-orientation of his approach.

Responding to this critical flaw in his analysis after it was pointed out by Dr. Martin, Dr. Neumark provided no more logical or theoretical basis to conclude that Cost Center was a relevant variable, but instead produced "supplemental tables" in which he added a test of "joint significance" for Cost Center, a statistical test for assessing whether a group of explanatory variables in a model are statistically significant as a whole. He concluded that the Cost Center variable passed the test. *See* Ex. B (Neumark Supp. Tables) columns 6 and 11; Ex. E (Neumark Tr.) 190:18-191:14, 203:18-205:16. The results of Dr. Neumark's test do not cure the basic flaw in his model, however, because there remains no theoretical basis to include the variable in the first place – *i.e.*, there is no evidence that Cost Center actually was a factor in compensation determinations. Dr. Neumark continues to rely on his theory that any variable showing statistical significance should be included, even if he does not know ***why*** it is relevant.

That is a fundamental error, because even variables that are indisputably irrelevant can turn out, mathematically, to be statistically significant. As an example, Dr. Martin conducted a test of joint significance for the day of the month on which an employee was hired (1 through 31) ("Hire Day"), a variable which Dr. Neumark agreed did not appear relevant. *See* Ex. D (Martin Supp. Rpt.) ¶ 2; Ex. E (Neumark Tr.) 164:9-165:24. Using the same methodology as Dr.

Neumark, but substituting Hire Day for Cost Center, Dr. Martin found that Hire Day similarly passed a test of joint significance even though this variable has no impact on compensation. *See* Ex. D (Martin Supp. Rpt.) ¶¶ 3-5. Because Dr. Neumark's supplemental tables still failed to justify his inclusion of Cost Center as an explanatory variable, they did not cure this dispositive flaw in his analysis.

In sum, Dr. Neumark's opinion fails *Daubert*'s "fit" requirement. It is a mismatch for the facts of this case because Dr. Neumark's decision to include Cost Center as a control in his model lacks any foundation in the record; even he acknowledged that he did not understand the meaning of the document on which he relied to include it. Given that Dr. Neumark's entire conclusion that there was a statistically significant gender-based pay disparity evaporates if Cost Center is omitted as a control, Dr. Neumark's opinion is irrelevant and must be excluded.

> 2. ***Dr. Neumark's Analysis Is Irrelevant Because It Fails To Evaluate the Degree To Which Compensation Decisions Across the Classes May Properly Be Aggregated.***

Again, Dr. Neumark's opinion is only relevant at this stage if it tends to show that a question common to the class can be answered for all class members on a class-wide basis. *See In re LIBOR*, 299 F. Supp. 3d at 471 (*Daubert* inquiry at class certification stage focuses on whether the expert opinions are admissible to "establish[] the various class certification requirements"); *accord In re Foreign Exch. Benchmark Rates Antitrust Litig.,* 407 F. Supp. 3d 422, 429 (S.D.N.Y. 2019).

Here, that question (or at least the question that Plaintiff claims Dr. Neumark answers, and for which she offers his testimony) is whether all female reporters, producers and editors in News were paid less than similarly situated men. *See* Pl.'s Withdrawn Br. at 19. But Dr. Neumark's study does not answer that question, nor show that it can be answered on a common

basis, because Dr. Neumark did not examine commonality: he assumed it.  Dr. Neumark did not

select the jobs to be aggregated; he was given a list of jobs by Plaintiff's counsel, was told to

assume that this was a cohesive group, and was asked to return one outcome for the entire group:

the single percentage by which the pay of all of the women in the group differed from the pay of

all of the men in the group.  Ex. E (Neumark Tr.) 54:23-55:6, 228:17-229:6.  He does not know

whether the jobs he studied – ranging from television anchors to booking producers to photo

editors – consisted of employees who performed functionally similar work; he did not try to

answer that question, and in fact testified that he was not qualified to answer that question.  *Id*. at

71:5-15 ("I did not do any – any kind of job analysis. It's not what labor economists do

anyways.").  Nor did he consider the fact that different rules applied to different jobs within the

group that he lumped together—*i.e.*, ████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████  *See* p.

5, *supra*.

  Nor can Dr. Neumark say, for example, that female Producers (Plaintiff's job) were paid

statistically significantly less than male Producers.  Ex. E (Neumark Tr.) 184:21-25.  He was

tasked to come up with a single, common result across all of the jobs that Plaintiff's counsel

selected; that he did so does not demonstrate that a single, common result is appropriate.

  To justify his aggregated analysis, Dr. Neumark assumed that decisions about

compensation and performance ratings for the hundreds of employees within the putative classes

are "highly centralized."  *See* Ex. A (Neumark Rpt.) ¶¶ 27-30; Ex. E (Neumark Tr.) 94:25-95:6.

He does not, however, know how many managers were involved in the performance rating

process (Ex. E (Neumark Tr.) 95:7-19), and he made no effort to control for the identity of the

manager making decisions about ratings or compensation (*id*. at 97:9-22).   Dr. Neumark accordingly cannot say whether few, some, or all managers' compensation decisions were infected by gender bias, or if so which ones, or to what extent it affected any individual class member.  *Id*. at 185:13-186:2.

Instead, he concluded that he could ignore variations in performance ratings and compensation decisions made by over 100 individual managers and aggregate them all into one unitary result because of Deputy Editor-in-Chief Reto Gregori's "final authority on core pay decisions."  *Id*. at 93:5-6.  But he did no analysis to support that premise.[29]  Further, asked in deposition whether it was appropriate to aggregate the data for all class members based on Mr. Gregori's involvement if (as the data shows) Mr. Gregori predominantly favored women in the changes he made to managers' compensation recommendations,[30] Dr. Neumark replied, "I don't know how much he's adjusting things. I don't know how much he's leaving there. I don't – I don't have enough information to assess that . . . ."  Ex. E (Neumark Tr.) 111:17-112:6.

In fact, though, Dr. Neumark had access to, and could have analyzed, detailed audit logs showing that 126 individual managers adjusted compensation for hundreds of employees during the relevant period, which affected the final compensation determination of approximately 75% of class members.   Ex. C (Martin Rpt.) ¶ 48; *see* Ex. E (Neumark Tr.) 101:19-106:13; Pl.'s Withdrawn Br. at 15, n.61 (noting circumstances under which managers were required to provide a written explanation when making proposed changes to initial compensation amounts suggested in BOCS).

---

[29] "Q. Did you do any analysis of how often performance ratings are changed by Gregori or some other central figure? A. So I didn't look at that. . . ."  *Id.* at 96:9-12.

[30] *See* Ex. C (Martin Rpt.) ¶ 48(e).

Instead, Dr. Neumark testified, he did not look at individual managers' decisions, but rather presented "a model estimated at the company level," thus simply assuming that such aggregation was appropriate instead of establishing that it was.  Ex. E (Neumark Tr.) 99:25-100:11.  He was "focused on what people got paid in relation to their gender" but was "not trying to explain the whole path of adjustment as to how one got there."  *Id.* at 106:5-8.  Ultimately, he was not interested in whether employees' final pay resulted from the decisions of more than a hundred individual managers or one central decisionmaker, because he was not "ask[ing] how is each manager behaving"; "the claims are against Bloomberg."  *Id*. at 99:25-100:24.

Dr. Neumark also acknowledged that his decision to aggregate pay decisions made by over a hundred managers for all of these individuals assumes that all of those managers give neutral factors affecting pay – job performance, seniority, experience, and so on – the same weight.  *Id*. at 138:17-140:6.  He cites no reason to think that all managers actually evaluated those factors the same way, but commented instead that the "reason we tend to aggregate" is because there "is not, you know, a huge number of workers at Bloomberg," and if the data is broken down into more granular units instead of aggregating it, "you introduce a lot of statistical unreliability."  *Id*. at 139:12-19.  In other words, aggregating individual decisions together was the only way he could generate his one common result across the class.  But aggregation is not the answer to the problem that the relevant groups are too small: if the relevant groups are "too small to generate significant results, . . . elevating the level of analysis [to a more aggregated level] runs afoul of the Supreme Court's objection" in *Dukes* that the analysis must be conducted at the level at which compensation decisions are actually made.  *Dukes v. Wal-Mart Stores, Inc*., 964 F. Supp. 2d 1115, 1120 (N.D. Cal. 2013); *see Dukes*, 564 U.S. at 352; *Bolden v. Walsh Constr. Co.*, 688 F.3d 893, 898 (7th Cir. 2012) ("[*Dukes*] tells us that local discretion cannot

support a company-wide class no matter how cleverly lawyers may try to repackage local variability as uniformity."); *Kassman v. KPMG LLP*, 416 F. Supp. 3d 252, 282 (S.D.N.Y. 2018) (expert analysis must "conform[] to the level of decision for the challenged practices").  There is a statistical test that can be applied to determine whether aggregation in a particular situation is appropriate, called a Chow test.  Dr. Neumark acknowledged the test and that he chose not to use it here; he said that while he "sometimes" uses it, he "tend[s] to focus more on what is admittedly somewhat more subjective."  Ex. E (Neumark Tr.) 142:22-144:19.

Plaintiff thus must attempt to bootstrap her way to commonality: she selected a list of jobs, provided it to Dr. Neumark to perform an aggregated analysis of those individuals' pay without any statistical assessment of whether aggregation is appropriate, and then uses Dr. Neumark's aggregated result to argue that common class treatment is appropriate.  Courts reject that circular approach:

> The sort of statistical evidence that plaintiffs present has the same problem as the statistical evidence in [*Dukes*]: it begs the question. Plaintiffs' expert . . . assumed that the appropriate unit of analysis is all of [Defendant's] Chicago-area sites. He did not try to demonstrate that proposition.

*Bolden*, 688 F.3d at 896; *see also Richardson v. City of New York*, 2021 WL 1910689, at *10 (S.D.N.Y. May 12, 2021) ("In the wake of *Dukes*, courts have been skeptical of 'aggregated statistical evidence . . . derived from hundreds of employment decisions made by myriad decision makers, at different times, under mutable procedures and guidelines, in different departments, . . . [and] concerning employees at varying levels of experience, responsibilities, and education.'") (citing *Kassman*, 416 F. Supp. 3d at 282).  Dr. Neumark's opinions are irrelevant for these reasons, independent of his unjustified inclusion of the Cost Center variable, and should be excluded.

**B.      Dr. Neumark's Opinion Is Inadmissible Because It Is Unreliable.**

Dr. Neumark's opinion also should be excluded because his analyses, and the conclusions he draws from them, are entirely unreliable.  "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand."  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002); *see also Washington v. Kellwood Co.*, 714 F. App'x 35, 39 (2d Cir. 2017) (summary order) (rejecting damages estimate because expert assumed facts that were belied by other facts in the record); *In re Terrorist Attacks on Sept. 11, 2001*, 2024 WL 5077293, at *4 (factors bearing on reliability may include the expert's success in accounting for alternative explanations, whether the expert has "unjustifiably extrapolated" to reach a conclusion, and degree of care applied, among others); *Jensen v. Cablevision Sys. Corp.*, 372 F. Supp. 3d 95, 111 (E.D.N.Y. 2019) ("[T]he Court is not obligated to accept conclusions that do not flow from the facts[.]").  Dr. Neumark's opinion is unreliable because he fails to account for starting pay, influenced as it may have been for many class members by their pay at a prior job, even though Plaintiff alleges starting pay strongly influenced the alleged pay discrepancies, and Dr. Neumark cannot rule out that possibility (because, again, he did not study it).  Moreover, because Dr. Neumark unjustifiably excludes certain observations from his model and because his class damages calculations rely on his irredeemably flawed analyses, they are also unreliable and should be excluded.

1.      *Dr. Neumark's Analysis Fails To Account For Starting Pay.*

Plaintiff's disparate impact theory is premised, in significant part, on her allegation that BLP relied on prior pay in setting starting salaries of new employees, which "hurts women" due

to supposed "industry wide pay disparities." *See* FAC ¶¶ 39-40; *see also id*. ¶¶ 61(b), 177-78, 193-94.  According to Plaintiff, "[s]tarting pay continues to impact compensation throughout employees' careers" at BLP, "as even if pay raises were given equally to male and female employees, the disparities created with starting pay would continue, in a phenomenon recognized as 'start low, stay low.'"  *Id*. ¶ 43. She continued to press this theory in her withdrawn motion for class certification.  *See* Pl.'s Withdrawn. Br. at 17-19, 26 n.104.

Dr. Neumark acknowledged that if starting pay were lower on average for women than for men because it was influenced by what new hires had been paid in jobs prior to joining BLP, that difference could persist even if raises and bonuses thereafter were decided on a purely gender-neutral basis.  Ex. E (Neumark Tr.) 45:8-47:3.  But Dr. Neumark also conceded that he is in no position to evaluate whether starting pay *at BLP* was a product of discrimination and that he did not consider it.  *See id.* at 47:4-49:16.  Further, as Dr. Neumark acknowledged in his own published article, differences in starting salary "may not reflect discrimination but rather unobserved differences between women and men," such as "bargaining, willingness to compete … preferences for workplace amenities and especially flexibility (hours, scheduling, etc.)."  Ex. V at 2-3; *see also* Ex. E (Neumark Tr.) 47:4-48:10.

He also did not evaluate the *nature* of employees' experience before hire at BLP, even though he concedes there can be a connection between pay and prior experience.  *See* Ex. E (Neumark Tr.) 118:18-121:5.  For example, an individual with years of reporting experience may start with a higher salary than someone hired as a reporter right after graduating from college.

Dr. Neumark thus agrees that the gender differences in pay he observed may be attributable at least in part (or, for all he knows, entirely) to starting pay decisions, and that those potentially consequential starting pay decisions may be influenced or determined by factors other

than discrimination.  Therefore, starting pay is a confounding variable that may offer a nondiscriminatory explanation for the gender differences in pay that Dr. Neumark (and Plaintiff) attribute to discrimination.  But Dr. Neumark concedes that he did not include starting pay as a control variable in his analysis, because he lacked the data necessary to determine its influence (at least to the extent that it was a function of prior pay).  *Id.* at 44:18-45:7.[31]  Plaintiff herself has conceded that she "cannot identify what portion of the pay disparity" was caused by the setting of initial salary on the basis of prior pay and what portion was attributable to the annual compensation determinations that Dr. Neumark studied.  Pl.'s Withdrawn Br. at 26, n.104.

Dr. Neumark's failure to account for starting pay renders his analysis unreliable.  It also further demonstrates the irrelevance of his opinions; his conclusions are not helpful to the factfinder because they do not assist the factfinder in determining whether BLP unlawfully discriminated in pay, or even whether that question can be answered on a class-wide basis.

2.    ***Dr. Neumark Has No Factual Basis For Excluding Employee-Years.***

As Dr. Martin pointed out, and as Dr. Neumark subsequently conceded, Dr. Neumark introduced errors into his analysis when he excluded any employees compensated in a foreign currency, which he did in order to filter out employees who are not in the putative New York and U.S. classes.  *See* Ex. C (Martin Rpt.) ¶ 10 n.28.  While Dr. Neumark assumed that such employees did not work in the United States and therefore are not putative class members, his assumption was incorrect because it failed to account for employees who moved abroad during the year and received a bonus in a foreign currency for work performed in the United States

---

[31] *See also id.* at 48:11-19 ("Q. And so you can't allow [for] the possibility that differentials in starting pay at Bloomberg were caused by nondiscriminatory factors as opposed to being a tainted control variable; right? A. I can't do any analysis to the question in this case. In other cases that's not been the case. But I simply – I can't answer the question. . . .").

during the previous year. *See id.*[32] Dr. Neumark conceded that Dr. Martin had correctly identified an "unambiguous … error" in his analysis but claimed that he was able to "fix" his admitted mistake by providing supplemental tables that simply excluded any years in which an employee left one of the putative classes. *See* Exs. B (Neumark Supp. Tables) & E (Neumark Tr.) 189:19-195:22; *see also* Pl.'s Withdrawn Br. at 20, n.83 (claiming that the supplemental tables "correct[ed] for issues in some instances of connecting bonus decisions made after the end of the year with the base salary determination made at the start of the year, particularly where an individual had moved jobs or locations mid-year").[33]

Dr. Neumark's "supplemental tables" failed to cure this deficiency in his analysis, however, because he lacked any factual foundation for his "solution" of simply excluding the employee-years at issue. When attempting to explain how he accounted for bonuses for employees who moved abroad mid-year, Dr. Neumark candidly admitted: "I honestly don't have a firm answer and haven't seen one about exactly how bonuses get determined and is it based on -- hypothetically it could be based on your performance before you left. That doesn't seem that plausible. It could be based on your performance where you are now. It could is be [sic] based on some combination. I don't know." *See id.* at 192:6-13. Lacking any idea how to account for bonuses in such a scenario, Dr. Neumark decided to "just exclude those years rather than … assigning the wrong one." *See id.* at 192:14-17. His belated exclusion of employee-years relies

---

[32] Dr. Martin provided the following example to illustrate the effect of Dr. Neumark's error: "[I]f an employee moves from New York in 2019 to London in 2020, their 2019 bonus – paid in February 2020 – will be paid in GBP. Because he drops all foreign currency records from his analysis, he drops this bonus from the 2019 total compensation of this employee and treats them as receiving no bonus, thereby underestimating their compensation. If the employee returned to the United States in 2021, he improperly attaches their 2021 bonus to their 2019 base pay to calculate their 2019 total compensation." *Id.* ¶ 10 n.28.

[33] Dr. Neumark could not recall whether he removed employee-years from the proposed New York class for employees who moved out of New York but remained in the United States between 2017 and 2020, stating that "[w]e should have," but not recalling "whether we did." *See* Ex. E (Neumark Tr.) 196:14-18.

on an assumption that a bonus awarded in February of Year 2 is unconnected to performance in a Year 1, notwithstanding his stated understanding that "bonuses paid in February of each year reflect payments for the work performed in the prior calendar year" (*see* Ex. A (Neumark Rpt.) ¶ 9(d)(ii); *see also id.* ¶ 10(b)). He made no effort to reconcile these conflicts in his own opinions and instead opted to summarily drop over 100 employee-year observations from his regression models without ever attempting to consider potential differences between employees who left early in Year 1 versus late in Year 1. As Dr. Neumark admitted, "I have no idea how this works. That's why I'm kind of most comfortable or I show you all the results excluding those years I don't know exactly how to treat." Ex. E (Neumark Tr.) 197:12-198:5. This is not a reliable analysis by any definition.

3.    ***Dr. Neumark's Proffered Class Damages Calculations Are Unreliable.***

Dr. Neumark also purports to calculate damages for the two proposed classes by multiplying the pay disparities he claims to have found by the average class member's total compensation for the respective class periods and adding statutory interest. *See* Ex. A (Neumark Rpt.) ¶¶ 57-60 & p. 31, Table 5. Because these figures rely on irredeemably flawed statistics produced by Dr. Neumark's irrelevant and unreliable analyses, his class damages calculations should be excluded from any future proceedings in this case. *See* Ex. C (Martin Rpt.) ¶¶ 29-30, 56 (concluding that there is no statistical support for Dr. Neumark's class damages estimates after correcting the flawed assumptions in his models).

## CONCLUSION

For all of the foregoing reasons, the Court should grant BLP's motion and exclude the opinions and testimony of Dr. David Neumark from consideration in connection with any future motion for class certification, motion for summary judgment and at any trial.

Dated: New York, New York
      February 20, 2025

                                PROSKAUER ROSE LLP

                                By: */s/Elise M. Bloom*
                                Elise M. Bloom
                                Rachel S. Philion
                                Allison L. Martin
                                Pinchos Goldberg
                                Eleven Times Square
                                New York, New York 10036
                                (t) 212-969-3000
                                (f) 212-969-2900
                                ebloom@proskauer.com
                                rphilion@proskauer.com
                                amartin@proskauer.com
                                pgoldberg@proskauer.com

                                Mark W. Batten (admitted *pro hac vice*)
                                One International Place
                                Boston, Massachusetts 02110
                                (t) 617-526-9850
                                (f) 617-526-9899
                                mbatten@proskauer.com
                                *Attorneys for Defendant Bloomberg L.P.*

## <u>LOCAL RULE 7.1(c) WORD COUNT CERTIFICATION</u>

Pursuant to Rule 7.1(c) of the Joint Local Rules for the Southern District of New York

and Eastern District of New York ("Local Rule"), the undersigned hereby certifies that this

Memorandum of Law was prepared with a computer; contains 9,022 words (excluding the

caption, table of contents, table of authorities, signature blocks, and this certification), including

footnotes; and complies with paragraph 2.D. of the Individual Practices of Magistrate Judge

Gabriel W. Gorenstein, which provides that "notwithstanding the provisions of Local Rule

7.[(c)] to the contrary, the Court does not impose page or word count limitations on memoranda

of law."

Dated:  New York, New York
        February 20, 2025

                                        <u>/s/Elise M. Bloom</u>
                                        Elise M. Bloom