# EXHIBIT 6

**FILED UNDER SEAL**

Page 1

1      * * * CONFIDENTIAL - ATTORNEYS' EYES ONLY * * *
2              UNITED STATES DISTRICT COURT
3            SOUTHERN DISTRICT OF NEW YORK
4
5   NAULA NDUGGA, ON BEHALF        )
    OF HERSELF AND SIMILARLY       )
6   SITUATED WOMEN,                )
                                   )
7                Plaintiff,        )
                                   )
8            vs.                   )    No.
                                   )    20-cv-07464 (GHW)
9   BLOOMBERG L.P.,                )
                                   )
10               Defendant.        )
    ------------------------       )
11
12
13
14
15                 October 22, 2024
16                 10:02 a.m.
17
18        Deposition of DAVID NEUMARK, held at
19     the offices of Proskauer Rose LLP, 11 Times
20     Square, New York, New York, before Laurie A.
21     Collins, a Registered Professional Reporter
22     and Notary Public of the State of New York.
23
24
25

```
 1      Neumark - Confidential - Attorneys' Eyes Only
 2    lingo, which means, you know -- well, that's what
 3    it means.
 4              For Blacks for periods two and three --
 5    that is, U.S. '17-'21 and U.S. 2021 -- there is
 6    estimated roughly 6 percent shortfall, and that's
 7    significant at the 10 percent level but not the 5
 8    percent level.
 9        Q.    And the 10 percent level is a level
10    that's not traditionally accepted by labor
11    economists or by courts as statistically
12    significant.  Do you agree with that?
13        A.    No, I don't.  I don't agree with that.
14    I mean, the courts -- I think the most often cited
15    case I think is Hazelwood, and I think that's a
16    fair statement of what that says.
17              There's some other cases I cite in my
18    report -- I think it's Footnote 54 -- about
19    reasons why you might not want to always skew to
20    that or the only bright line that matters.
21              Labor economists are, you know -- I
22    hope we're more sophisticated statisticians, you
23    know.  5 percent significance level is the
24    standard.  What -- what that means -- there's
25    something called the P value, which is the
```

Page 30

```
 1     Neumark - Confidential - Attorneys' Eyes Only
 2   significance level.  So if the significance level
 3   is exactly 5 percent, the P value is .05.
 4            We report the T -- here the T
 5   statistics, sometimes the P values, and, you know,
 6   5 percent significance is somewhat -- you hold
 7   that result with somewhat more confidence with 7
 8   for or 8 percent or 9 percent, and you hold it
 9   with a lot more confidence than 20 percent
10   significance.
11            But I will say there are many, many
12   papers in labor economics -- including my own but
13   definitely not just my own -- where people talk
14   about results that are significant at 10 percent
15   level and draw conclusions.
16       Q.    Did you conduct any analysis on whether
17   there's a pay disparity based on an intersection
18   of race and gender, that is, a pay disparity for
19   Black women?
20       A.    I have not.
21       Q.    Were you asked to do that?
22       A.    To my recollection, no.
23       Q.    Did you ever consider conducting such
24   an analysis?
25       A.    Not in this case.  I'm writing a paper
```

1    Neumark - Confidential - Attorneys' Eyes Only
2    haven't seen that goes to my opinions.  Certainly
3    when you're starting and learning what's in the
4    data, you run things and you say, Oh, we have that
5    wrong, we fix it, this variable doesn't make
6    sense, we look at it and there's something that
7    can't be negative has negative values or whatever.
8             So there's preliminary versions of
9    output files on the way, but those are just being
10    corrected in the code and refined as we go.
11            But, as I said, back to our discussion
12    right at the outset, there is simply no reason to
13    not report a result that would be an obvious thing
14    to do if it didn't support my conclusion, because
15    defense experts are smart people too and will
16    figure that out.  At least that's my operating
17    assumption at any rate.
18    Q.    You did no analysis of whether there
19    was any disparity in starting salaries between
20    female and male employees; is that right?
21    A.    There was -- I know that was in the
22    original complaint, but to the best of my analysis
23    there was no data -- the issue there was the issue
24    of starting pay to prior pay, and there was no
25    data retained on prior pay that was asked about,

```
 1      Neumark - Confidential - Attorneys' Eyes Only
 2   to my understanding, although I can't confirm that
 3   because I have never seen any data.
 4        Q.    So you're saying you didn't have the
 5   data to do an analysis of starting pay as a
 6   function of prior pay; is that right?
 7        A.    Correct.
 8        Q.    Did you consider starting pay as a
 9   control variable in the analysis that you did do?
10        A.    No.
11        Q.    Why not?
12        A.    That would be a bad idea.
13        Q.    Why is that?
14        A.    So I have -- I mean -- the allegations
15   in this case -- and, again, I have no opinion on
16   whether it's true or not because I don't have the
17   data, but just to state them -- are that Bloomberg
18   asked about prior pay.
19              I think we all know -- maybe you
20   disagree -- that in general when you ask about
21   prior pay women's response is lower because women
22   are paid less in the labor market.  It doesn't
23   matter that this case why discrimination or not.
24              And therefore if companies are kind of
25   matching or prior pay plus 5 percent or something,
```

Page 46

1    Neumark - Confidential - Attorneys' Eyes Only
2    starting pay for women is going to be lower than
3    otherwise similar men.  In other cases I have
4    worked, I have certainly see that.  Obviously that
5    evidence does not pertain to this case, but you
6    asked for my explanation.
7              So if starting pay reflects pay
8    discrimination, then it's what we call a bad
9    control or what you call tainted variable.  You're
10   putting on the right-hand side -- you know,
11   suppose there's a case where women come in lower
12   than otherwise comparable men and that gap in
13   percentage terms just never goes away, you know,
14   just random variation, but on average that
15   persists because raises are based on men and women
16   get the same ratings, raises are a given
17   percentage.
18             Well, then, ten years later on average
19   there's going to be the same gender pay gap.  Then
20   if you put in the control, you might say you've
21   explained it, but what you've actually done is
22   shown that the starting pay gap is driving the
23   current pay gap.  So it's a bad control.
24             You put in -- you don't want to put in
25   something on the right-hand side or as an

```
 1      Neumark - Confidential - Attorneys' Eyes Only
 2   independent variable that can itself reflect
 3   discrimination.
 4        Q.    There are also nondiscriminatory
 5   explanations for differences in starting pay;
 6   right?
 7        A.    Of course.
 8        Q.    All kinds of things; correct?
 9   Bargaining is one reason that a female's starting
10   pay might be less; right?
11        A.    Could be.
12        Q.    Willingness to compete?
13        A.    People -- there are some -- there is
14   some evidence of that, not so much on pay, but,
15   yeah, willingness to compete.
16        Q.    Preferences for workplace amenities and
17   flexibility?
18        A.    Just to be clear, I'm saying -- I'm not
19   saying I know what direction this is going, but
20   they can affect starting pay.
21        Q.    That's all I'm asking is whether they
22   could affect starting pay.
23        A.    Yes.
24        Q.    And other factors such as college major
25   or the nature of prior experience, those could
```

Page 48

1      Neumark - Confidential - Attorneys' Eyes Only

2      influence starting pay as well?

3          A.    Yes.

4          Q.    None of those have anything to do with

5      gender, obviously; right?

6          A.    Well, they might be related to gender.

7          Q.    Right, but they're not related to

8      discrimination on the basis of gender; right?

9          A.    Not by the company doing the hiring.

10     Fair enough, right.

11         Q.    And so you can't allow the possibility

12     that differentials in starting pay at Bloomberg

13     were caused by nondiscriminatory factors as

14     opposed to being a tainted control variable;

15     right?

16         A.    I can't do any analysis to the question

17     in this case.  In other cases that's not been the

18     case.  But I simply -- I can't answer the

19     question.  What I would want to answer the

20     question -- so even -- you know -- would be --

21     would be starting pay data and then -- and then

22     you wouldn't have all the things you just

23     mentioned, but some of those things are

24     obtainable.

25              I have in past cases gone to LinkedIn

```
                                          Page 49
 1      Neumark - Confidential - Attorneys' Eyes Only
 2   and constructed prior experience measures.  It
 3   doesn't get prior pay starting pay question,
 4   because my understanding is those data were simply
 5   not retained.
 6              But regardless, no reasonable labor
 7   economist would put in starting pay as a control
 8   in testing for discrimination, because if there is
 9   discrimination, starting pay can reflect it as
10   well.
11              So I have seen no evidence that -- and
12   Dr. Martin hasn't presented any -- that different
13   let's call them broadly catchall for what you said
14   differences in what people did or bring to the
15   table before they started Bloomberg account for
16   the gender differences.
17      Q.    Did you perform any analysis of whether
18   there were differences in the performance ratings
19   of male and female class members?
20      A.    Well, I -- the most important thing I
21   do is control for performance ratings, which at
22   the end of the day is what you really care about.
23   I did look at the overall description recently for
24   the two class periods:  New York '17-'20 and U.S.
25   21.  That's not reported anywhere so...
```

```
                                            Page 51
 1      Neumark - Confidential - Attorneys' Eyes Only
 2    I've done on hiring discrimination.
 3         Q.    Hiring, not pay?
 4         A.    Correct.
 5         Q.    Have you done any analysis of
 6    whether -- of the age effects with respect to pay?
 7         A.    I have done a lot of work on what we
 8    call the age earnings profile in the context of
 9    models of discrimination.  That's a long time ago.
10    And I don't think I ever did anything in relation
11    to gender.
12              Pay is -- unlike every other dimension
13    of discrimination -- race, ethnicity, et cetera,
14    gender -- age is not one where people focus on
15    pay, because older people tend to be paid more,
16    not less.
17              There's other indicators of potential
18    discrimination.  Older workers who lose their jobs
19    have a lot harder time finding a job, unemployment
20    spells are longer.  But pay is not usually the
21    focus of that research because the prima facie
22    evidence tends to go the other way, for many other
23    reasons.
24         Q.    Did you consider here that a disparity
25    might be attributable to age rather than to
```

1    Neumark - Confidential - Attorneys' Eyes Only

2        A.    What I mean -- what I mean there is

3    that's a -- that is the shorthand phrase.  If you

4    read a paper in labor economics -- not -- I can't

5    say everywhere, obviously; there's a lot of

6    paper -- when people say statistically significant

7    without saying the P value is at the 5 percent

8    level or the 10 percent level, that's -- I mean,

9    that's almost always what they mean.

10              If they're careful, they will at least

11    the first time they use that phrase define what

12    they mean.  So there probably are cases where

13    someone says, I might be referring to the 10

14    percent level, but I'm going to keep saying that.

15              But I would say in my writing -- I

16    didn't review this question for this deposition,

17    but I would say you would probably find many cases

18    where at least after the first time where I define

19    the significance level I would use statistically

20    significant to mean the 5 percent level.

21              But I would also many times describe

22    results as statistically significant, but I would

23    specify at the 10 percent level just to -- just

24    for clarity.

25        Q.    And as you mentioned before, the

Page 59

1       Neumark - Confidential - Attorneys' Eyes Only
2    Hazelwood case talks about two standard deviations
3    as being the necessary standard for statistical
4    significance as a legal matter; is that right?  Is
5    that your understanding?
6               ATTORNEY WEBBER:  Just objection for
7          the record.  This is beyond the scope of
8          his -- if you're asking for a legal opinion,
9          that's beyond the scope of his proffered
10         expertise.
11         A.    I was just reading here whether what's
12    in parentheses is a quote, and it's not.  So I
13    don't want to say what -- I don't want to look at
14    this and claim to know -- remember what it says
15    exactly.
16              But that is my understanding, that when
17    people -- and I have done it in other reports --
18    are referring to kind of aware of the 5 percent
19    statistical significance level comes from as a
20    common criterion in this kind of -- this kind of
21    work.
22              If that's the case, people refer -- I
23    will not claim to have reviewed, you know, all the
24    cases about this by any means.  There's a couple
25    others here I cite which are you might call

```
                                               Page 60
 1      Neumark - Confidential - Attorneys' Eyes Only
 2   exceptions just to indicate that it's not a --
 3   it's not a sort of -- it's not -- as I said
 4   before, it's not an either/or; it's a standard
 5   that people use.
 6            There's no -- there's no -- there's no
 7   statistical reason that we should -- that we
 8   didn't settle on 6 percent or 7 percent or 8
 9   percent.  We settled on 5 probably because it
10   means a -- I don't know -- a 1 in 20 chance that
11   we could have found a result where there's no
12   result sounds more natural than a 1 in 17.8
13   chance.
14            But there's no -- there's no scientific
15   reason it's a standard and these things happen in
16   all kinds of research.
17      Q.    It's not a scientific standard, but it
18   is a legal standard, as you understand it;
19   correct?
20      A.    My understanding is Hazelwood refers to
21   that, and there are some other examples cited here
22   that make exceptions.
23            Look, I'm going not the one -- I'm not
24   the one deciding -- adjudicating the case.  I'm
25   telling you that -- I know -- I don't know
```

Page 61

Neumark - Confidential - Attorneys' Eyes Only

1   Neumark - Confidential - Attorneys' Eyes Only

2   comprehensively what the courts say, but I am

3   giving you some things here what courts say.

4         I do know comprehensively and have

5   expertise in what labor economists do.  As I said,

6   5 percent significance is stronger than 10 percent

7   significance, but we don't ignore results

8   significant at the 10 percent level.

9         I would also point out that there's

10   a -- there's a way of thinking about evidence

11   which is a little hard to summarize in a single

12   P value or a single significance level of one

13   estimate, and that's the phrase -- and I think I

14   used before -- robustness.

15         You know, there's a lot -- there's a

16   lot of versions of the pay regressions in my

17   paper -- in my paper -- in my report.  There's --

18   you know, there's the four different periods.

19   There's many different specifications.  There's

20   now more because you have the supplemental tables.

21   I don't know the count but more than 50, I think.

22         Researchers look at the totality of the

23   evidence in deciding what conclusion to draw.  As

24   I said, if in most of those specifications there

25   was not a significant result and there were --

Page 62

Neumark - Confidential - Attorneys' Eyes Only

1    let's say at the 5 percent level and there were a
2    couple that were, we probably wouldn't be sitting
3    here.  Or at least I wouldn't be sitting here; you
4    might be sitting here.
5
6                In this case and the analysis most -- a
7    lot of the results -- first of all, every single
8    estimate except for this one analysis which I
9    don't think is well motivated, just looking at job
10   profiles with the word "producer," but all of the
11   analysis, the full data, every single estimate is
12   negative and a very high share of significance at
13   the 5 percent level and many more at the 10
14   percent level.
15               I am sure that any -- I can't be sure
16   but I'm confident that any reasonable labor
17   economist would say there's a robust relationship
18   here of low pay for women.
19        Q.    Did you select the cases that appear in
20   Footnote 54?
21        A.    No, I asked -- my recollection is I
22   just -- I -- the Hazelwood cite I used in other
23   reports, and I just asked for suggestions of other
24   cases that might say different things.  And those
25   were provided to me, and then I kind of looked at

```
 1      Neumark - Confidential - Attorneys' Eyes Only
 2   deposition.  And I think it ends there.
 3      Q.    All right.  So the conclusion that the
 4   compensation process and the ratings process are
 5   highly centralized is based on information you
 6   cite in paragraphs 27 and 28.  Is that your
 7   testimony?
 8      A.    I believe it's all there unless --
 9      Q.    I'd like a complete answer --
10      A.    Okay.  Sure.
11      Q.    -- so take as much time as you need.
12      A.    Okay.  So...
13           (Pause.)
14      A.    So I talk about business units in
15   paragraph 29 not having different compensation
16   policies and practices.  I talk about cost centers
17   in paragraph 30 not playing a role in compensation
18   guidelines although playing a role in amounts --
19   or being related to amounts available for raises.
20   I think after that I get into families and all and
21   horizontal job classification, so that's not about
22   that.
23           So I believe that is all, because after
24   that I start to describe my regression.
25      Q.    All right.  So the basis for the
```

```
                                          Page 105
 1      Neumark - Confidential - Attorneys' Eyes Only
 2              It would be very hard to know how to
 3   sort of compare and contrast those across people
 4   and quantify you know productivity measure based
 5   on that.
 6      Q.    You do understand that the audit logs
 7   that we're talking about related to changes for
 8   compensation and not performance evaluations;
 9   right?
10      A.    Yes, yes, yes.  But I would -- I would
11   have thought it would be, hey, I think this person
12   should get more or less and here's why, which I
13   might think would be something about -- I mean, I
14   don't know what other reason people would write
15   down that I think they deserve more for this
16   reason.  Presumably it has something to do with
17   how you are as an employee or some dimension.
18      Q.    You could see in the logs -- even if
19   you couldn't or didn't think you should analyze
20   the text comments, you could see the direction of
21   the changes that were being made and compare that
22   to the gender of the employee whose number was
23   changing; right?
24      A.    Yes, and Martin actually does some of
25   that.
```

1      Neumark - Confidential - Attorneys' Eyes Only

2          Q.     Yes.  You did not?

3          A.     I did not, no.

4          Q.     Why not?

5          A.     I was -- I'm focused on what people got

6      paid in relation to their gender.  I'm not trying

7      to explain the whole path of adjustment as to how

8      one got there.  And I'm not sure -- I'm not sure

9      what that tells me, the fact that -- I believe she

10     says a greater share of the upward adjustments

11     were for women than men, but that doesn't tell me

12     anything about where I end up, because who knows

13     where I started.

14         Q.     Does your report take a position on

15     what causes the disparities that you identify?

16         A.     So I can't see intent.  I can't measure

17     intent.  I can -- I can -- literally what I can do

18     is estimate a statistical relationship between pay

19     and gender, controlling for the other factors in

20     my model to net out the influence of -- if there

21     were gender differences in education and tenure,

22     job profiles, et cetera, cost centers.

23             You know, all one can ever say from

24     data is the data are consistent with

25     discrimination in the sense that -- go back to I

1      Neumark - Confidential - Attorneys' Eyes Only

2    Sullivan, member of the global compensation team

3    who supported News, also testifies repeatedly to

4    the primary decision-making about compensation

5    exercised by Mr. Gregori.

6                Again, not quantifying, agreeing.  But

7    that's an example.  Strongly worded, although not

8    a quote; that's my language, I agree.

9         Q.    Paragraph 33 carries over to page 21,

10   if you would go to page 21.  In talking about peer

11   groups, in the middle of the paragraph right after

12   the reference to Note 96, there's a sentence that

13   says, I cannot identify statement of the

14   underlying logic in creating peer groups; right?

15        A.    I see that, yes.

16        Q.    Is that one of the reasons that you

17   don't include peer group in the main regression

18   analysis?

19        A.    No, no.  The main reason is I don't

20   have it till 2020.  I'm discussing here -- this is

21   this -- I think the main point of this

22   paragraph -- another run-on paragraph, sorry -- is

23   to make the argument that I control for things

24   that go into peer groups.

25                But I am making the observation that

1    Neumark - Confidential - Attorneys' Eyes Only
2    it's hard to extract a real definitive statement
3    about what goes into peer groups.  People are
4    saying different things.  I don't have any -- I've
5    never seen like a table, a chart.
6              And when people are listing different
7    things, I don't know if they're actually telling
8    us everything they know or telling us three of the
9    things they recall.  I'm listing all the things
10   they mention, and say I control for those.
11        Q.    But it's not essential to have a
12   statement of logic, then, for each of the control
13   variables that you use, or is it?
14        A.    All -- I am hedging here.  If someone
15   said definitively peer groups are based on
16   variables X, Y, and Z, then I could say
17   definitively since I control for variables X, Y, Z
18   and Z I can control for all the things that make
19   peer groups.
20              I'm saying -- I think the flavor is I'm
21   pretty close to that, but it's a little hard to be
22   definitive.  Logic -- "fact" may be a better a
23   word, the logic here, I suppose.  But I don't
24   have -- because I don't have that definitive
25   statement, I'm making that clear.

Page 122

1     Neumark - Confidential - Attorneys' Eyes Only
2              Nonetheless, I show regressions -- here
3    we go.  I mention positions in paragraph 9(g), but
4    I don't say anything there.  This is where Zoom
5    depositions are good because you can do an
6    electronic search.
7              Anyways, I do remember -- even if I
8    can't find it now and I might not have cited it --
9    testimony that positions did not get attention in
10   thinking about the jobs people did.  Nonetheless,
11   I do a sensitivity, a robustness analysis, and
12   show that controlling for position doesn't change
13   things.  That's in Table --
14        Q.    Yep.
15        A.    -- A-3 and in fact controlled for
16   position -- at least for the New York class leads
17   to larger gender gaps and hence would lead to
18   larger damages if I included it.
19        Q.    What led you to conduct a sensitivity
20   test on position?
21        A.    So basically I do -- I do a bunch
22   right?  I do -- I talk about here.  I do position,
23   I do peer group, I do prior performance score.
24   That's not the whole list, maybe.
25              Essentially when I thought there was an

Page 123

1      Neumark - Confidential - Attorneys' Eyes Only
2    either ambiguity in the record or just kind of a
3    good reason -- positions sound like horizontal
4    differentiation of jobs.  I may in fact -- I
5    simply don't remember -- have started out by
6    including them.  But there was testimony that
7    said -- you know, really profiles is the
8    descriptive information they rely on.
9              So that was my choice of sensitivity in
10   a sensitivity or robustness analysis.  And, again,
11   Dr. Martin raised a few more points, and I added
12   some more of those for the same logic.
13             ATTORNEY BATTEN:  This is a good spot
14        to break, so why don't we take our lunch now.
15             THE VIDEOGRAPHER:  Off the record at
16        1300.  Ending media unit number 3.
17             (Time noted:  1:00 p.m.)
18
19
20
21
22
23
24
25

Page 133

1     Neumark - Confidential - Attorneys' Eyes Only
2          Q.     What does that mean?
3          A.     That there's not -- this kind of goes
4     back to our discussion I think was the last thing
5     we were discussing before lunch about whether if
6     there are different policies across units you
7     might -- you might not necessarily want to
8     aggregate across them or you might at least
9     explore the consequence of not doing it.
10              So I'm just saying why I'm not
11    disaggregating by cost center.
12         Q.     But why is it relevant control if it
13    doesn't play a role in compensation anyway?
14         A.     Because rate -- because there's
15    documents and testimony that amount available for
16    raises can vary by cost center and that in my
17    supplemental tables -- they were included in a
18    form in this report.  I didn't really talk about
19    them.
20              But in the supplemental table I more
21    explicitly test for that and show that they do
22    matter, although you can see that in A-4 here as
23    well.
24         Q.     And the documents that you're referring
25    to about cost center are those that are cited in

Page 134

1      Neumark - Confidential - Attorneys' Eyes Only

2    Note 77; is that right?

3        A.    I think it's the -- I think it's -- I

4    think it's the first and the third -- oh, sorry,

5    there's only two.  Yes, those exhibits and --

6    those documents, yes.

7        Q.    Other than the testimony and the

8    documents that are cited in Note 77, did you rely

9    on any other evidence to conclude that different

10   cost centers may have different amounts available

11   for raises?

12       A.    So I said two things.  When I wrote the

13   report, this is what I cited.  As I said, I

14   didn't -- whether -- I just don't remember whether

15   I read other depositions that said the same thing.

16   And I don't cite them all; I just cite enough to

17   make the case, if I think it's clear.

18            I don't remember whether others

19   testified to that.  And subsequent to the report

20   in responding to Dr. Martin, I looked more

21   explicitly at the data and testing for the

22   significance of cost centers in the regressions,

23   and they clearly matter strongly.

24       Q.    And in doing supplemental tables in

25   response to Dr. Martin's analysis, did you review

1     Neumark - Confidential - Attorneys' Eyes Only

2         Q.    Did you consider controlling for cost

3     center in 2017 and 2021 but not the other years?

4         A.    No.

5         Q.    Why not?

6         A.    You know, the fact that I -- I mean, I

7     never know exactly why the documents that surface

8     surface.  I'm not involved in this process; right?

9     I get handed things.  I think I'm handed

10    everything -- I hope so -- that's relevant.

11            You know, the fact that I see this for

12    two years and no one says it didn't happen the

13    other years doesn't give any me any reason it

14    doesn't happen in other years.  But that's my only

15    explanation.  I simply didn't do, nor does Martin.

16        Q.    But why is the default that if you're

17    not sure then it must have been included rather

18    than the absence of a document suggesting it

19    wasn't?

20        A.    Well, so first of all, for the years --

21    for the years in which I have information, it

22    wasn't -- it did matter.  And second of all, you

23    know, adding controls -- the worst that can happen

24    from adding controls that maybe someone thinks

25    don't belong in the model, as long as they're not

Page 151

 1      Neumark - Confidential - Attorneys' Eyes Only
 2    tainted, bad models -- and that's not I don't
 3    think any of the discussion here or from Martin
 4    about cost center controls -- is you reduce
 5    precision a little bit.
 6              .   Extraneous -- I mean, that's a
 7    standard econometrics textbook result that, you
 8    know, truly extraneous variables just reduce the
 9    precision of the estimates or increase the
10    standard deviations.
11              I have them in, so I'm not worried
12    about that.  If anything, I'm being less precise
13    than I could be by including them.  There's no --
14    there's no bias from including them.  The
15    coefficients might be zero if they don't matter at
16    all, and they clearly aren't.
17        Q.    So is it not important to you to know
18    whether funding actually varied by cost center
19    before controlling for it?
20        A.    Well, I mean, as I said, I can confirm
21    it, in my opinion, for two years, and there's a
22    reference to possibly other years.  And, you know,
23    at the end of the day I can also look at the
24    regression and there's no harm to adding the
25    controls.

```
 1       Neumark - Confidential - Attorneys' Eyes Only
 2             So if you told me definitively or
 3    assumed definitively these pools were identical
 4    for the other two years, I don't -- that's -- it's
 5    not clear I would do anything differently anyways,
 6    because I'm adding the controls; and if they won't
 7    matter, they won't matter.
 8             There's nothing -- it doesn't generate
 9    bias in the estimated gender gap to include a
10    control that's not potentially influenced by
11    discrimination, which is what I mean by a tainted
12    or bad control.
13       Q.    But you must have to have some
14    theoretical justification for the inclusion of a
15    control, generally speaking; right?
16       A.    And I do.
17       Q.    We'll come to that.
18             Like you wouldn't control for hair
19    color just because the data were available; right?
20       A.    Believe, irrelevant or not, there's
21    research based on discrimination based on features
22    of hair, but I don't think I would call that
23    discrimination.  It's not legal discrimination,
24    anyways.
25       Q.    If you had data about hair color, you
```

Page 153

1    Neumark - Confidential - Attorneys' Eyes Only
2    wouldn't include it as a control just because why
3    not; right?
4        A.    Right.
5        Q.    There has to be some theoretical basis,
6    you would agree?
7        A.    Some -- a theoretical basis, other
8    evidence, which even might be without a theory.  I
9    don't know if you would call this theoretical
10   evidence or some other evidence, but some
11   indication that it matters.
12           (Discussion off the record.)

**Page 154**



Page 155

Page 159



Page 160



**Page 161**

18          Q.    Well, you already control for business

19    unit -- right? -- apart from cost center?

20          A.    Uh-huh.

21          Q.    And so why if these additional business

22    units are the ones that are getting increased

23    guidelines -- increased guideline increases, why

24    doesn't that make the cost center control

25    redundant?

1    Neumark - Confidential - Attorneys' Eyes Only

2        A.    Again, we could -- you know -- I

3    suspect neither of us could interpret this

4    exactly, but, you know, to my mind it's not

5    entirely clear what this means.  It mentions cost

6    centers.  It mentions business units.

7             Again, if they were truly redundant, I

8    would not find strong significant effects of cost

9    center, and I do.  That's the bottom line that

10   is -- I don't know how you ignore that evidence;

11   or, you know, given the regression evidence that

12   cost center plays a large role in these

13   regressions, what motivation there possibly is for

14   excluding them and saying that's more reliable

15   evidence.  That escapes me completely.

16       Q.    Well, aren't there all kinds of

17   variables that could theoretically have

18   statistical significance even though there's no

19   theoretical relationship to compensation?

20       A.    No -- well, you might be -- there's a

21   lot of things that theoretically could have an

22   effect on compensation.  You mentioned hair color

23   before.  I would guess if I put it in it wouldn't

24   matter.  There's research on lookism.  So if

25   people thought certain hair color is better

1    Neumark - Confidential - Attorneys' Eyes Only

2    that could be -- that should be included in the

3    model; right?

4        A.    I would sort of yes, but I would be

5    shocked if that showed up as significant

6    regression.  Based on what I'm seeing, I'm not

7    shocked that cost center showed up as significant

8    regression.

9        Q.    How about the day of the month that an

10   individual was hired 1 through 31?  There's a lot

11   of data on that for every employee in every

12   employee year I guess in the model.  Should that

13   be included if it shows a joint significance?

14       A.    Well, that could matter for lots of

15   reasons, like timing of bonuses, prorating of

16   bonuses.

17       Q.    The day of the month?

18       A.    When you got hired and the year, the

19   date.

20       Q.    In subsequent years?

21       A.    I mean, I wouldn't expect it -- it

22   wouldn't expect that to matter.

23       Q.    But what if it did?

24       A.    Then I would stop and think about it

25   before I said you should leave it out.  I wouldn't

Page 165

1     Neumark - Confidential - Attorneys' Eyes Only

2     say I'm sure it shouldn't be there, especially if

3     there's a document that admittedly -- this one,

4     not the other one -- is perhaps subject to

5     interpretation and suggests it should be in there.

6          Q.    Well, suppose you don't have such

7     document but the variable it nevertheless turns

8     out mathematically has a joint significance value

9     of 0.00.  Should that variable be included despite

10    the lack of any theoretical basis for it?

11         A.    I don't think there's a one-size-

12    fits-all answer.  I mean, people discover things

13    in data and then it turns out we construct

14    theories of why they do matter.

15              So people -- people didn't use to put

16    schooling in wage regressions before the human

17    capital model.  I don't -- I don't literally know

18    the evolution of did someone run the regression

19    first to come up with a theory first, but now it's

20    standard.

21         Q.    Well, can you think of a basis for my

22    day of the month example that would make it a

23    relevant variable?

24         A.    That would persist in other years?  No.

25         Q.    You said you don't have a mapping of

```
                                        Page 190
```

1          Neumark - Confidential - Attorneys' Eyes Only

2          A.     Yes.

3          Q.     Did you personally prepare these

4    tables?

5          A.     Did I type them?  No.  But I personally

6    controlled the content of them.

7          Q.     Did EconOne actually prepare the

8    charts?

9          A.     Yeah, they actually run the regressions

10   and usually output the numbers in the tables, and

11   then I edit the death out of them.

12         Q.     Did anyone assist you other than

13   EconOne's role in preparing these tables?

14         A.     No.

15         Q.     And were each of the items in the

16   tables substantively your ideas?

17         A.     Yes.

18         Q.     So can you explain what you did in

19   supplemental Table 1?

20         A.     Sure.  So Dr. Martin pointed out that

21   there were -- she didn't say the number.  It

22   turned out there were I think 89 of them.

23                She pointed out there were cases

24   where -- we sort of discussed this before --

25   someone was in a class position and then out of it

1    Neumark - Confidential - Attorneys' Eyes Only

2    and -- and I think that could be either because of

3    job profile or country -- and then was back in it;

4    and that I had inadvertently -- if you were, say,

5    in the class of 2019, out in '20, and back in '21,

6    I inadvertently mapped the '21 bonus back a year.

7    So that was an error based on what is -- well,

8    yeah, based on understanding of the data.

9             So what you have here is you have the

10   same four periods -- New York, U.S., et cetera --

11   like you have before.  You have base pay total

12   comp like before.  You have added to here now what

13   I mentioned the cost center joint significance

14   test.

15            And then first row of each panel is

16   what was from my report.  Model 1 is I -- what I

17   say is I correct for the gap year bonus

18   assignment, that is, I just -- if it was missing

19   for a year, I just treat it as zero instead of

20   assigning the bonus from the next year.

21            And as I then thought about this, I

22   thought it's not clear that's the right thing to

23   do because -- I think we were discussing before I

24   work in, let's say, New York till some point in

25   the year, I go to London, there's a bonus in

Page 192

```
 1    Neumark - Confidential - Attorneys' Eyes Only
 2   pounds, presumably decided on, certainly paid out
 3   at least in London, I assume -- I assume based on
 4   my work there.  Does it really make sense to call
 5   that U.S. pay for the year to which it applies.
 6              I honestly don't have a firm answer and
 7   haven't seen one about exactly how bonuses get
 8   determined and is it based on -- hypothetically it
 9   could be based on your performance before you
10   left.  That doesn't seem that plausible.  It could
11   be based on your performance where you are now.
12   It could is be based on some combination.  I don't
13   know.
14              So I do some alternatives.  What I call
15   V2 is sort of saying I don't know how to treat
16   bonuses, so I just exclude those years rather
17   than -- rather than assigning the wrong one where
18   it says wrong one we're assigning zero NV3, NV4.
19   And you can see that's why the sample in each case
20   gets a little smaller in that case.  That's the
21   set of gray highlighted rows.
22              And two alternatives, I don't really
23   know what's right.  I don't like these as much.
24   But since I don't know exactly what's right, I do
25   these.  I exclude the bonus, but I put in a dummy
```

Page 193

Neumark - Confidential - Attorneys' Eyes Only

1    variable for those years which will sort of pick

2    up the fact that you don't have a bonus --

3    right? -- which could help explain why your total

4    comp is lower.

5            And then I alternatively include the

6    bonus, but I also include a dummy because, again,

7    the bonus could be different because it's being

8    made in -- either in a different location or for a

9    different job and possibly some unknown hybrid of

10   the two -- the two positions you held.

11       Q.    So do I understand correctly that you

12   don't have enough information to choose between

13   V2, V3, and V4?

14       A.    Yes.  I would say I view -- I view --

15   why do I prefer V2?  V2 is just leaving out some

16   data, but there's no sense that I'm using the data

17   incorrectly.  V3 and V4 I use a little more data

18   because I keep the year and in one case I keep the

19   bonus.

20           But I realize I don't have a full

21   understanding of whether the sort of bonus

22   determination for these -- this handful of

23   observations -- and you can see the differences, a

24   bit less than 100 -- exactly how the bonus gets

```
                                        Page 194
```

 1      Neumark - Confidential - Attorneys' Eyes Only
 2    determined in those cases.
 3         Q.    Going back a little bit, for V1 --
 4         A.    Yes.
 5         Q.    -- you mention in the notes with
 6    respect to V1 an employee who left to foreign
 7    country -- I assume that's left to go to a foreign
 8    country --
 9         A.    Yeah.
10         Q.    -- and return to the U.S.?
11         A.    So you had a year or it could be longer
12    where you were working somewhere else and then
13    came back.
14         Q.    Does this correction for V1 also
15    include employees who moved in and out of class
16    job profiles?
17         A.    Yeah, that's an e.g.  So those are the
18    two reasons which -- well, if there was something
19    written, it would have said that.  Yes, it's both.
20    That's why it says e.g.  It would have been clear
21    to write both cases.
22         Q.    Maybe you answered this next question
23    in a prior answer; and if so, I apologize.  But
24    Dr. Martin had noted in her report that if an
25    employee moved from New York in 2019 to London in

```
 1      Neumark - Confidential - Attorneys' Eyes Only
 2   reasons why I think that might be the case.  They
 3   have nothing to do with data, of course.
 4        Q.    It's all the stuff we talked about
 5   earlier today about annual funding and so forth?
 6        A.    There's nothing else underlying this
 7   than that discussion and the actual statistical
 8   results, correct.
 9        Q.    In your original report, you conducted
10   a number of sensitivity tests, and I think you
11   told me earlier today you chose to do such a test
12   wherever there was an ambiguity or some other good
13   reason to do one; is that fair?
14        A.    I said something like that, yes, yes.
15        Q.    Did you not think during the original
16   report that a sensitivity test on cost center
17   would be appropriate?
18        A.    I clearly didn't then or I would have
19   done it.  So, no, I did not.  I thought -- I
20   viewed the deposition testimony and related stuff
21   as pretty unambiguous.
22        Q.    And was there any point in doing a
23   sensitivity test for your supplemental tables on
24   cost center?
25        A.    I mean, nothing -- my opinion on that
```

Page 207

1       Neumark - Confidential - Attorneys' Eyes Only
2    hasn't changed.  Obviously the Martin report is
3    there for the record.  But my opinion about the
4    appropriateness, including or excluding, hasn't
5    changed.
6       Q.    Did Dr. Martin effectively conduct a
7    sensitivity test on cost centers?  Is that a fair
8    description of what she did?
9       A.    As she describes it, no.  She says it's
10   the only right thing to do.  That is how I read
11   her report.
12      Q.    What's a wall test?
13      A.    So a wall -- a joint hypothesis test,
14   we were just describing -- this is probably more
15   than you want to know --
16      Q.    Probably, but give it to me anyway.
17      A.    There are three ways to do a joint
18   hypothesis test.  A likelihood ratio test is based
19   on the null model, that is, you estimate the model
20   without the coefficients -- without the variables
21   included, and you can construct a test statistic
22   based on that.
23              An F test you estimate the model with
24   the variables included, and you test on that
25   model.

```
 1      Neumark - Confidential - Attorneys' Eyes Only
 2          Q.     And I assume you would give the same
 3    answer as to (b) and (c) of paragraph 51?
 4          A.     Correct.
 5                 Now you're moving backwards instead of
 6    forward.
 7          Q.     Yeah, that's right.  I'm as forward as
 8    I can go, so I can only go backwards.
 9          A.     No problem.
10          Q.     And bear with me a second, because some
11    of these things we've already talked about and I
12    don't want to repeat.
13          A.     No problem.
14                 (Pause.)
15          Q.     Let's go to paragraph 14, please.
16          A.     14?
17          Q.     Uh-huh.
18          A.     Okay.
19          Q.     Do you agree that if peer group is
20    added in the sensitivity test that you did the
21    results for total compensation are not significant
22    at the 5 percent level?
23          A.     So why don't we look to the new tables
24    just to have what I agree on.  So this is Table 3.
25    I lost my place.  Sorry -- well, actually, so
```

Page 217

1     Neumark - Confidential - Attorneys' Eyes Only
2     she's making a statement about my report, so I
3     guess it makes more sense to look at my report.
4     A-3.
5              So she is referring to model 4
6     specifically.  So just to clarify, there's two
7     ways I deal with peer group, as we discussed.
8     One, I included dummies for it and a catchall for
9     the -- in this panel A many cases where I don't
10    have it and model 4 which she references where I
11    am missing it for roughly 80 percent of the
12    sample.
13             So that -- she is referring to the
14    standard deviation of the T statistic.  It falls
15    from above 2 in let's say the first row to 1.87
16    for base pay, 1.91 for total comp.  So those are
17    both significant at the 10 percent level, not the
18    5 percent level.
19             I do think it's critical to point
20    out -- and she doesn't, which doesn't surprise
21    me -- that the estimates -- the estimated gaps are
22    the same or bigger; right?  So for base pay, 3.7,
23    3.7, and for total comp it actually goes up from
24    4.0 to 4.3.
25             Almost for sure, let me say, the --

Page 218

 1      Neumark - Confidential - Attorneys' Eyes Only

 2   because the gap is actually getting bigger, the

 3   only reason the standard deviations or what I call

 4   the T statistic is falling is because you have a

 5   lot fewer observations, because that count

 6   actually shows up in the formula.

 7              So this is a case where I would say,

 8   you know, if you think peer group belongs in the

 9   model, you believe that, you know, model with peer

10   group is more reliable.  When you do it, the point

11   estimate is bigger, that is, the gender gap is

12   bigger, the damages were actually bigger.  But

13   obviously you can't estimate that for the full

14   sample because you don't have it.  You do for New

15   York.

16              In fact in every -- in my new table,

17   Table 3, if I'm not mistaken, in every single case

18   where you do that comparison, the gender gap is

19   bigger when I include peer group, like in what is

20   called model 4 there, only where available.

21              So I would take that as pretty strongly

22   confirming evidence.  I would be hard-pressed, I

23   think, to believe a reasonable labor economist to

24   say -- and now I'm looking at my new Table 3 --

25   when the estimate goes from 4.2 percent to 4.7

1      Neumark - Confidential - Attorneys' Eyes Only

2    percent -- well, there it remains significant.

3             But even if it fell below 5 percent in

4    significance level but the estimate actually got

5    bigger, that a labor economist wouldn't say that's

6    evidence of a robust negative relationship and you

7    shouldn't pay attention to the decline in standard

8    deviations from the much smaller sample.

9        Q.    I think you referred to this earlier.

10   If you move to paragraph 26 of Dr. Martin's

11   report.

12       A.    26.

13       Q.    This is the analysis that she does of

14   producer job profiles.

15       A.    Yes.

16       Q.    I think you said earlier today you

17   disagreed with that approach?

18       A.    I don't remember exactly what I said,

19   but I have a lot of trouble understanding the

20   motivation for this approach, I think is closer to

21   what I said, but that's what I mean otherwise.

22       Q.    I didn't mean to put words in your

23   mouth; I just wanted to return to the topic.

24       A.    Yeah.

25       Q.    Describe, if you will, your criticism

**ERRATA SHEET**
**Deposition of David Neumark, Ph.D., taken on October 22, 2024**

*Ndugga v. Bloomberg, L.P.*
**Southern District of New York, Case No. 20-cv-07464 (GHW)(GWG)**

I, **David Neumark**, do hereby declare pursuant to 28 U.S.C. § 1746, under the penalty of perjury
under the laws of the United States of America that the foregoing testimony is true and correct
(with the exception of the following changes listed below):

| Page Number | Line Number | Original Text | Corrected Text | Reason |
|---|---|---|---|---|
| 7 | 25 | stock and | Stockton | Transcription/ typographical error |
| 11 | 3 | attorney, I | attorney. I | " " |
| 11 | 17 | handful of significant | handful of insignificant | " " |
| 18 | 6 | employee or observations | employee-year observations | " " |
| 18 | 12 | of hire | if hired | " " |
| 19 | 10 | differences | differences, | " " |
| 20 | 24 | exists | exits | " " |
| 21 | 5 | there | there – it | " " |
| 22 | 15 | complimented | complemented | " " |
| 22 | 21 | means, | mean, | " " |
| 26 | 7 | profiles, | profiles -- | " " |
| 26 | 23-24 | I don't believe I have something there. | I do believe I have something there. | " " |
| 28 | 5 | model that | model – that | " " |
| 28 | 7 | dumb | dummy | " " |
| 28 | 8 | dumb | dummy | " " |
| 28 | 8-9 | who are raised in | by race and | " " |
| 29 | 6 | estimated | an estimated | " " |
| 29 | 19 | skew | hew | " " |
| 30 | 8 | for or | or | " " |
| 31 | 11 | marginalize | marginalized | " " |
| 33 | 6 | to we | when we | " " |
| 33 | 7 | ethnicity, i.e., Hispanic, | ethnicity (i.e., Hispanic), | " " |
| 35 | 13 | █ | █ | " " |
| 35 | 17 | █ | █ | " " |
| 35 | 21 | █ | █ | " " |

| Page Number | Line Number | Original Text | Corrected Text | Reason |
|---|---|---|---|---|
| 35 | 23 | ▮ | ▮ | " " |
| 36 | 3 | ▮ | ▮ | " " |
| 36 | 3, 6, 10, 12, 21 | ▮ | ▮ | " " |
| 36 | 18 | ▮ | ▮ | " " |
| 36 | 21 | ▮ | ▮ | " " |
| 37 | 6, 8 | ▮ | ▮ | " " |
| 37 | 9 | ▮ | ▮ | " " |
| 38 | 23 | controls variables | control variables | " " |
| 39 | 2 | interpretation | interpretation, | " " |
| 42 | 14 | give | gave | " " |
| 43 | 12 | New | NEW | " " |
| 43 | 16 | this is not an | this is an | " " |
| 44 | 7 | can't be negative | can't be negative, | " " |
| 44 | 22 | analysis | knowledge | Misspoke |
| 44 | 23 | the issue | the issue -- | Transcription/ typographical error |
| 44 | 24 | starting pay to prior pay | starting pay in relation to prior pay | " " |
| 45 | 22 | market. It | market -- it | " " |
| 45 | 23 | that this case why | for this case whether | clarity |
| 45 | 25 | matching or | matching on | Transcription/ typographical error |
| 49 | 2-3 | It doesn't get | I don't get into the | " " |
| 49 | 3 | prior pay starting pay | prior pay-starting pay | " " |
| 49 | 13 | let's | -- let's | " " |
| 49 | 13 | said | said -- | " " |
| 49 | 23 | description | descriptives | " " |
| 50 | 9 | app | output | Misspoke |
| 53 | 19 | complimented | complemented | Transcription/ typographical error |
| 53 | 21 | understanding at | understanding of | " " |
| 58 | 6 | paper | papers | " " |
| 59 | 18 | aware of | where | " " |
| 60 | 23 | I'm going not | I'm not | " " |
| 61 | 14 | used | used it | " " |
| 62 | 2 | level | level -- | " " |
| 66 | 25 | significance. | significant. | " " |

| Page Number | Line Number | Original Text | Corrected Text | Reason |
|---|---|---|---|---|
| 67 | 6 | sample. If | sample -- if | " " |
| 68 | 22 | that there | whether there | " " |
| 68 | 24 | question. | questions. | " " |
| 72 | 9 | the best | to the best | " " |
| 80 | 5 | The hire | The hire year | " " |
| 80 | 5 | on salary. | at a salary. | " " |
| 80 | 9 | remain | remaining | " " |
| 81 | 17 | doing | about doing | " " |
| 83 | 25 | 2021. | '20 and '21. | " " |
| 89 | 15 | bonus decision | the bonus decision | " " |
| 89 | 15-16 | that instruct me as a bonus decision, not paid | that struck me as a bonus decision not made | " " |
| 89 | 16 | decision, | decision -- | " " |
| 89 | 24 | Title 7 | Title VII | " " |
| 90 | 16 | news | News | " " |
| 91 | 13 | leaning | leaning on | " " |
| 93 | 7-8 | starting payoffs rows | starting pay offers | " " |
| 93 | 9 | deposition | deposition, | " " |
| 93 | 10 (2 times) | deposition | deposition, | " " |
| 93 | 22 | overrided | overridden | " " |
| 93 | 23 | deposition | deposition, | " " |
| 93 | 24 | primer | primary | " " |
| 93 | 25 | exercise | exercised | " " |
| 95 | 17 | right sound | first round | " " |
| 96 | 6 | initial, | initial -- | " " |
| 98 | 25 | et cetera, | et cetera -- | " " |
| 100 | 10 | similar | similarly | " " |
| 100 | 11 | worker, I think | workers, which I think | " " |
| 101 | 23 | ███████ | ███████ | " " |
| 102 | 17 | knowledge | knowledge, | " " |
| 102 | 17 | aware | aware -- | " " |
| 104 | 9-10 | threshold. It | threshold -- it | " " |
| 104 | 11-12 | the principal | in principle | " " |
| 107 | 4 | factors, the | factors, that | " " |
| 107 | 8 | popper | Popper | " " |
| 109 | 11 | exchanged | in exchanges | " " |
| 115 | 17 | X, Y, Z | X, Y, | " " |
| 115 | 18 | and Z | and Z, | " " |
| 116 | 22 | let | lets | " " |

| Page Number | Line Number | Original Text | Corrected Text | Reason |
|---|---|---|---|---|
| 116 | 23 | let | lets | " " |
| 119 | 12 | starting whether there | there | " " |
| 119 | 13 | was a | was the | " " |
| 119 | 14 | argue the | argue that | " " |
| 121 | 4 | did | didn't | " " |
| 121 | 24-25 | hard. Give | hard -- give | " " |
| 122 | 15 | controlled | controlling | " " |
| 122 | 16 | class lead | class, leads | " " |
| 123 | 4 | jobs. I | jobs -- I | " " |
| 123 | 12 | for the | by the | " " |
| 126 | 8 | Russian | regression | " " |
| 127 | 20 | is | is to | " " |
| 128 | 3 | the regression shows this | "the regression shows this" | " " |
| 129 | 7 | start | starts | " " |
| 129 | 7 | 2021, | 2021 -- | " " |
| 129 | 7 | use | lose | " " |
| 129 | 25 | But if there's | But there's | " " |
| 130 | 13 | controls are | controlling for it | " " |
| 131 | 10 | yeah. The | yeah -- the | " " |
| 131 | 14 | material. | materially. | " " |
| 132 | 15 | for a | for the | " " |
| 133 | 14 | Because rate | Because, right | " " |
| 133 | 15 | amount | amounts | " " |
| 133 | 16 | cost center | cost center. | " " |
| 133 | 16 | and | (new paragraph) And | " " |
| 133 | 17-18 | a form | A-4 | " " |
| 133 | 18 | report. | report -- | " " |
| 135 | 8 | correctly, | correctly -- | " " |
| 136 | 2 | on what and what | on what – on what | " " |
| 136 | 19 | higher or | higher or lower | " " |
| 138 | 6 | pool | pooled | " " |
| 138 | 7 | experience | an experience | " " |
| 140 | 3 | we | they | " " |
| 140 | 17 | exert | expert | " " |
| 141 | 6 | under | over | " " |
| 141 | 7 | correct; | correct, | " " |
| 143 | 6-7 | any pair set – big debt | any big set | "pair set" – misspoke; "big debt" – transcription error |

| Page Number | Line Number | Original Text | Corrected Text | Reason |
|---|---|---|---|---|
| 145 | 11 | of half, | for half, | Transcription/ typographical error |
| 150 | 15 | do, | do it, | " " |
| 152 | 20 | Believe, irrelevant or not, | Believe it or not, | " " |
| 155 | 12 | ███ | ███ | " " |
| 156 | 11-12 | ███ | ███ | " " |
| 156 | 20 | ███ | ███ | " " |
| 156 | 21 | ███ | ███ | " " |
| 158 | 10 | ███ | ███ | " " |
| 158 | 15 | ███ | ███ | " " |
| 159 | 6 | ███ | ███ | " " |
| 160 | 13 | ███ | ███ | " " |
| 162 | 9 | line | line -- | " " |
| 162 | 10 | is – I | is, I | " " |
| 164 | 5 | significant | significant in a | " " |
| 164 | 21 | it – it | it – I | " " |
| 165 | 19 | first to | first or | " " |
| 167 | 13 | ███ | ███ | " " |
| 167 | 15 | ███ | ███ | " " |
| 167 | 16 | ███ | ███ | " " |
| 168 | 7-8 | ███ | ███ | " " |
| 169 | 12 | ███ | ███ | " " |
| 170 | 16 | ███ | ███ | " " |
| 171 | 3 | ███ | ███ | " " |
| 172 | 23 | Bloomberg opinion | Bloomberg Opinion | " " |
| 173 | 7 | New | NEW | " " |
| 175 | 7 | for say. | per se. | " " |
| 180 | 12, 13 | New | NEW | " " |
| 181 | 5 | New | NEW | " " |
| 184 | 13 | of that. | and that. | " " |
| 188 | 12 | use | using | " " |
| 189 | 6 | pay | paid | " " |
| 189 | 17 | family | female | " " |
| 189 | 18 | relevant | highly | " " |
| 191 | 11 | pay total | pay, total | " " |
| 191 | 13 | mentioned | mentioned -- | " " |
| 192 | 17 | wrong one | wrong one. | " " |
| 192 | 17 | where | Where | " " |

| Page Number | Line Number | Original Text | Corrected Text | Reason |
|---|---|---|---|---|
| 192 | 18-19 | it says wrong one we're assigning zero NV3, NV4. And | it says V2:V1 we're assigning zero. In V3, in V4 – and- | " " |
| 194 | 20 | clear | clearer | " " |
| 195 | 10 | foreign | a foreign | " " |
| 195 | 11 | same | some | " " |
| 197 | 3 | presume | presumably | " " |
| 198 | 17 | cases | classes | " " |
| 198 | 25 | as presented, | was presented, | " " |
| 201 | 21 | can't | I can | " " |
| 201 | 22 | V3 and 4, use | in V3 and V4, using | " " |
| 202 | 14 | deviations, | deviations? | " " |
| 203 | 16 | robust | robustness | " " |
| 205 | 4 | is to | is -- to | " " |
| 205 | 13 | significant, | insignificant, | " " |
| 205 | 15 | makes | which makes | " " |
| 205 | 22 | point | joint | " " |
| 205 | 23 | hypothesis. They | hypothesis that they | " " |
| 207 | 13 | wall | Wald | " " |
| 208 | 2 | wall | Wald | " " |
| 208 | 6 | log, | in logs, | " " |
| 208 | 14 | ranted | relevant | " " |
| 209 | 9 | issue in | issue and in | " " |
| 210 | 7 | you get | you can get | " " |
| 210 | 17 | connections | corrections | " " |
| 210 | 25 | in time. | at a time. | " " |
| 211 | 12 | done | doesn't | " " |
| 211 | 16 | New | NEW | " " |
| 212 | 12 | New -- New | NEW -- NEW | " " |
| 214 | 21 | conducted | instructed | " " |
| 215 | 18 | not one, the R-squared of | not one, the R-squares of | " " |
| 215 | 22 | issue was | issue is | " " |
| 215 | 23 | in its | and its | " " |
| 217 | 14 | of the | or the | " " |
| 218 | 23 | economist to | economist would | " " |
| 222 | 14 | I started paying | starting pay is | " " |
| 225 | 18 | when the | what the | " " |
| 227 | 18 | tell you anything, | tell you everything | " " |

| Page Number | Line Number | Original Text | Corrected Text | Reason |
|---|---|---|---|---|
| 230 | 11 | applicants posting | applicants, posting | " " |
| 230 | 14 | hires. | applies. | Misspoke |
| 230 | 23 | Labor Markets. | in Labor Markets. | Transcription/ typographical error |
| 231 | 22 | freakonomics | Freakonomics | " " |
| 234 | 5 | deep | dependent | " " |
| 234 | 6 | pays | pay is | " " |
| 234 | 14 | are partial list, | are – partial list -- | " " |
| 236 | 15 | pay 3 | pay -- 3 | " " |

Date: 12/2/2024 | 12:31 PM PST

David Neumark

David Neumark