UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| NAULA NDUGGA, ON BEHALF OF HERSELF AND SIMILARLY SITUATED WOMEN, | : : : : | 20-cv-07464 (GHW) (GWG) |
| Plaintiff, | : : | **ECF CASE** |
| -against- | : : | |
| BLOOMBERG L.P., | : : | |
| Defendant. | : : | |

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS ................................................................................................... 2

    A.    Bloomberg L.P. ............................................................................................... 2

    B.    Bloomberg News ............................................................................................. 2

    C.    Named Plaintiff and Her Allegations ............................................................. 3

    D.    Managers in News Used Their Judgment to Make Determinations about Performance Ratings and Compensation Each Year. ................................. 5

        1.    Hundreds of Managers in News Exercised Their Discretion in Assigning Performance Ratings ............................................... 5

        2.    Hundreds of Managers Exercised Their Discretion to Make Individualized Determinations about Discretionary Compensation Increases and Bonuses. ........................................ 7

        3.    Plaintiff Misrepresents the Evidence Regarding Mr. Gregori's Involvement in Compensation Determinations. ....................... 12

        4.    Decisions about Starting Pay Were Highly Individualized. .................... 15

    E.    Plaintiff's Statistical Analyses Do Not Support Any Inference of Class-wide Discrimination. .................................................................... 16

ARGUMENT ...................................................................................................................... 17

I.    LEGAL STANDARD ................................................................................................. 17

II.    PLAINTIFF DOES NOT PROVE COMMONALITY .................................................. 18

    A.    The Disparate Impact Claims Present No Common Questions or Answers ......................................................................................................... 18

        1.    Plaintiff Does Not Identify a Specific Employment Practice That Presents a Common Question for All Proposed Class Members. ................................................................................. 19

        2.    Neither the Nature of the Proposed Classes nor the Existence of High-Level Frameworks for Exercising Discretion Support Commonality. ............................................. 22

3.      The Cases on Which Plaintiff Relies Are Distinguishable. ...................... 23

4.      Plaintiff's Statistics Are Fundamentally Flawed and Do Not
Provide "Significant Proof" of Class-wide Discrimination. ..................... 24

B.      The Disparate Treatment Claims Present No Common Questions
or Answers. ................................................................................................ 30

1.      The Statistical Evidence Does Not Provide "Significant
Proof" of Systemic Discrimination on the Basis of Sex. ......................... 30

2.      Plaintiff Does Not Offer Any Non-Statistical Evidence of
Intentional Sex Discrimination. ............................................................... 31

III.    PLAINTIFF'S PROPOSED CLASSES DO NOT SATISIFY THE
REQUIREMENTS OF RULE 23(B)(3) ............................................................ 33

A.      Individual Issues Would Predominate. .................................................... 33

B.      A Single Trial Adjudicating an Array of Disparate Claims Would
Not Be Superior. ....................................................................................... 37

IV.     PLAINTIFF FAILS TO PROVE TYPICALITY OR ADEQUACY ............................ 38

A.      Plaintiff's Theory of Intersectional Discrimination Is Not Typical
of, and Conflicts with, the Sex Discrimination Claims of the
Proposed Classes....................................................................................... 39

B.      Plaintiff Has Offered No Proof of Her Adequacy. ................................. 42

C.      Plaintiff's Lack of Familiarity with the Factual Basis for Her Pay
Discrimination Claims Renders Her Inadequate...................................... 43

V.      PLAINTIFF IMPERMISSIBLY EXPANDS HER DEFINITION OF THE
PROPOSED NEW YORK CLASS ........................................................................ 44

CONCLUSION.................................................................................................................... 45

## **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Adkins v. Morgan Stanley,*
   307 F.R.D. 119 (S.D.N.Y. 2015), *aff'd*, 656 F. App'x 555 (2d Cir. 2016) ...........................34

*Ahad v. Bd. of Trs. of S. Ill. Univ.,*
   2018 WL 4350180 (C.D. Ill. Sept. 12, 2018) .........................................................................20

*Allen v. City of N.Y.,*
   2022 WL 4133132 (S.D.N.Y. Sept. 12, 2022)........................................................................36

*Amchem Prods., Inc. v. Windsor,*
   521 U.S. 591 (1997)................................................................................................................37

*Artis v. Yellen,*
   307 F.R.D. 13 (D.D.C. 2014)..................................................................................................20

*Bennett v. Nucor Corp.,*
   656 F.3d 802 (8th Cir. 2011) .................................................................................................22

*Boyd v. Interstate Brands Corp.,*
   256 F.R.D. 340 (E.D.N.Y. 2009) .....................................................................................25, 26

*Cahill v. Nike, Inc.,*
   2022 WL 19226181 (D. Or. Nov. 22, 2022)...............................................................21, 23, 27

*Campbell v. Nat'l R.R. Passenger Corp.,*
   311 F. Supp. 3d 281 (D.D.C. 2018).............................................................................20, 28, 29

*Carpenter v. Boeing Co.,*
   2004 WL 2661691 (D. Kan. Feb. 24, 2004), *aff'd*, 456 F.3d 1183 (10th Cir.
   2006) ..................................................................................................................................29, 30

*Chalmers v. City of N.Y.,*
   2022 WL 4330119 (S.D.N.Y. Sept. 19, 2022).............................................................24, 34, 42

*Chen-Oster v. Goldman, Sachs & Co,*
   325 F.R.D. 55, 74 (S.D.N.Y. 2018) ............................................................................... *passim*

*Chin v. Port Authority of N.Y. & N.J.,*
   685 F.3d 135 (2d Cir. 2012)...................................................................................................26

*Comcast Corp. v. Behrend,*
   569 U.S. 27 (2013)............................................................................................................17, 33

*Costelo v. Chertoff*,
258 F.R.D. 600 (C.D. Cal. 2009) ............................................................45

*Darvin v. Int'l Harvester Co.*,
610 F. Supp. 255 (S.D.N.Y. 1985) ...............................................41, 43, 44

*Deboissiere v. Am. Modification Agency*,
2010 WL 1849265 (E.D.N.Y. May 5, 2010) ...........................................42

*Diaz v. Residential Credit Sols., Inc.*,
297 F.R.D. 42 (E.D.N.Y. 2014) ..............................................................42

*E.E.O.C. v. Sterling Jewelers Inc.*,
788 F. Supp. 2d 83 (W.D.N.Y. 2011) ......................................................37

*Edmond v. City of Chi.*,
2023 WL 3847098 (N.D. Ill. June 6, 2023) .............................................20

*Ellis v. Costco Wholesale Corp.*,
285 F.R.D. 492 (N.D. Cal. 2012) .......................................................20, 24

*Frazier v. Consol. Rail Corp.*,
1986 WL 11237 (D.D.C. July 31, 1986).................................................40

*Garcia De León v. N.Y. Univ.*,
2022 WL 2237452 (S.D.N.Y. June 22, 2022) .........................................37

*Hazelwood Sch. Dist. v. United States*,
433 U.S. 299 (1977)...............................................................................25

*Heggs v. City of N.Y.*,
2023 WL 9786044, at *22 (E.D.N.Y. Aug. 24, 2023), *report & recommendation adopted*, 2024 WL 759439 (E.D.N.Y. Feb. 23, 2024)...............................36

*Hoffman v. Transworld Sys. Inc.*,
2023 WL 421113 (W.D. Wash. Jan. 26, 2023).......................................45

*Humphrey v. Int'l Paper*,
2003 WL 22111093 (N.D. Ill. Sept. 11, 2003) .......................................45

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
299 F. Supp. 3d 430 (S.D.N.Y. 2018)....................................................18

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
827 F.3d 223 (2d Cir. 2016)...................................................................39

*In re Vale S.A. Sec. Litig.*,
2019 WL 11032303 (S.D.N.Y. Sept. 27, 2019) (Woods, J.) .......17, 38, 40

*In re Wal-Mart Wage & Hour Emp. Pracs. Litig.*,
    2008 WL 3179315 (D. Nev. June 20, 2008) ........................................................ 45

*Int'l Bhd. of Teamsters v. United States*,
    431 U.S. 324 (1977) .................................................................................. 31, 32, 36

*Jackson v. Bloomberg, L.P.*,
    298 F.R.D. 152 (S.D.N.Y. 2014) ...................................................................... 42

*Johnson v. Nextel Commc'ns Inc.*,
    780 F.3d 128 (2d Cir. 2015) ........................................................................... 36

*Jones v. Nat'l Council of Young Men's Christian Ass'ns of U.S.*,
    34 F. Supp. 3d 896 (N.D. Ill. 2014) ....................................................... 19, 23, 28

*Kassman v. KPMG LLP*,
    416 F. Supp. 3d 252 (S.D.N.Y. 2018) ..................................................... *passim*

*Koehler v. Infosys Techs. Ltd. Inc.*,
    628 F. Supp. 3d 835 (E.D. Wis. 2022) .............................................................. 24

*Little v. Wash. Metro. Area Transit Auth.*,
    249 F. Supp. 3d 394 (D.D.C. 2017) .................................................................. 34

*Loc. 3621, EMS Officers Union v. City of N.Y.*,
    2022 WL 17175798 (S.D.N.Y. Nov. 22, 2022) ...................................... *passim*

*Mangahas v. Eight Oranges Inc.*,
    2024 WL 2801922 (S.D.N.Y. May 31, 2024) .................................................... 41

*Moore v. Boeing Co.*,
    2004 WL 3202777 (E.D. Mo. Mar. 31, 2004) .................................................. 30

*Moore v. PaineWebber, Inc.*,
    306 F.3d 1247 (2d Cir. 2002) ......................................................................... 33

*Moore v. Publicis Grp. SA*,
    2014 WL 11199094 (S.D.N.Y. May 15, 2014) ................................... 22, 35, 36, 37

*Myers v. Hertz Corp.*,
    624 F.3d 537 (2d Cir. 2010) ........................................................................... 17

*Norman v. Arcs Equities Corp.*,
    72 F.R.D. 502 (S.D.N.Y. 1976) ...................................................................... 43

*Oakley v. Verizon Commc'ns Inc.*,
    2012 WL 335657 (S.D.N.Y. Feb. 1, 2012) ....................................................... 38

*Ottaviani v. State Univ. of N.Y. at New Paltz*,
    875 F.2d 365 (2d Cir. 1989)......................................................................25

*Payne v. Travenol Lab'ys, Inc.*,
    673 F.2d 798 (5th Cir. 1982) ...................................................................40

*Pritchard v. Cnty. of Erie*,
    2018 WL 1036165 (W.D.N.Y. Feb. 23, 2018) ........................................41

*Puffer v. Allstate Ins. Co.*,
    255 F.R.D. 450 (N.D. Ill. 2009), *aff'd*, 675 F.3d 709 (7th Cir. 2012) ........30, 37, 38

*Reid v. Lockheed Martin Aeronautics Co.*,
    205 F.R.D. 655 (N.D. Ga. 2001)........................................................30, 35

*Richardson v. City of N.Y.*,
    2021 WL 1910689 (S.D.N.Y. May 12, 2021) ................................. *passim*

*Robinson v. Metro-N. Commuter R.R. Co.*,
    267 F.3d 147, 159 (2d Cir. 2001)............................................................35

*Ross v. Lockheed Martin Corp.*,
    267 F. Supp. 3d 174 (D.D.C. 2017) ..............................................22, 23, 29

*Russell v. Forster & Garbus, LLP*,
    2020 WL 1244804 (E.D.N.Y. Mar. 16, 2020)...........................42, 43, 44

*Sanchez v. Velocity Invs., L.L.C.*,
    2015 WL 12777990 (N.D. Ga. Dec. 11, 2015).......................................42

*Savino v. Comput. Credit, Inc.*,
    164 F.3d 81 (2d Cir. 1998).......................................................................41

*Scott v. Chipotle Mexican Grill, Inc.*,
    954 F.3d 502 (2d Cir. 2020).....................................................................33

*Sicav v. James Jun Wang*,
    2015 WL 268855 (S.D.N.Y. Jan. 21, 2015) ...........................................42

*Smith v. City of Jackson, Miss.*,
    544 U.S. 228 (2005)................................................................................22

*Stafford v. Bojangles' Rests., Inc.*,
    123 F.4th 671 (4th Cir. 2024) ...............................................................18

*Sughrim v. State of N.Y.*,
    690 F. Supp. 3d 355 (S.D.N.Y. 2023)...................................................20

*Tabor v. Hilti, Inc.*,
    703 F.3d 1206 (10th Cir. 2013) ..................................................................22, 37

*Tennie v. City of N.Y. Dep't of Soc. Servs. of N.Y.C. Hum. Res. Admin.*,
    1987 WL 6156 (S.D.N.Y. Jan. 30, 1987) ........................................................39, 40

*United States v. City of N.Y.*,
    717 F.3d 72 (2d Cir. 2013)......................................................................................34

*Valelly v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    2023 WL 2918982 (S.D.N.Y. Apr. 12, 2023)........................................................24

*Valerino v. Holder*,
    283 F.R.D. 302 (E.D. Va. 2012) ......................................................................20, 23

*Valley Drug Co. v. Geneva Pharms., Inc.*,
    350 F.3d 1181 (11th Cir. 2003) .............................................................................40

*Vincent v. Money Store*,
    304 F.R.D. 446 (S.D.N.Y. 2015) ..........................................................................45

*Waisome v. Port Authority of N.Y. & N.J.*,
    948 F.2d 1370 (2d Cir. 1991)................................................................................26

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)..................................................................................... *passim*

*Watson v. Fort Worth Bank & Tr.*,
    487 U.S. 977 (1988)........................................................................................19, 22

*Woods-Early v. Corning Inc.*,
    330 F.R.D. 117 (W.D.N.Y. 2019).........................................................................20

*Wynn v. N.Y.C. Hous. Auth.*,
    314 F.R.D. 122 (S.D.N.Y. 2016), *aff'd*, 730 F. App'x 92 (2d Cir. 2018) ........17, 35

*Yi Xiang v. Inovalon Holdings, Inc.*,
    327 F.R.D. 510 (S.D.N.Y. 2018) ..........................................................................42

*Zivkovic v. Laura Christy LLC*,
    329 F.R.D. 61 (S.D.N.Y. 2018) ............................................................................42

## STATUTES

42 U.S.C. § 2000e ....................................................................................................1, 4

## OTHER AUTHORITIES

Fed. R. Civ. P. 12 .......................................................................................................20

Fed. R. Civ. P. 23 ................................................................................................ *passim*

MCLAUGHLIN ON CLASS ACTIONS § 4:27 (21st ed.) ...................................................42

## PRELIMINARY STATEMENT

The putative class claims in this lawsuit are alleged by a single Plaintiff, Naula Ndugga, who worked for Bloomberg News ("News") as an entry-level producer starting in January 2018. Even though she only worked as a producer and only in New York, she seeks to bring claims of pay discrimination based on sex under Title VII on behalf of herself and a class of hundreds of female reporters, editors, and producers who worked in News nationwide from February 3, 2021 through December 31, 2021 (the "U.S. Class"), as well as under the New York State Human Rights Law on behalf of herself and a class of female reporters, editors, and producers who worked in New York from August 9, 2017 through December 31, 2020 (the "New York Class").

Plaintiff does not, and cannot, demonstrate that this case is suitable for class-wide adjudication. There is no uniform policy or practice that affected the pay of every member of the putative classes in the same way. Instead, subjective decisions about performance ratings and compensation in News were made by hundreds of different managers, each of whom was exercising their own discretion and independent judgment to make highly individualized determinations based on each employee's performance and contributions.

Recognizing that this scenario is incompatible with class certification, Plaintiff's latest theory (which is not pled anywhere in the Complaint) is that Reto Gregori, Deputy Editor-in-Chief of News, was the alleged ultimate puppet master responsible for making every employment decision for each of the 3,000 employees in News. But other than sweeping generalizations and hyperbolic rhetoric, all Plaintiff is able to show is that Mr. Gregori's role was largely confined to approving the ratings and pay decisions made by managers below him, with limited exceptions. Plaintiff has no evidence – much less "significant proof" – that Mr. Gregori determined the pay of all (or even a significant number of) women in the proposed classes. Class certification should be denied.

## STATEMENT OF FACTS

### A. Bloomberg L.P.

Bloomberg L.P. ("BLP") is a global financial, software, data and media company.[1] BLP provides a wide range of products and services to individuals, businesses, and institutions, including financial software tools, enterprise applications and order management systems for the institutional marketplace, as well as news to financial companies and organizations, a global television network, website, radio stations and magazines. At all relevant times, BLP has maintained robust policies prohibiting all forms of discrimination, including discrimination and harassment based on sex, as well as retaliation.[2] These policies applied to all employment decisions, including compensation and evaluations.[3] BLP requires all employees to participate in annual training regarding its non-discrimination policies.[4]

### B. Bloomberg News

Bloomberg News (also internally known as Editorial and Research[5]) is a global financial and business news organization with over 3,000 employees working across more than 100 news bureaus worldwide.[6] During the time period relevant to this Motion (2017 to 2021), News was comprised of dozens of Business Units that each focused on a distinct geographic region, coverage area, or platform, such as, for example, Breaking News and Markets, Technology, Americas,

---

[1] *See* Memorandum in Support of Plaintiff's Motion for Class Certification (Dkt. 330, "Br.") n.1. As used herein, citations to "BLP Ex. __" refer to the exhibits annexed to the Declaration of Elise M. Bloom ("Bloom Decl."). Plaintiff's exhibits attached to the Declaration of Dana Busgang (Dkt. 333) are cited as "Pl. Ex."

[2] BLP Ex. J at BLP_Syeed_0000381-84.

[3] *Id.* at BLP_Syeed_0000381 ("This policy of non-discrimination governs all aspects of employment decisions and practices, including but not limited to the following: … rates of pay or other forms of compensation…."); *see also, e.g.,* BLP Ex. K (email to managers about compensation processes, stating "an employee's protected status (e.g., gender, age, ethnicity, etc.) cannot in any way influence this process.").

[4] BLP Ex. A (Deposition of Mindy Massucci ("Massucci Tr.")) 84:2-11; BLP Ex. B (Deposition of Katherine Polis ("Polis Tr.")) 42:6-9.

[5] BLP Ex. C (Deposition of Lisa Jennings ("Jennings Tr.")) 21:10-14; *see also id.* 26:19-24.

[6] https://www.bloomberg.com/company/what-we-do/news-media/ (last accessed June 18, 2025); BLP Ex. D (Deposition of Reto Gregori ("Gregori Tr.")) 25:18 (over 3,000 employees in News).

Government, Investigations, TV & Radio, and QuickTake (formerly known as TicToc[7]), among dozens of others.[8] Each Business Unit in News was run by a different senior executive.[9] ███████
███████████████████████████████████████████████████████████████████████████████
███████.[10]

The Editorial and Research Management Committee (the "Committee") was responsible for overseeing News during the relevant time period.[11] The Committee has always included John Micklethwait, the Editor-in-Chief of News, and Mr. Gregori, and was expanded in 2019 to include Heather Harris, Chief Content Officer.[12] In 2020, the Committee was further expanded to add eight additional senior executives, half of whom were women.[13]

### C.    Named Plaintiff and Her Allegations

Plaintiff began working for BLP as intern in News on September 5, 2017.[14] This internship was Plaintiff's first job out of college, and she had no prior paid journalism experience.[15] At the conclusion of this internship program in November 2017, BLP hired several interns – all of whom were women – into full-time roles in the News "rotator" program.[16] Plaintiff was not among those

---

[7] BLP Ex. E (Deposition of Andre-Pierre du Plessis ("du Plessis Tr.")) 32:17-19. This Business Unit was unrelated to the similarly named social media platform, TikTok.

[8] BLP Ex. C (Jennings Tr.) 46:24-47:3, 47:16-17, 60:21-61:3; see also Pl. Ex. 65 (Martin Rep.) ¶ 10(j) (listing 33 Business Units used as indicator variables).

[9] BLP Ex. F (Deposition of Shelby Siegel ("Siegel Tr.")) 30:25-31:3.

[10] BLP Ex. C (Jennings Tr.) 96:6-98:3; BLP Ex. F (Siegel Tr.) 31:7-34:3.

[11] BLP Ex. C (Jennings Tr.) 22:9-23:24. The Committee was known as the Editorial Management Committee for a portion of the relevant time period. Id.

[12] BLP Ex. L; BLP Ex. D (Gregori Tr.) 21:3-17.

[13] BLP Ex. L; Pl. Ex. 11 (announcing expansion of the Committee); BLP Ex. D (Gregori Tr.) 22:10-24:4.

[14] BLP Ex. M.

[15] BLP Ex. G (Deposition of Naula Ndugga ("Pl. Tr.")) 27:12-19.

[16] BLP Ex. D (Gregori Tr.) 137:21-138:13; BLP Ex N (excerpts of HR data for individuals hired into rotator program from Plaintiff's internship class). The rotator program is ████████████████████████
█████████████████████████████████████████████████████████████
BLP Ex. D (Gregori Tr.) 137:21-138:13; see also id. 216:13-217:8 ████████████████████████
████████████████████████████████████

selected to join the rotator program, but she was offered a temporary assignment as an independent contractor assisting a newly created Business Unit called QuickTake.[17]

On January 29, 2018, BLP hired Plaintiff as a full-time producer in its New York office.[18] Plaintiff only worked as a producer in QuickTake—and never as a reporter or an editor—and only in New York until her voluntary resignation from employment in early 2022.[19]

In her Fifth Amended Complaint ("FAC"), Plaintiff alleges claims of disparate treatment and disparate impact discrimination in pay on the basis of sex under Title VII and the New York State Human Rights Law ("NYSHRL") on behalf of herself and other female reporters, editors and producers.[20] Members of the putative classes worked in nearly 30 cities across the country, in more than 30 different Business Units, and held more than 30 different Job Profiles (which are akin to job titles), ranging from on-air television anchors to correspondents to video editors, among many others, performing a wide range of different job duties.[21]

She also alleges individual claims of discrimination "on the basis of race and on the basis of sex" in pay under the NYSHRL and the New York City Human Rights Law.[22]

---

[17] BLP Ex. G (Pl. Tr.) 74:16-20, 297:12-14; *see also* BLP Exs. O & P. Plaintiff was not offered a position in the rotator program because of her low score (68) on the intern program news test, as well as concerns about mistakes in her work and her ability to work independently, although supervisors recognized that she had potential. *See* BLP Ex. Q; *see also* BLP Ex. D (Gregori Tr.) 221:20-222:6 (explaining that Plaintiff "didn't make the grade" to be hired into the rotator program).

[18] BLP Ex. M.

[19] *Id.*

[20] BLP Ex. R (FAC) ¶¶ 56, 57, 165-96. Although Plaintiff now seeks certification of a class alleging discrimination based on sex only, at her deposition, she unequivocally testified that her claims are based on her belief that BLP discriminated against her in terms of her pay because she is both Black and a woman, and not because of her sex alone. BLP Ex. G (Pl. Tr.) 144:16-146:14. *See* § IV.A., *infra*.

[21] Pl. Ex. 66 (Neumark Rep.) Table A-1 (listing over 30 "class job profiles") & Table A-4 at 35 (listing nearly 30 work cities); Pl. Ex. 65 (Martin Rep.) ¶ 10(j) (Dr. Neumark used indicator variables for 33 Business Units).

[22] BLP Ex. R (FAC) ¶¶ 201, 207.

**D.    Managers in News Used Their Judgment to Make Determinations about Performance Ratings and Compensation Each Year.**

BLP relied on hundreds of managers in News to exercise their discretion to assess employee performance and make highly individualized decisions about pay based on merit and performance relative to peers.[23] Determinations about salary increases in News typically were made at the end of each year, as set forth below ███████████████████████████

████████████████████████████████████████████████████████████

████████████ [24]

**1.    _Hundreds of Managers in News Exercised Their Discretion in Assigning Performance Ratings._**

Performance evaluations in News were conducted mid-year and at year-end.[25] This process began with each employee's immediate supervisor (typically, a team leader) making an initial determination about ratings based on that employee's performance and contributions.[26] Team leaders and managers were encouraged to ████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████ [27] They also were encouraged to consider how each employee performed relative to his or her peers.[28]

---

[23] BLP Ex. C (Jennings Tr.) 161:9-162:13; BLP Ex. H (Deposition of Krista Sullivan ("Sullivan Tr.")) 45:15-19; Pl. Ex. 65 (Martin Rep.) ¶¶ 48, 48(a)-(d) & Figures 7-9; _see also_ Pl. Ex. 25 at BLP_Syeed_0009772.

[24] BLP Ex. C (Jennings Tr.) 181:3-21, 195:9-18; BLP Ex. H (Sullivan Tr.) 170:17-171:11; BLP Ex. D (Gregori Tr.) 158:16-23.

[25] BLP Ex. D (Gregori Tr.) 48:14-16; BLP Ex. A (Massucci Tr.) 90:4-7.

[26] BLP Ex. C (Jennings Tr.) 259:10-15, 301:21-302:3; _see also_ BLP Ex. S (describing the ratings process as starting with the team leaders, _i.e._, the "TLs").

[27] Pl. Ex. 26 at BLP_Syeed_0010032; BLP Ex. T ███████████████████████████
███████████████

[28] _See, e.g.,_ Pl. Ex. 26 at BLP_Syeed_0010041; Pl. Ex. 25 at BLP_Syeed_0009766 ████████████
██████████████████████████████████████  ̄BLP Ex. T ̄
█████████████████████████████████ _see also_ BLP Ex. U (communications amongst team leaders in QuickTake soliciting and conveying performance feedback).

Team leaders used their discretion to assign numerical ratings ███████████ ████ across a set of performance metrics ████████████████████████████ ███████████████████████████[29]

███████████████████████████████████████████████████████████

████[30] An overall performance rating was then calculated ████████████ ████████████████████████[31] While managers were encouraged to aim towards having a curve-like distribution of ratings,[32] they were not required to strictly adhere to the suggested distribution and, in fact, ███████████████[33]

After team leaders entered their ratings, they would submit them up to their respective manager.[34] Those managers reviewed the ratings and used their discretion to either approve, reject or change them as they deemed appropriate before submitting them up further.[35] This same process

---

[29] BLP Ex. D (Gregori Tr.) 64:2-8 ███████████████████████████████████; BLP Ex. C (Jennings Tr.) 308:3-7 ███████████████████████████████████, 307:13-20.

[30] BLP Ex. C (Jennings Tr.) 307:21-25 ██████████ 302:11-25 ██████████████ ████████ 308:8-17 ████████████████████████████████████████████ *see also* BLP Ex. F (Siegel Tr.) 186:5-15. ███████████████ *See* Pl. Ex. 25 at BLP_Syeed_9766.

[31] BLP Ex. C (Jennings Tr.) 307:4-309:11; BLP Ex. H (Sullivan Tr.) 70:22-71:11. For non-supervisory employees (like proposed class members), ██████████████████████████████████████████████ BLP Ex. C (Jennings Tr.) 308:19-309:11.

[32] BLP Ex. D (Gregori Tr.) 60:20-22, 61:18-62:3; *see also, e.g.,* Pl. Exs. 19 & 24 (describing the distributions as "suggested"). Human Resources also was involved in determining the proposed distributions, contrary to Plaintiff's misrepresentation that Mr. Gregori alone set them. (Br. 6). BLP Ex. C (Jennings Tr.) 312:17-21; *see also, e.g.,* Pl. Ex. 16 (Human Resources proposed the suggested distribution for 2019, which Mr. Gregori merely endorsed, commenting "as usual, we won't stick to it").

[33] BLP Ex. D (Gregori Tr.) 61:18-62:3 (describing distribution guidelines as ████████████████ █████████████████ For instance, in mid-year 2018, the guidelines suggested that ██ % of overall ratings be 4s or 5s (Pl. Ex. 24), but the actual distribution of manager-assigned ratings of 4s and 5s was ██ % across News. BLP Ex. V. ████████████████████████████████████████████ *Id.*

[34] BLP Ex. S (outlining the process and deadlines for different levels of managers within the Breaking News & Markets Business Unit to submit their ratings); *see also* BLP Ex. D (Gregori Tr.) 55:7-17 (explaining that, in the context of BLP Ex. S, "TL" referred to team leaders, "ME" referred to managing editors, and "EE" referred to executive editors).

[35] BLP Ex. D (Gregori Tr.) 55:25-56:6; BLP Ex. C (Jennings Tr.) 315:4-17; BLP Ex. S.

continued through each level of the management hierarchy, up through the head of each Business Unit.[36] The heads of the Business Units then submitted the ratings up to Mr. Micklethwait and Mr. Gregori.[37] As Mr. Gregori testified, he was highly deferential to the ratings determinations made by other managers, and he only occasionally made or requested changes to ratings.[38] Tellingly, Plaintiff is only able to point to *four* instances in which Mr. Gregori rejected or modified ratings over a span of five years.[39] Of the four, one pertains solely to reducing a *male* employee's rating[40]; two concerned mid-year ratings, which did not affect compensation[41]; and the last one was generalized without directing changes for any specific employee.[42]

2.      ***Hundreds of Managers Exercised Their Discretion to Make Individualized Determinations about Discretionary Compensation Increases and Bonuses.***

Hundreds of individual managers within News reviewed and adjusted employee compensation on an annual basis.[43] These decisions included two components: (1) a discretionary bonus based on the prior year's performance, and (2) total target compensation, which is comprised of a base salary and target bonus, for the upcoming year.[44] While News had certain processes in place to help facilitate managerial decision-making—as many employers do—each individual

---

[36] BLP Ex. D (Gregori Tr.) 55:18-56:11; BLP Ex. C (Jennings Tr.) 315:4-17; BLP Ex. S; *see also, e.g.,* BLP Exs. X, Y & Z (reflecting discussions about performance ratings between managers in QuickTake).

[37] BLP Ex. D (Gregori Tr.) 56:12-57:2; BLP Ex. C (Jennings Tr.) 311:2-15.

[38] BLP Ex. D (Gregori Tr.) 72:12-74:5 ██████████████████████████████████████████████████████████

[39] Br. nn.28-29, citing Pl. Exs. 39, 51, 43 & 38. Plaintiff also cites Pl. Ex. 31 as another supposed example (Br. n.28), but this document does not reflect Mr. Gregori rejecting ratings entered by another manager, as she suggests. Rather, it only vaguely mentions guidance given at mid-year about a *future* evaluation cycle. Pl. Ex. 31.

[40] Pl. Ex. 38.

[41] Pl. Ex. 39 (July 2018); Pl. Ex. 43 (June 2017); BLP Ex. H (Sullivan Tr.) 29:25-30:11 ████████████████████████████

[42] Pl. Ex. 51.

[43] Pl. Ex. 65 (Martin Rep.) ¶¶ 48-49 & Figures 7-9; BLP Ex. C (Jennings Tr.) 242:10-244:4.

[44] BLP Ex. C (Jennings Tr.) 176:23-177:6.

manager was ultimately responsible for exercising their discretion and business judgment to make merit-based pay determinations.[45]

Beginning in 2018 and continuing into 2019, News began to implement peer groups as a component of its evaluation and compensation processes.[46] ████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████[47]████████████
████████████████████████████████████████████████████████████████████
███████████████████[48]██████████████████████████████████████████████
██████████████████████[49]████████████████████████████████████████████
███████████████████████████████████.[50] Proposed class members were assigned to more than 40 different peer groups.[51]

After year-end performance ratings were determined by managers through the process described above, ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

---

[45] BLP Ex. C (Jennings Tr.) 242:10-244:4 █████████████████████████████████████
████████████ 244:17-245:8 ████████████████████████████████████████████████
██████████████; *see also* BLP Ex. A (Massucci Tr.) 333:20-21 █████████████████████

[46] BLP Ex. C (Jennings Tr.) 63:20-64:21 (peer groups were initially formed for a subset of Job Profiles in News, ███████████ in 2018), 99:23-100:7 (majority of employees in News were in peer groups by 2019); Pl. Ex. 13 at slides 2 & 3.

[47] Pl. Ex. 53 at BLP_Syeed_0014849; Pl. Ex. 13 at slides 2 & 3.

[48] BLP Ex. C (Jennings Tr.) 63:20-64:21, 80:13-25, 90:15-24, 109:22-110:18, 119:7-120:2; BLP Ex. F (Siegel Tr.) 14:9-16:2 ███████████████████████████████████████████████████ 76:7-77:7

[49] BLP Ex. F (Siegel Tr.) 16:16-19, 21:4-16; Pl. Ex. 53 (reflecting █████████████████████

[50] BLP Ex. C (Jennings Tr.) 90:15-18; BLP Ex. F (Siegel Tr.) 14:9-15:18, 25:8-17, 36:11-37:7, 78:12-79:13; *see also* BLP Ex. AA (listing

[51] Pl. Ex. 66 (Neumark Rep.) Table A-3, Panel A, Model 4 (showing 42 peer groups for proposed New York Class). The "Notes" below Table A-3 state that the parentheses after model "controls" represent the number of categories.



███████████████████████████████████████████████.[52] These ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ were entered into an

algorithmic tool used to calculate preliminary compensation values.[53] This calculation also used a

set of logical "rules"[54] (which differed from year-to-year)████████████████████████████

████████████████████████████████████████████.[55] ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████[56] ████████████████████████████

██████████████████████████████████[57]

---

[52] *See, e.g.*, Pl. Ex. 13 at slide 2; BLP Ex. F (Siegel Tr.) 180:3-7; BLP Ex. D (Gregori Tr.) 90:24-91:11 ████████
███████████████████████████ BLP Ex. H (Sullivan Tr.) 62:13-16, 133:5-135:3

[53] Pl. Ex. 64 at pp. 8-9 (listings categories of inputs); BLP Ex. H (Sullivan Tr.) 29:2-12, 31:7-15, 32:6-17.
██████████████████████████████████████████████████████████
████████████████████████████ Pl. Ex. 12 at slide 3; BLP Ex. H (Sullivan Tr.) 58:6-60:21,
113:2-19, 72:2-73:6.

[54] These rules were colloquially referred to as the "algo rules."

[55] Pl. Ex. 10 ████████████████████████████████████████████████████████
████████████████████████████████████████████████ *see also*
████████ Pl. Exs. 8 & 9 (News algo rules for year-end 2019 and 2021); BLP Ex. BB ████████
██████████████ *see also* BLP Ex. H (Sullivan Tr.) 33:5-16.

[56] *See* Pl. Exs. 8 & 10; BLP Ex. C (Jennings Tr.) 210:14-211:5 ████████████████████████
████████████████████████████████████████████████████

[57] BLP Ex. H (Sullivan Tr.) 51:12-22, 83:6-84:18; BLP Ex. C (Jennings Tr.) 226:14-18.

Critically, however, those preliminary values did not determine final compensation.[58] Hundreds of managers were responsible for assessing the values generated by the algorithm's calculations, and determining whether to increase, decrease, or proceed with the specific numbers for each member of their team.[59] ▐▌▐▌▐▌▐▌▐▌▐▌▐▌

▐▌▐▌▐▌ [60] Ultimately, however, they were vested with the discretion to decide how to best allocate their pool of compensation funding across their team, and to make decisions that ▐▌

▐▌▐▌▐▌▐▌▐▌▐▌▐▌▐▌▐▌ "[61] Managers entered their determinations into BOCS,[62] and submitted them up to their managers who, in turn, reviewed them and exercised their own discretion as to whether to approve or modify them.[63] This same process repeated at each level of management up through the senior leaders of each Business Unit, and ultimately were approved by Mr. Gregori and Mr. Micklethwait.[64]

---

[58] See, e.g., BLP Ex. C (Jennings Tr.) 214:14-215:4 ▐▌▐▌▐▌▐▌▐▌ ▐▌▐▌ 242:10-244:4; Pl. Ex. 12 at slides 3-5 ▐▌▐▌▐▌▐▌▐▌ Pl. Ex. 13 at slide 3 (same).

[59] BLP Ex. C (Jennings Tr.) 242:10-244:4; BLP Ex. F (Siegel Tr.) 202:7-18; BLP Ex. H (Sullivan Tr.) 48:11-16; *see also* BLP Ex. H (Sullivan Tr.) 26:3-13 ▐▌▐▌▐▌▐▌▐▌ ▐▌▐▌▐▌▐▌ BLP Ex. F (Siegel Tr.) 222:11-16.

[60] Pl. Ex. 12 at slides 4 & 5; *see also* Pl. Ex. 13 at slide 3 ▐▌▐▌▐▌▐▌ ▐▌▐▌▐▌ BLP Ex. H (Sullivan Tr.) 34:11-20.

[61] Pl. Ex. 12 at slides 4 & 5; Pl. Ex. 13 at slide 3; BLP Ex. C (Jennings Tr.) 242:10-244:4 ▐▌▐▌▐▌▐▌ 244:17-245:8 ▐▌▐▌▐▌ *see also* BLP Ex. CC (discussions between managers in QuickTake regarding ▐▌▐▌▐▌ ▐▌▐▌▐▌ BLP Ex. DD (reallocating bonus funds due to employee departure).

[62] All increases or decreases to proposed compensation in BOCS were tracked (BLP Ex. C (Jennings Tr.) 266:15-17), and are reflected in "audit logs" that BLP produced in discovery. *See* Pl. Ex. 62 (cherry-picked excerpt of BOCS audit logs); BLP Ex. EE (additional excerpts from BOCS audit logs). These logs show the initial values calculated by the algorithm as the earliest dated entry for each employee. *See* BLP Ex. H (Sullivan Tr.) 154:24-155:21. For all changes entered by a manager, the logs also show the name of the manager who made the change and the exact amount entered in each instance, including if multiple adjustments were made by one or more managers for the same employee in a given year. *Id.* 156:15-157:2 (discussing Pl. Ex. 62); BLP Ex. EE.

[63] BLP Ex. C (Jennings Tr.) 290:4-13; *see also* BLP Ex. D (Gregori Tr.) 94:8-95:3.

[64] *Id.*

By the time salary adjustments and bonuses were finally determined, they had been reviewed by multiple managers and, approximately 75% of the time, were not the same as the initial values calculated by the algorithm.[65] A total of 126 different managers in News made compensation adjustments in BOCS between 2018 and 2021.[66] They collectively made 5,550 changes to bonuses and target total compensation figures, which determined the pay of approximately 500 employees in the population analyzed by Plaintiff's expert in each year.[67]

Managers also entered narrative comments in BOCS ██████████████████████ ████████████████████████.[68] These comments further underscore the wide array of highly individualized factors that different managers considered when deciding pay. These included, for example, rewarding employees who had won a journalism award; excelled in covering a "very strategically vital" beat; had received an offer from a competitor or were a flight risk; demonstrated significant professional growth and potential over the prior year; or were paid less than peers on their team.[69] These comments also show that managers decided to keep pay flat, or only give a minimal increase, in a number of different unique circumstances, such as where an employee was not performing up to expectations in a new role or for disciplinary reasons.[70]

---

[65] Pl. Ex. 65 (Martin Rep.) ¶¶ 48(a)-(b), 49. More specifically, of the 2,807 employee-year records analyzed by Plaintiff's expert, 2,085 of them reflected compensation changes made by at least one manager. *Id.* ¶ 48(b). *See also, e.g.*, BLP Ex. EE (excerpts of BOCS audit logs) at "Tab 1-2018" for ID Number ███████████ ████████████████████████████████████████████████████████████████████████████

[66] Pl. Ex. 65 (Martin Rep.) ¶¶ 48 & 48(a), Figure 6.

[67] Pl. Ex. 65 (Martin Rep.) ¶¶ 48(b)-(d), Figures 7-9. For context, Plaintiff's proposed New York Class includes 315 women total between 2017 and 2020, and her proposed U.S. Class includes 338 women. (Br. n.106.)

[68] BLP Ex. H (Sullivan Tr.) 86:3-87:8.

[69] BLP Ex. FF (excerpt of BOCS comments); *see, e.g., id.* at Rows 192, 35, 48, 60, 161, 222.

[70] *See, e.g., id.* at Rows 17-19, 104, 133, 218, 315.

3.    ***Plaintiff Misrepresents the Evidence Regarding Mr. Gregori's Involvement in Compensation Determinations.***

Plaintiff significantly exaggerates the extent to which Mr. Gregori determined the compensation of putative class members and their male counterparts.[71] Of the 5,550 adjustments to bonuses and target total compensation made by 126 different managers in BOCS between 2018 and 2021, only approximately 12% were made by Mr. Gregori.[72] This means that, in these instances, final pay was determined by managers below Mr. Gregori almost 90% of the time. Plaintiff herself is a prime example of this; Mr. Gregori *never* modified the pay decisions that were made by Plaintiff's immediate manager during the year-end processes.[73]

Significantly, the changes Mr. Gregori did make were predominantly to *increase* compensation in favor of female putative class members.[74] For instance, of the 286 total changes to bonuses that Mr. Gregori made between 2018 and 2021, 139 of his adjustments were to increase the bonuses of female employees, whereas 95 were increases to the bonuses of male employees.[75] He also made 389 adjustments to target total compensation across the same four-year time period, and increased target total compensation 153 times for female putative class members (compared to 30 increases for male employees).[76] In percentage terms, the majority of Mr. Gregori's adjustments to target total compensation for females were increases (65%), while the substantial majority of those changes for men were decreases (80%).[77] Plaintiff entirely ignores this evidence

---

[71] She relies on a "filtered" version of the BOCS logs as supposed evidence of Mr. Gregori's changes (Br. n.70, citing Pl. Ex. 63), but she neglects to disclose that approximately half of these records are entirely irrelevant because they pertain to individuals who worked outside of the U.S. or were otherwise outside of the population that her own expert chose to analyze.

[72] *See* Pl. Ex. 65 (Martin Rep.) ¶¶ 48(c)-(e), Figures 8 & 9.

[73] BLP Ex. JJ.

[74] Pl. Ex. 65 (Martin Rep.) ¶ 48(e). Dr. Neumark acknowledged that he did not conduct any analysis of the BOCS audit logs. BLP Ex. I (Deposition of David Neumark ("Neumark Tr.")) 105:18-106:3.

[75] Pl. Ex. 65 (Martin Rep.) ¶ 48(e).

[76] *Id.*

[77] *Id.*

and does not even try to reconcile it (nor could she) with her accusations that Mr. Gregori was the biased decision-maker who caused an alleged pay disparity.

She instead resorts to speculating that the BOCS logs may not capture all of Mr. Gregori's adjustments because, according to her, he regularly directed other managers to enter his changes in BOCS. There is no evidence to support this theory. She is only able to come up with three instances of this over a five-year period and those, based on her own count, affected only 17 employees at most (or approximately 0.5% of the 3,000 employees in News).[78] This is worlds away from a pervasive practice, as she suggests. These three isolated instances also show no sex bias; rather, they all show Mr. Gregori asking other managers to *increase* the compensation of female employees.[79]

Plaintiff also repeatedly overstates and misrepresents the evidence related to Mr. Gregori's exercise of discretion before the hundreds of lower-level managers make their pay determinations.

- *Peer groups*. Plaintiff's accusation that ████████████████████ ████████████[80] is untrue. What is actually reflected in the evidence she cites is ██████████████████████████████████████████████████ ████████[81]██████████████████████████████████ ████████[82].

- *Stack ranking*. Plaintiff does not offer a shred of evidence to support her misrepresentation that ████████████████████████████████

---

[78] Br. 16, n.66, citing Pl. Exs. 32, 36 & 55.

[79] Plaintiff's Ex. 55 suggests an increase for ID "8353156647," who is a woman. *See* Bloom Decl. ¶ 39. As it relates to Plaintiff's Ex. 32, BLP produced a similar iteration of this document without redactions over any discussion concerning putative class members and their male peers (BLP Ex. GG), which shows that Mr. Gregori increased compensation for three women ██████████ "27553413064," and "3182631574"). *See* Bloom Decl. ¶ 39. Plaintiff's Ex. 36 also reflects Mr. Gregori proposing a "meaningful raise" for a female employee ████████ ██████.

[80] Br. 13-14 (emphasis added).

[81] BLP Ex. D (Gregori Tr.) 86:6-20. There also is no evidence that any of these corrected errors actually affected putative class members.

[82] As Plaintiff admits (Br. 13), ████████████████████████████████████████ ████████████████████ BLP Ex. C (Jennings Tr.) 80:3-12, 144:21-145:7.



Plaintiff's suggestion that other documentary evidence showing Mr. Gregori's involvement is "underinclusive" (Br. 16 & n.68) also is demonstrably false. Even though the parties agreed that BLP would unredact 35% of documents with redactions concerning putative class members' ratings or compensation, the vast majority of documents subject to this agreement were

---

[83] Br. 14-15.

[84] Br. 14-15, n.60, citing Gregori Tr. 60:3-11. ███████████████████████████████████
████████████████████████████████████████████. BLP Ex. C (Jennings Tr.) 149:19-24.

[85] Br. 12, n.48, citing Pl. Ex. 34 and testimony discussing Pl. Ex. 34.

[86] Br. 12-13 & n.49, citing Pl. Ex. 34 and testimony discussing Pl. Ex. 34.

[87] Plaintiff is aware that the ████████ employee (whose name is redacted in Pl. Ex. 34) is outside the scope of this case because, as a good-faith compromise to resolve a discovery dispute, BLP agreed to remove redactions from this document (and others) for discussions related to putative class members and their male peers, and to replace those redactions with a unique anonymizer. *See* BLP Ex. HH. As part of this agreement, BLP re-produced Plaintiff's Ex. 34 with a unique anonymizer for one individual referenced in a different part of this document, but maintained its redactions concerning the other employees who are not relevant to this case. BLP also explicitly informed Plaintiff that this document was being provided with all class-related redactions removed. *See* BLP Ex. II.

communications between lower-level managers, and did not involve or mention Mr. Gregori. Of the documents that did involve Mr. Gregori, almost all of them were unredacted pursuant to this compromise, with the exception of only three unique documents—all of which Plaintiff submitted with her Motion.[88]

### 4. *Decisions about Starting Pay Were Highly Individualized.*

Decisions about starting pay were based on a variety of different factors, such as ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ ██

████████████████████████████████[90] Mr. Gregori's role was largely confined to

approving offers that others presented to him.[91] The lone exception that Plaintiff has identified is

her own starting salary, which Mr. Gregori suggested should be consistent with what was being

offered to the women hired out of her intern class into the rotator program.[92]

---

[88] Pl. Exs. 36, 39 & 52.

[89] BLP Ex. C (Jennings Tr.) 168:8-170:22, 231:25-232:4; *see, e.g.,* BLP Ex. A (Massucci Tr.) 42:2-43:15 ████████████████████████████████████████████████████████ BLP Ex. D (Gregori Tr.) 190:10-191:2.

[90] BLP Ex. C (Jennings Tr.) 168:8-23, 170:15-171:6, 171:17-172:22; BLP Ex. F (Siegel Tr.) 244:10-13; *see also, e.g.,* Pl. Ex. 41 at BLP_Syeed_0012955 ████████████████████████

[91] BLP Ex. D (Gregori Tr.) 213:4-8; *see also* Pl. Exs. 30, 35, 40, 41, 42, 44, 47, 50 (all reflecting that salary offers were decided by someone below Mr. Gregori and that he merely approved them without modification).

[92] Pl. Ex. 21. As mentioned above (n.17), Plaintiff was not offered a position in the rotator program because of her score on the news test, among other performance concerns (*see* BLP Ex. Q), but managers believed she had potential so she was offered a temporary role as a contingent worker for QuickTake. *See* BLP Exs. P & O; BLP Ex. D (Gregori Tr.) 221:20-222:6. When Plaintiff was subsequently offered a full-time producer position, the initial salary proposed for her was higher than the salary of the interns in her class who were hired into the rotator program (*see* Pl. Ex. 21). ████████████████████████████████████████████████████████ ██████████████ BLP Ex. D (Gregori Tr.) 216:13-217:8; *see also id.* 221:20-222:6. ████████████████████████████████████████████████████████ ████████████████ *See* BLP Ex. N.

### E.    Plaintiff's Statistical Analyses Do Not Support Any Inference of Class-wide Discrimination.

Plaintiff retained Dr. David Neumark to "evaluate evidence of pay discrimination against women" at BLP.[93] After conducting a regression analysis that aggregated all data from all of the varying Job Profiles and locations and Business Units,[94] and using the widely-adopted rule of two standard deviations for statistical significance, Dr. Neumark found no significant disparity in total compensation for the proposed U.S. Class, and a 4% disparity in the proposed New York Class that was slightly over the two-standard deviation threshold.[95]

BLP retained Dr. Denise Martin as a rebuttal expert to evaluate and opine on Dr. Neumark's analyses and conclusions. Dr. Martin concluded, based on her review of the factual record in this case and her extensive experience, that Dr. Neumark's regression model was not aligned with the factors considered at BLP to determine employee compensation.[96] After making small changes to partially correct Dr. Neumark's unsupported assumptions and otherwise taking his model as a given, Dr. Martin found that there is no statistically significant difference between the compensation of male and female employees in the putative classes.[97] Dr. Martin also conducted an analysis for individuals who held a Job Profile that included Producer, like Plaintiff did, which showed no statistically significant results with respect to total compensation or base pay for the proposed U.S. Class.[98] This analysis also revealed that, for the proposed New York

---

[93] Pl. Ex. 66 (Neumark Rep.), Declaration of David Neumark ¶ 2.

[94] BLP has moved to exclude Dr. Neumark's opinions and testimony from consideration in connection with this Motion on the grounds that they are neither relevant nor reliable. *See* Dkt. 345, (the "*Daubert* Motion") & Dkt. 365 (the "*Daubert* Reply").

[95] Specifically, for the U.S. Class Dr. Neumark calculated that women were paid 3% less, with a difference of 1.64 standard deviations, and for the New York Class, the difference was 4% at 2.12 standard deviations. Pl. Ex. 66 (Neumark Rep.) ¶¶ 8(b), (e).

[96] *See* Pl. Ex. 65 (Martin Rep.) ¶ 2.

[97] *Id*. ¶ 2.

[98] *Id*. ¶ 27, Figure 4.

Class, female Producers were paid *more* in total compensation and base pay than male Producers, with no statistical significance.[99]

## ARGUMENT

### I.    LEGAL STANDARD

Plaintiff bears the burden of "affirmatively demonstrat[ing] [her] compliance" with each of the requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—as well as Rule 23(b)(3)'s requirements of predominance and superiority. *In re Vale S.A. Sec. Litig.*, 2019 WL 11032303, at \*3-4 (S.D.N.Y. Sept. 27, 2019) (Woods, J.); *see also, e.g.*, *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010). Plaintiff must establish "by a preponderance of the evidence that each of Rule 23's requirements has been met." *Myers*, 624 F.3d at 547. Certification of a class may be granted "only after determining that" Plaintiff has established "whatever underlying facts are relevant to a particular Rule 23 requirement." *Wynn v. N.Y.C. Hous. Auth.*, 314 F.R.D. 122, 126 (S.D.N.Y. 2016), *aff'd*, 730 F. App'x 92 (2d Cir. 2018) (internal quotations and citation omitted).

Courts must conduct a "rigorous analysis" of whether Rule 23's prerequisites are met, including assessing all relevant evidence and "weighing conflicting evidence as necessary." *Richardson v. City of N.Y.*, 2021 WL 1910689, at \*6 (S.D.N.Y. May 12, 2021); *see also In re Vale S.A. Sec. Litig.*, 2019 WL 11032303, at \*4 (Woods, J.). As the Supreme Court has repeatedly emphasized, this "rigorous analysis" will "frequently entail overlap with the merits of the plaintiff's underlying claim" because the class certification considerations generally are "enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33-34 (2013) (internal quotations omitted); *Wal-Mart Stores, Inc.*

---

[99] *Id*. ¶ 27, Figure 4.

*v. Dukes*, 564 U.S. 338, 351-52 (2011). Plaintiff's suggestion that the Court can give short shrift to any disputes implicating the merits of her claims or her statistical showing is wrong. *Dukes* makes clear that proof of commonality "necessarily overlaps" with the merits in a case involving discrimination claims, and that deficient statistical proof will preclude certification of a class. 564 U.S. at 352, 356-57; *see also, e.g.*, *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 471 (S.D.N.Y. 2018) ("disputes between experts must be resolved if necessary to the Rule 23 analysis").

## II.    PLAINTIFF DOES NOT PROVE COMMONALITY

Rule 23(a)(2) requires Plaintiff to prove that there are "questions of law or fact common to the class." Because "any competently crafted class complaint literally raises common 'questions,'" not every common question will do. *Dukes*, 564 U.S. at 349. Plaintiff must establish a common contention that is "capable of classwide resolution" such that "determination of its truth or falsity will resolve an issue that is central to the validity" of all class members' claims "in one stroke." *Id.* at 349-50. What matters for class certification is "the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* at 350 (emphasis in original).[100] In a case involving claims of discrimination, a plaintiff must present "a common question that 'will produce a common answer to the crucial question *why was I disfavored*'" for all class members. *Kassman v. KPMG LLP*, 416 F. Supp. 3d 252, 274 (S.D.N.Y. 2018) (quoting *Dukes*, 564 U.S. at 352) (emphasis in original). Plaintiff cannot make this showing.

### A.    The Disparate Impact Claims Present No Common Questions or Answers.

A disparate impact claim requires a plaintiff to "identify a specific employment practice or policy," "demonstrate that a disparity exists," and establish a causal relationship between the

---

[100] *See also, e.g.*, *Stafford v. Bojangles' Rests., Inc.*, 123 F.4th 671, 679 (4th Cir. 2024) ("courts must only permit class-wide proceedings if they have the potential to generate 'common answers that drive the litigation.'").

challenged practice and the disparity. *Kassman*, 416 F. Supp.3d at 274-75. At the class certification stage, a plaintiff must "begin by identifying the *specific* employment practice that is challenged." *Dukes*, 564 U.S. at 357 (quoting *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 994 (1988) (emphasis added)). Here the disparate impact claims challenge one allegedly discriminatory "practice": Mr. Gregori's supposed discretion over "every stage of the multipart evaluation and compensation systems." (Br. 1, 26.)[101]

>    1.   ***Plaintiff Does Not Identify a Specific Employment Practice That Presents a Common Question for All Proposed Class Members.***

Plaintiff acknowledges that she "must identify 'a common mode of exercising discretion'" sufficient to "glue" together all putative class members' claims of sex discrimination. *Kassman*, 416 F. Supp. 3d at 275-76 (quoting *Dukes*, 564 U.S. at 356). Despite this, she claims that "[a]ll that matters" is whether all putative class members were "subject to" Mr. Gregori's discretionary decision-making. (Br. 30.) This is precisely the type of question that will not satisfy Rule 23(a)(2) because it is framed at too high a level of abstraction. *See Dukes,* 564 U.S. at 349. The question of whether putative class members were "subject to" Mr. Gregori's discretion – in any hypothetical or generalized sense – would provide no common answer about the reasons behind the thousands of discrete pay decisions challenged in this case.

For Plaintiff's theory of discrimination to be capable of class-wide resolution, she must be able to show that Mr. Gregori actually exercised his discretion in a way that was "sufficiently 'consistent,' 'pervasive,' or 'classwide'" to produce common questions and answers across the putative classes." *Richardson*, 2021 WL 1910689, at *8. Put differently, she must demonstrate that he changed the ratings or pay of putative class members with such pervasive "regularity [to] establish [him] as a common denominator among the many such decisions." *Jones v. Nat'l Council*

---

[101] BLP Ex. R (FAC) ¶¶ 1, 176-79, 192-95.

*of Young Men's Christian Ass'ns of U.S.*, 34 F. Supp. 3d 896, 908 (N.D. Ill. 2014); *see also, e.g.*, *Edmond v. City of Chi.,* 2023 WL 3847098, at *10 (N.D. Ill. June 6, 2023) (commonality not satisfied because there was no evidence that the central decision-makers made "*all*" promotion decisions for the class) (emphasis added); *Ahad v. Bd. of Trs. of S. Ill. Univ.*, 2018 WL 4350180, at *10 (C.D. Ill. Sept. 12, 2018) (denying class certification because plaintiff failed to establish that top-level decisionmaker "regularly changed" compensation and thus "was the subjective decision-maker that inserted gender bias into the pay determinations"); *Artis v. Yellen*, 307 F.R.D. 13, 25 (D.D.C. 2014) (commonality lacking where plaintiffs did not establish that a "high-level manager was involved in *many or all* of the challenged employment decisions") (emphasis added); *Campbell v. Nat'l R.R. Passenger Corp.*, 311 F. Supp. 3d 281, 317 n.6 (D.D.C. 2018) (plaintiffs had not established that "only upper-level management were involved in many or all the challenged employment decisions").[102]

She does not, and could not, come close to making this showing. As to final year-end pay decisions, BOCS records confirm that Mr. Gregori, in large part, merely approved the decisions made by hundreds of other managers. He made only 12% of the total managerial changes and, in fact, never made *any* change to any of Plaintiff's year-end pay determinations.[103] *See Valerino v. Holder*, 283 F.R.D. 302, 317 (E.D. Va. 2012) (denying class certification for lack of

---

[102] Plaintiff herself cites a number of cases recognizing that commonality requires consistent and pervasive decision-making by the allegedly common decision-maker(s). *See* Br. 30, citing *Sughrim v. State of N.Y.*, 690 F. Supp. 3d 355, 363-65, 391 (S.D.N.Y. 2023) (challenged denials of religious accommodation requests were all made by the same small group of decisionmakers); *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 511-12 (N.D. Cal. 2012) (senior management's involvement in promotions was "consistent, and pervasive, classwide"); *Woods-Early v. Corning Inc.*, 330 F.R.D. 117, 124 (W.D.N.Y. 2019) (noting that "courts have found commonality" where top management "uniformly" exercised discretion). Contrary to Plaintiff's suggestion, *Woods-Early* also does not support a finding of commonality here because *Woods-Early* involved a motion to dismiss class allegations under Rule 12(b)(6). 330 F.R.D. at 122. That the allegations in *Woods-Early* regarding commonality were not "so implausible that they must be disregarded," *id.* at 124-25, is immaterial to whether Plaintiff has proven commonality by a preponderance of the evidence.

[103] Pl. Ex. 65 (Martin Rep.) ¶¶ 48(c)-(e), Figures 8 & 9; BLP Ex. JJ.

commonality/typicality where top decisionmaker modified 20% of decisions made by managers below him). This does not establish that he is the "common denominator" across the several thousand pay decisions challenged in this case.

Plaintiff's attempt to draw outsized attention to Mr. Gregori's role at other earlier points in various processes only serves to further underscore how much individual variability exists under her own theory of disparate impact. *See, e.g.*, *Loc. 3621*, *EMS Officers Union v. City of N.Y.,* 2022 WL 17175798, at *11 (S.D.N.Y. Nov. 22, 2022) (claims of discrimination occurring at different stages in promotion process precluded commonality, even though one decision-maker approved all promotions). She alleges, for instance, that Mr. Gregori lowered her starting salary – for reasons that are unique to her hiring circumstances and entirely nondiscriminatory – and speculates that this had "a lasting impact" on her pay (Br. 18), but she does not say the same for any other putative class member. She points to a small number of instances in which he asked managers to adjust ratings, but then offers no evidence of what rating change was made or whether it had any effect on compensation. She notes that ███████████████████████████ but, again, is silent about whether that mattered to final compensation. At most, her putative class claims relate to a scattershot of isolated and sporadic alleged occurrences, which "squarely supports that an individualized inquiry" would be necessary for every single putative class member to determine whether Mr. Gregori's discretionary decision-making "had a disparate impact on pay." *Cahill v. Nike, Inc.*, 2022 WL 19226181, at *23 (D. Or. Nov. 22, 2022); *see also Dukes*, 564 U.S. at 350 ("[d]issimilarities within the proposed class are what have the potential to impede the generation of common answers."). There is no "glue" to tie together all of these fact-specific claims.

2.    ***Neither the Nature of the Proposed Classes nor the Existence of High-Level Frameworks for Exercising Discretion Support Commonality.***

The size of the proposed classes does nothing to alter the conclusion that Plaintiff cannot establish a common mode of exercising discretion. Courts routinely decline to certify classes that are smaller than those she seeks to represent. *See, e.g.*, *Moore v. Publicis Grp. SA,* 2014 WL 11199094, at *8 (S.D.N.Y. May 15, 2014) (denying certification of 150-member class); *Bennett v. Nucor Corp.*, 656 F.3d 802, 808 (8th Cir. 2011) (affirming denial of certification of a class of approximately one hundred employees who worked in a single plant location); *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1228-29 (10th Cir. 2013) (affirming denial of certification of a class of 294 women). Moreover, like in *Kassman*, the proposed classes cover an array of different jobs and seniority levels, and the proposed U.S. Class members were dispersed across nearly 30 cities nationwide.[104] 416 F. Supp. 3d at 277. These conditions make it "difficult, if not impossible" to prove that managers exercised discretion in a common way. *Id.*

Plaintiff's suggestion that BLP's ███████████████████████████ ██████ somehow "constrain[ed]" managerial discretion (Br. 32) also is baseless.[105] Tellingly, she makes no effort to explain how any of these high-level processes supposedly impeded the exercise

---

[104] Pl. Ex. 66 (Neumark Rep.) Tables A-1 & A-4.

[105] To the extent Plaintiff suggests that the algorithm, standing alone, presents a common contention (Br. n.109), this too is unavailing. She offers no evidence that the algorithm itself produced discriminatory results, even though she had the BOCS records showing the algorithm's output that would be necessary for such an analysis. *See Dukes*, 564 U.S. at 357 (for purposes of class certification, a plaintiff must "begin by identifying the *specific* employment practice that is challenged") (quoting *Watson*, 487 U.S. at 994) (emphasis added); *Loc. 3621*, 2022 WL 17175798, at *8 (plaintiff must "isolate[e] and identify[] the *specific* employment practices that are allegedly responsible for any observed statistical disparities.") (quoting *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 241 (2005)) (emphasis added). Absent evidence that the algorithm's calculations systemically disfavored women *and* that this contributed to a sex-based disparity in final pay after 75% of the initial values were modified during the managerial review process (neither of which exists), the algorithm cannot be a common policy or practice upon which a class could be certified. *See, e.g., Loc. 3621*, 2022 WL 17175798, at *10 (bottom-line statistical disparity was "unhelpful" for purposes of proving commonality because it was not linked to any particular part of the multi-step promotional processes); *Ross v. Lockheed Martin Corp*., 267 F. Supp. 3d 174, 200 (D.D.C. 2017) (without evidence showing that a particular common feature of evaluation processes was what caused the discriminatory outcomes, the court cannot conclude that class members will share a "common answer" to "*why was I disfavored*") (emphasis in original).

of discretion, or what constraints they may have imposed on managers. The reason for this is simple: they do not. They merely function as "frameworks" for BLP managers to then exercise their discretion and make subjective decisions about ratings and pay, as described above (*see* pp. 5-111). *See Kassman*, 416 F. Supp. 3d at 278 ("uniform and firm-wide" compensation processes do not constrain how managers exercised discretion in making decisions); *Jones*, 34 F. Supp. 3d at 906 (managerial discretion is not constrained by a system that uses "numerical performance ratings" to assess employees on subjective "company-wide core values").[106]

As other courts have recognized, commonality requires more than gesturing to a system in which discretion is exercised "*as a whole* and contend[ing], as Plaintiff[] do[es], that it acted as 'an identical or similar headwind against all class members.'" *Ross*, 267 F. Supp. 3d at 200 (finding commonality lacking and declining to certify a class for purposes of settlement) (emphasis in original); *Valerino*, 283 F.R.D. at 314 ("*some* common structure governing promotion" is not enough for commonality) (emphasis in original).

### 3.    *The Cases on which Plaintiff Relies Are Distinguishable.*

Plaintiff repeatedly cites *Chen-Oster v. Goldman, Sachs & Co.* throughout her Motion, but *Chen-Oster* is fundamentally distinguishable from this case in material ways. First, the plaintiffs in *Chen-Oster* were not only challenging the exercise of discretion, but rather had identified three specific practices that they alleged were discriminatory (360 review, quartiling, and cross-ruffing) and applied across the classes, which the court found to be a critical distinguishing factor from 325 F.R.D. 55, 74 (S.D.N.Y. 2018). Second, plaintiffs presented evidence of sex-based pay differentials that were "statistically significant by several standard deviations." *Id*. at 76. Third,

---

[106] *See also, e.g.*, *Cahill*, 2022 WL 19226181, at *27 ("[t]he presence of centralized guidelines along with discretion is insufficient to present a common question"); *Richardson*, 2021 WL 1910689, at *8 (practice of capping raises at 8% "has no bearing on a supervisor's ability…to recommend whether the employee deserves, say, a 2% or an 8% increase").

plaintiffs put forth evidence showing that "approximately 22% and 50% of the observed pay differences, respectively, can be explained by the differences in female and male 360 review and quartile ratings." *Id.* These were all key facts with respect to the court's ruling; none exist here.

*Ellis* and *Chalmers v. City of New York* are distinguishable for similar reasons. In *Ellis*, the court emphasized that plaintiffs had identified specific, company-wide promotion practices – again, beyond "the mere general delegation of authority" – that they alleged were discriminatory and applicable across the class. 285 F.R.D. at 509. Likewise, in *Chalmers*, the plaintiffs identified three allegedly discriminatory policies (paying class members the collective bargaining agreement minimum; treating class members as civilian employees for collective bargaining purposes; and failure to monitor pay across agencies) that applied to all class members. 2022 WL 4330119, at *14 (S.D.N.Y. Sept. 19, 2022). The court found that these policies did not involve the exercise of discretion on any "individualized" basis from one class member to the next. *Id.* Both *Ellis* and *Chalmers* stand in stark contrast to Plaintiff's claims that solely challenge the exercise of discretion.

#### 4. *Plaintiff's Statistics Are Fundamentally Flawed and Do Not Provide "Significant Proof" of Class-wide Discrimination.*

As set forth in BLP's *Daubert* Motion, the Court should exclude Dr. Neumark's opinions because they are neither relevant nor reliable. *See, e.g., Valelly v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 2023 WL 2918982, at *4 (S.D.N.Y. Apr. 12, 2023) ("courts in the Second Circuit regularly 'subject expert testimony to *Daubert*'s rigorous standards insofar as that testimony is relevant to the Rule 23 class certification analysis'") (citation omitted); *see also Koehler v. Infosys Techs. Ltd. Inc.*, 628 F. Supp. 3d 835, 892 (E.D. Wis. 2022) (excluding Dr. Neumark's opinions and denying class certification). Even if Dr. Neumark's opinions are not excluded, the Court

should "safely disregard" them as insufficient to establish commonality, much like the expert opinions in *Dukes*. 564 U.S. at 353-55.

i      No Statistically Significant Pay Disparity Exists with Respect to the Proposed U.S. Class.

Dr. Neumark's opinions, even when accepted at face value with all of their flaws, do not provide "substantial proof" of sex discrimination common to the proposed U.S. Class. In order for statistics to support an inference of discrimination, a disparity must be statistically significant. *Ottaviani v. State Univ. of N.Y. at New Paltz*, 875 F.2d 365, 371 (2d Cir. 1989). Courts have recognized two to three standard deviations as reaching statistical significance. *See, e.g., id.* at 371-72; *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308 nn.14, 17 (1977).

Dr. Neumark's results regarding the proposed U.S. Class fall well short of this standard. Even with all of his erroneous assumptions favoring a finding of discrimination, he was only able to come up with a difference of 1.64 standard deviations, which he admits is below the level that courts (and econometricians) generally deem to be statistically significant.[107] This does not establish commonality.

*Boyd v. Interstate Brands Corp.* is highly instructive. 256 F.R.D. 340 (E.D.N.Y. 2009). In *Boyd*, the plaintiffs presented evidence of race-based disparities in promotions at 1.94 standard deviations. *Id.* at 360 n.24. Recognizing that this figure was very close to statistical significance (which is 1.96 standard deviations), the court nevertheless denied class certification, holding that "plaintiffs' statistics do not demonstrate common questions of fact because they do not tend to show that being African American has had a widespread effect on employees' promotions…." *Id.* at 360-61. The court explained that "[a]bsent a showing of significant statistical disparity," plaintiffs failed to meet their burden under Rule 23. *Id.* at 343, 361-62. Dr. Neumark's findings for

---

[107] Pl. Ex. 67 (Neumark Supp.) at Table 2, Panel D; Pl. Ex. 66 (Neumark Rep.) ¶ 22.

25

the U.S. Class, which are even less compelling than those in *Boyd,* similarly cannot provide the requisite "significant proof" of sex discrimination against the entire class.

Plaintiff does not provide any authority in which a court certified a class based on comparable statistics. She relies on *Waisome v. Port Authority of New York & New Jersey* and *Chin v. Port Authority of New York & New Jersey*, but both of these cases are readily distinguishable because they involved sample sizes that were too small to reliably indicate statistical significance. *See Waisome*, 948 F.2d 1370, 1379 (2d Cir. 1991) (statistics related to 75 promotions); *Chin*, 685 F.3d 135, 153 (2d Cir. 2012) (statistics related to 36 promotions and, since no Asian Americans had been promoted, "requiring a statistical showing of 95–percent confidence would make it mathematically impossible to rely upon statistics"). The 750 records in the analysis for the proposed U.S. Class pose no such concerns.

Moreover, in both *Waisome* and *Chin*, the courts found plaintiffs' other evidence of discrimination sufficient to make up for the statistical results impacted by the small samples. In *Waisome*, the court held that statistically significant race-based disparities in the test portion of the promotion process, coupled with evidence that Black employees were promoted at a rate that was less than four-fifths of the rate of White employees, was sufficient to give rise to an inference of discrimination. 948 F.2d at 1379-80. The court in *Chin* relied on the absence of *any* promotions of Asian Americans, as well as "substantial" evidence supporting the conclusion "that the plaintiffs were more qualified than some of the white officers who were promoted." 685 F.3d at 153. No comparable evidence exists here to justify ignoring the deficient statistics. *See* § II.B., *infra.* Because Plaintiff's statistical evidence does not prove commonality, the Court should deny certification of the proposed U.S. Class.

ii    Dr. Neumark's Aggregate Statistics Are Fatally Deficient and
Offer No Proof of Causation.

Dr. Neumark's flawed statistical analyses do not provide the "significant proof" that commonality demands to certify either proposed class.

*First*, Dr. Neumark's analyses improperly rely on the inclusion of Cost Center, ███ ████████████ that does not affect employee compensation, as a control variable.[108] He admits that if *only* Cost Center is excluded from his model, there is no statistically significant difference in the pay of male and female employees in either of the putative classes.[109] He offers no theoretical justification for including Cost Center, and admits that he does not understand whether the memos on which he relied were referring to Cost Center or to Business Unit (which he separately included as a control).[110]

*Second*, Dr. Neumark's aggregated model, like the one in *Dukes*, cannot establish an inference of class-wide discrimination because it fails to "conform[ ] to the level of decision for the challenged practices." *Kassman*, 416 F. Supp. 3d at 282. "An aggregated statistical analysis is only appropriate in analyzing practices that are uniform across a company." *Cahill*, 2022 WL 19226181, at *24. The discretionary compensation decisions at issue here, however, are far from uniform, as they were made by hundreds of managers below the level that Dr. Neumark assessed and pertained to employees working in a variety of dissimilar jobs. Courts routinely find these types of aggregated statistics inadequate because they are "derived from hundreds of employment decisions made by myriad decision makers, at different times, under mutable procedures and

---

[108] *See* Pl. Ex. 66 (Neumark Rep.) ¶¶ 30, 34; BLP Ex. I (Neumark Tr.) 132:16-21. *See Daubert* Motion at 12-18 & *Daubert* Reply at 3-8.

[109] *See* BLP Ex. I (Neumark Tr.) 166:6-167:8; *see also* Pl. Ex. 65 (Martin Rep.) ¶ 23.

[110] *See Daubert* Motion at 12-18 & *Daubert* Reply at 3-8; Pl. Ex. 66 (Neumark Rep.) ¶ 30, n.77 (citing Jennings Ex. 18 and Sullivan Ex. 1); BLP Ex. I (Neumark Tr.) 160:5-7, 161:2-5, 161:21-162:6; *see also id.* 165:12-14 ("people discover things in data and then it turns out we construct theories of why they do matter.").

guidelines, in different departments, … [and] concerning employees at varying levels of experience, responsibilities, and education." *Kassman*, 416 F. Supp. 3d at 282 (citation omitted); *see also Richardson*, 2021 WL 1910689, at *10; *Jones*, 34 F. Supp. 3d at 909-10.

*Third,* even though Plaintiff's theory of commonality is based on the allegation that Mr. Gregori's alleged discretion over "every stage of the multipart evaluation and compensation systems" was the practice that harmed female putative class members, Dr. Neumark's aggregated statistical analyses only purport to address whether there is a bottom-line differential in final pay amounts, without offering any explanation of what specific subjective employment decision(s) (by Mr. Gregori or otherwise) caused the alleged disparities. As the Supreme Court has recognized, "'merely proving that the discretionary system has produced a [sex]... disparity *is not enough'* where plaintiffs are unable to identify a specific employment practice that is responsible for the alleged disparity." *Campbell*, 311 F. Supp. 3d at 319 (quoting *Dukes*, 564 U.S. at 357) (emphasis in original). Dr. Neumark admitted, for example, that he did not conduct any analysis of whether there was a sex-based disparity in starting salaries (notwithstanding that Plaintiff claims her starting salary had a lingering effect on her pay throughout her employment).[111] He did look at whether there was a sex-based differential in performance ratings of male and female employees, but discovered differences that were, in his words, "very small" and therefore opted not include those results anywhere in his report.[112] He also did not conduct any analysis of the algorithm or

---

[111] BLP Ex. I (Neumark Tr.) 44:18-45:10. Although Dr. Neumark claimed he lacked sufficient data to analyze whether BLP's alleged consideration of candidate's prior pay affected starting salaries, it is undisputed that he did have data regarding starting salaries that he could have analyzed to determine whether there was any differential between initial pay of female and male employees. *See* Pl. Ex. 66 (Neumark Rep.) ¶ 10(a) (explaining that he constructed his data set to include "base pay at the date of hire").

[112] BLP Ex. I (Neumark Tr.) 49:17-50:19. Dr. Neumark also admitted that he did no analysis related to Mr. Gregori's changes to ratings. *Id*. 96:9-12.

any other step in the compensation processes that preceded the final pay amounts.[113] Since Dr. Neumark's analysis does nothing to isolate which stage of the "multipart" evaluation and compensation processes was responsible for any alleged disparities in final pay, there is no evidence to support a finding that any single employment practice was the common cause of the allegedly lower pay for all putative class members. *See id.* at 318-19 ("statistical correlation cannot substitute for a specific finding of class-action commonality," which requires plaintiff to show defendant's "uniform policies" led to the alleged discrimination against the entire class).[114]

*Lastly*, the statistical evidence undercuts any suggestion that the supposedly centralized decision-making caused any alleged pay disparity between men and women. If, as Plaintiff claims, Mr. Gregori's decision-making "pervaded putative class members' compensation on an aggregate and individualized basis" (Br. 29), then one would expect to see sex disparities in pay that are consistent across News. *See, e.g.*, *Carpenter v. Boeing Co.*, 2004 WL 2661691, at *5 (D. Kan. Feb. 24, 2004), *aff'd*, 456 F.3d 1183 (10th Cir. 2006) (describing "[t]he issue on class certification" as whether the alleged impact is sufficiently dispersed amongst the class). But no such evidence exists. There is no statistically significant pay disparity between the compensation of male and female Producers for the putative U.S. Class and, for the proposed New York Class, female Producers were actually paid *more* than their male counterparts.[115] This further belies any suggestion that Mr. Gregori's exercise of discretion was the "uniformly applied, common

---

[113] *See, e.g., id.* 168:13-16 ("I have not…focused on the different steps that lead to the final pay."), 170:3-7 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[114] *See also Ross*, 267 F. Supp. 3d at 198 (finding commonality lacking because plaintiff's statistical evidence was insufficient to establish causation on a class-wide basis); *Loc. 3621*, 2022 WL 17175798, at *10 (denying class certification because statistical and anecdotal evidence did not establish that "there are classwide answers as to which of Defendants' specific employment practice or practices are discriminatory.").

[115] Pl. Ex. 65 (Martin Rep.) ¶¶ 26-27, Figure 4; *see also* BLP Ex. I (Neumark Tr.) 184:21-25 (acknowledging that his analysis did not conclude that female Producers were paid statistically significantly less than male Producers).

practice…driving the [allegedly] unequal outcomes at issue." *Richardson*, 2021 WL 1910689, at *9.[116]

### B.    The Disparate Treatment Claims Present No Common Questions or Answers.

To obtain certification of a class alleging disparate treatment, Plaintiff must "provide evidence of a 'systemwide pattern or practice' of pervasive discrimination against the class." *Kassman*, 416 F. Supp. 3d at 281. This requires "significant proof" of widespread discrimination or that "intentional discrimination was [BLP's] standard operating procedure." *Loc. 3621*, 2022 WL 17175798, at *8 (citation omitted); *see also Dukes*, 564 U.S. at 353. In the context of class certification, courts have recognized that such "significant proof" may exist where there is a class-based disparity that "is statistically significant by *several* standard deviations," and "a substantial portion of the difference is traceable" to the allegedly discriminatory employment practices. *Loc. 3621*, 2022 WL 17175798, at *11 (internal quotations omitted and emphasis added); *Richardson*, 2021 WL 1910689, at *9 (quoting *Chen-Oster*, 325 F.R.D. at 76).

#### 1.    *The Statistical Evidence Does Not Provide "Significant Proof" of Systemic Discrimination on the Basis of Sex.*

Even though Plaintiff accuses Mr. Gregori of being solely responsible for the alleged pay disparity between putative class members and males, she does not provide any evidence that the decisions he personally made are indicative, or even suggestive, of a pattern or practice of

---

[116] *See, e.g., Carpenter*, 2004 WL 2661691, at *4 (no evidence that class members "*as a group*" suffered harm when certain jobs showed no disparities, or had disparities that benefitted females, despite a statistically significant disparity across all jobs together) (emphasis in original); *Moore v. Boeing Co.*, 2004 WL 3202777, at *12 (E.D. Mo. Mar. 31, 2004) ("Although the aggregation of all of the job groups within a site may suggest a pay disparity favoring men, within many of the job groups there is not a statistically significant disparity, and in some groups, women are actually favored."); *Reid v. Lockheed Martin Aeronautics Co.*, 205 F.R.D. 655, 673 (N.D. Ga. 2001) ("Black employees in pay grades or job groups for which there was never a statistically significant disparity adverse to [B]lacks do not readily share common issues with [B]lack employees in pay grades or job groups where such a disparity existed."); *see also Puffer v. Allstate Ins. Co.*, 255 F.R.D. 450, 465 (N.D. Ill. 2009), *aff'd*, 675 F.3d 709 (7th Cir. 2012) (salary disparities that varied between different pay grades "do not show a uniform pattern or practice of discrimination").

intentional sex discrimination (notwithstanding that she has the BOCS records reflecting his changes). Nor does she offer proof that any portion of any supposed pay gap is traceable to his decisions. *See Loc. 3621*, 2022 WL 17175798, at \*11; *c.f. Chen-Oster*, 325 F.R.D. at 75-76. She also entirely ignores Dr. Martin's analysis (which Plaintiff's own expert did not challenge) showing that Mr. Gregori's adjustments overwhelmingly benefitted women,[117] which is unsurprising given that her claims of intentional discrimination based on sex are irreconcilable with this evidence showing that 83% of Mr. Gregori's changes to bonuses, and 65% of his changes to target total compensation, for female putative class members were increases.

She instead relies solely on Dr. Neumark's aggregated analyses as supposed proof of a bottom-line differential in pay between women and men. For all of the same reasons discussed above, *see* § II.A.4, *supra*, his flawed and unreliable analyses also fail to supply the requisite substantial proof that BLP had a standard operating procedure of discriminating based on sex. And, even with their defects, this statistical evidence does not demonstrate "the kind of gross disparities that on their face would suggest discriminatory intent." *Kassman*, 416 F. Supp. 3d at 282 (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 (1977)).

### 2. *Plaintiff Does Not Offer Any Non-Statistical Evidence of Intentional Sex Discrimination.*

Plaintiff also does not offer a shred of non-statistical proof that could give rise to an inference of systemic sex discrimination against the proposed classes. Notably, she does not submit a single declaration from any putative class member to support her Motion.[118] She tries to downplay this glaring omission by claiming that statistics alone can establish commonality, but

---

[117] Pl. Ex. 65 (Martin Rep.) ¶ 48(e).

[118] During discovery, Plaintiff moved to compel production of contact information for certain putative class members and specifically argued that she needed this information to collect anecdotal evidence to support her anticipated Rule 23 motion. Dkt. 122 at 2-4. The Court granted her motion. Dkt. 136 (9/30/22 Tr.) 22:9-23:3.

concedes that anecdotal evidence is routinely submitted to "b[ring] the cold numbers convincingly to life." *Teamsters*, 431 U.S. at 339; *see also Dukes*, 564 U.S. at 358 (noting that *Teamsters* involved anecdotal evidence from approximately one of every eight class members). Plaintiff's inability to find even *one* other putative class member who also claims to have been affected by allegedly pervasive, company-wide sex discrimination is telling, and further distinguishes this case from those on which she relies. *See, e.g.*, *Chen-Oster*, 325 F.R.D. at 76 (commonality established based on pay disparities that were "statistically significant by several standard deviations" *and* were causally linked to the discriminatory employment practices *and* supported by anecdotal evidence including declarations from class members about sexual assault, sexual harassment and other sex-based disparate treatment).

Unable to drum up any evidence of sex animus beyond her own allegations, Plaintiff accuses BLP of failing to address known "systemic" inequalities in pay between men and women. This drastically mischaracterizes the evidence. For instance, she misrepresents that Mr. Gregori "recognized that BLP did not have parity in pay" (Br. 22) when, in actuality, her cited Exhibit 49 reflects discussions about pay increases for a small number of specific employees in her QuickTake Business Unit, most of whom are not putative class members. By way of another example, she claims that her Exhibit 33 shows Mr. Gregori's awareness of "pay gaps" within QuickTake, but this document ████████████████████████████████████████ ████████████████████████,[119] and has nothing to do with a gap based on sex, as Plaintiff suggests. Even when taken together, her sparse evidence shows nothing more than highly individualized discussions about specific employees and their unique circumstances. None of this comes close to showing awareness of "systemic" disparities in pay due to sex.

---

[119] BLP Ex. A (Massucci Tr.) 341:19-343:19.

In *Kassman*, the court considered – and rejected – a similar "failure to remedy" argument. 416 F. Supp. 3d at 283-84. The court found that "[a]t most, Plaintiffs have shown that KPMG was aware of a pay and promotions gap, and that the firm's efforts have not completely eradicated the gap," but correctly recognized that that does not constitute "significant proof" of systemic discrimination. *Id.* at 284. Like in *Kassman*, because Plaintiff has no evidence of a general, company-wide policy of sex discrimination that affected the pay of all putative class members, her Motion should be denied.

## III.  PLAINTIFF'S PROPOSED CLASSES DO NOT SATISIFY THE REQUIREMENTS OF RULE 23(B)(3)

### A.  Individual Issues Would Predominate.

Class certification under Rule 23(b)(3) also requires Plaintiff to prove that common issues would predominate over individual ones at trial. *Comcast Corp.*, 569 U.S. at 34. This standard is "even more demanding" than Rule 23(a), *id.*, because even if Plaintiff can identify some common questions that can be answered with common evidence, predominance requires that those common issues be "more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002). In analyzing predominance, the Court "must assess (1) the elements of the claims and defenses to be litigated, (2) whether generalized evidence could be offered to prove those elements on a class-wide basis or whether individualized proof will be needed to establish each class member's entitlement to relief, and (3) whether the common issues can profitably be tried on a class-wide basis, or whether they will be overwhelmed by individual issues." *Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 512 (2d Cir. 2020) (internal quotations and citation omitted). Here, the numerous individualized issues behind each challenged pay decision would overwhelm common issues and overrun this Court with hundreds of individual trials on liability and damages for each person in the two proposed classes.

**Disparate Impact Claims.** Plaintiff suggests that evidence regarding causation and job-relatedness would be subject to generalized proof (Br. 40), but this fundamentally misstates the nature of her disparate impact claims. The specific employment practice that she has identified as allegedly causing disparate pay for female reporters, editors and producers is Mr. Gregori's subjective discretion, not BLP's "compensation policies" as a whole. In contrast to cases like *Chalmers* and *Chen-Oster* where plaintiffs were challenging specific practices (beyond the mere exercise of discretion) applicable to all class members in which generalized proof may be sufficient to establish that the processes as a whole are necessary, establishing causation and that Mr. Gregori's exercise of discretion in a given situation was job-related will necessarily require individualized proof that is unique to each specific decision he was making (or not making), the circumstances surrounding it, and what job it was related to, among a number of other things. *See, e.g.*, *Adkins v. Morgan Stanley*, 307 F.R.D. 119, 143 (S.D.N.Y. 2015), *aff'd*, 656 F. App'x 555 (2d Cir. 2016) (predominance lacking because the amount of influence that defendant exerted over each of the challenged decisions varied); *Little v. Wash. Metro. Area Transit Auth.*, 249 F. Supp. 3d 394, 425 (D.D.C. 2017) (predominance defeated because trier of fact must determine, for each putative class member, whether that individual was harmed by the allegedly discriminatory policy, or if each employment decision was made for a different reason).

**Disparate Treatment Claims.** Even if Plaintiff's statistics alone were sufficient for a *prima facie* case of intentional discrimination (which they are not), BLP is entitled to a "broad opportunity" to present "any relevant evidence" – whether statistical or non-statistical – showing that it lacked the intent to discriminate based on sex during the first phase of any trial. *United*

*States v. City of N.Y.*, 717 F.3d 72, 86-87 (2d Cir. 2013);[120] *see also Kassman*, 416 F. Supp. 3d at 285 (an employer is "entitled to" elicit evidence regarding the non-discriminatory reasons for individual managers' respective compensation decisions). Plaintiff admits this, but says that this would involve some unspecified form of "generalized proof." (Br. 41.) That is not so. Because the compensation decisions at issue in this case were made by hundreds of managers, proving (or disproving) that Mr. Gregori was motivated by unlawful sex bias would not establish anything about whether BLP intentionally discriminated against the swaths of putative class members (including Plaintiff herself) whose raises and bonuses were determined solely by managers below him. Rebutting an inference of class-wide discrimination will "necessarily" require presenting evidence about "the actions of each managerial employee who influenced a class member's pay and the particular circumstances of any change in the class member's compensation or lack thereof." *Moore*, 2014 WL 11199094, at *8.[121]

Plaintiff misleadingly suggests that the second stage of any trial would only involve damages determinations, but this too is incorrect. Determining a putative class member's "eligibility for relief" is determining liability. *See, e.g.*, *Robinson*, 267 F.3d at 158 n.4 ("[r]eferring to the first phase of a pattern-or-practice disparate treatment suit as the 'liability phase' is something of a misnomer because…the remedial phase also implicates questions of liability, albeit liability to each individual class member"). BLP also is entitled to "raise any individual affirmative

---

[120] *Robinson v. Metro-N. Commuter R.R. Co.*, cited by Plaintiff (Br. 42), similarly recognizes that a defendant is entitled to present "anecdotal and other non-statistical evidence" to rebut the inference of discrimination at the liability stage of a pattern-or-practice claim. 267 F.3d 147, 159 (2d Cir. 2001).

[121] *See also Wynn*, 314 F.R.D. at 128 (finding predominance lacking because resolving whether there was a pattern or practice of discrimination would "do little to resolve the question of liability without analyzing the circumstances of individual class members"); *Reid*, 205 F.R.D. at 681-85 (Rule 23(b)(3) not satisfied because "[c]laims of discrimination, in employment or elsewhere, depend heavily on the specific circumstances and conditions in which the victim finds himself or herself. An individual's qualifications, experience, and background for a particular job…must be considered in any case where discrimination is alleged.").

defenses it may have, and to 'demonstrate that the individual [claimant] was denied an employment opportunity for lawful reasons.'" *Dukes*, 564 U.S. at 367 (quoting *Teamsters*, 431 U.S. at 362). This will require litigating issues involving individual-specific proof, such as, *inter alia*, whether the employee was adversely affected with respect to pay, which Dr. Neumark's model admittedly does not measure[122]; the decision-makers who determined performance ratings and pay; what factors they considered in making the decisions; performance of the employee and, in some instances, the employee's peers to whom they were compared. These "litany of individualized issues" on matters central to liability "would subsume any common issues at trial." *Allen v. City of N.Y.*, 2022 WL 4133132, at *2 (S.D.N.Y. Sept. 12, 2022) (holding that plaintiff failed to establish predominance because the class-wide discrimination claims turned on, *inter alia*, the reason for the challenged employment decisions, whether each decision was affected by bias, and whether defendants "had legitimate, non-discriminatory reasons for each" decision).

**Damages.** Although the need for individualized damages assessments, without more, ordinarily will not preclude class certification, it is still a relevant factor "that [courts] consider in deciding whether issues susceptible to generalized proof outweigh individual issues." *Heggs v. City of N.Y.*, 2023 WL 9786044, at *22 (E.D.N.Y. Aug. 24, 2023), *report & recommendation adopted*, 2024 WL 759439 (E.D.N.Y. Feb. 23, 2024) (citation omitted). Plaintiff admits that even if liability is established with respect to each putative class member, there "will also need to be individualized calculation of damages—compensatory, punitive, [and] back pay…—based on the circumstances of each class member's case." *Moore*, 2014 WL 11199094, at *8. Plaintiff's skeletal trial plan also proposes a class-wide award of punitive damages in the liability stage (Br. 43), but this is unlawful. *See Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 149 (2d Cir. 2015)

---

[122] BLP Ex. I (Neumark Tr.) 185:13-186:24.

("determining a punitive damages ratio without any grounding in a compensatory damages award is impracticable and fails to give the jury an adequate basis for determining what measure of punitive damages is appropriate."); *see E.E.O.C. v. Sterling Jewelers Inc.*, 788 F. Supp. 2d 83, 89-92 (W.D.N.Y. 2011). The trial plan also says nothing about determinations of compensatory damages, which the Complaint purports to seek on behalf of the putative classes. Where, like here, "class certification only serves to give rise to hundreds or thousands of individual proceedings requiring individually tailored remedies, it is hard to see how common issues predominate." *Puffer*, 255 F.R.D. at 471.

**B.    A Single Trial Adjudicating an Array of Disparate Claims Would Not Be Superior.**

Plaintiff must also prove that certification of each of the classes is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The predominance of individual issues means that the class action device offers no efficiency with respect to any of the proposed classes, and it also threatens to resolve claims of absent class members without permitting them – or BLP – to present evidence regarding their individual, potentially dispositive circumstances. *See, e.g.*, *Tabor*, 703 F.3d at 1230; *Garcia De León v. N.Y. Univ.*, 2022 WL 2237452, at *17 (S.D.N.Y. June 22, 2022) ("fatal dissimilarities among putative class members make use of the class-action device inefficient or unfair.") (internal quotations and citation omitted). Plaintiff's proposed trial plan would effectively require over 600 mini trials for each of the individuals in the two proposed classes, and would achieve none of the "economies of time, effort, and expense" that the class action mechanism is intended to capture. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997); *see also Moore*, 2014 WL 11199094, at *8 (holding mini trials for 150 class members on discrimination claims would not be manageable).

Claims arising out of employment relationships also are not the type of cases "where it makes no economic sense for an individual to pursue his own claim."[123] *Oakley v. Verizon Commc'ns Inc.*, 2012 WL 335657, at *18 (S.D.N.Y. Feb. 1, 2012) (addressing FMLA claims); *see also Puffer*, 255 F.R.D. at 473 ("[c]ountless gender discrimination claims are brought individually"). This is particularly true where, like here, putative class members were paid, on average, more than $▮▮▮ per year, with some earning nearly $▮▮▮ per year,[124] and would be able to recover potential damages and attorneys' fees in any individual action. Plaintiff's counsel in this case (Donna Clancy) expressly touts her experience representing "hundreds of victims of discrimination" against large corporations, including mentioning one such single-plaintiff lawsuit that she filed within the past year against BLP on behalf of a putative class member.[125] Plaintiff's unfounded speculation about potential "barriers" and "redundancies" also does nothing to demonstrate superiority.

## IV.    PLAINTIFF FAILS TO PROVE TYPICALITY OR ADEQUACY

Plaintiff also must prove that "the claims or defenses of the representative parties are typical of the claims or defenses of the class," and that she will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(3)-(4). Typicality will not exist unless "each class member's claim arises from the same course of events" *and* "each class member makes similar legal arguments to prove the defendant's liability." *In re Vale S.A. Sec. Litig.*, 2019 WL 11032303, at *6 (Woods, J.). The adequacy requirement is twofold: "the proposed class representative must

---

[123] Statistics published by the federal judiciary reflect that over 14,000 employment lawsuits (including those alleging disability discrimination) were filed in U.S. District Courts in fiscal year 2023 alone. *See* https://www.uscourts.gov/data-news/data-tables/2023/09/30/judicial-facts-and-figures/44 (last accessed June 18, 2025).

[124] Pl. Ex. 66 (Neumark Rep.) ¶¶ 40, 43; Bloom Decl. ¶ 40.

[125] Dkt. 331 ¶¶ 5, 9-10. Specifically, the individual plaintiff in *Keenan v. Bloomberg L.P.*, New York Supreme Court, New York County, Index No. 155679/2024 (*id.* ¶10(6)) is a putative class member in this case. In addition to the plaintiff in *Keenan* and Plaintiff in this case, Ms. Clancy also mentions that she represents seven other plaintiffs in single-plaintiff suits against BLP alone. *Id.* ¶10.

have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 231 (2d Cir. 2016).

### A.    Plaintiff's Theory of Intersectional Discrimination Is Not Typical of, and Conflicts with, the Sex Discrimination Claims of the Proposed Classes.

Class certification should be denied because Plaintiff's theory of pay discrimination does not apply to most of the class she seeks to represent, and it conflicts with the interests of other proposed class members.[126] *See Tennie v. City of N.Y. Dep't of Soc. Servs. of N.Y.C. Hum. Res. Admin.*, 1987 WL 6156, at *3 (S.D.N.Y. Jan. 30, 1987) (typicality does not exist unless the "basis of the alleged discrimination against the named plaintiffs is the same as against other members of the proposed class").

Plaintiff repeatedly testified that she believes BLP discriminated against her because she is both Black *and* a woman—and not because of her sex alone.[127] In fact, she specifically rejected the idea that she was discriminated against because of her gender alone. When asked about the basis for her discrimination claims, she testified:

> Everything that happens to me is because I am a Black woman. ***It's not because I am either Black or a woman***....When I am saying that these [alleged discriminatory] things are happening to me, ***I know it's not isolated*** because I am just Black or ***just because I am a woman***.[128]

She also specifically emphasized that she believed her pay and "[a]ll of these [other allegedly discriminatory] things are happening on an intersection. They're not happening because I am either/or."[129]

---

[126] Typicality tends to merge with the adequacy requirement of Rule 23(a)(4), although adequacy also implicates concerns about conflicts of interest. *See, e.g.*, *Dukes*, 564 U.S.at 349 n.5. Given this overlap, BLP addresses Plaintiff's lack of typicality and adequacy together as it relates to her individual discrimination claims, but also separately raises other adequacy concerns below.

[127] BLP Ex. G (Pl Tr.) 142:24-146:14.

[128] *Id.* 142:24-144:11 (emphasis added).

[129] *Id.* 144:16-146:14.

Based on her own admissions, Plaintiff's theory of pay discrimination will require her to make *different* arguments to establish liability than other members of the putative classes who are alleging discrimination on the basis of sex alone. *See, e.g.*, *In re Vale S.A. Sec. Litig.*, 2019 WL 11032303, at *6 (Woods, J.). This is fatal to typicality. In *Tennie*, for instance, the court recognized that plaintiffs' claims of pay discrimination based on sex and race presented "significantly different legal and factual questions" than those of White women in the proposed class "who allege only sex discrimination." 1987 WL 6156, at *3. The *Tennie* court excluded White women from the certified class, noting that including their differing claims would further complicate "an already complex action and might lead to conflicts" amongst class members. *Id.*

While *Tennie* expressed concerns about the mere possibility of conflicts, Plaintiff's prosecution of her individual claims will fundamentally conflict with the interests of proposed class members because she has claimed that White women in the putative classes were paid more than her and other Black employees. For instance, she complains that Madison Mills – a White putative class member – received a $40,000 raise in 2021, whereas Plaintiff was given a raise of only $3,500 in the same year.[130] She also claims that Black women – but not White women – received "worse reviews than their peers," and that those ratings were used to reduce bonuses and raises, resulting in Black women being "paid less across the board."[131] As other courts have recognized, Plaintiff cannot represent a class that includes "non-minority females since she has alleged that non-minority females have been given preferential treatment over her." *Frazier v. Consol. Rail Corp.*, 1986 WL 11237, at *2 (D.D.C. July 31, 1986).[132]

---

[130] BLP Ex. R (FAC) ¶¶ 153, 106; BLP Ex. G (Pl. Tr.) 307:18-25 (identifying Ms. Mills as the "White colleague" referenced in this allegation).

[131] BLP Ex. R (FAC) ¶¶ 53-54.

[132] *See also Payne v. Travenol Lab'ys, Inc.*, 673 F.2d 798, 810-11 (5th Cir. 1982) (female plaintiffs claiming pay discrimination based on sex and race could not represent a class that included Black men because their sex discrimination claim alleged that "males were favored at their expense."); *Valley Drug Co. v. Geneva Pharms., Inc.*,

Plaintiff entirely ignores her own testimony and allegations, and summarily asserts that she brings "pay discrimination claims *only* based on sex."[133] (Br. 36-37) (emphasis in original). This is demonstrably false. In the FAC, as well as in prior iterations of her complaints, she clearly asserts individual discrimination claims "on the basis of race *and* on the basis of sex *in denying her equal compensation*."[134] Even if these claims were not pled in the FAC, however, Plaintiff's sworn testimony that she believes was treated differently because she is a Black woman, and not because of her sex alone, is what matters with respect to defining her claims. She has provided her theory of what the answer will be to the "crucial question" – "*why was I disfavored*" (Br. 29) – as to her pay. She cannot now disavow this testimony simply because she realizes that her individual answer does not apply to all women in the classes she seeks to represent. Any effort to do so would only serve to raise serious credibility questions rendering her further unsuitable to represent a class, as this would become a focus of cross-examination at any trial and "unduly burden the class by diverting attention from the substance" of the class claim. *Pritchard v. Cnty. of Erie*, 2018 WL 1036165, at *17 (W.D.N.Y. Feb. 23, 2018).[135]

---

350 F.3d 1181, 1189 (11th Cir. 2003) (class certification should be denied where a plaintiff "claim[s] to have been harmed by the same conduct that benefitted other members of the class").

[133] Plaintiff's reliance on *Chen-Oster* and *Mangahas v. Eight Oranges Inc*. for the proposition that her individual claims are not disqualifying is misplaced. Both of those cases involved plaintiffs alleging individual retaliation claims and different types of class claims, but BLP has never suggested that Plaintiff's retaliation claim makes her an unsuitable representative. *Chen-Oster*, 325 F.R.D. at 79-80; *Mangahas,* 2024 WL 2801922, at *10 (S.D.N.Y. May 31, 2024). Moreover, unlike in *Mangahas* where the court recognized that plaintiffs' retaliation claims were not "inconsistent with the proposed class's interests" in pursuing wage-and-hour claims, 2024 WL 2801922, at *10, here, Plaintiff's claims that White women received higher pay and performance ratings than her (and other Black women) *are* inconsistent with the interests of White putative class members.

[134] BLP Ex. R (FAC) ¶ 201 (emphasis added); *see also id.* ¶ 207 ("Defendant discriminated against Plaintiff Ndugga on the basis of race and on the basis of sex in setting her compensation…").

[135] *See also, e.g., Savino v. Comput. Credit, Inc.,* 164 F.3d 81, 87 (2d Cir. 1998) (affirming denial of class certification because plaintiff's inconsistent accounts about unlawful conduct forming the "very basis for his lawsuit surely would create serious concerns as to his credibility at any trial"); *Darvin v. Int'l Harvester Co.,* 610 F. Supp. 255, 257 (S.D.N.Y. 1985) ("credibility problems are a basis for denying" class certification).

### B.    Plaintiff Has Offered No Proof of Her Adequacy.

Even though Plaintiff admits that she must satisfy each of the Rule 23 prerequisites by a preponderance of the evidence, she does not submit a shred of proof establishing her adequacy as a proposed class representative. Her conclusory statements in her brief do not carry her burden under Rule 23. *See, e.g.*, *Sicav v. James Jun Wang*, 2015 WL 268855, at *6 (S.D.N.Y. Jan. 21, 2015) (courts must "ensure that there is a basis in admissible evidence for each factual representation made in support of class certification.").

As even the cases Plaintiff cites reflect,[136] plaintiffs seeking certification of a class routinely submit sworn statements detailing their understanding of their responsibilities as a class representative, their willingness and ability to vigorously prosecute the case, and their active involvement in the case, among other topics bearing on their adequacy. *See, e.g.*, *Russell v. Forster & Garbus, LLP*, 2020 WL 1244804, at *5 (E.D.N.Y. Mar. 16, 2020).[137] Where, like here, a plaintiff fails to submit any evidence establishing that she will adequately protect the interests of absent class members, "the Court must find that the Plaintiff has not met the [adequacy] requirement." *Diaz v. Residential Credit Sols., Inc*., 297 F.R.D. 42, 52 (E.D.N.Y. 2014); *see also Deboissiere v. Am. Modification Agency*, 2010 WL 1849265, at *2 (E.D.N.Y. May 5, 2010) (finding plaintiff inadequate because her declaration did not address her willingness and ability to serve as a class representative). The same conclusion is warranted here.

---

[136] *See, e.g.*, Br. 37-38, citing *Jackson v. Bloomberg, L.P*., 298 F.R.D. 152, 165 (S.D.N.Y. 2014) (finding adequacy satisfied "based upon [p]laintiff's declaration"); *Yi Xiang v. Inovalon Holdings, Inc.*, 327 F.R.D. 510, 524 (S.D.N.Y. 2018) (proposed class representative submitted declaration); *Zivkovic v. Laura Christy LLC*, 329 F.R.D. 61, 72-74 (S.D.N.Y. 2018) (named plaintiff, as well as "proposed alternative class representatives," submitted declarations), *Chalmers*, 2022 WL 4330119, at *16 (citing plaintiffs' deposition testimony on adequacy issues).

[137] *See also* MCLAUGHLIN ON CLASS ACTIONS § 4:27 (21st ed.) ("each" proposed representative should submit an affidavit "demonstrating their willingness and ability to take an active role in pursuing the case"); *Sanchez v. Velocity Invs., L.L.C*., 2015 WL 12777990, at *5 (N.D. Ga. Dec. 11, 2015) (plaintiff's failure to submit an affidavit regarding adequacy warranted denial of class certification).

### C.    Plaintiff's Lack of Familiarity with the Factual Basis for Her Pay Discrimination Claims Renders Her Inadequate.

Courts also deem representatives "inadequate" where they demonstrate a lack of familiarity with the action they purport to be litigating on behalf of a class. In *Darvin*, for instance, the plaintiff was deemed inadequate in part because his deposition testimony "demonstrates that his personal knowledge of many of the facts pleaded in the complaint is extremely limited or nonexistent." 610 F. Supp. at 257; *see also Russell*, 2020 WL 1244804, at *4 (plaintiff who lacked familiarity with complaint and basis for lawsuit could not be an adequate class representative); *Norman v. Arcs Equities Corp.*, 72 F.R.D. 502, 506 (S.D.N.Y. 1976) (deeming putative representative inadequate in part due to failure to answer deposition questions responsively).

Plaintiff's inability to recall basic facts about her pay discrimination claims undermines her ability to serve as the sole representative of the two proposed classes. She was unable to answer fundamental questions at her deposition about her claims, such as (for example):

- the identity of the male or female employees referenced in paragraphs 34 and 35 of the Fourth Amended Complaint who were allegedly offered disparate starting salaries, or who allegedly told her about any alleged disparity in starting pay. Notably, Plaintiff could not say whether she even knew the identities of these employees at the time she filed the Complaint, stating that she would need to "defer to [her] attorney on that;"[138]

- whether she was aware of BLP ever relying on prior pay in setting starting pay, again stating that she would need to defer to her attorney for the factual basis of her allegation that this was an allegedly "common" policy;[139]

- the identity of any employee who allegedly had their rating lowered by the Committee;[140]

- the identity of the individuals in her internship class who she claims were offered higher starting salaries than she, or whether any of those individuals were even men;[141]

---

[138] BLP Ex. G (Pl. Tr.) 162:24-167:25, 168:9-170:15.

[139] *Id*. 203:4-207:14; *see also* BLP Ex. W (Fourth Am. Comp.) ¶¶ 1, 32, 43, 53(b) (alleging that the Committee decides starting salary based upon prior pay).

[140] BLP Ex. G (Pl. Tr.) 299:10-302:18; *see also* BLP Ex. W (Fourth Am. Compl.) ¶ 44 (alleging that the Committee "routinely" directs changes to ratings).

[141] BLP Ex. G (Pl. Tr.) 65:9-68:3, 70:11-71:9, 79:10-80:23; *see also* BLP Ex. W (Fourth Am. Compl.) ¶¶ 37 & 61 ("male producers who were hired out of the same internship program as Ms. Ndugga were paid a starting salary of $75,000").

- the prior experience and backgrounds of the "male team members" whom she identified by name as being allegedly higher-paid comparators;[142] and
- whether anyone at BLP had ever made a comment that she believed was discriminatory because of her sex.[143]

In fact, Plaintiff testified that she did not know, or could not recall, the answer to questions about her claims at least 120 times. As other courts have similarly concluded, Plaintiff cannot serve as the sole representative – and thus as a fiduciary – of the putative classes when she appears to have virtually no knowledge of the facts underlying her claims. *Darvin*, 610 F. Supp. at 257; *Russell*, 2020 WL 1244804, at *4.

## V. PLAINTIFF IMPERMISSIBLY EXPANDS HER DEFINITION OF THE PROPOSED NEW YORK CLASS

Even if Plaintiff had carried her burden of proving all Rule 23 requirements (which she has not), her proposed New York class still cannot be certified as set forth in her Motion because it is overly broad in two material respects.

*First*, Plaintiff is improperly seeking certification of a New York class that is fundamentally broader than what she pled in the Complaint. In the Complaint, she defines the putative New York class as limited to female reporters, editors and producers "who work, or worked for Bloomberg <u>Media</u> within the State of New York."[144] Her Motion, however, entirely omits any mention of "Media" in this definition and instead seeks certification of all journalists across News, even though she acknowledges that News is a "separate division" from Media (Br. 4).[145] Plaintiff is not entitled to expand her putative class definition to now encompass a broader

---

[142] BLP Ex. G (Pl. Tr.) 105:4-112:17, 223:5-7.

[143] *Id.* 115:17-116:11.

[144] BLP Ex. R (FAC) ¶ 57 (emphasis added).

[145] ███ BLP Ex. D (Gregori Tr.) 37:21-38:13; BLP Ex. F (Siegel Tr.) 76:14-77:7. ███ *Id.* Plaintiff's reference to "Media" in the Complaint presumably refers to the subset of reporters, editors, and producers in these Business Units. This

group of employees in News—including individuals who never worked for Media—when this exceeds the scope of what is pled in her Complaint. *See, e.g.*, *Vincent v. Money Store*, 304 F.R.D. 446, 453 (S.D.N.Y. 2015) (declining to certify a class that was defined more broadly than what was alleged in the complaint).[146] Although courts may consider whether to certify a narrower class in circumstances where a plaintiff's definition is overly broad, *see id.*, there is no basis to do so here because Plaintiff has offered no proof that any of the Rule 23 prerequisites would be satisfied with respect to the narrower class pled in her Complaint of reporters, editors and producers who worked for Media in New York.

*Second,* Plaintiff's proposed New York Class begins in August 2017, but she does not even fall within her own class definition until she began working for BLP as a producer in January 2018. *See Humphrey v. Int'l Paper*, 2003 WL 22111093, at *4 (N.D. Ill. Sept. 11, 2003) (denying class certification and explaining "[t]he named plaintiffs clearly cannot have standing to maintain an action for a time period that preceded" their employment at the facility where the alleged discrimination occurred). Plaintiff cannot bring claims on behalf of others that pre-date her own full-time employment with BLP.

## **CONCLUSION**

For all of the foregoing reasons, the Court should deny Plaintiff's motion for class certification, together with such other and further relief as the Court deems just and proper.

---

would encompass a much smaller group of employees than the putative New York Class that she seeks to have certified.

[146] *See also, e.g.*, *Costelo v. Chertoff*, 258 F.R.D. 600, 604-05 (C.D. Cal. 2009) ("[t]he Court is bound to class definitions provided in the complaint and, absent an amended complaint, will not consider certification beyond it."); *Hoffman v. Transworld Sys. Inc.,* 2023 WL 421113, at *6 n.9 (W.D. Wash. Jan. 26, 2023) (refusing to consider plaintiff's revised class definitions that were "far more expansive" than what was pled in the complaint); *In re Wal-Mart Wage & Hour Emp. Pracs. Litig.*, 2008 WL 3179315, at *6 (D. Nev. June 20, 2008) ("[t]he Court therefore must reject Plaintiffs' Motion for Class Certification to the extent it seeks to expand the … class definition beyond the parameters contained in Plaintiffs' Complaints.").

Dated:  New York, New York
        June 23, 2025

PROSKAUER ROSE LLP

By:  */s/Elise M. Bloom*
Elise M. Bloom
Rachel S. Philion
Allison L. Martin
Eleven Times Square
New York, New York 10036
(t) 212-969-3000
(f) 212-969-2900
ebloom@proskauer.com
rphilion@proskauer.com
amartin@proskauer.com

Mark W. Batten (admitted *pro hac vice*)
One International Place
Boston, Massachusetts 02110
(t) 617-526-9850
(f) 617-526-9899
mbatten@proskauer.com
*Attorneys for Defendant Bloomberg L.P.*

## <u>LOCAL RULE 7.1(c) WORD COUNT CERTIFICATION</u>

Pursuant to Rule 7.1(c) of the Joint Local Rules for the Southern District of New York and Eastern District of New York ("Local Rule"), the undersigned hereby certifies that this Memorandum of Law was prepared with a computer; contains 16,969 words (excluding the caption, table of contents, table of authorities, signature blocks, and this certification), including footnotes; and complies with paragraph 2.D. of the Individual Practices of Magistrate Judge Gabriel W. Gorenstein, which provides that "notwithstanding the provisions of Local Rule 7.[(c)] to the contrary, the Court does not impose page or word count limitations on memoranda of law."

Dated:  New York, New York
      June 23 2025

<u>/s/Elise M. Bloom</u>
Elise M. Bloom
