# EXHIBIT G

Page 1

1

2    UNITED STATES DISTRICT COURT

     SOUTHERN DISTRICT OF NEW YORK

3    --------------------------------------X

4    NAULA NDUGGA, on behalf of herself

5    and similarly situated women,

6                          Plaintiff,

7        - against -

8    BLOOMBERG L.P.,

9                          Defendant.

10   CASE NO.: 20-cv-07464(GHW)(GWG)

     --------------------------------------X

11

12       * * *  C O N F I D E N T I A L * * *

13

14                   Eleven Times Square

                     New York, New York

15

                     November 15, 2023

16                   10:04 a.m.

17

18           VIDEOTAPED DEPOSITION of Plaintiff,

19   NAULA NDUGGA, before Melissa Gilmore, a

20   Stenographic Reporter and Notary Public of the

21   State of New York.

22

23

24

25

```
                                          Page 27
 1                 NDUGGA - CONFIDENTIAL
 2        A.     Yes, ma'am.
 3        Q.     Was that a paid position?
 4        A.     Yes, ma'am.
 5        Q.     And were you paid money for that, or
 6   did you receive compensation in some other
 7   form?
 8        A.     To the best of my recollection, we
 9   were paid a salary, but there was also a
10   scholarship, like a residential dorm
11   scholarship.
12        Q.     Prior to your internship at
13   Bloomberg L.P., is it correct that you had no
14   paid journalism experience?
15        A.     Yes, ma'am.
16        Q.     And the job -- the internship at
17   Bloomberg was your first job out of college; is
18   that correct?
19        A.     Yes.
20        Q.     Other than what you described to us
21   as a news reporter from August 2013 to May of
22   2015, did you have any other journalism
23   experience prior to becoming an intern at
24   Bloomberg?
25        A.     Outside of my education, no.
```

Page 65

1                NDUGGA - CONFIDENTIAL
2    refresh your recollection?
3         A.    I don't know.  I'm not a hundred
4    percent sure.  Probably seeing a list of names,
5    but I'm not a hundred percent sure.
6         Q.    Do you have a list of names
7    somewhere?
8         A.    I do not.
9         Q.    Did you discuss your compensation
10   with anybody else that was part of your intern
11   group?
12        A.    I believe so.  I can't remember
13   exactly who it was.  I believe it was a group
14   discussion of just what our offer packages
15   looked like.
16        Q.    Who was in the group?
17        A.    I do not recall.
18        Q.    When you said a few minutes ago that
19   you don't remember discussing your compensation
20   with the people that I had listed, were none of
21   those people part of this group discussion?
22        A.    To the best of my memory, I don't
23   know.  I'm not a hundred percent sure.  I can't
24   recall that.
25        Q.    Can you recall anything about the

Page 66

1              NDUGGA - CONFIDENTIAL
2    discussion?
3         A.    I think it was just a matter of how
4    much or what the offer letters looked like and
5    what our teams looked like, but I don't exactly
6    recall, like, specifics.
7         Q.    Well, tell me, do you remember any
8    specifics of what the offer packages looked
9    like?
10        A.    I -- to the best of my understanding
11   and my recollection, I believe that it was
12   shared with me that those offers were higher
13   than what I was offered at that time.
14        Q.    Whose offer was higher?
15        A.    I don't recall specifically whose
16   offer was higher.
17        Q.    What was the sex of the people whose
18   offers were higher?
19        A.    I do not recall.  To the best of my
20   recollection, this is -- it felt like a general
21   conversation.  I do not recall whose offers
22   were higher and whose weren't.  But I just know
23   that I was not receiving that.
24        Q.    Your testimony here today is that,
25   based on the discussion among people who you

Page 67

NDUGGA - CONFIDENTIAL

1

2  can't remember and the specifics of which you

3  cannot recall, you believe that your

4  compensation was lower than some of the people

5  in the discussion; is that right?

6          MS. CLANCY:  Objection to form.

7      Q.    You can answer.

8      A.    Okay.  I -- what I am saying and

9  what I'm trying to express is this conversation

10  is one that I do not recall specifics from, but

11  I did get the understanding that my

12  compensation was lower than what was offered to

13  other people.  As to who exactly those people

14  are and what those offers looked like, I cannot

15  speak to that because I do not recall.

16      Q.    Were there people whose compensation

17  was lower than yours?

18      A.    I do not recall.  I don't believe

19  so, but I don't recall.

20      Q.    Sitting here today, can you identify

21  any men who were -- received full-time offers

22  out of your internship program?

23      A.    Not off the top of my head.  Not at

24  this time.

25      Q.    Do you know if any men did actually

Page 68

1                    NDUGGA - CONFIDENTIAL
2    receive full-time offers?
3         A.    I don't know.
4         Q.    Have you ever seen any records to
5    suggest that any of the male interns in your
6    intern class actually got an offer from
7    Bloomberg?
8         A.    I have not seen any physical
9    documents.
10        Q.    Well, whether they're physical
11   documents or electronic documents, have you
12   seen any documents which would suggest that any
13   male that was part of your intern class got a
14   full-time offer from Bloomberg?
15        A.    To the best of my recollection, I
16   have not seen any documents.
17        Q.    And, sitting here today, you cannot
18   tell me whether any male that was in your
19   internship class actually got a full-time
20   offer, correct?
21        A.    No, ma'am, I do not recall that.
22        Q.    Do you know whether any of the
23   females who got offers were paid more money
24   than you?
25        A.    I do not recall if they were part of

```
 1                NDUGGA - CONFIDENTIAL
 2            That's correct, that's an accurate
 3   statement; is that right?
 4       A.    I believe so.
 5       Q.    And then you go on to say "which was
 6   $10,000 lower than the starting salary of male
 7   producers who were hired out of the same
 8   internship program."
 9            Do you see that allegation?
10       A.    Yes, I do.
11       Q.    Which male producers who you claim
12   were hired out of the same internship program
13   were paid $10,000 more than you?
14       A.    I do not recall specific people.  I
15   cannot name specific people at this time.
16       Q.    Can you name anybody?
17       A.    No, I cannot.  Off the top of my
18   head, I do not recall any names at this time.
19       Q.    At the time that you made this
20   allegation --
21       A.    Uh-huh.
22       Q.    -- were you thinking of somebody
23   specific?
24            MS. CLANCY:  Objection to form.
25       A.    I was thinking generally of my
```

```
                                        Page 71
                        NDUGGA - CONFIDENTIAL
 1
 2    understanding that my salary was $10,000
 3    lower -- or my offer rate starting was $10,000
 4    lower than the conversations that I'd had.  As
 5    to who I had those conversations with, I do not
 6    recall specific people or specific names at
 7    this time.
 8          Q.    Or specific sexes; is that right?
 9          A.    Yes, ma'am.
10                MS. BLOOM:  Can you mark that as
11          Exhibit 6?
12                (Ndugga Exhibit 6, E-Mail, Bates
13          Stamped NDUGGA00013214, marked for
14          identification.)
15          Q.    You've just been handed a copy of a
16    document that's been marked as Ndugga Exhibit
17    Number 6.
18                Do you recognize this as a copy of
19    an e-mail that you wrote?
20          A.    To the best of my knowledge, yes.
21          Q.    And is that your Gmail address?
22          A.    Yes, it is.
23          Q.    And who did you write this e-mail
24    to?
25          A.    It says to Mindy Massucci.
```

```
                                            Page 74
 1              NDUGGA - CONFIDENTIAL
 2        A.    Yes.
 3        Q.    And you received $65,000, correct?
 4        A.    Well, I -- from my understanding,
 5   what I'm taking away from this is that this is
 6   per hour.
 7        Q.    60 or $70 an hour?
 8        A.    Yes, ma'am.
 9        Q.    Not $65,000 a year?
10        A.    I believe that's probably what I
11   meant.
12        Q.    When you were offered a full-time
13   position, it was for $65,000 a year; is that
14   right?
15        A.    Yes, it was.
16        Q.    And in between the time that you
17   were working as an intern and the time that you
18   were hired full-time, you had a contractor
19   position, correct?
20        A.    Yes.
21        Q.    And what were you paid in that
22   contractor position?
23        A.    I do not recall specifically --
24        Q.    And when --
25        A.    -- what I was paid per hour.
```

Page 79

1                NDUGGA - CONFIDENTIAL
2    becoming hired as a full-time employee, she was
3    paid an annual salary of $65,000."
4         A.    Yes.
5         Q.    That's your allegation, correct?
6         A.    Yes.
7         Q.    And that's what is reflected in your
8    offer letter, correct?
9         A.    Yes.
10        Q.    And then you say -- you refer to
11   "male producers who were hired out of the same
12   internship program as Ms. Ndugga who were paid
13   a starting salary of $75,000, a $10,000
14   difference."
15              Who are those male producers that
16   you're referring to?
17        A.    As I mentioned before, I do not
18   recall.  I cannot give you specific names at
19   this time.
20        Q.    At the time that you made this
21   allegation, did you have information as to who
22   these alleged male producers were?
23        A.    As I've mentioned before, I do not
24   recall specific names, but I do know that there
25   was a 10,000 difference between my salary and

NDUGGA - CONFIDENTIAL

1

2   what I started at and what my understanding was

3   of other people's salaries.

4        Q.    But when you talk about other

5   people, you can't tell us whether those were

6   men or women; is that right?

7        A.    As I've mentioned before, I do not

8   recall.

9        Q.    So you cannot tell us whether they

10  were men or women, correct?

11       A.    As I've mentioned before, this was a

12  general conversation I was having with people.

13  I cannot give you specifics at this time.

14       Q.    I understand that.  So you -- I just

15  want to make sure I understand your answer,

16  though.

17            When you say you cannot give me

18  specifics, you cannot give me specifics as to

19  whether -- whether it was men or women or both

20  who you're claiming were paid $10,000 more than

21  you.

22       A.    My assumption is that it was both.

23  I -- but as I've said before, I do not recall.

24       Q.    Was there anybody in your internship

25  class that you believe was hired a full-time

```
 1              NDUGGA - CONFIDENTIAL
 2      Q.    -- correct?
 3      A.    As of that time.
 4      Q.    Okay.  Can you look at page 18 of
 5   Exhibit 5, paragraph 62, and let me know when
 6   you have that in front of you?
 7      A.    I have that in front of me.
 8      Q.    Great.  Okay.  So paragraph 62, you
 9   refer to various male team members; is that
10   right?
11      A.    Yes, I do.
12      Q.    The first person that you talk about
13   is David Meyers.
14            What was his position during the
15   time that you worked at Bloomberg?
16      A.    I believe it was executive producer.
17      Q.    What, if anything, can you tell me
18   about Mr. Meyers' professional work experience?
19      A.    I don't know.  I can't speak to that
20   specifically.  I don't have access to his
21   resume.
22      Q.    Do you know how long he has worked
23   in the media industry?
24      A.    No, I do not.
25      Q.    If I told you that he had worked in
```

```
1                 NDUGGA - CONFIDENTIAL
2     the media industry since January of 2015, you
3     would have no basis for disputing that,
4     correct?
5          A.    No.
6          Q.    The next person in paragraph 62 is
7     Will Shaker.
8               What was his title?
9          A.    He was a producer, I believe.
10         Q.    And what can you tell me about
11    Mr. Shaker's work history prior to Bloomberg?
12         A.    I do not have his resume.  I can't
13    speak to what he did prior to that.
14         Q.    Do you know anything about his work
15    history prior to Bloomberg?
16         A.    Not that I can recall at this time.
17         Q.    Do you know whether or not his
18    position at Bloomberg was the first job that he
19    had out of college?
20         A.    Again, I can't speak to it.  I don't
21    have access to his resume.
22         Q.    And was he a producer or a senior
23    producer?
24         A.    I believe he was a producer.
25         Q.    Andrew Mach, what was his job?
```

Page 107

1               NDUGGA - CONFIDENTIAL
2       A.    A social curator.
3       Q.    What is a social curator?
4       A.    They work adjacent to the producers
5    to disseminate our stories on social.
6       Q.    Do you know whether Will Shaker had
7    spent three years at CBS News before joining
8    Bloomberg?
9       A.    I cannot speak to his resume.  I
10   don't have access to it.
11      Q.    Okay.  With regard to Mr. Mach, what
12   can you tell me about his professional
13   experience before he came to Bloomberg?
14      A.    Again, I don't have access to his
15   resume.  I cannot speak to it.
16      Q.    If I told you that he's worked in
17   the media industry since April of 2009, you
18   have no basis for disputing that; is that
19   right?
20      A.    Again, I do not have access to his
21   resume.  I cannot speak to it.
22      Q.    Angelo Spagnolo, what was his
23   position?
24      A.    Social curator.
25      Q.    What can you tell me about his

```
 1            NDUGGA - CONFIDENTIAL
 2   professional experience before joining
 3   Bloomberg?
 4        A.    Again, I don't have access to his
 5   resume.  I can't speak to it.
 6        Q.    Do you know how long he had been in
 7   the media industry before joining Bloomberg?
 8        A.    I do not have access to his resume,
 9   and I can't speak to it.
10        Q.    Brian Wall, what was his position?
11        A.    Brian was a producer.
12        Q.    What can you tell me about Brian's
13   experience prior to joining Bloomberg?
14        A.    I do not have access to his resume.
15   I can't speak to it.
16        Q.    Do you know how many years he had
17   worked in media prior to joining Bloomberg?
18        A.    I don't have access to his resume,
19   and I can't speak to it.
20        Q.    Do you know if he worked for CBS
21   News before joining Bloomberg?
22        A.    I cannot speak to it.
23        Q.    Henry Seltzer, what was his
24   experience -- well, first of all, what was his
25   job at Bloomberg?
```

```
 1              NDUGGA - CONFIDENTIAL
 2        A.    I do not know his specific title.
 3        Q.    What was his experience before
 4   joining Bloomberg?
 5        A.    I don't have his resume.  I can't
 6   speak to it.
 7        Q.    And without his resume, you have no
 8   knowledge one way or another as to how much
 9   experience he had in the industry before
10   Bloomberg, correct?
11        A.    I cannot speak to specifics of what
12   his experience was.
13        Q.    Do you know if he had any experience
14   in the industry before joining Bloomberg?
15        A.    I do not know.
16        Q.    Alexander Gittleson, what was his
17   position?
18        A.    I don't know his specific title.
19        Q.    And what was his experience before
20   joining Bloomberg?
21        A.    Again, I don't have access to his
22   resume.  I can't speak to it.
23        Q.    Would the same be true for each of
24   the other individuals that is listed in
25   paragraph 6?
```

```
1              NDUGGA - CONFIDENTIAL
2         And when I say "the same be true,"
3    that you have no knowledge one way or another
4    as to their professional experience before
5    joining Bloomberg.
6         A.    As I've said, I do not have access
7    to their resumes, so I cannot speak to that.
8         Q.    Well, regardless of whether you have
9    access to their resumes or not, do you have any
10   personal knowledge as to the prior work
11   experience of any of the individuals listed in
12   paragraph 62?
13        A.    I cannot recall at this time.  I'm
14   sure I have had conversations with them about
15   their experiences, but I cannot recall
16   specifics at this time.
17        Q.    Do you have any documents which
18   would refresh your recollection?
19        A.    Not that I can think of at this
20   time.
21        Q.    And so, if their resumes reflected
22   prior media experience before joining
23   Bloomberg, you have no basis for disputing
24   that, correct?
25             MS. CLANCY:  Objection to form.
```

1              NDUGGA - CONFIDENTIAL
2              You can answer.
3         A.    Would -- I don't understand the
4    question.  Would you mind rephrasing it?
5         Q.    Absolutely.  If you were shown
6    resumes for each of these people --
7         A.    Uh-huh.
8         Q.    -- you have no basis for disputing
9    the content -- the truth of the content on
10   those resumes, correct?
11             MS. CLANCY:  Objection, form.
12        A.    I can't speak to any -- to what they
13   present.
14        Q.    But you have no independent personal
15   knowledge as to the professional work
16   experience of any of the individuals in
17   paragraph 62, correct?
18        A.    Again, as I've mentioned, I'm sure
19   I've had personal conversations with them.
20   I've had conversations with them at one point
21   or another about their experiences.  But as to
22   what they put on their resume, I can't speak to
23   that.
24        Q.    As to their personal experience,
25   sitting here today, can you tell me about the

NDUGGA - CONFIDENTIAL

1
2  personal professional experience of any of the
3  people in paragraph 62?
4         And I mean their professional
5  experience before coming to Bloomberg.
6      A.    Again, as I've mentioned, I do not
7  recall specifics.  I'm sure I have had
8  conversations with many of the men listed on
9  this -- on this document about their personal
10 and professional -- professional experience
11 specifically, but I do not recall at this time
12 and I can't speak to it.
13     Q.    Do you know if any of the
14 individuals that are listed in paragraph 62 --
15 if, for any of those individuals, the job at
16 Bloomberg was their first job out of college?
17     A.    I can't speak to that.
18     Q.    Now, you've made a claim in this
19 case for sex discrimination; is that correct?
20     A.    Yes, ma'am.
21     Q.    Can you tell me the facts upon which
22 you base your allegation that you were
23 discriminated against because of your sex while
24 at Bloomberg?
25     A.    Would you mind rephrasing the

1           NDUGGA - CONFIDENTIAL

2        A.    Again, off the top of my head in

3    this moment, I cannot remember any specifics,

4    but I'm happy to go through this document if

5    that would be helpful to this response.

6        Q.    Well, let's start with this.  So,

7    sitting here today, other than your pay, you

8    can't tell me any other ways in which you claim

9    you were discriminated against because of your

10   sex; is that right?

11       A.    I am saying that I cannot recall

12   specifics in this moment.

13       Q.    And did anyone ever make a comment

14   to you -- and your sex is female; is that

15   right?

16       A.    Yes, ma'am.

17       Q.    Did anybody ever make a comment to

18   you while you were at Bloomberg that you

19   believed was discriminatory because of your

20   sex?

21       A.    Yes, I do believe so.  But, again, I

22   cannot recall specifics at this time.

23       Q.    Can you recall any specific as to

24   any comment that was made to you that you

25   believe was derogatory to you because of your

```
                                           Page 116

 1               NDUGGA - CONFIDENTIAL

 2   sex while at Bloomberg?

 3        A.    Again, I cannot recall specifics at

 4   this time.

 5        Q.    So nothing.  You can't tell me one

 6   comment.

 7               Is that your testimony?

 8        A.    I am saying that I do not recall at

 9   this time.  Yes, there were plenty of comments,

10   I'm sure.  But, again, I do not recall at this

11   time.

12        Q.    Do you have any documents or other

13   records that would refresh your recollection as

14   to comments that you claim were made to you

15   that were derogatory because of your sex while

16   you worked at Bloomberg?

17        A.    I'm sure my complaint has several of

18   it.

19        Q.    And other than your complaint, do

20   you have any other documents which would

21   refresh your recollection as to comments that

22   you believe were derogatory about your sex and

23   that were made to you while you were employed

24   at Bloomberg?

25        A.    I'm sure that there are other
```

```
                                        Page 142
 1                NDUGGA - CONFIDENTIAL
 2        A.    That I can remember at this time.
 3        Q.    When you say "at this time," does
 4   that mean in this minute?
 5        A.    Yes, in this very minute, in this
 6   moment.
 7        Q.    Did you have a greater recollection
 8   of any of this yesterday?
 9              MS. CLANCY:  Objection.
10        A.    I was not being faced with these
11   questions yesterday.
12        Q.    So you said that, from looking at
13   your complaint, that this might refresh your
14   recollection as to your claims in this case.
15              So I'd like you to take a look at
16   Exhibit 5, and I'd like you to tell me if, from
17   looking at Exhibit 5, there's any other ways in
18   which you claim you were discriminated against
19   because of your sex other than your pay.
20        A.    (Document review.)  I'm sorry.  Is
21   this on page --
22        Q.    I'm not on any particular page.
23        A.    Okay.
24        Q.    This is your complaint.  And my
25   question is about your claim of sex
```

```
                                              Page 143
 1                 NDUGGA - CONFIDENTIAL
 2    discrimination.
 3              And my recollection is that you told
 4    me earlier that if you looked at your complaint
 5    that might refresh your memory as to any of the
 6    facts that support your claim that you've been
 7    discriminated against because of your sex
 8    besides your pay.
 9        A.    Well --
10        Q.    So now I'm asking you to look at it
11    and tell me.
12        A.    -- I think, one, it's important to
13    note that I am a Black woman and that I
14    experience life on an intersection.  Everything
15    that happens to me is because I am a Black
16    woman.  It's not because I am either Black or a
17    woman.  Those identities are never separate for
18    me.
19              That's how I experience the world
20    and that's how the world experiences me.  When
21    I am saying that these things are happening to
22    me, I know it's not isolated because I am just
23    Black or just because I am a woman.  It's
24    happening on an intersection of my identity.
25        Q.    Okay.  So are you claiming in this
```

```
                                            Page 144
 1              NDUGGA - CONFIDENTIAL
 2    case that you're discriminated against because
 3    you're a woman, or are you claiming that you're
 4    discriminated against because you're a Black
 5    woman?
 6              MS. CLANCY:  Objection, calls for a
 7         legal conclusion.
 8              You can answer.
 9         A.    Again, I experience life on an
10    intersection.  I am both a woman and a Black
11    person.
12         Q.    Okay.  So if you could look at your
13    complaint.  And these are your factual
14    allegations.
15         A.    Yes.
16         Q.    If you can tell me if -- from
17    looking at your complaint, if this refreshes
18    your recollection as to any ways other than
19    your pay that you believe you were
20    discriminated against because you are a --
21    because you are a female?
22              MS. CLANCY:  Objection.
23              So it's about 41 pages, so take your
24         time to look through if you'd like.
25              MS. BLOOM:  Sure.  I mean, she told
```

```
                                              Page 145
 1                  NDUGGA - CONFIDENTIAL
 2        me that she reviewed this in preparing for
 3        her deposition and that this was the only
 4        thing that -- the only document that she
 5        remembered reviewing.  But --
 6             MS. CLANCY:  That's not correct
 7        testimony.
 8             MS. BLOOM:  Well, we could read it
 9        back if we need to.  But at this time,
10        this is her complaint, so I'm asking her
11        about her claims.
12        A.    (Document review.)
13             Well, again, just from briefly
14   looking over it, I think that I've spoken to
15   without going into all of these specific
16   details.  I'm happy to go through it if you
17   want, line by line, if that is -- would better
18   answer your questions.
19             But, again, I think it has to do
20   with pay.  It has to do with the opportunities
21   that I was given.  It has to do with the
22   stories that were being covered.  It has to do
23   with how the stories were being covered.  It
24   has to do with how people were being treated
25   day-to-day.
```

```
                                      Page 146
 1              NDUGGA - CONFIDENTIAL
 2              And I think that also seeing that
 3   compared to specifically White male
 4   counterparts, they were being treated better.
 5   They did not have the same obstacles that I
 6   did.  They did not have to face the same
 7   challenges that I did.  They did not have to
 8   face any of that.
 9              I think -- and, again, going back to
10   I am both Black and a woman.  I experience life
11   on an intersection.  All of these things are
12   happening on an intersection.  They're not
13   happening because I am either/or.  It's because
14   this is who I am.
15        Q.    Okay.  We talked about pay, and we
16   talked about covering stories and how stories
17   are covered; is that right?
18        A.    Yes, ma'am.
19        Q.    Okay.  You mentioned opportunities.
20        A.    Yes.
21        Q.    What opportunity or opportunities
22   are you claiming that you should have been
23   given but were not given because of your sex?
24        A.    Whether it was promotions,
25   opportunities to kind of branch out, whether it
```

```
                                            Page 162
 1              NDUGGA - CONFIDENTIAL
 2   other seniors of the team and be able to
 3   interact with them more and not be limited
 4   in --
 5        Q.    And who were the other seniors?
 6        A.    I know AP came on to our day shift.
 7   I think he was kind of the major shift.  He
 8   came on to the day shift.
 9        Q.    Did you get assignments from Claire?
10        A.    Initially before she went on
11   maternity leave, she would also help give
12   assignments out.  But I think, for the most
13   part, David was responsible for that.
14        Q.    So any of the assignments that you
15   had in this first period of time are
16   assignments that were given to you by David; is
17   that correct?
18        A.    From what I can remember, most of
19   those assignments were coming from David.  I'm
20   sure there were probably other people who may
21   have given out assignments.  But, from what I
22   can recall at this time, they were mostly
23   coming from David.
24        Q.    Okay.  If you can look at
25   paragraph 34, please.
```

1                    NDUGGA - CONFIDENTIAL
2              Can you tell me who the male
3    reporters or editors are that are referenced in
4    paragraph 34?
5         A.    At this time I cannot speak to that
6    specifically.
7         Q.    Can you tell me who the female new
8    hires are that are referenced in paragraph 34?
9         A.    At this time I can't speak to that
10   specifically.
11        Q.    Can you tell me how you know that
12   the editorial management committee often agrees
13   to offer more money to male reporters or
14   editors seeking a better salary but declines to
15   do so for female new hires?
16        A.    To the best of my recollection, from
17   conversations we would have as a team, as
18   teammates, I can't speak to specifically who it
19   is or recall who it is at this time.  But there
20   was a general understanding that the women who
21   were coming in, the women who were on the team,
22   were all making less than what the men were.
23        Q.    Who were the people that you were
24   having these conversations with?
25        A.    As I mentioned before, I cannot

```
 1              NDUGGA - CONFIDENTIAL
 2   recall specific people at this time.  I just
 3   know that those were conversations that were
 4   ongoing across the team.
 5        Q.    Do you have any evidence which would
 6   show that women were making less than men?
 7        A.    Again, I'm referencing to
 8   conversations that were ongoing at the time.  I
 9   don't have any specifics that I can give at
10   this time.
11        Q.    So if we went to trial and you were
12   going to recreate that, how would you recreate
13   the allegation in paragraph 34 that "The
14   editorial management committee often agrees to
15   offer more money to male reporters or editors
16   seeking a better salary but declines to do so
17   for female new hires"?
18             MS. CLANCY:  Objection, calls for a
19        legal conclusion.
20             MS. BLOOM:  No, it doesn't.  It
21        calls for facts.
22             MS. CLANCY:  You can ask the facts.
23        But how would she put together something
24        at trial by her attorneys?
25             MS. BLOOM:  I didn't say a word
```

```
                                        Page 165
 1              NDUGGA - CONFIDENTIAL
 2      about the attorneys.
 3              MS. CLANCY:  Exactly.
 4              MS. BLOOM:  I would ask --
 5              MS. CLANCY:  But it implies.
 6              MS. BLOOM:  -- you to stop coaching
 7      her.  You want to --
 8              MS. CLANCY:  You asked --
 9              MS. BLOOM:  -- object to the form of
10      the question, do it.
11              MS. CLANCY:  -- me a question.  You
12      conferred with me in the conversation, and
13      I responded.
14  BY MS. BLOOM:
15      Q.    You can answer the question.
16              MS. CLANCY:  My objection is noted.
17      A.    Again, as I mentioned, this was an
18  ongoing conversation.  It was not just me.
19  This was a conversation going on across the
20  newsroom.  It was not limited to me.  It was
21  not limited to Quicktake.  I'm sure that there
22  are people who would be more than happy to
23  speak to that themselves.
24              But, as I've mentioned, at this
25  time, I cannot recall who those people are and
```

```
 1              NDUGGA - CONFIDENTIAL
 2   I can -- the specifics of those conversations.
 3   But there was the general understanding across
 4   the team, across our news department that men
 5   were making more than women were.
 6        Q.     But, sitting here today, you can't
 7   tell me the name of a single man or the name of
 8   a single woman.
 9             Is that your testimony?
10        A.     Today, to the best of my
11   recollection, I cannot do that.  If I do
12   remember anything, I will be sure to -- and
13   more than happy to share it.
14        Q.     And how would you go about
15   reconstructing, though, who those men and women
16   are?
17        A.     I don't --
18             MS. CLANCY:  Objection.  That's
19        totally improper.
20             MS. BLOOM:  No, it's not.  You
21        can --
22             MS. CLANCY:  How would she
23        reconstruct --
24             MS. BLOOM:  You can object to the
25        form of the question.
```

```
                                            Page 167
 1                  NDUGGA - CONFIDENTIAL
 2        Q.    You can answer the question.
 3              MS. CLANCY:  Well, I will continue
 4        my objections.  If she's able to answer.
 5        A.    I don't think that it's a matter of
 6    reconstructing.  I don't have to reconstruct
 7    anything.  It did happen.  That was what was
 8    going on.  Those were the conversations that
 9    were happening in the newsroom.  I don't have
10    to reconstruct anything.
11              I think it's a matter of whether --
12    finding out who these people are.  I told
13    you -- I've already said that, to the best of
14    my recollection, I cannot recall these
15    specifics at this time.  But if I do, I will be
16    more than happy to share that.
17        Q.    Well, how are you going to go about
18    finding out who these women are, for example?
19              MS. CLANCY:  Objection.
20        A.    Well, I think that memories come and
21    go.  I think that, in this moment, in this
22    minute, I may not remember, but I could
23    remember down the line.  And at that point I
24    will be more than happy to share with you who
25    those people are if it does come back to me.
```

```
 1              NDUGGA - CONFIDENTIAL
 2       Q.    If I wanted to figure out who those
 3  people are, what would you suggest I do?
 4              MS. CLANCY:  Objection.
 5       A.    Well, I think that that is maybe
 6  something for you to take on and have those
 7  conversations with the women who are at
 8  Bloomberg.
 9       Q.    If you look at paragraph 35, you
10  allege that "Male reporters are frequently
11  hired at salaries that are $20,000 or more
12  above the salary of their female peers."
13              Do you see that allegation?
14       A.    Yes, I do.
15       Q.    What is the basis for that
16  allegation?
17       A.    Again, as I just said, these are
18  conversations that were ongoing.  Employees, as
19  people, as co-workers, we have these
20  conversations together all the time.  These
21  were conversations that were ongoing if people
22  shared their salaries and came to the
23  understanding that they are making more or
24  making less than others.
25              And, as I've said before, I cannot
```

```
 1              NDUGGA - CONFIDENTIAL
 2   speak to those specifics right now.  I do not
 3   recall those specific people or those specific
 4   times, but those are conversations that were
 5   ongoing and may still be ongoing at this point.
 6        Q.    When you reviewed -- when you --
 7   when the complaint was filed, publicly filed on
 8   your behalf, what information did you have to
 9   support the allegation in paragraph 35 of your
10   complaint?
11        A.    I would defer to my attorney on
12   that.
13        Q.    Did you know the identity of these
14   male reporters that are referenced in
15   paragraph 35 of the complaint at the time that
16   you filed this?
17        A.    I would defer to my attorney on
18   that.
19        Q.    I'm asking if you knew, not if your
20   attorney knew.
21        A.    Well --
22        Q.    This is your complaint.
23        A.    -- I understand that.  This
24   complaint was filed almost three years ago at
25   this point.
```

1              NDUGGA - CONFIDENTIAL

2        Q.    At the time you filed it, did you

3    know the identity of the male reporters

4    referenced in paragraph 35?

5        A.    To the best of my recollection, I --

6    no names are coming to my mind at this time.

7        Q.    That's not my question.  My question

8    is whether you knew those names when you filed

9    the complaint.

10       A.    If I had that conversation with my

11   attorney, I will have shared all of the

12   information that I had as to what exactly that

13   is.  I haven't reviewed that information or

14   those specifics in a while, so I can't speak to

15   that at this time.

16       Q.    Okay.  And if you had that

17   information, would it be fair to assume that

18   you would have produced that information in

19   discovery?

20            MS. CLANCY:  Objection.

21       A.    Again, as I've mentioned, I have

22   given all the information that I have.

23       Q.    To your attorneys.  That's your

24   testimony?

25       A.    Yes, ma'am.

Page 203

                        NDUGGA - CONFIDENTIAL
 1
 2        A.    I don't think anyone specifically
 3   told me that, to the best of my recollection.
 4        Q.    Are you aware of Bloomberg relying
 5   on any individual's prior salary in setting
 6   that individual starting pay?
 7        A.    Not that I can recall or speak to at
 8   this time.
 9        Q.    Have you ever seen any policy which
10   provided that Bloomberg relied on prior
11   compensation in setting starting pay?
12        A.    Not that I can recall or speak to at
13   this time.
14        Q.    When you say "not that I can recall
15   or speak to at this time," do you have any
16   recollection of ever seeing a policy like that?
17        A.    Again, not that I recall or can
18   speak to at this time.  I unfortunately cannot
19   remember every single thing that I've seen or
20   been told or has been shared with me.
21        Q.    So if I wanted to find out if that
22   was true, that allegation was true, what do you
23   suggest I do?
24              MS. CLANCY:  Objection.
25              Elise, that's really inappropriate.

```
 1              NDUGGA - CONFIDENTIAL
 2          MS. BLOOM:  She can answer or not.
 3          MS. CLANCY:  You're an attorney.  I
 4      mean, this is inappropriate for a fact
 5      witness here.
 6          MS. BLOOM:  I don't think so, and
 7      she can answer the question.
 8      A.    I don't know what I would suggest to
 9  you.
10      Q.    If you were going to -- if you were
11  going to reeducate yourself about your specific
12  allegation that "Defendant's common policies
13  included its reliance on prior salary in
14  setting starting pay," how would you go about
15  reeducating yourself?
16      A.    I would do my very best to remember
17  and to share with you.
18      Q.    Would you look at any documents?
19      A.    I can't think of anything
20  specifically at this time.
21      Q.    So what you would do is do your very
22  best to try to remember, but not look at any
23  specific documents.
24          Is that what you're saying?
25          MS. CLANCY:  Objection.  Objection.
```

1              NDUGGA - CONFIDENTIAL

2        Q.    You can answer.

3        A.    I think that the implication of what

4   you are asking me is that I would make

5   something up.  And that is something I would

6   never do.

7        Q.    No, actually, that's not my

8   implication.  I'm just trying to understand

9   what you would do.  And if you took that as my

10  implication, that absolutely was not my

11  implication.  I wasn't implying that at all.

12            I'm just trying to make sure that I

13  understand what you would do to kind of -- to

14  reeducate yourself about a very specific

15  allegation that's in your complaint.

16        A.    And, as I mentioned before, I, at

17  this time, cannot in this moment, in this

18  minute, recall specific documents.  But I would

19  do my very best to do so.

20        Q.    And where would you look for those

21  documents?

22            MS. CLANCY:  Objection.

23        A.    I don't know.  I think that I would

24  just do my best to look for it or try and find

25  it, whether it's in the complaint or whatever

```
 1              NDUGGA - CONFIDENTIAL
 2   else.  I do not have specifics at this time, in
 3   this very minute.  I cannot speak to specifics
 4   of that.
 5        Q.    And where did you get that
 6   information from in putting the complaint
 7   together and providing the facts that form the
 8   basis for your complaint?
 9              MS. CLANCY:  Objection to the extent
10         that it calls for any attorney/client
11         privileged communications.
12        A.    So I would defer to my attorney on
13   that.
14        Q.    So you're saying you didn't have any
15   independent facts other than what you talked
16   about with your attorney?
17        A.    I --
18              MS. CLANCY:  Objection, misleading.
19        A.    I didn't say that.  I said that I
20   would defer to my attorney for her help on
21   what -- how -- where that came from and the
22   conversations that we had.
23        Q.    Okay.  I'm not asking about the
24   conversations that you had with your attorney.
25              But what I am asking you is where
```

Page 207

                    NDUGGA - CONFIDENTIAL
 1
 2   the information came from that forms the basis
 3   for that allegation in your complaint.
 4        A.    I think that I --
 5             MS. CLANCY:  Objection to the extent
 6        that it calls for any attorney/client
 7        communications to respond to that
 8        question.
 9             So if you can answer it without
10        revealing any conversations, then go
11        ahead.
12        A.    I think that I've already shared and
13   answered the question that I do not recall any
14   specifics at this time.
15        Q.    Okay.  If you can look at page 18,
16   paragraph 67 -- I'm sorry.  Let's look at
17   paragraph 63 first, please.
18             What promotions do you claim were
19   you overlooked for?
20        A.    I believe I was overlooked for
21   senior producer promotions, specifically right
22   before I took my short-term leave and when I
23   returned.  I believe I'd had a conversation
24   with Mindy about outlining a role that would be
25   more focused on culture, identity and race and

```
                                           Page 223
 1                 NDUGGA - CONFIDENTIAL
 2        Q.    By anybody else?
 3        A.    I cannot specifically speak to any
 4    other conversations at this time.
 5        Q.    Did you ever talk to Mr. Wall about
 6    his background?
 7        A.    Not that I can recall at this time.
 8             MS. BLOOM:  Can we mark this,
 9        please?
10             (Ndugga Exhibit 13, E-Mail, Bates
11        Stamped BLP_Syeed_0008267, marked for
12        identification.)
13        Q.    I just handed you a copy of a
14    document that's been marked as Exhibit 13.  Let
15    me know when you've had an opportunity to
16    review that.
17        A.    (Document review.)  I've reviewed
18    it.
19        Q.    If you look at the bottom of the
20    page, it looks like you were sending a draft of
21    an e-mail to AP and asking him to take a look
22    at it; is that right?
23        A.    Yes.
24        Q.    And in the draft, you're talking
25    about the rationale behind the new beat
```

Page 297

1              NDUGGA - CONFIDENTIAL

2       you.

3              THE VIDEOGRAPHER:  Agreement?

4              MS. BLOOM:  It's fine.

5              THE VIDEOGRAPHER:  The time on the

6       video monitor is 5:05 p.m.  We are off the

7       record.  This end media 4.

8              (Recess taken.)

9              THE VIDEOGRAPHER:  We are back on

10      the record.  The time on the video monitor

11      is 5:27 p.m.  This start media 5.

12         Q.    You never participated in the

13      rotator program, correct?

14         A.    No, I did not.

15         Q.    Do you know what the rotator program

16      is?

17         A.    Yes, I do.

18         Q.    What is it?

19         A.    It is a program that has people

20      rotate on different teams.

21         Q.    Can you look at paragraph 44 of your

22      complaint which is Exhibit 5?

23         A.    (Document review.)

24         Q.    And if you could read the paragraph

25      and let me know after you've had an opportunity

1                    NDUGGA - CONFIDENTIAL

2          Q.    But you don't have any evidence of

3    that, correct?

4          A.    Not that I can speak to at this

5    time.

6          Q.    Do you have any documents which

7    would support that?

8          A.    Not that I can speak to at this

9    time.

10         Q.    Do you have any -- are you aware of

11   any individual whose ratings were manipulated

12   by the editorial management committee?

13         A.    I think that there was more so the

14   general understanding.  As I mentioned, this

15   came up generally in a conversation with

16   Angela, who used to work at Bloomberg as -- in

17   HR.

18         Q.    Well, which employees?

19         A.    I cannot speak to individuals at

20   this time.

21         Q.    Do you have any evidence of

22   somebody's rating actually being manipulated by

23   the editorial management committee?

24               MS. CLANCY:  Objection.

25         A.    As mentioned, I cannot speak to that

1                NDUGGA - CONFIDENTIAL

2    at this time.  I do not have the specifics at

3    this time.

4        Q.    When you say you don't have the

5    specifics at this time, do you have any

6    documents or facts which would support the

7    allegation in paragraph 44 of your complaint?

8        A.    Not that I'm aware --

9              MS. CLANCY:  Objection.  Asked and

10           answered.

11       A.    Not that I'm aware of at this time.

12       Q.    Well, how about that you were aware

13   of at any time?

14       A.    As I mentioned before, this

15   knowledge came to me via Angela while we were

16   having a conversation about our experiences at

17   Bloomberg as Black women.  And she shared that

18   she is aware, as an HR representative, of Black

19   women's numbers being manipulated or lower than

20   what the average person was at Bloomberg.

21       Q.    So you're basing your allegation in

22   paragraph 44 on what you say Angela Wiley said

23   to you?

24       A.    Yes.

25       Q.    Has anybody ever specifically told

1                   NDUGGA - CONFIDENTIAL

2    you that they believe that their rating was

3    reduced?

4         A.    Not that I can recall at this time.

5         Q.    Do you have any documents which

6    would refresh your memory on that?

7         A.    Not that I can think of at this

8    time.

9         Q.    The allegation in paragraph 44

10   refers to draft evaluations for reporters,

11   producers and editors; is that correct?

12        A.    Yes.

13        Q.    And the allegation is that team

14   leaders prepare draft evaluations for

15   reporters, producers and editors, and those

16   drafts are submitted to the bureau chief.  And

17   then the bureau chief forwards the ratings to

18   the EMC; is that right?

19        A.    Yes.

20        Q.    And then the EMC makes changes in

21   those ratings.

22              That's the allegation?

23        A.    Yes.

24        Q.    And that apply -- and -- okay.

25              But you have no specifics, correct?

Page 302

1              NDUGGA - CONFIDENTIAL

2       A.    Not at this time.

3       Q.    And you have no documents which

4   would provide specifics or refresh your

5   recollection, correct?

6       A.    Not that I can think of at this

7   time.

8       Q.    When you say, "Not that I can think

9   of at this time," when I ask you if you have

10  any documents, do you have documents somewhere

11  that you would use to refresh your recollection

12  about any of these allegations?

13            MS. CLANCY:  Objection.

14      A.    What I mean by that is, in this

15  minute, as you're asking me this question, I

16  cannot immediately think of a specific

17  document.  But if I am to think of anything,

18  I'll be more than happy to share that with you.

19      Q.    If you could look at paragraph 110.

20  Let me know when you've had a chance to review

21  it.

22      A.    (Document review.)  I've reviewed

23  it.

24      Q.    Who are the Black and Brown

25  teammates that you claim resigned?

```
 1              NDUGGA - CONFIDENTIAL
 2   made up that group that had this understanding?
 3        A.    Black people at Bloomberg.
 4        Q.    What are their names?
 5        A.    Again, as I've mentioned before, I
 6   cannot give you specific names.  I do not
 7   remember every single name.  The names that I
 8   have recalled, I have shared with you.  And if
 9   I remember any other names, I will be sure to
10   share them at that point.
11        Q.    Do you have any documents that would
12   refresh your recollection as to the names?
13        A.    If I were to see the documents that
14   show people quitting or people's end dates, I'm
15   sure that would jog my memory.
16        Q.    Do you have any such documents?
17        A.    Not that I can recall.
18        Q.    Now, in paragraph 111, you refer to
19   a White colleague on your team that received a
20   $40,000 raise.
21        A.    Yes.
22        Q.    Who's the White colleague?
23        A.    Madison Mills.
24        Q.    So a female?
25        A.    Yes, a White woman.
```

Page 340

1

2                    C E R T I F I C A T E

3

4    STATE OF NEW YORK )

                              :ss

5    COUNTY OF RICHMOND)

6

7              I, MELISSA GILMORE, a Notary Public

8    within and for the State of New York, do hereby

9    certify:

10             That NAULA NDUGGA, the witness whose

11   deposition is hereinbefore set forth, was duly

12   placed under oath by me and that such

13   deposition is a true record of the testimony

14   given by such witness.

15             I further certify that I am not

16   related to any of the parties to this action by

17   blood or marriage; and that I am in no way

18   interested in the outcome of this matter.

19             IN WITNESS WHEREOF, I have hereunto

20   set my hand this 1st day of December, 2023.

21

22   _____

            MELISSA GILMORE

23

24

25