UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
NAULA NDUGGA,                                          :

               Plaintiff,                    :

                                                OPINION AND ORDER
   -v.-                                               :

                                              20 Civ. 7464 (GHW) (GWG)
BLOOMBERG L.P.,                                       :

               Defendant.                 :
---------------------------------------------------------------X
**GABRIEL W. GORENSTEIN, United States Magistrate Judge:**

      Plaintiff Naula Ndugga has sued defendant Bloomberg L.P. ("Bloomberg" or "BLP") for

violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII") on

behalf of a proposed class of news personnel who worked at Bloomberg in 2021, and for

violations of the New York State Human Rights Law, N.Y. Exec. Law §§ 290-301 ("NYSHRL")

on behalf of a proposed subclass of news personnel who worked at Bloomberg in 2017 through

2020.  See Fifth Amended Complaint, filed July 10, 2024 (Docket # 296) ("Compl."), ¶¶ 165-96.

Bloomberg moves to exclude the opinions and testimony of Ndugga's expert witness David

Neumark.[1]  For the following reasons, Bloomberg's motion is denied.

---

[1]  See Notice of Motion, filed Feb. 20, 2025 (Docket # 344); Memorandum of Law in Support of Defendant's Motion to Exclude the Opinions and Testimony of David Neumark, filed Feb. 20, 2025 (Docket # 345) ("Mem."); Declaration of Elise M. Bloom, filed Feb. 20, 2025 (Docket # 346) ("Bloom Decl."); Opposition to Defendant's Motion to Exclude the Opinions and Testimony of David Neumark, filed Mar. 13, 2025 (Docket # 358) ("Opp."); Reply Memorandum of Law in Further Support of Defendant's Motion to Exclude the Opinions and Testimony of David Neumark, filed Apr. 2, 2025 (Docket # 365) ("Reply").

      The foregoing record citations are to the original unredacted, sealed filings.  Redacted versions of each document are filed on the ECF system at Docket ## 421-23

## I.   BACKGROUND

### A.  Procedural Background

At the time suit was brought, Ndugga was a "[n]ews producer" at Bloomberg.  Compl. ¶ 1.  On July 10, 2024, Ndugga filed the operative complaint in which she alleges "systemic sex discrimination in compensation . . . directed from the highest levels at Bloomberg."  Id.  The complaint asserts numerous class claims, in addition to claims on her own behalf.  See id. ¶¶ 165-222.

On December 20, 2024, Ndugga filed a motion for class certification.[2]  In the motion, Ndugga sought to certify, for purposes of New York state-law claims, a proposed class of "[a]ll female Reporters, Producers, and Editors who: (1) were not Team Leaders or in other supervisory positions; and (2) were subjected to Defendant's compensation systems for work performed in New York at any time from August 9, 2017 through December 31, 2020" to pursue New York state law claims.  Class Cert. Mem. at 25.  She also sought to certify, in order to pursue parallel Title VII claims, a proposed class of "[a]ll female Reporters, Producers, and Editors who: (1) were not Team Leaders or in other supervisory positions, and (2) were subjected

---

[2]  See Notice of Plaintiff's Motion for Class Certification, filed Dec. 20, 2024 (Docket # 329); Memorandum of Law in Support of Plaintiff's Motion for Class Certification, filed Dec. 20, 2024 (Docket # 330) ("Class Cert. Mem."); Declaration of Dana Busgang in Support of Plaintiff's Motion for Class Certification, filed Dec. 20, 2024 (Docket # 333) ("Busgang Decl."); Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification, filed June 23, 2025 (Docket # 379) ("Class Cert. Opp."); Reply Memorandum of Law in Support of Plaintiff's Motion for Class Certification, filed July 14, 2025 (Docket # 385) ("Class Cert. Reply"); Sur-Reply Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification, filed July 18, 2025 (Docket # 395) ("Class Cert. Sur-Reply"); Letter from Mark W. Batten, dated Aug. 27, 2025 (Docket # 406); Letter from Christine E. Webber, dated Sept. 10, 2025 (Docket # 411).

The foregoing record citations are to unredacted, sealed filings.  Redacted versions of each filing are filed on the ECF system.

to Defendant's compensation systems for work performed in the United States at any time from February 3, 2021 through December 31, 2021." Id. at 26.

In the memorandum of law accompanying the motion, Ndugga relied heavily on an expert report authored by Dr. David Neumark, see, e.g., id. at 19-22, particularly in order to "satisfy the commonality requirement" of Rule 23, see id. at 33-35.[3]

On February 11, 2025, defendant requested permission to file a motion to exclude the opinions and testimony of Neumark from consideration in connection with Ndugga's motion for class certification under the principles of Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993). See Letter, filed Feb. 11, 2025 (Docket # 340). Finding that Ndugga relied heavily on Neumark's opinions in support of the motion for class certification, the Court initially determined that it would be best to resolve the admissibility of those opinions before the parties submitted any more briefs in connection with the class certification motion. See Order, dated Feb. 12, 2025 (Docket # 343). After the Daubert motion was fully briefed, however, the Court changed course and determined that it would be best to decide the Daubert motion in conjunction with the class certification motion. See Order, dated June 9, 2025 (Docket # 374). Both motions are now fully briefed.

B. Dr. Neumark's Opinion

Neumark is a labor economist holding the position of "Distinguished Professor of Economics at the University of California-Irvine." Neumark Decl. ¶ 1. Neumark was retained by plaintiff "to evaluate evidence of pay discrimination against women . . . at Bloomberg." Id. ¶ 2.

---

[3] See Expert Report of David Neumark, dated July 1, 2024, annexed as Ex. 66 to Busgang Decl. at *4-*60 (Docket # 333-66) ("Neumark Report"); Declaration of David Neumark, dated July 1, 2024, annexed as Ex. 66 to Busgang Decl. at *2-*3 (Docket # 333-66).

1.   Neumark's Original Report

Neumark used "data produced by Bloomberg that contain employment history and compensation records for the employees in the proposed Classes" to "construct a dataset of annual employee records."  Neumark Report ¶¶ 9, 10.  Neumark analyzed that data to "compare[] compensation at Bloomberg for similarly-situated female and male employees."  Id. ¶ 12.  "In addition to pay, the data" used by Neumark "include[d] an indicator for the gender of an employee, and characteristics of the individuals and their jobs."  Id.

Neumark analyzed the data using a regression model to "estimate[] the female pay penalty (if there is one) once we adjust for possible differences between female and male employees that could account for a pay gap between women and men."  Id. ¶ 13.  As Neumark explains,

> For example, suppose that we simply compare average pay of all female and male employees at Bloomberg, and find that average pay of female employees is 10% lower.  It is possible that women do different jobs, and those jobs could pay less. It is also possible that women and men are in broadly similar jobs, but the women have lower performance.  In either case, our intuition would be that the 10% estimate overstates the pay gap for comparable women and men in comparable jobs, and we should hence adjust for these differences between women and men before estimating the female pay penalty.  Of course, the opposite is also possible, so adding controls for the individual or job could lead to a larger or smaller estimated female pay penalty.
>
> This is precisely what a regression model does.  A regression model "holds constant" or "controls for" these other factors.  These phrases mean that, in estimating a regression model, we adjust the pay gap for differences in the jobs employees hold, and their characteristics and performance, so that we are comparing pay between women and men with similar performance, education, and experience.

Id. ¶¶ 13-14.  Neumark further explains that "[w]hen a pay regression model includes controls for the different jobs people do, the only pay differences between women and men that

contribute to [the] estimated gender pay gaps are differences between women and men who are in the same job." Id. ¶ 18.

Accordingly, "[t]o control for differences in characteristics and jobs between men and women, [Neumark] include[s] several variables: race, experience since hire at Bloomberg, potential experience prior to hire at Bloomberg, education degree, employment city, Job Profile, year-end performance rating score, Cost Center, . . . Business Unit," and whether someone had part-time status. Id. ¶ 37.

Most relevant to the motion before the Court are the variables "Cost Center" and "Business Unit." According to Neumark, "Business Units are organizational sub-entities, some of which are under the Editorial and Research Departments. Business Units can cover different subject matters, and hence provide some information about a person's job." Id. ¶ 29 (footnotes omitted). Neumark explains that "there is no need to disaggregate my analyses by Business Unit," because "policies and practices related to compensation do not differ by Business Unit within the Editorial and Research Department." Id. Neumark nevertheless "allow[s] for the possibility that pay differs by Business Unit because these may contain different types of jobs." Id.

The inclusion of Cost Center is challenged by defendant. See Mem. at 12-18. Cost Center is "a different organizational category to which costs can be charged." Neumark Report ¶ 30. Neumark acknowledges that "Cost Center does not play a role in compensation guidelines, so again, there is no rationale to disaggregate by Cost Center in doing my analysis. However, raises and hence pay may differ by Cost Center since different Cost Centers may have different amounts available for raises." Id. (footnote omitted).

5

Neumark performed two main regression analyses: one that did not include Performance Rating scores (Model 1) and one that did include Performance Rating Scores (Model 2).  Id. ¶ 44.  The Performance Rating is the "[y]ear-end manager rating," which, according to testimony from Bloomberg, primarily determines year-end salary and bonuses.  Id. ¶¶ 37(m), 38(e).

According to Neumark,

> The results for the Model 1 regression for New York 2017-2020 show that Base Pay and Total Compensation of female employees were 3.9% below and 4.4% below similarly-situated male employees, respectively.  These disparity estimates have standard deviations of 2.15 and 2.16, respectively, which imply statistical significance at the 5% level.

Id. ¶ 45.

> The results for the Model 1 regression for U.S. 2021 show that Base Pay and Total Compensation of female employees were 2.9% below and 3.2% below similarly-situated male employees, respectively.  These disparity estimates have standard deviations of 1.76 and 1.68, respectively, which imply statistical significance at the 10% level.

Id. ¶ 46.

> The results for the Model 2 regression for New York 2017-2020 show that Base Pay and Total Compensation of female employees were 3.6% below and 4.0% below similarly-situated male employees, respectively.  These disparity estimates both have standard deviations of 2.12, respectively, which imply statistical significance at the 5% level.

Id. ¶ 49.

> The results for the Model 2 regression for U.S. 2021 show that Base Pay and Total Compensation of female employees were 2.8% below and 3.0% below similarly-situated male employees, respectively.  These disparity estimates have standard deviations of 1.69 and 1.64, respectively, which imply statistical significance at the 10% level.

Id. ¶ 50.

Neumark concluded "to a reasonable degree of expert certainty that women reporters, editors, and producers at Bloomberg News were paid less than similarly-situated men during the analyzed periods." Id. ¶ 56.

### 2. Martin's Criticism and Neumark's Supplemental Tables

Subsequently, in a report dated August 30, 2024, Dr. Denise Martin, defendant's expert witness, provided a response to Neumark's report. See Expert Report of Denise Neumann Martin, dated Aug. 30, 2024, annexed as Ex. 65 to Busgang Decl. (Docket # 333-65) ("Martin Report"). As relevant to the present motion, Martin pointed out that Neumark "drops from his analysis . . . any employee compensated in a foreign currency." Id. ¶ 10 n.28. This "introduces errors into his analysis." Id.

> For example, if an employee moves from New York in 2019 to London in 2020, their 2019 bonus — paid in February 2020 — will be paid in GBP. Because he drops all foreign currency records from his analysis, he drops this bonus from the 2019 total compensation of this employee and treats them as receiving no bonus, thereby underestimating their compensation. If the employee returned to the United States in 2021, he improperly attaches their 2021 bonus to their 2019 base pay to calculate their 2019 total compensation.

Id.

In his deposition, Neumark acknowledged this "error." See Deposition of David Neumark, dated Oct. 22, 2024, annexed as Ex. E. to Bloom Decl. (Docket # 346-5) and filed in unredacted form (Docket # 352-4) ("Neumark Dep."), at 191:7. However, Neumark also highlighted that it was unclear how best to deal with a circumstance in which an employee was paid in the U.S. but who subsequently moved abroad and received their bonus in a foreign currency, presumably "based on [their] work there." Id. at 191:21-192:13.

Accordingly, Neumark prepared three alternate analyses. Id. at 192:14-193:11. In the first — labeled as V2 — Neumark "just exclude[d] those years rather than . . . assigning" no

bonus. Id. at 192:13-21. In the second alternative — V3 — Neumark "exclude[d] the bonus, but" also included a "dummy variable for those years which will sort of pick up the fact that you don't have a bonus . . . which could help explain why your total comp is lower." Id. at 192:25-193:5. Lastly, in the third alternative — V4 — Neumark included both the bonus and the dummy variable. Id. at 193:6-11. Neumark offers V2 as the principal alternative. See Supplemental Tables, dated Sept. 26, 2024, annexed as Ex. 67 to Busgang Decl. (Docket # 333-67) ("Neumark Supp."), at *2 tbl. 1 (highlights the rows providing the results from V2); Neumark Dep. at 193:15-20 ("I prefer V2.").

As part of her motion for class certification, Ndugga submitted the supplemental analysis conducted by Neumark in response to Martin's criticism. See Class Cert. Mem. at 20 n.83 (writing that, in response to Martin's criticism, "Neumark refined his analysis and produced supplemental tables").

Neumark's supplemental analysis provided only alternative versions of Model 2. See Neumark Supp. at *1 tbl. 1, *4 tbl. 2, *6 tbl. 3. V2 of Neumark's Model 2 regression for the New York 2017-2020 class now shows that Base Pay of female employees was 4.2% below similarly-situated male employees with a standard deviation of 2.39. Id. at *4 tbl. 2. The analysis further shows that Total Compensation of female employees in this class was 4.4% below similarly-situated male employees with a standard deviation of 2.29. Id.

V2 of Neumark's Model 2 regression for the U.S. 2021 class now shows that Base Pay of female employees was 3.1% below similarly-situated male employees with a standard deviation of 1.86. Id. The analysis further shows that Total Compensation of female employees in this class was 3.1% below similarly-situated male employees with a standard deviation of 1.64. Id.

## II.    LEGAL STANDARDS

### A.  Legal Standard under Rule 702

"The district court's determination whether to admit expert testimony is guided by Fed. R. Evid. 702." United States v. Gatto, 986 F.3d 104, 117 (2d Cir. 2021).

Rule 702, as amended in 2023, provides as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)    the testimony is based on sufficient facts or data;

(c)    the testimony is the product of reliable principles and methods; and

(d)    the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The 2023 amendment resulted from proposed changes to "clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702 advisory committee's note to 2023 amendment.  Furthermore, "[o]nce the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence." Id.

Under Fed. R. Evid. 702, the district court "acts as a gatekeeper and 'is charged with the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" Bustamante v. KIND, LLC, 100 F.4th 419, 427 (2d Cir. 2024) (internal quotation marks omitted) (quoting Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002)).  The question of relevance is tied to Rule 702's requirement that the expert testimony "will help the trier of fact to understand the evidence or to determine a fact in issue."

See Daubert, 509 U.S. at 591 (explaining that the first condition of Rule 702 "goes primarily to relevance").

As part of this analysis, "a judge assessing a proffer of expert scientific testimony under Rule 702 should also be mindful of other applicable rules." Id. at 595; accord Bustamante, 100 F.4th at 427. "Specifically, 'the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant.'" Bustamante, 100 F.4th at 427 (quoting Amorgianos, 303 F.3d at 265). Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. The Supreme Court has described this inquiry as "one of 'fit.'" Daubert, 509 U.S. at 591 (quoting United States v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985)). This analysis "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." Id. at 592. For example,

> the study of the phases of the moon . . . may provide valid scientific "knowledge" about whether a certain night was dark, and if darkness is a fact in issue, the knowledge will assist the trier of fact. However (absent creditable grounds supporting such a link), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night.

Id. at 591.

"If the evidence is relevant, a district court 'must next determine whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered.'" Bustamante, 100 F.4th at 427 (quoting Amorgianos, 303 F.3d at 265). "In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case." Amorgianos, 303 F.3d at 265 (citation and internal quotation marks omitted). This

inquiry is a "flexible one," Daubert, 509 U.S. at 594, and "must be tied to the facts of a particular case," Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999) (cleaned up). Accordingly, as one court has described, "[f]lexible methodologies . . . can be implemented in multiple ways; despite the fact that the methodology is generally reliable, each application is distinct and should be analyzed for reliability." In re Acetaminophen - ASD-ADHD Prods. Liab. Litig., 707 F. Supp. 3d 309, 337 (S.D.N.Y. 2023) (quoting In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig., 858 F.3d 787, 795 (3d Cir. 2017)); accord In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig., 2025 WL 354671, at *4 (S.D.N.Y. Jan. 30, 2025).

Generally, the focus of the court's analysis "must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595.

Here, as described above, Neumark provides a regression analysis. Case law holds that "[i]n the context of regression analysis testimony, some (slightly) more specific standards have emerged in the case law." Reed Constr. Data Inc. v. McGraw-Hill Cos., 49 F. Supp. 3d 385, 399 (S.D.N.Y. 2014), aff'd, 638 F. App'x 43 (2d Cir. 2016). Thus, to be admissible, a regression analysis must (1) "examine an appropriate selection of data"; (2) "be the product of a consistently followed methodology"; and (3) "control for the 'major factors' that might influence the dependent variable." Id. at 400.

As to the third requirement, "[n]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility." Bazemore v. Friday, 478 U.S. 385, 400 (1986) (concurrence in part joined by all Justices); accord Sobel v. Yeshiva Univ., 839 F.2d 18, 36 (2d Cir. 1988) ("The failure, by either side, to include a relevant variable (or the inclusion of an irrelevant or multicollinear variable) will go to the probative value of the analysis, not its admissibility."). The exception to this rule is the failure to account for "major factors."

11

Bazemore, 478 U.S. at 400 (concurrence in part joined by all Justices); id. at 400 n.10 ("[T]here may . . . be some regressions so incomplete as to be inadmissible as irrelevant.").

The contrasting cases of Bazemore and Bickerstaff v. Vassar Coll., 196 F.3d 435 (2d Cir. 1999), are "instructive on this point." Reed Constr. Data Inc., 49 F. Supp. 3d at 401. In Bickerstaff, a lecturer sued Vassar College for purportedly discriminating against her on the basis of race and gender in failing to promote her to the position of full professor. See Bickerstaff, 196 F.3d at 440-41. In support, Bickerstaff offered a statistical report including a multiple regression analysis which "controlled for the independent variables of experience, rank, productivity, and discipline." Id. at 448. This "regression analysis, however, [did] not even purport to account for two . . . major variables — teaching and service," which were two of the three criteria Vassar used to decide whether to grant a salary increase. Id. at 449. Because "[t]hese variables [were] too significant not to be accounted for in the regression analysis in this case," this omission was fatal to the analysis. Id. On the other hand, in Bazemore, the plaintiffs, alleging racial discrimination in employment, sought to introduce a multiple regression analysis as evidence of discrimination. Bazemore, 478 U.S. at 386-87 (per curiam). Although the regression analysis failed to control for county-to-county differences in salary increases, Bazemore found the regression analysis admissible, concluding that "it is clear that a regression analysis that includes less than 'all measurable variables' may serve to prove a plaintiff's case." Id. at 400 (concurrence in part joined by all Justices).

"Because the burden of proving helpfulness and relevance rests on the proponent of a regression analysis, it is the proponent who must establish that the major factors have been accounted for in a regression analysis." Freeland v. AT & T Corp., 238 F.R.D. 130, 145 (S.D.N.Y. 2006); accord United States v. Teva Pharms. USA, Inc., 2019 WL 13244252, at *2

12

(S.D.N.Y. July 1, 2019); In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig., 2025 WL 354671, at *17. "At the same time, a defendant challenging a regression analysis must at least identify the significant, missing variables." Teva Pharms. USA, Inc., 2019 WL 13244252, at *2 (citing Sobel, 839 F.2d at 34); accord In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig., 2025 WL 354671, at *17. "While the burden to show relevance and admissibility always rests with the proponent, 'a mere conjecture or assertion on the defendant's part' is insufficient." Teva Pharms. USA, Inc., 2019 WL 13244252, at *2 (quoting Sobel, 839 F.2d at 34); accord In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig., 2025 WL 354671, at *17. "Rather, 'such an attack should be specific and make a showing of relevance for each particular variable it contends plaintiffs ought to include.'" In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig., 2025 WL 354671, at *17 (quoting Sobel, 839 F.2d at 34). As one district court has explained, this burden is "minimal." Teva Pharms. USA, Inc., 2019 WL 13244252, at *2.

B. *Daubert* Inquiry at the Class Certification Stage

Although "[t]he Supreme Court has not definitively ruled on the extent to which a district court must undertake a Daubert analysis at the class certification stage . . . the Court [has] offered limited dicta suggesting that a Daubert analysis may be required at least in some circumstances." In re U.S. Foodservice Inc. Pricing Litig., 729 F.3d 108, 129 (2d Cir. 2013) (citation omitted). Accordingly, "courts in the Second Circuit regularly 'subject expert testimony to Daubert's rigorous standards insofar as that testimony is relevant to the Rule 23 class certification analysis.'" Bowling v. Johnson & Johnson, 2019 WL 1760162, at *7 (S.D.N.Y. Apr. 22, 2019) (quoting Scott v. Chipotle Mexican Grill, Inc., 315 F.R.D. 33, 55 (S.D.N.Y. 2016)); accord Valelly v. Lynch, 2023 WL 2918982, at *4 (S.D.N.Y. Apr. 12, 2023).

13

"However, the scope of the <u>Daubert</u> analysis is cabined by its purpose at this stage: 'the inquiry is limited to whether or not the expert reports are admissible to establish the requirements of Rule 23.'" <u>Chen-Oster v. Goldman, Sachs & Co.</u>, <u>114 F. Supp. 3d 110, 115</u> (S.D.N.Y. 2015) ("<u>Chen-Oster I</u>") (quoting <u>Ge Dandong v. Pinnacle Performance Ltd.</u>, <u>2013 WL 5658790</u>, at *13 (S.D.N.Y. Oct. 17, 2013)); <u>accord</u> <u>Bowling</u>, <u>2019 WL 1760162</u>, at *7.

Importantly, "because the challenged expert evidence is offered in support of class certification, as to which the District Judge is both gatekeeper and factfinder, 'there is no risk of jury confusion,' and 'all doubts should be resolved in favor of admissibility.'" <u>Molly C. v. Oxford Health Ins., Inc.</u>, <u>2024 WL 4850813</u>, at *2 (S.D.N.Y. Nov. 21, 2024) (citations omitted).

III.    DISCUSSION

Defendant argues that

> Neumark's opinion is inadmissible and should be excluded for two interrelated reasons: (i) it is irrelevant because it relies on unfounded assumptions and therefore does not "fit" the facts of this case, and (ii) it is unreliable because it fails to account for factors that are integral to BLP's compensation process.

Mem. at 11.  We address these arguments next.

A.  <u>Relevance</u>

Defendant argues that Neumark's opinion is not relevant because "it relies on unfounded assumptions — specifically, that Cost Center affects compensation and that BLP's compensation and performance evaluation decisions may be analyzed on an aggregate basis — which find no support in the record or Dr. Neumark's analysis." <u>Id.</u> at 12.

1.  <u>Neumark's Inclusion of the "Cost Center" Variable</u>

Defendant takes issue with Neumark's "inclusion of Cost Center, an accounting category, as a control to capture differences across jobs and ensure that he is comparing similarly situated employees." <u>Id.</u>  Defendant argues that "Dr. Neumark's decision to include Cost Center as a

14

control in his model lacks any foundation in the record" and that "Neumark had no basis to assume that Cost Center affected employee compensation." Id. at 13, 18.  Accordingly, defendant contends that Neumark's opinion "is a mismatch for the facts of this case" and "fails Daubert's 'fit' requirement." Id. at 18.  "Given that Dr. Neumark's entire conclusion that there was a statistically significant gender-based pay disparity evaporates if Cost Center is omitted as a control, Dr. Neumark's opinion is irrelevant and must be excluded." Id.

Defendant points out that Neumark "himself acknowledges that 'Cost Center does not play a role in compensation guidelines'" but includes it "based on the speculation that 'raises and hence pay may differ by Cost Center since different Cost Centers may have different amounts available for raises.'" Id. at 13 (citing Neumark Report ¶ 30).  Defendant asserts that "[t]o support this assumption, Dr. Neumark relied entirely on references to Cost Center in two compensation guidelines memos for 2017 and 2021, respectively, which address funding for year-end bonuses and salary increases." Id. (citing Neumark Report ¶ 30 n.77).  Regarding the 2021 memo, defendant argues that it "is entirely irrelevant because it provides compensation guidelines to be applied for 2022, which is outside the relevant time period for either putative class." Id.  Regarding the 2017 memo, defendant acknowledges that the memo "announces that six 'Business Units' (of 29 total in Dr. Neumark's model) would have a guideline pay increase of ██████ instead of the ████ available for other Business Units" and "notes that these Business Units 'show up under News . . . ████████████████████████ '" Id. at 14 (footnote omitted).  However, defendant argues that "this oblique reference does not suggest that funding for compensation increases varied by Cost Center so as to justify including Cost Center as a control." Id.  In any case, "even if the 2017 memo provided a basis for controlling for a single

15

██████████, nothing in it justified controlling for the dozens of <u>other</u> Cost Centers listed by Dr. Neumark." <u>Id.</u>

Seeming to address the 2017 memo's reference to the ████████████ defendant challenges any broader connection between Business Units and Cost Centers: "there is no one-to-one mapping of Business Units to Cost Centers: there are multiple Cost Centers associated with the six business units allocated greater funding in the 2017 memo [which] are also associated with other Business Units that did not receive greater funding." <u>Id.</u>

Lastly, defendant argues that "Neumark also could not account for the 2018, 2019, and 2020 versions of the same memos, which apply the same guideline increases for raises across the board to all News employees without regard to Business Unit or Cost Center." <u>Id.</u> at 15. In fact, defendant argues, "the 2018, 2019, and 2020 memos (and related deposition testimony) established that the same guideline increase would apply across the board in News regardless of Business Unit or Cost Center." <u>Id.</u> at 16. Yet, Neumark "included Cost Center as a control variable in those years." <u>Id.</u> at 15.

Defendant contends that the true reason Neumark included Cost Center as a variable was "because it turned out that Cost Center generated statistically significant results." <u>Id.</u> at 14-15 (emphasis omitted). In support, defendant highlights portions of Neumark's testimony to argue that "Neumark contends that any variable that generates statistically significant results should be included in the analysis, even if there is no theoretical basis to include it." <u>Id.</u> at 15. Defendant argues that such a "extraordinary endorsement of reasoning backwards from desired result to theoretical justification renders Dr. Neumark's analysis unsound and therefore inadmissible." <u>Id.</u>

According to defendant, these issues compel the conclusion that

Neumark's opinion fails <u>Daubert</u>'s 'fit' requirement. It is a mismatch for the facts of this case because Dr. Neumark's decision to include Cost Center as a control in

his model lacks any foundation in the record; even he acknowledged that he did not understand the meaning of the document on which he relied to include it.

Id. at 18.[4]

In response, Ndugga argues that Bloomberg's own witnesses' testimony make clear that funding for annual compensation can vary by Cost Center. See Opp. at 18. In other words, contrary to defendant's contentions, Neumark's justification to include Cost Center as a variable "stems from BLP witnesses' testimony" and was "identified before running regression analyses." Id. Specifically, Ndugga contends that "BLP's witnesses testified" that "Cost Center data provided information about where each employees' pay is funded from." Id. Ndugga explains, "[t]his matters because different Cost Centers can have different budgets available." Id. In support, Ndugga cites to the same witness testimony relied upon by Neumark in his decision to include Cost Center as a control variable. See id. at 18-19; Neumark Report ¶ 30 n.77.

Specifically, Ndugga cites to the deposition of Krista Sullivan, a "Compensation Team Leader" for Bloomberg, who makes it clear that "within News, to identify the budget that a particular individual is covered by, one must look to Cost Center":

> Q. [W]as that typical that there can be different budgets set for different parts of editorial and research? A. Yes, there could be. There could be different budgets for the different areas of News and Research. Q. And in identifying, sort of, which individuals are going to be covered by which budget, specifically distinguishing ███████████████████████████; would you be identifying those — or would one identify those by looking to the cost center and seeing which of the people who report up to ████████████████████ ████████? A. Yes. The way we break out news and editorial is by cost centers,

---

[4] Defendant also highlights that while Neumark conducted sensitivity tests — which, according to defendant, are "a method for evaluating whether a model's results are sensitive to small changes" — for several variables, "he failed to conduct a sensitivity test for Cost Center in his original report." Id. at 16. However, defendant acknowledges that in Neumark's supplemental tables, Neumark "added a test of 'joint significance' for Cost Center" and "concluded that the Cost Center variable passed the test." Id. at 17. Thus, it appears to us that to the extent there was an initial failure to conduct a sensitivity test, that omission has now been cured.

17

they both roll up to John Micklethwait, but the cost center that is attached to the employee is what breaks them out between ███████████████████████.

Opp. at 18-19 (citation omitted) (alteration in original).

Ndugga also cites to the testimony of Lisa Jennings, a "Global Business Partner and 30(b)(6) designee" for Bloomberg:

> Q.  It looks like even though these individuals had a reporting relationship up to Mr. Micklethwait, that because they were in a different cost center, that made more money available to give raises to them; is that right?  A.  That is how it appears in the memo, that they were getting the full ███ funding.  Q.  Okay.  So, even if cost center didn't dictate sort of who your ultimate manager was or necessarily distinguish your job in other ways, it could impact the amount of funding available for salary increases and bonuses at yearend?  A.  So, it seems that's the case for 2017, the way the funding was distributed. I can't speak to any other year because I haven't seen a similar memo."

Id. at 19 n.67 (citation omitted).

Ndugga also challenges defendant's other factual assertions — that Neumark relied solely on two memoranda in support of his justification, that the "memoranda cannot establish a pattern of Cost Center being a potential source of different compensation budgets throughout the class period," and that "Neumark admitted the memoranda do not support his conclusion that Cost Center could impact compensation" — and provides citations to the record in an attempt to controvert them.  Id. at 19-21.

Thus, Ndugga argues that because "labor economic theory instructs that the amount of money available for compensation is relevant to explaining compensation," where "budgets vary, that should be controlled for."  Id. at 21.  Accordingly, "Neumark had a more than sufficient basis to believe Cost Center was an important variable to control for" and this is "enough for admissibility."  Id. (citing cases).

In reply, defendant argues that

18

> Plaintiff fails to satisfy her burden of demonstrating that Dr. Neumark's opinions — which hinge entirely on his unfounded speculation that Cost Center "may" have affected putative class pay in each year between 2017 and 2021 — are based in sufficient fact. Cost Center was not a factor that was considered in determining employee compensation, and Plaintiff does not show otherwise. Since there is no theoretical justification for Dr. Neumark's inclusion of 89 separate Cost Centers as control variables in his regression model, his opinions are irrelevant and must be excluded.

Reply at 3-4. In support, defendant disputes many of Ndugga's factual claims, arguing that Neumark has failed to establish "that compensation decisions at BLP were made based on Cost Center during the relevant time period." Id. at 6. Regarding the testimony of Sullivan, cited above, defendant writes that the full context of the transcript makes clear that Sullivan's answer "relates to a portion of the 2021 compensation guidelines memo regarding raises, i.e., 'total compensation increases,' that Dr. Neumark has acknowledged are irrelevant because they were implemented in 2022 after the putative class period." Id. at 4-5 (footnotes omitted). Regarding the testimony of Jennings, cited above, defendant argues that Jennings's responses were tentative — testifying as to how it "appears" and "seems" — and only spoke to the 2017 compensation guidelines. Id. at 5.

Resolution of these factual disputes is unnecessary because it would not affect the admissibility of Neumark's regression analysis. The Second Circuit has held that "[t]he failure, by either side, to include a relevant variable (or the inclusion of an irrelevant or multicollinear variable) will go to the probative value of the analysis, not its admissibility," Sobel, 839 F.2d at 36 (emphasis added), so long as the analysis does not neglect "major factors," Bazemore, 478 U.S. at 400. Accord Chen-Oster v. Goldman, Sachs & Co., 2022 WL 814074, at *11 (S.D.N.Y. Mar. 17, 2022) ("Chen-Oster II").

While Ndugga relies on these very citations, see Opp. at 22, defendant does not respond to them in the portion of its brief addressing the purportedly erroneous inclusion of Cost Center,

19

see Reply 3-8.[5]  In fact, defendant's briefs provide no citations to case law addressing the inclusion of a purportedly irrelevant variable in a regression analysis.  See Mem.; Reply.  Thus, while "[t]here may . . . be some regressions so incomplete as to be inadmissible as irrelevant," Bazemore, 478 U.S. at 400 n.10 (concurrence in part joined by all Justices), defendant does not explain how the inclusion of Cost Center makes Neumark's regression inadmissible.  Accordingly, Neumark's inclusion of the Cost Center variable, even if defendant prevailed on its claim that its inclusion is speculative, does not render Neumark's regression inadmissible.  Rather, the inclusion of Cost Center goes to the probative value of Neumark's analysis, not its relevance.

The case law relied upon by defendant does not change this outcome.  Defendant cites to Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 261-63 (4th Cir. 2005), as "affirming the exclusion of statistical expert's opinions" and holding that "inclusion of 'EEO job groupings' as control variables rendered expert's analyses deficient because job groupings were not used in employer's performance evaluation processes."  Reply at 6.  However, in Anderson, the Fourth Circuit excluded the analysis because it "was based on comparisons that were not relevant to [the plaintiff's] claims," Anderson, 406 F.3d at 263, not because an irrelevant variable was included.  Insofar as the Fourth Circuit took issue with the use of "EEO job groupings," it was because they lacked adequate control factors.  See id. ("[T]here is simply too much disparity in the groups that have been used to control, and an absence of the use of a control factor that would control for the actual job title or the job duties.") (emphasis added).

---

[5]  Defendant does address Sobel in another portion of its reply.  However, there, defendant only challenges Ndugga's reliance on Sobel in purportedly attempting to shift the burden of proof.  See Reply at 16 n.36.

Defendant also relies on case law establishing that expert testimony must "rest on knowledge, a term that connotes more than subjective belief or unsupported speculation." See Mem. at 16 (citing Northway Med. Ctr. Condo v. Hartford Fin. Servs. Grp., Inc., 2024 WL 3876380, at *6 (S.D.N.Y. Aug. 20, 2024)); Reply at 6 (citing Atl. Specialty Ins. v. AE Outfitters Retail Co., 970 F. Supp. 2d 278, 289 (S.D.N.Y. 2013)).  While this is a correct statement of law, it does not change the fact that the Second Circuit has held that the inclusion of a purportedly irrelevant variable "will go to the probative value of the analysis, not its admissibility."  Sobel, 839 F.2d at 36.  The knowledge requirement does not mandate that no step of an expert's analysis may be based on subjective decision-making — after all, such subjectivity is commonplace in regression analysis.  See B & R Supermarket, Inc. v. Visa Inc., 2024 WL 4252031, at *20 (E.D.N.Y. Sept. 20, 2024) ("Subjective decision-making about which variables to include or how to control for other variables is a daily part of the scientific and statistical process."); Reed Constr. Data Inc., 49 F. Supp. 3d at 400-01 (recognizing "subjectivity" in an expert's selection of variables but noting that "[n]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility") (quoting Bazemore, 478 U.S. at 400 (concurrence in part joined by all Justices)).

Accordingly, Neumark's inclusion of Cost Center as a control variable does not affect the relevance of Neumark's report and testimony.

2. Neumark's Purported Failure to Evaluate the Degree to Which Compensation Decisions Across Classes May Be Properly Aggregated

Bloomberg argues that Neumark's analysis is flawed because it aggregates data from all job categories instead of analyzing each category separately.  Mem. at 18-19.  "To justify his aggregated analysis," defendant contends "Neumark assumed that decisions about compensation and performance ratings for the hundreds of employees within the putative classes are 'highly

21

centralized.'" Id. at 19.  Defendant argues that this assumption was baseless.  See id. at 19-20.  Specifically, Neumark "made no effort to control for the identity of the manager making decisions about ratings or compensation," and thus "cannot say whether few, some, or all managers' compensation decisions were infected by gender bias, or if so which ones, or to what extent it affected any individual class member."  Id. at 19-20.

Defendant argues that Neumark's purported decision to "ignore variations in performance ratings and compensation decisions made by over 100 individual managers and aggregate them all into one unitary result" was based on the assumption that "Deputy Editor-in-Chief Reto Gregori" had "final authority on core pay decisions."  Id. at 20 (footnote omitted).  Neumark, however, "did no analysis to support that premise."  Id.  Thus, Neumark "did not examine commonality: he assumed it."  Id. at 19.

Defendant argues that Neumark's aggregated analysis of individuals' pay without "any statistical assessment of whether aggregation is appropriate" may not be used to prove commonality.  Id. at 22.  Quoting Bolden v. Walsh Construction Co., 688 F.3d 893, 896 (7th Cir. 2012), defendant argues that the "sort of statistical evidence that plaintiffs present has the same problem as the statistical evidence in [Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338 (2011)]: it begs the question.  Plaintiffs' expert . . . assumed that the appropriate unit of analysis is all of [Defendant's] Chicago-area sites.  He did not try to demonstrate that proposition."  Id. (quoting Bolden, 688 F.3d at 896) (ellipses and alteration in original).  Thus, defendant argues, because "Neumark's opinion is only relevant at this stage if it tends to show that a question common to the class can be answered for all class members on a class-wide basis," Neumark's opinions are irrelevant and should be excluded.  Id. at 18; see id. at 22.

The Court is not persuaded by these arguments.

22

In the portion of her motion for class certification addressing the "commonality" requirement of Fed. R. Civ. P. 23(a)(2), Ndugga provides (1) evidence of a common mode of exercising discretion — Gregori's involvement throughout the compensation decision-making process — and (2) evidence of class-wide discrimination. See Class Cert. Mem. at 28-35. Ndugga does not rely on or cite to Neumark's report or testimony in the section purporting to establish the former claim — that Gregori's involvement pervaded Bloomberg News's compensation decision-making process. See id. at 9-19. Instead, Ndugga relies on Neumark's report only as evidence of class-wide discrimination. See id. at 33-35. Specifically, Ndugga argues,

> Plaintiff has identified a common mode of exercising discretion: deposition testimony and document discovery establish that Gregori had a hand on every stage of BLP's compensation process. Her expert's statistical analyses, which show statistically significant pay gaps between men and women, offer the "significant proof" to establish commonality for Plaintiff's disparate treatment and impact claims.

Id. (citation omitted).

Accordingly, because Ndugga does not rely on Neumark's opinion to establish the existence of a centralized decision-maker, Neumark's opinion need not be relevant to the question of whether a centralized decision-maker exists in order to be admissible. Instead, Neumark's opinion must be relevant to the inquiry into whether, assuming there is a centralized decision-maker, there is evidence of discrimination that produces a class-based disparity.

Framed in this context, Neumark's report is relevant even if it is based on the assumption that there is a "common practice" of employment decisions — his testimony, after all, would be used only "to answer the common question of whether there is a disparity." Opp. at 26. While Neumark's assumption of a common practice of employment decisions may well be incorrect, this does not render his report inadmissible. See United States v. M/Y Amadea, 2025 WL

23

460030, at *1 (S.D.N.Y. Jan. 15, 2025) ("[A]ssertions that an expert witness's testimony is based upon unfounded assumptions go to the weight, not the admissibility, of the testimony.").

Defendant faults Neumark for being unable to "say, for example, that female Producers (Plaintiff's job) were paid statistically significantly less than male Producers." Mem. at 19 (citation omitted). However, if there is a common practice of employment decisions across job profiles — a matter that must be independently proved for purposes of class certification — Neumark's report did not need to specifically compare pay differences amongst producers.

The cases relied upon by defendant do not change this outcome. Defendant argues that Neumark's analysis must "conform[] to the level of decision for the challenged practices," id. at 22 (alteration in original), by citing Kassman, 416 F. Supp. 3d at 282, and (for a similar proposition, see Mem. at 21) Dukes v. Wal-Mart Stores, Inc., 964 F. Supp. 2d 1115, 1120 (N.D. Cal. 2013). However, these cases are inapposite. Here, Neumark's report does conform to the level of decision for the challenged practice: Gregori's alleged class-wide involvement. As Kassman explains, "if plaintiffs demonstrate that practices are uniform across the company, then courts have found 'good reason to rely on [company-wide] statistics.'" Kassman, 416 F. Supp. 3d at 282 (citing Ellis v. Costco Wholesale Corp., 285 F.R.D. 492, 523 (N.D. Cal. 2012)). Here, Ndugga is arguing that Gregori's involvement was common across the class. Class Cert. Mem. at 9-19. While Ndugga will ultimately be responsible for "demonstrate[ing]" this proposition, Kassman, 416 F. Supp. 3d at 282, Neumark's report could properly assume it to be true.

Defendant's other citations are not on point. For instance, Bolden (cited in Mem. at 22), did not address whether the expert report at issue was admissible. See Bolden, 688 F.3d at 897 ("We need not determine whether Smith's study should have been excluded under Fed. R. Evid. 702."). Instead, Bolden addressed only the weight of the report. See id.

In sum, to be relevant to Ndugga's motion for class certification, Neumark could properly assume the centrality of Gregori's decision-making for purposes of conducting his analysis.

B. Reliability

Defendant argues that Neumark's opinion is not reliable "because he fails to account for starting pay" and "unjustifiably excludes certain observations from his model" and "because his class damages calculations rely on his irredeemably flawed analyses." Mem. at 23. We address these arguments in turn.

1. Neumark's Purported Failure to Account for Starting Pay

Defendant faults Neumark for failing to control for starting pay. Id. at 23-25. But this argument is essentially disposed of by the case law we have already discussed regarding inclusion or exclusion of specific variables in a regression analysis. See B & R Supermarket, Inc., 2024 WL 4252031, at *20 ("Subjective decision-making about which variables to include or how to control for other variables is a daily part of the scientific and statistical process."); Reed Constr. Data Inc., 49 F. Supp. 3d at 400-01 (recognizing "subjectivity" in an expert's selection of variables but noting that "[n]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility") (quoting Bazemore, 478 U.S. at 400 (concurrence in part joined by all Justices)).

Certainly, an expert's statistical analysis can be irrelevant as a matter of law if it fails to account for the "major factors." Bazemore, 478 U.S. at 400 (concurrence in part joined by all Justices); see id. at 400 n.10 ("[T]here may . . . be some regressions so incomplete as to be inadmissible as irrelevant."). But we see no reason why starting pay — which, as defendant has admitted, was determined by defendant, see Class Cert. Opp. at 15 ("Starting salaries were

25

determined by the hiring manager and recruiter, with input from the compensation team as needed.") — is such a major factor that it must be controlled for in the regression analysis.

After all, starting pay is not some external confounding variable that could provide a neutral explanation for differences in pay between men and women.  Rather, Bloomberg itself set the starting pay.  If, as defendant would have it, starting pay was controlled for, and it turned out that differences in starting pay explain the pay disparity between men and women, such a result could itself show that Bloomberg discriminated against women.[6]  Accordingly, it makes no sense to control for a variable that Bloomberg itself was completely responsible for setting and which was itself potentially the result of discriminatory practices at Bloomberg.

Indeed, Neumark explained in his deposition that starting pay would be "a bad control" or a "tainted variable" because it "can itself reflect discrimination."  Neumark Dep. at 46:8-10, 47:2-3.  We find that Neumark "reasonably suspected that [this] variable[] [was] tainted, that is, that [it itself is] affected by gender bias."  Chen-Oster I, 114 F. Supp. 3d at 118.  "Thus, there was a legitimate basis for him to omit [this variable] from his analysis on the ground that [it was itself] subject to bias and would therefore mask discrimination."  Id.; accord Morgan v. United Parcel Serv. of Am., Inc., 380 F.3d 459, 470 (8th Cir. 2004) ("Regression analyses in discrimination cases attempt to control for the legitimate reasons for pay disparities through the use of explanatory variables.  But, illegitimate reasons — reasons themselves representative of the unlawful discrimination at issue — should be excluded from the regression (or otherwise dealt with) to avoid underestimating the significance of a disparity.").

---

[6]  This is because there is no obvious non-discriminatory reason why there would be a difference between men and women in starting pay other than as a result of the effect of variables that Neumark's study already controls for, such as education, performance rating, and experience.  See Neumark Report ¶ 37.

26

Defendant asserts that "starting pay decisions may be influenced or determined by factors other than discrimination." Mem. at 24-25. However, insofar as total compensation is influenced by discrimination at Bloomberg, such discrimination would also plausibly influence starting pay. Thus, because Neumark's analysis attempts to account for factors other than discrimination when examining the total compensation received by the putative plaintiff class, controlling for starting pay is not obviously required. Our conclusion that starting pay was appropriately omitted as a potentially confounding variable is in line with the rulings of other courts. See Chen-Oster I, 114 F. Supp. 3d at 118 (collecting cases).

Plaintiff mentions in her opposition that "the practice of setting starting pay is not a separate practice which Plaintiff now moves the Court to find caused disparate impact." Opp. at 32. Defendants seize on this statement to argue that, if plaintiff is "no longer alleging that sex bias influenced starting pay decisions, then starting pay cannot be said to be tainted." Reply at 14. But the mere fact that plaintiff is not pursuing the practice of setting starting pay as a "separate practice" does not mean that plaintiff is conceding that starting pay was set in a non-discriminatory manner. Plaintiff is entitled to challenge the compensation decision-making at Bloomberg without specifically challenging each component of this process.

Accordingly, the Court finds that Neumark's testimony was not rendered unreliable because it did not account for starting pay. See Thor Equities, LLC v. Factory Mut. Ins. Co., 627 F. Supp. 3d 330, 339 (S.D.N.Y. 2022) ("An expert's statistical analysis is generally not irrelevant merely because it fails to account for all variables that might impact the expert's conclusion. Where the expert's analysis accounts for all 'major factors,' the failure to include additional variables 'will affect the analysis' probativeness, not its admissibility.'") (citation omitted); E.E.O.C. v. Bloomberg L.P., 2010 WL 3466370, at *8-9 (S.D.N.Y. Aug. 31, 2010) ("That

27

[Bloomberg's expert] did not account for every possible variable that may have impacted the class members' compensation does not render his report inadmissible. . . . Here, because [Bloomberg's expert] did not omit major variables from his analysis . . . the Court finds that his opinion is sufficiently reliable to be admissible under Rule 702." (citation omitted)).

### 2. Neumark's Exclusion of Employee-Years

Defendant argues that, "[a]s Dr. Martin pointed out, and as Dr. Neumark subsequently conceded, Dr. Neumark introduced errors into his analysis when he excluded any employees compensated in a foreign currency, which he did in order to filter out employees who are not in the putative New York and U.S. classes." Mem. at 25. Specifically, in Neumark's original report, "Dr. Neumark assumed that [employees compensated in a foreign currency] did not work in the United States and therefore are not putative class members." Id. at 25. However, this "assumption was incorrect because it failed to account for employees who moved abroad during the year and received a bonus in a foreign currency for work performed in the United States during the previous year." Id. at 25-26.

After Martin pointed out this error, Neumark "claimed that he was able to 'fix' his admitted mistake by providing supplemental tables that simply excluded any years in which an employee left one of the putative classes." Id. at 26.

However, defendant alleges that "Neumark's 'supplemental tables' failed to cure this deficiency in his analysis . . . because he lacked any factual foundation for his 'solution' of simply excluding the employee-years at issue." Id. Defendant argues that

> When attempting to explain how he accounted for bonuses for employees who moved abroad mid-year, Dr. Neumark candidly admitted: "I honestly don't have a firm answer and haven't seen one about exactly how bonuses get determined and is it based on — hypothetically it could be based on your performance before you left. That doesn't seem that plausible. It could be based on your performance where you are now. It could is be [sic] based on some combination. I don't

28

> know."  Lacking any idea how to account for bonuses in such a scenario, Dr.
> Neumark decided to "just exclude those years rather than . . . assigning the wrong
> one."

Id. (citations omitted).  Defendant further states that Neumark's purported

> exclusion of employee-years relies on an assumption that a bonus awarded in
> February of Year 2 is unconnected to performance in a Year 1, notwithstanding his
> stated understanding that "bonuses paid in February of each year reflect payments
> for the work performed in the prior calendar year."  He made no effort to
> reconcile these conflicts in his own opinions and instead opted to summarily drop
> over 100 employee-year observations from his regression models without ever
> attempting to consider potential differences between employees who left early in
> Year 1 versus late in Year 1.

Id. at 26-27 (citations omitted).  Defendant argues that "[t]his is not a reliable analysis by any

definition."  Id. at 27.

> Ndugga responds:.

> Neumark in his supplemental tables corrected for issues of connecting bonus
> decisions made after the end of the year with the base salary determination made
> at the start of the year, particularly where an individual had moved jobs or
> locations mid-year.  Dr. Neumark explained that when an employee moved
> between a class and a non-class position midyear — either because of a change in
> role or geography — he did not have sufficient information to tie the bonus
> amount to the work done while in the class position.  He therefore stated it was
> best practice to exclude these observations — fewer than 100 observations out of
> nearly 2,000.  However, Dr. Neumark also demonstrated very similar results if
> those 89 observations were included.

Opp. at 35-36 (footnotes omitted).  In the first of these alternative analyses, Neumark "included

those 89 observations only with base salary in a class-covered job and added a variable to note

that bonus was omitted because it was awarded after the person moved out of the class."  Id. at

36.  This version is referred to as V3 in the supplemental tables.  See Neumark Supp. *2 tbl. 1.

In the second alternative analysis, referred to as V4 in the supplemental tables, see id., Neumark

"included both salary and bonus for the 89 observations, with an added variable to note that the

bonus was included despite being awarded after the employee had moved out of the class." Opp. at 36.

Ndugga contends that these "alternative analyses, as well as Dr. Neumark's preferred model, were all similar, with all statistically significant for the New York class at the 5% level, and for the US Class at the 10% level." Id. "Thus, Dr. Neumark devised appropriate and reliable analyses for dealing with imperfect data." Id.

In response, defendant argues that it "is plainly false" that the alternative analyses are statistically significant. Reply at 17. Specifically, defendant argues that "[i]n his 'alternative' V3 and V4 models that do not drop any employee-year observations, Dr. Neumark does not find any statistically significant results for the putative U.S. class with respect to total compensation." Id. Defendant asserts that Ndugga "has not established that [Neumark's] 'solution' to address his lack of understanding — summarily dropping over a hundred employee-year observations from his analysis — was based on any facts, much less 'sufficiently grounded in reliable facts.'" Id. at 18 (citing Atl. Specialty Ins., 970 F. Supp. 2d at 285).

The Court will not exclude Neumark's report on this basis. Neumark's exclusion of some observations in one of his models does not render his opinion unreliable.

First, the Court notes that defendant does not cite to any case law to help guide the Court's analysis of the circumstances when the exclusion of some observations in a regression analysis renders the analysis unreliable. See Mem.; Reply. Thus, while defendant invokes Rule 702's mandate that an expert's testimony must be "based on sufficient facts or data," Fed. R. Evid. 702(b); see Mem. at 9 (citing Fed. R. Evid. 702), defendant does not explain why the exclusion of 89 observations (out of 1,983) in the New York class and of 29 observations (out of 783) in the U.S. class, Neumark Supp. at *2 tbl. 1, renders the data insufficient.

30

Second, the sparse case law that addresses these circumstances suggests that Neumark's exclusion of some observations is not enough to find his conclusions unreliable. Thus, one court concluded that "'simply discard[ing]' any observations with missing values[] remains 'the standard treatment of missing data' and 'the most common method in the absence of readily available alternatives.'" In re Pool Prods. Distrib. Mkt. Antitrust Litig., 2016 WL 2756437, at *9 (E.D. La. May 12, 2016) (concluding that the expert's "approach to the missing data is therefore not unreliable, and the Court will not exclude his opinion on this basis").

Third, as Ndugga points out, see Opp. at 36, "[t]he courts draw a distinction between insufficient data and imperfect data. If a proposed expert lacks the basic information required by professionals in his field to form an opinion, his testimony will be excluded. Imperfect data, however, goes to the weight of the expert's opinion, not its admissibility, and is not grounds for exclusion." Molly C., 2024 WL 4850813, at *12 (citations omitted). Here, defendant makes no argument that — in the case of employees who worked part of the year domestically before moving to a foreign location and received a bonus abroad — data existed as to which portion of the bonus was given for domestic work and which portion of the bonus was given for foreign work. Indeed, Neumark explained in his deposition that he did not have data on which portions of the bonuses paid to employees who spend part of the year domestically and part of the year abroad were paid for domestic work (and vice versa). Neumark Dep. at 191:21-192:14. If the missing data, which involves a tiny percentage of the data points, makes any difference to the regression analysis, this may affect the weight that Neumark's report deserves. It does not suggest that his methodology was itself unreliable. As one court has explained, "[t]he question for Daubert purposes is not whether the expert employed the best possible input data to form her testimony, but whether 'the testimony is based on sufficient facts or data.'" In re Int. Rate Swaps

31

Antitrust Litig., 2023 WL 8675625, at *4 (S.D.N.Y. Dec. 15, 2023) (citing Fed. R. Evid. 702).

Defendant has made no showing that the missing observations render Neumark's opinion insufficient.

Thus, the Court rejects defendant's contention that Neumark's decision to omit a number of observations renders his opinion unreliable.

### 3.  Unreliability in Neumark's Class Damages Calculations

Lastly, defendant argues that

> Neumark also purports to calculate damages for the two proposed classes by multiplying the pay disparities he claims to have found by the average class member's total compensation for the respective class periods and adding statutory interest.  Because these figures rely on irredeemably flawed statistics produced by Dr. Neumark's irrelevant and unreliable analyses, his class damages calculations should be excluded from any future proceedings in this case.

Mem. at 26 (citations omitted).  However, while Ndugga argues that the predominance requirement of Fed. R. Civ. P. 23(b)(3) "can be calculated using BLP's records for dates of employment and using the average disparities based on Dr. Neumark' tabulations," Class Cert. Mot. at 41, Ndugga's class certification motion does not raise any substantive issues regarding damages.  Thus, we have no occasion to address whether Neumark's analysis is reliable as to damages.

32

IV.     CONCLUSION

For the above reasons, Bloomberg's motion to exclude the opinions and testimony of

Ndugga's expert witness David Neumark for purposes of the class certification motion (Docket

# 344) is denied.

Dated:  March 19, 2026
        New York, New York


_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge