UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
NAULA NDUGGA,                                          :

                                                      :     ORDER
                         Plaintiff,
                                                      :     20 Civ. 7464 (GHW) (GWG)
     -v.-
                                                      :

BLOOMBERG L.P.,                                       :

                                                      :
                         Defendant.
-------------------------------------------------------------X

GABRIEL W. GORENSTEIN, United States Magistrate Judge

     The Court previously filed a Sealed Order dated March 31, 2026 (Docket # 435) that
directed defendant to supply new versions of the Opinion and Order and Report and
Recommendation (Docket ## 433 and 434, respectively) that contained fewer redactions.
Defendant then made the filings required by the Sealed Order.   See Docket # 437.

     As stated in the Sealed Order, the Sealed Order was filed under seal "to preserve the
status quo in the event defendant files objections pursuant to Fed. R. Civ. P. 72(a)."   Docket
# 435 at 4.   The Sealed Order further stated that "[i]f no objections are filed, or if any objections
are rejected, the Court will file an unsealed version of this Order that redacts only material whose
redaction has been approved by this Order."   Id.

     No objections were filed.   Accordingly, the Court annexes to this Order a version of the
Sealed Order that redacts only material whose redaction has been approved by the Sealed Order.

          SO ORDERED.

Dated: April 17, 2026
          New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
NAULA NDUGGA,                                        :

                                                    :        SEALED ORDER

                        Plaintiff,                  :

                                                    :        20 Civ. 7464 (GHW) (GWG)
        -v.-
                                                    :

                                                    :

BLOOMBERG L.P.,                                     :

                                                    :

                        Defendant.                  :
-------------------------------------------------------------X

GABRIEL W. GORENSTEIN, United States Magistrate Judge

        The Court previously ruled that it was "at this time accept[ing] the redactions as set forth in Docket ## 421-23 for the reasons stated in Docket # 424."   Docket # 426 at 1.   Pursuant to Fed. R. Civ. P. 54(b), the Court "has discretion to reconsider its non-final orders sua sponte." Sanderson v. Leg Apparel, LLC, 2023 WL 8039499, at *1 (S.D.N.Y. Nov. 20, 2023).   The Court has reconsidered its prior decision and alters it as set forth herein.

        We have previously laid out the standards for sealing materials filed in federal court. See Docket # 402.   In brief, the documents filed in relation to plaintiff's class certification motion and defendant's Daubert motion are "judicial documents" to which a "presumption of access attaches."   Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 119 (2d Cir. 2006). The legal framework for our consideration of defendant's application to seal these documents is described in this Court's decision in Aberdeen City Council v. Bloomberg, L.P., 2023 WL 5254757 (S.D.N.Y. Aug. 16, 2023).   We incorporate by reference our discussion of those standards.   In contrast to Aberdeen, however, which involved a discovery application, the documents at issue here were filed in relation to a class certification motion and a Daubert motion.   Filings related to such motions are subject to a strong presumption of access under the common law and the First Amendment.   Tropical Sails Corp. v. Yext, Inc., 2016 WL 1451548, at *3 (S.D.N.Y. Apr. 12, 2016) ("First Amendment right of access" applies to class certification filings); In re Zimmer M/L Taper Hip Prosthesis or M/L Taper Hip Prosthesis with Kinectiv Tech. & Versys Femoral Head Prods. Liab. Litig., 2021 WL 4706199, at *2 (S.D.N.Y. Oct. 8, 2021) ("Filings related to Daubert motions are judicial documents subject to a significant presumption of access under the common law and the First Amendment.") (citation omitted).

        "[C]onclusory" assertions of harm do not overcome the presumption of public access. Anonymous v. Anonymous, 2024 WL 2136745, at *3 (S.D.N.Y. May 13, 2024) (quoting In re N.Y. Times Co., 828 F.2d 110, 116 (2d Cir. 1987)).   Rather, there must be a showing that some harm would occur if the information were released.   See Optionality Consulting PTE. LTD. v.

Edge Tech. Group LLC, 2024 WL 1464660, at *2 (S.D.N.Y. Apr. 4, 2024) (rejecting clam of confidentiality where party did not "explain . . . how harm will result"); Vinci Brands LLC v. Coach Services, Inc., 2023 WL 6289969, at *2 (S.D.N.Y. Sept. 27, 2023) (rejecting claim of confidentiality where "the parties do not explain how public access . . . would 'cause competitive harm'").   Indeed, case law holds that "[t]he party opposing disclosure must make a particular and specific demonstration of fact showing that disclosure would result in an injury sufficiently serious to warrant protection; broad allegations of harm unsubstantiated by specific examples or articulated reasoning fail to satisfy the test."   In re Parmalat Sec. Litig., 258 F.R.D. 236, 244 (S.D.N.Y. 2009) (emphasis added).

Having reexamined defendant's proposed redactions to the Report and Recommendation on plaintiff's class certification motion and the Opinion and Order on defendant's Daubert motion, see Docket ## 433 and 434, we are not persuaded that defendant has made this showing in a number of areas.

We begin by noting that we leave in place the rulings made in our Order of August 11, 2025, which stated that defendant could redact:

> specific numbers used as inputs to the algorithm governing compensation (including performance rating thresholds or dollar amounts), algorithm rules, individual salary amounts, aggregate funding amounts for compensation increases and bonuses, and personally identifiable information of Bloomberg nonparty employees, such as name, start date, and other biographical information (and discussions of individual employees that might reveal their identities).

Docket # 402 at 3.   But our reexamination convinces us that the proposed redactions go beyond what this paragraph permits and are not supported by the sworn statement from Bloomberg's Chief of Staff of News.   See Docket # 424.

In each instance below, we considered whether the declaration makes "a particular and specific demonstration of fact showing that disclosure would result in an injury sufficiently serious to warrant protection" as to the information defendant seeks redaction of.   In re Parmalat Sec. Litig., 258 F.R.D. at 244.

To address the propriety of sealing this information, the Court looks to defendant's proposed redactions as they appear in the two decisions (Docket ## 433 and 434) in lieu of examining the underlying filed documents.   This provides a more manageable basis for considering defendant's application.

We now turn to each decision and categorize the proposed redactions contained therein.

I.   Report and Recommendation (Docket # 434) (sealed version at # 431-1):

Numbers redacted on pages 7-9.   We view these as reflecting numerical inputs that may properly be redacted.

2

"Stacked" redactions on pages 10-11, 47.   The word "stacked" in various forms has been redacted, but there is nothing to indicate that any harm would befall defendant if this word in its various forms were revealed.   Docket # 424 does not address the issue.   Thus, the word in its various forms should be unredacted.

"Algorithm" and other "algo"-related redactions on page 11ff.   The words "algorithm" and "algo," along with other references to the existence of an algorithm, have been redacted, but there is nothing to indicate that any harm would befall defendant if these words were revealed, if it were revealed that an algorithm exists, or if it were revealed that defendant uses an algorithm to set compensation or bonus payments.   Docket # 424 does not address the issue except perhaps in the most conclusory terms.

We accept that the inputs to the algorithm arguably come within the Court's prior ruling and thus may remain redacted for now.   Accordingly, the following may remain redacted: the indented paragraph on page 11 and, in the first full paragraph on page 12, the phrases "████" "████████████████" and "████████████████" but not the other proposed redactions in that paragraph.

The redactions may remain in the second paragraph on page 12 as these reflect algorithm rules.

The numbers in the indented paragraphs on page 13 can also remain redacted, as can the last two numbers redacted on page 16.

"TicToc [QuickTake]" redaction on page 16.   Seemingly with respect to the reference to the TicToc or QuickTake team on page 16, Bloomberg's Chief of Staff of News states:

> [I]nformation about how BLP's business units in News were internally described and considered in relation to their consumer-facing audience reflects BLP's internal business philosophy and strategic decisions about how to position and distribute its editorial content across platforms. Such deliberations are not public, and disclosure would provide competitors with insights into BLP's content strategy.

Docket # 424 ¶ 9.   The Court can understand that "deliberations" should not be made public, but defendant has not shown how the mere fact that there is a unit with a particular name would cause it any harm.

Compensation guidelines-related redactions on pages 35-37.   The two numbers on page 35 may remain redacted.   The number on page 36 may remain redacted.   The number on page 37 may remain redacted.

"Media Cost Center" redactions on page 35ff.   Nothing in Docket # 424 addresses how the revelation that there exists a "Media Cost Center" or other specific cost centers would cause

harm to defendant.   To the extent paragraph 9 of Docket # 424 is intended to address this question, it does not show why revealing that there is a unit with a particular name and function would cause "an injury sufficiently serious to warrant protection."   In re Parmalat Sec. Litig., 258 F.R.D. at 244.

II.   Opinion and Order (Docket # 433) (sealed version at # 431-2):

"Media Cost Center" redactions on page 15ff.   These references should be unredacted for the reasons stated above.   The numbers on pages 15 and 18 may remain redacted as they reflect numerical inputs.

Conclusion

The defendant is ordered to prepare new redacted versions of the Report and Recommendation and the Opinion and Order consistent with this Order and to file them as an attachment to a letter on or before April 14, 2026.

The rulings herein apply of course to redactions to any underlying documents. Accordingly, new versions of the affected documents, showing only redactions as permitted by this Order, shall be filed by April 28, 2026.   Defendant shall file these documents with a docket description that contains a reference to the original docket number (as described in the last paragraph of Docket # 402 and as reflected in the filings already made by defendant at Docket ## 421-23).

The Clerk is directed to file this Order under seal (so that it is visible only to the Court) to preserve the status quo in the event defendant files objections pursuant to Fed. R. Civ. P. 72(a). If no objections are filed, or if any objections are rejected, the Court will file an unsealed version of this Order that redacts only material whose redaction has been approved by this Order.

SO ORDERED.

Dated:  March 31, 2026
        New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

Managers' ratings would be reviewed by several layers of senior management. Bloomberg points to an e-mail, dated November 18, 2019, sent by Emma O'Brien, as representative of this process. See Opp. at 6 n.34 (citing E-mail from Emma O'Brien, dated Nov. 18, 2019, annexed as Ex. S to Bloom Decl. (Docket # 380-19) ("O'Brien E-mail")). In that e-mail, managers were instructed to submit their ratings to managing editors, who in turn were instructed to submit the ratings (with any changes) to executive editors, who were to submit the ratings (with any further changes) to Chris Collins, the "head of Breaking News and Markets." See O'Brien E-mail; Gregori Dep.: Bloomberg Excerpts at 55:7-56:11. Collins would then submit the ratings to Gregori and Micklethwait. Gregori Dep.: Bloomberg Excerpts at 56:12-15.

At his deposition, Gregori was asked about his role in reviewing ratings:

Q. So, Mr. Gregori, when you reviewed ratings that was not just for, am I correct that it's not just for individuals who are in the direct line of reporting to you but everybody from News who ultimately has to be approved by John Micklethwait[,] you would see those ratings first?
A. That is correct.
Q. And you could either ask for changes overall to meet the curve or you can also decide that you wanted changes base[d] on a specific individual and say this is the person who should be written down to a 4 or upgraded to a 2; correct?
. . .
A. In theory I can do that.
Q. And you have done all those things; correct?
A. Occasionally, yes.
Q. What do you mean by "occasionally"?
A. Ideally managers do a good job so I don't have to go and push back and say change this or that[,] but if a manager doesn't do a good job[,] and occasionally that happens[,] then I have a conversation and reject the ratings so they could redo them.
Q. And sometimes it's just that you and the manager have a disagreement about how to rate a particular individual, right?
A. I would not go — if a manager has a clear view of the performance of a person[,] I'm not going to second[-]guess the manager. If the overall distribution looks weird or if the manager says x-person should, I want a significant raise for a certain reporter or we need to give this person a certain, a massive raise, if the manager rates that person a ▊ or a ▊[,] I would say that doesn't make sense[,] then it's not really a disagreement[,] it's more of a conversation[,] so whatever we

7

come up with in the end that it makes sense so you have, so the pay reflects the performance rating.

Q. And you also want the performance rating to reflect the performance?

A. In theory that would be a good thing, yes.

Id. at 72:5-73:22.

Ndugga points to four instances in which Gregori rejected or modified ratings and another in which Gregori references having provided guidance on future ratings. See Mem. at 7 nn.28-29.

In an e-mail exchange dated July 23, 2018, Gregori wrote to a manager, "Yours look good, largely (a bit on the generous side, but fine). One thing — I'd recommend keeping [a male employee] as a ▮. I really don't think he's done anything particularly impressive (or much more than previously). He's a ▮ at the moment." E-mail from Reto Gregori, dated July 23, 2018 (11:25 AM), annexed as Ex. 38 to Busgang Decl. (Docket # 333-38) ("July 23, 2018 E-mail"). The manager responded by explaining that the male employee's rating had been a "bone of contention among" his supervisors, one of whom felt that it was odd to "give him a ▮" while also "prais[ing] him for improvement." E-mail from Brad Stone, dated July 23, 2018, annexed as Ex. 38 to Busgang Decl. (Docket # 333-38). Gregori suggested that the manager "keep him [at a ▮], with the upward trajectory, and then upgrade him at year-end when it actually matters (and a reminder that he will never see the rating)." E-mail from Reto Gregori, dated July 23, 2018 (6:34 PM), annexed as Ex. 38 to Busgang Decl. (Docket # 333-38).

In another e-mail to a manager, with the subject line "You saw I rejected ratings," Gregori wrote, "We need a few more ▮s (you have only ▮% or so of the organization rated worse than ▮, which is a little too generous). Separately, I upgraded [REDACTED] and [REDACTED] in light of your other message re $." E-mail from Reto Gregori, dated July 23,

8

2018 (7:00 PM), annexed as Ex. 39 to Busgang Decl. (Docket # 333-39) ("2d July 23, 2018 E-mail").

In another e-mail to a manager, with the subject line "Ratings Rejected," Gregori wrote, "Can you have another go and have more of a curve distribution[?]  At the moment you have more ▪s than ▪s.  I know everyone is brilliant, but still."  E-mail from Reto Gregori, dated Dec. 17, 2021, annexed as Ex. 51 to Busgang Decl. (Docket # 333-51) ("December 17, 2021 E-mail").

In another e-mail to a manager, Gregori wrote:

> I'm sending your ratings back to you for a little tweaking.  The distribution is a little skewed toward the top.  Can you please have another look at the ▪s and ▪s (you only have ▪% ▪s, compared with ▪% the last ▪ rating cycles)[?]  I realize you have a lot of people who are rated for the first time, accounting for a large part of the ▪s, but there are also quite a lot of upgrades.

E-mail from Reto Gregori, dated June 21, 2017, annexed as Ex. 43 to Busgang Decl. (Docket # 333-43) ("June 21, 2017 E-mail").

Lastly, in an e-mail dated July 21, 2020, Gregori told Micklethwait that "there's a slight increase in upgrades, led by [manager], who wanted to signal how hard everyone worked etc etc. I told those extra-nice managers . . . we expect them to revert to a slightly more normal curve for year-end."  E-mail from Reto Gregori, dated July 21, 2020, annexed as Ex. 31 to Busgang Decl. (Docket # 333-31) ("July 21, 2020 E-mail").

Thus, while Ndugga shows that Gregori had the power to reject or modify ratings —and on three occasions exercised that power, — see June 21, 2017 E-mail; December 17, 2021 E-mail; 2d July 23, 2018 E-mail — she has not shown how often he did so.  In other words, she has not pointed to evidence that would allow a finding as to the degree to which Gregori influenced ratings.

stacked.  See Deposition of Krista Sullivan, dated May 20, 2024, annexed as Ex. H to Bloom Decl. (Docket # 380-8) ("Sullivan Dep.: Bloomberg Excerpts"), at 62:13-16.

Jennings testified that Gregori "had the access to move people up or down [in a stack rank] without going back into the review and changing the [underlying performance rating]." Jennings Dep.: Ndugga Excerpts at 148:2-9; accord Peer Groups Mem. at *3.  Similarly, Gregori testified that "people submit their ratings for their people and then I can look at what ever stack the system creates and in rare instances if something looks out of order in theory I can change that, yes."  Gregori Dep.: Ndugga Excerpts at 60:7-11.  While Ndugga argues that Gregori "shuffled the rankings . . . and directed managers to make changes to the stacks," Mem. at 14-15, she points to no instances of him actually having done so.  For her part, Jennings testified that she was not sure if Gregori "made any changes or not."  Jennings Dep.: Bloomberg Excerpts at 149:23-24.

### 2.  Compensation Decision-Making

Employee compensation at Bloomberg News was made up of a base salary and a discretionary bonus.  See Jennings Dep.: Bloomberg Excerpts at 176:16-177:6.

Bloomberg News used an algorithm (sometimes called "algo" within Bloomberg) to make initial compensation recommendations for employees during the relevant periods.  See Sullivan Dep.: Ndugga Excerpts at 27:20-28:3.  The algorithm made individualized recommendations based on a number of inputs, including:

[.]

11

Opp. at 9; see Defendant's Objections and Verified Answers to Plaintiff's Fourth Set of Interrogatories, dated Aug. 7, 2024, annexed as Ex. 64 to Busgang Decl. (Docket # 333-64) ("August 7, 2024, Interrogatories"), at 8-9.  Additionally, the algorithm considered "██████████ ████████████" August 7, 2024, Interrogatories at 8; see Editorial Managers Presentation, dated Nov. 2018, annexed as Ex. 12 to Busgang Decl. (Docket # 333-12), at 3 (indicating that the algorithm considered "████████████████" when determining "increase in comp").  After making individualized recommendations, the algorithm drew a "curve" or "plot" which displayed all of the initial compensation recommendations within a given peer group.  See Jennings Dep.: Bloomberg Excerpts at 226:14-18; Editorial Managers Presentation at 3.

The algorithm followed various rules in making initial compensation recommendations. See Deposition of Krista Sullivan, dated May 20, 2024, annexed as Ex. 7 to Busgang Decl. (Docket # 333-7) ("Sullivan Dep.: Ndugga Excerpts"), at 33:5-16.  These rules might set a "███████████████████████████████████████ ██████████████████████████████" for example.  Id. at 33:11-2, 14-16. Jennings explained that the rules generally operated to "distribut[e] more money to well-rated people in . . . peer groups that are lowly comped."  Jennings Dep.: Bloomberg Excerpts at 211:2-5.  For instance, ██████████████████████████████████ █████████████████████████████████████████████ ████████████████████████" Algo Rules, undated, annexed as Ex. 10 to Busgang Decl. (Docket # 333-10).

Krista Sullivan, a "comp team" leader, testified that she "would discuss with Reto [Gregori] the algo rules or logic for each year."  Sullivan Dep.: Ndugga Excerpts at 97:14-19.

12

Sullivan added that Gregori was the only member of the Committee who would discuss what the rules would be with the comp team.  See id. at 98:14-20.  If Gregori requested to change the rules and his proposed changes were consistent with available funding, Sullivan would honor his requests.  See id. at 109:21-110:6.

In a given year, after the "initial rules" had been loaded into the algorithm, the comp team would "run a simulation" and show Gregori "the recommendations that were generated."  Id. at 44:24-45:4.  The comp team would "sometimes make changes" before the recommendations were finalized.  Id. at 51:24.  "[A]t times," these changes would be made at Gregori's request.  Id. at 52:4-6.  Ndugga offers a single example of the kinds of changes Gregori requested, see Mem. at 12 n.48, 13 n.39 — an e-mail in which Gregori told Sullivan:

> I'm wondering whether we shouldn't give everyone who is rated ▮▮ an automatic bump in 2020 bonus of a minimum of $▮▮ so it's meaningful for the junior members of society.  While ▮▮% is fine for someone in Bloomberg Opinion with a top rating, a junior markets reporter who killed it this year and also gets ▮▮% will still only get something like $▮▮ more in bonus, which doesn't seem particularly motivating . . . .
>
> Some of the 2021 recommendations for middling performers seem big compared with slightly less good people.  One that caught my eye is [REDACTED] in London (▮▮▮▮▮▮▮▮), who is slated to get an ▮▮% increase for 2021, when people rated ▮▮, like [female employee] in NYC, is looking at a bonus cut and a drop.  Maybe we should limit increases for people rated between ▮▮ and ▮▮.

E-mail from Reto Gregori, dated Jan. 4, 2021, annexed as Ex. 34 to Busgang Decl. (Docket # 333-34) ("January 4, 2021 E-mail").

Gregori also asked, "[C]an we zero out the 2021 increase for [REDACTED] on Opinion, who is already ridiculously overpaid for historical reasons[?]"  Id.  This question posed by Grigori is Ndugga's only evidence that Gregori "directed changes to" initial compensation recommendations for individual employees.  Mem. at 12.  But Bloomberg asserts, and Ndugga

13

Ndugga asserts that Gregori would "direct[] lower level managers to make changes, which would not appear as attributable to Gregori in the [BOCS] audit logs."  Mem. at 16.  She cites to four e-mails from Gregori by way of proof.  See id. at 16 n.66; Webber Letter at 3.

One e-mail is in response to a message from a manager flagging "a large discrepancy amongst some people on the TicToc [QuickTake] team."  E-mail from Rachel Parisee, dated Mar. 8, 2019, annexed as Ex. 32 to Busgang Decl. (Docket # 333-32).  Gregori wrote back that he had "talked with [manager] and John [Micklethwait] and they are fine to fix the discrepancies."  E-mail from Reto Gregori, dated Apr. 5, 2019, annexed as Ex. 32 to Busgang Decl. (Docket # 333-32) ("April 5, 2019 E-mail").  He proposed changes to four employees' pay. See id.

In another e-mail, Gregori told Sullivan to make changes to 13 employees' pay.  See E-mail from Reto Gregori, dated July 8, 2020, annexed as Ex. 36 to Busgang Decl. (Docket # 333-36) ("July 8, 2020 E-mail").

In another e-mail, Gregori wrote to Collins, "Looking at peer groups – [female employee] feels underpaid considering the value she brings. [BOCS] recommendation feels a bit meager." E-mail from Reto Gregori, dated Jan. 14, 2022 (8:43 AM), annexed as Ex. 36 to Busgang Decl. (Docket # 333-55).  Collins wrote back, "Got it."  E-mail from Chris Collins, dated Jan. 14, 2022 (8:49 AM), annexed as Ex. 36 to Busgang Decl. (Docket # 333-55).  In a subsequent message, Collins wrote to Gregori to say "also re this, algo gives [male employee] ▮▮▮ vs I think he asked you for ▮▮ ?  We can make the change[.]"  E-mail from Chris Collins, dated Jan. 14, 2022 (10:46 AM), annexed as Ex. 36 to Busgang Decl. (Docket # 333-55).  Gregori responded, "Yeah that's fine."  E-mail from Reto Gregori, dated Jan. 14, 2022 (3:47 PM), annexed as Ex. 36 to Busgang Decl. (Docket # 333-55).

16

In conclusion, the Court finds that Neumark's statistics regarding the proposed U.S. Class "do not demonstrate common questions of fact because they do not tend to show that being" female "has had a widespread effect on" compensation for this proposed class. Boyd, 256 F.R.D. at 360.

    2.  For Both Proposed Classes, Plaintiff's Statistical Evidence Is Flawed

Bloomberg argues that Neumark improperly included "Cost Center, an accounting category that does not affect employee compensation, as a control variable," undermining the probative value of his findings. Opp. at 27. The Court finds this argument persuasive.

Cost Center, as Neumark acknowledged, "does not play a role in compensation guidelines, so . . . there is no rationale to disaggregate by Cost Center." Neumark Report ¶ 30. But he included Cost Center on the theory that "raises and hence pay may differ by Cost Center since different Cost Centers may have different amounts available for raises." Id. (emphases added). Neumark cited to four pieces of evidence in support of this statement. See id. ¶ 30 n.77. None justify the inclusion of Cost Center.

First, Neumark cited to a memorandum addressed to John Micklethwait and dated December 12, 2017. See Memorandum, dated Dec. 12, 2017, annexed as Ex. S to Declaration of Elise M. Bloom, filed Feb. 20, 2025 (Docket # 352-17) ("2017 Compensation Guidelines Mem."). This memorandum explains that while the "2018 Target Total Compensation guideline increase is ▮▮% for [Bloomberg] News," it is ▮▮% for six "Business Units which . . . fall under Media cost center view." Id. at 1. However, this reference to the "Media cost center" provides no justification for the inclusion of Cost Center. For one thing, "Business Unit" is already included as a variable in Neumark's analysis. Neumark Report ¶ 37(h); Memorandum of Law in Support of Defendant's Motion to Exclude the Opinions and Testimony of David Neumark, filed

35

Feb. 20, 2025 (Docket # 345) ("Bloomberg <u>Daubert</u> Mem.") at 14.  Thus, including Cost Center

does not control for any potential difference in funding available for employee compensation not

already accounted for by the inclusion of Business Unit.  Moreover, the 2017 memorandum only

mentions the "Media cost center" and thereby does not justify controlling for all 89 cost centers.

<u>See</u> Neumark Report at 37-38 (listing all cost centers).

Second, Neumark cited to Jennings's testimony regarding the 2017 memorandum:

Q.  It looks like even though these individuals had a reporting relationship up to
Mr. Micklethwait, that because they were in a different cost center, that made
more money available to give raises to them; is that right?
A.  That is how it appears in the memo, that they were getting the full ▮▮▮
funding.
Q.  Okay.  So, even if cost center didn't dictate sort of who your ultimate manager
was or necessarily distinguish your job in other ways, it could impact the amount
of funding available for salary increases and bonuses at yearend?
A.  So, it seems that's the case for 2017 . . . .  I can't speak to any other year
because I haven't seen a similar memo.

Jennings Dep.: Ndugga Excerpts at 191:2-191:20.  Jennings's testimony provides no additional

justification for the inclusion of Cost Center.  Her testimony simply reaffirms the plain

understanding of the 2017 memorandum.  As just discussed, the 2017 memorandum does not

justify the inclusion of Cost Center.

Third, Neumark cited to another memorandum addressed to John Micklethwait, this one

dated December 12, 2021.  <u>See</u> Memorandum, dated Dec. 12, 2021, annexed as Ex. R to

Declaration of Elise M. Bloom, filed Feb. 20, 2025 (Docket # 352-16) ("2021 Compensation

Guidelines Mem.").  However, as Bloomberg notes, <u>see</u> Bloomberg <u>Daubert</u> Mem. at 13, this

particular memorandum refers to "2022 Target Total Compensation."  2021 Compensation

Guidelines Mem at 1.  Because 2022 is outside the relevant time period for either putative class,

the 2021 memorandum provides no justification for the inclusion of Cost Center.  Certainly, the

2021 memorandum also covers "bonuses for work performed in 2021," as Ndugga observes.

36

Opposition to Defendant's Motion to Exclude the Opinions and Testimony of David Neumark, filed Mar. 13, 2025 (Docket # 358) at 20.  However, the 2021 memorandum does not provide for different amounts of funding for these bonuses across Cost Centers.  See 2021 Compensation Guidelines Mem. at 1.

Fourth, Neumark cited to Sullivan's testimony regarding the 2021 memorandum. Because of the 2021 memorandum's limitations, discussed above, Sullivan's testimony provides no further justification for the inclusion of Cost Center as an explanatory variable.  At most, Sullivan's testimony reaffirms that "different Cost Centers may have different amounts available for raises."  Neumark Report ¶ 30.

Separately, Ndugga references yet another memorandum to John Micklethwait, this one dated December 13, 2019.  See Memorandum, dated Dec. 13, 2019, annexed as Ex. 17 to Busgang Decl. (Docket # 333-17) ("2019 Compensation Guidelines Mem.").  It states that "$▮▮▮▮" had been allocated "for employees who had career progressions from June through November based on preliminary projections which are currently being finalized (pertaining to Business Units that show up under News in BOCS but fall under Media cost center view)."  Id. at 1.  This statement does not provide support for the inclusion of Cost Center for the same reasons given above: Business Unit is already included as a variable in Neumark's analysis, see Neumark Report ¶ 37, and although the 2019 memorandum mentions the "Media cost center," it does not refer to the other 88 cost centers Neumark controlled for.  See Neumark Report at 37-38 (listing all different Cost Centers).  Additionally, Neumark does not appear to have considered

37

control in his model lacks any foundation in the record" and that "Neumark had no basis to assume that Cost Center affected employee compensation." Id. at 13, 18. Accordingly, defendant contends that Neumark's opinion "is a mismatch for the facts of this case" and "fails Daubert's 'fit' requirement." Id. at 18. "Given that Dr. Neumark's entire conclusion that there was a statistically significant gender-based pay disparity evaporates if Cost Center is omitted as a control, Dr. Neumark's opinion is irrelevant and must be excluded." Id.

Defendant points out that Neumark "himself acknowledges that 'Cost Center does not play a role in compensation guidelines'" but includes it "based on the speculation that 'raises and hence pay may differ by Cost Center since different Cost Centers may have different amounts available for raises.'" Id. at 13 (citing Neumark Report ¶ 30). Defendant asserts that "[t]o support this assumption, Dr. Neumark relied entirely on references to Cost Center in two compensation guidelines memos for 2017 and 2021, respectively, which address funding for year-end bonuses and salary increases." Id. (citing Neumark Report ¶ 30 n.77). Regarding the 2021 memo, defendant argues that it "is entirely irrelevant because it provides compensation guidelines to be applied for 2022, which is outside the relevant time period for either putative class." Id. Regarding the 2017 memo, defendant acknowledges that the memo "announces that six 'Business Units' (of 29 total in Dr. Neumark's model) would have a guideline pay increase of █ % instead of the █ % available for other Business Units" and "notes that these Business Units 'show up under News . . . but fall under Media cost center view.'" Id. at 14 (footnote omitted). However, defendant argues that "this oblique reference does not suggest that funding for compensation increases varied by Cost Center so as to justify including Cost Center as a control." Id. In any case, "even if the 2017 memo provided a basis for controlling for a single

15

they both roll up to John Micklethwait, but the cost center that is attached to the employee is what breaks them out between news and editorial and media news.

Opp. at 18-19 (citation omitted) (alteration in original).

Ndugga also cites to the testimony of Lisa Jennings, a "Global Business Partner and 30(b)(6) designee" for Bloomberg:

> Q. It looks like <u>even though these individuals had a reporting relationship up to Mr. Micklethwait, that because they were in a different cost center, that made more money available to give raises to them; is that right? A. That is how it appears in the memo</u>, that they were getting the full ███ funding. Q. Okay. So, <u>even if cost center didn't dictate sort of who your ultimate manager was or necessarily distinguish your job in other ways, it could impact the amount of funding available for salary increases and bonuses at yearend? A. So, it seems that's the case for 2017, the way the funding was distributed.</u> I can't speak to any other year because I haven't seen a similar memo."

Id. at 19 n.67 (citation omitted).

Ndugga also challenges defendant's other factual assertions — that Neumark relied solely on two memoranda in support of his justification, that the "memoranda cannot establish a pattern of Cost Center being a potential source of different compensation budgets throughout the class period," and that "Neumark admitted the memoranda do not support his conclusion that Cost Center could impact compensation" — and provides citations to the record in an attempt to controvert them. Id. at 19-21.

Thus, Ndugga argues that because "labor economic theory instructs that the amount of money available for compensation is relevant to explaining compensation," where "budgets vary, that should be controlled for." Id. at 21. Accordingly, "Neumark had a more than sufficient basis to believe Cost Center was an important variable to control for" and this is "enough for admissibility." Id. (citing cases).

In reply, defendant argues that

18