UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

NAULA NDUGGA, ON BEHALF OF
HERSELF AND SIMILARLY SITUATED
WOMEN,                                                    20-cv-07464 (GHW) (GWG)

    Plaintiff,

  -against-

BLOOMBERG L.P.,

    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X


**PLAINTIFF'S OBJECTIONS TO REPORT AND RECOMMENDATION**

**TABLE OF CONTENTS**

**Page(s)**

I.      Introduction ................................................................................................................. 1

II.    Standard of Review ...................................................................................................... 1

III.   Argument ..................................................................................................................... 2

        A.     Statistical Evidence Adequately Establishes Discrimination for Both
             Classes ................................................................................................................ 5

             1.     Cost Center Was a Proper Control ............................................................. 5

                    a.     There Is a Theoretical Rationale to Control for Cost Center .......... 6

                    b.     Statistical Results Further Support Cost Center's Inclusion ........... 8

             2.     The Statistical Disparities for the U.S. Class Are Sufficiently
                 Significant ............................................................................................... 10

        B.     The Other Elements of Class Certification Are Also Satisfied ........................... 15

             1.     Decisionmaking by an Individual or Small Group, as Present Here,
                 Is a Common Mode of Exercising Discretion ........................................... 16

             2.     The Statistical Disparities Are Traceable to the Identified Common
                 Mode of Exercising Discretion .................................................................. 23

IV.   Conclusion ................................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013)......................................................................................................2

*Arista Recs., LLC v. Doe 3*,
    604 F.3d 110 (2d Cir. 2010).........................................................................................1

*Bazemore v. Friday*,
    478 U.S. 385 (1986)...........................................................................................7, 12, 13

*Bell v. PNC Bank, Nat'l Ass'n*,
    800 F.3d 360 (7th Cir. 2015) .......................................................................................3

*Boyd v. Interstate Brands Corp.*,
    256 F.R.D. 340 (E.D.N.Y. 2009) ................................................................................10

*Chalmers v. City of New York*,
    2022 WL 4330119 (S.D.N.Y. Sep. 19, 2022)..............................................................4

*Chen-Oster v. Goldman, Sachs & Co.*,
    325 F.R.D. 55 (S.D.N.Y. 2018) ........................................................................ *passim*

*Chin v. Port Auth. of N.Y. & N.J.*,
    685 F.3d 135 (2d Cir. 2012).............................................................................. *passim*

*Cronas v. Willis Grp. Holdings, Ltd.*,
    2011 WL 5007976 (S.D.N.Y. Oct. 18, 2011) .............................................................20

*E.E.O.C. v. Joe's Stone Crab, Inc.*,
    220 F.3d 1263 (11th Cir. 2000) .................................................................................13

*E.E.O.C. v. Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus.*,
    186 F.3d 110 (2d Cir. 1999)........................................................................................23

*Eagle v. Vee Pak, Inc.*,
    343 F.R.D. 552 (N.D. Ill. 2023)..................................................................3, 4, 5, 14

*Ellis v. Costco Wholesale Corp.*,
    285 F.R.D. 492 (N.D. Cal. 2012)..........................................................................5, 13, 20

*Hill v. City of New York*,
    136 F.Supp.3d 304 (E.D.N.Y. 2015), *order amended and supplemented*, 2019
    WL 1900503 (E.D.N.Y. Apr. 29, 2019) ...................................................................3

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Hnot v. Willis Grp. Holdings Ltd.*,
228 F.R.D. 476 (S.D.N.Y. 2005) ....................................................................................20

*Jimenez v. Allstate Ins. Co.*,
765 F.3d 1161 (9th Cir. 2014) ..........................................................................................4

*Johnson v. Nextel Commc'ns Inc.*,
780 F.3d 128 (2d Cir. 2015)...............................................................................................2

*Jones v. Nat'l Council of Y.M.C.A. of the U.S.A.*,
34 F.Supp.3d 896 (N.D. Ill. 2014) .............................................................................19, 20

*Kassman v. KPMG LLP*,
416 F.Supp.3d 252 (S.D.N.Y. 2018)....................................................................5, 9, 16, 19

*Loc. 2507, Uniformed EMTs, Paramedics & Fire Inspectors v. City of New York*,
2024 WL 4276495 (S.D.N.Y. Sep. 24, 2024)................................................................3, 4

*Lopa v. Fireman's Fund Ins. Co.*,
2014 WL 1311531 (E.D.N.Y. Mar. 31, 2014) ..................................................................1

*Moussouris v. Microsoft Corp.*,
2018 WL 3328418 (W.D. Wash. June 25, 2018)............................................................19

*Munoz v. Orr*,
200 F.3d 291 (5th Cir. 2000) .........................................................................................25

*Ndugga v. Bloomberg L.P.*,
2023 WL 4744184 (S.D.N.Y. July 25, 2023) .........................................................8, 18, 22

*Paige v. California*,
291 F.3d 1141 (9th Cir. 2002), *as amended on denial of reh'g and reh'g en
banc* (July 18, 2002) ......................................................................................................13

*Pichardo v. Carmine's Broadway Feast Inc.*,
2016 WL 5338551 (S.D.N.Y. Sep. 23, 2016)...................................................................1

*Port Auth. Police Asian Jade Soc'y of N.Y. & N.J. Inc. v. Port Auth. of N.Y. &
N.J.*,
681 F.Supp.2d 456 (S.D.N.Y. 2010)............................................................................24, 25

*Ross v. Lockheed Martin Corp.*,
267 F.Supp.3d 174 (D.D.C. 2017).................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Rossini v. Ogilvy & Mather, Inc.*,
798 F.2d 590 (2d Cir. 1986)......................................................................................................12

*Brock ex rel S.B. v. N.Y.C. Dep't of Educ.*,
2015 WL 1516602 (S.D.N.Y. Mar. 31, 2015) ...........................................................................1

*Segar v. Smith*,
738 F.2d 1249 (D.C. Cir. 1984)................................................................................................13

*Sobel v. Yeshiva Univ.*,
839 F.2d 18 (2d Cir. 1988)..........................................................................................................8

*Stockwell v. City & Cnty. of S.F.*,
749 F.3d 1107 (9th Cir. 2014) .....................................................................................................5

*Sughrim v. New York*,
690 F.Supp.3d 355 (S.D.N.Y. 2023).........................................................................................21

*United Air Lines, Inc. v. Evans*,
431 U.S. 553 (1977)...................................................................................................................12

*United States v. Tortora*,
30 F.3d 334 (2d Cir. 1994)...........................................................................................................1

*Valerino v. Holder*,
283 F.R.D. 302 (E.D. Va. 2012) .........................................................................................21, 22

*Velez v. MedRite, LLC*,
2025 WL 2650137 (S.D.N.Y. Sept. 15, 2025)............................................................................1

*Waisome v. Port Auth. of N.Y. & N.J.*,
948 F.2d 1370 (2d Cir. 1991).........................................................................................11, 12, 23

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011).............................................................................................................2, 3, 5

*Watson v. Fort Worth Bank & Tr.*,
487 U.S. 977 (1988)...................................................................................................................23

*Woods-Early v. Corning Inc.*,
330 F.R.D. 117 (W.D.N.Y. 2019)..............................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Wright v. Stern*,
450 F.Supp.2d 335 (S.D.N.Y. 2006)........................................................................................23

*Zivkovic v. Laura Christy LLC*,
329 F.R.D. 61 (S.D.N.Y. 2018) ...............................................................................................2

**STATUTES**

28 U.S.C. § 636...............................................................................................................................1

42 U.S.C. § 2000e-2.......................................................................................................................23

## I.    INTRODUCTION

Plaintiff objects to the Magistrate Judge's March 19, 2026 Report & Recommendation ("R&R"), Dkt. 436-1, on her Motion for Class Certification, Dkt. 329, on four grounds. First, Plaintiff's expert properly included a budget control variable. Second, the gender pay gaps were sufficiently statistically significant for both the New York and U.S. classes. Third, the record is replete with significant proof of a single decisionmaker's common mode of exercising his discretion over compensation for class members. And finally, an inference of causation can be drawn from the statistical disparities to the challenged common practice. The R&R should be rejected and class certification granted.

## II.    STANDARD OF REVIEW

When reviewing an R&R, the District Court has full discretion to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). For any dispositive matter, such as a motion for class certification, "any part of the magistrate judge's recommendation that has been properly objected to *must* be reviewed by the district judge *de novo*." *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 116 (2d Cir. 2010) (citing Fed. R. Civ. P. 72(b) (emphasis added)); *see also Pichardo v. Carmine's Broadway Feast Inc.*, 2016 WL 5338551, at *1 (S.D.N.Y. Sep. 23, 2016) (class certification motion is deemed a dispositive motion).[1] "A de novo determination entails an independent review of all objections and responses to the magistrate's findings and recommendations." *Lopa v. Fireman's Fund Ins. Co.*, 2014 WL 1311531, at *1 (E.D.N.Y. Mar. 31, 2014) (citing *United States v. Tortora*, 30 F.3d 334, 337 (2d Cir. 1994)); *see also Brock ex rel S.B. v. N.Y.C. Dep't of Educ.*, 2015 WL 1516602, at *3 (S.D.N.Y.

---

[1] To the extent Defendant urges only a clear error review because Plaintiff's arguments here were also raised before the magistrate judge, she notes that she *must* have already made similar arguments in order to avoid waiver. *See Velez v. MedRite, LLC*, 2025 WL 2650137, at *4 (S.D.N.Y. Sept. 15, 2025) (Woods, J.).

Mar. 31, 2015) (a court must "arrive at its own, independent conclusion" under *de novo* review (internal citation omitted)).

To grant class certification, the Court must find the requisite Rule 23 elements only by a preponderance of the evidence. *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015). While rigorous, this standard is still limited. "Merits questions may be considered . . . only to the extent . . . that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465-66 (2013). Courts, including this one, have recognized the Second Circuit's preference for any doubts to be resolved "in favor and not against the maintenance of the class action." *E.g.*, *Zivkovic v. Laura Christy LLC*, 329 F.R.D. 61, 68 (S.D.N.Y. 2018) (Woods, J.) (citation omitted)). As set forth below, the R&R's application of the class certification standard does not reflect this instruction or apply the correct standard for evaluating commonality.

## III.    ARGUMENT

The R&R focuses exclusively on one element of Rule 23: commonality.[2] But in doing so, it evaluates Plaintiff's evidence as though it were adjudicating her claims on the merits, rather than determining whether those claims are susceptible to common proof. That is error.

Commonality is satisfied where claims "depend upon a common contention" that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Plaintiff can provide the "glue" necessary for commonality through "significant proof" that Defendant Bloomberg ("BLP") "operated under a

---

[2] The R&R does not opine on whether Plaintiff established the other elements of Rule 23. Plaintiff incorporates by reference her arguments on the remaining factors from her prior briefing on class certification to show those elements were also established. *See* Dkt. 440-4 ("Mot.") at 25-27, 35-44; Dkt. 440-2 at 23-40 ("Reply").

general policy of discrimination." *Id.* at 353. For commonality, "significant proof" requires Plaintiff show "'common answers will be determined via [the] class action approach,' notwithstanding Plaintiffs' ultimate success or failure on the merits." *Loc. 2507, Uniformed EMTs, Paramedics & Fire Inspectors v. City of New York*, 2024 WL 4276495, at *5 (S.D.N.Y. Sep. 24, 2024) (statistics and evidence of common policies presented "'generalized proof' . . . [that] is more than 'capable of generating common answers' to issues 'central' to the parties' dispute." (citations omitted)); *Hill v. City of New York*, 136 F.Supp.3d 304, 353-54 (E.D.N.Y. 2015), *order amended and supplemented*, 2019 WL 1900503 (E.D.N.Y. Apr. 29, 2019) (where plaintiffs allege a "policy applies regardless of individual circumstances," determining defendant's liability "will turn on class-wide inquiries on the existence and pervasiveness of the policy and practice"). Thus, commonality is satisfied by submission of "evidence to show that the existence of the policy in the case is '*capable of proof at trial* through evidence that is common to the class.'" *Eagle v. Vee Pak, Inc.*, 343 F.R.D. 552, 573 (N.D. Ill. 2023) (emphasis in original; quoting *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 374-76 (7th Cir. 2015)); *id.* at 574 (proffering enough evidence "to support a legal theory common to the entire class . . . is precisely what the Supreme Court meant by 'significant proof' in *Wal-Mart*").

The R&R conflates the class certification question (whether Plaintiff has proffered, by a preponderance of the evidence, significant proof of the existence of a common policy) with the liability question (whether Plaintiff has proved by a preponderance of the evidence that Defendant's policy actually discriminated against the proposed classes). *See Chen-Oster v. Goldman, Sachs & Co.*, 325 F.R.D. 55, 77 (S.D.N.Y. 2018) ("Whether Plaintiffs' evidence conclusively proves discrimination is a matter for trial."); *see also id.* at 76 ("[T]his is not the stage at which to decide whether there is in fact a pattern of pervasive discrimination."). "Whether the

3

policies that Plaintiffs describe exist and violate federal and state law are questions common to all class members." *Loc. 2507*, 2024 WL 4276495, at *4-6 (commonality was established even though defendant disputed plaintiffs' evidence, which could still fail on the merits at trial). By prematurely addressing merits questions, the R&R substitutes its judgment on the paper record for a jury's judgment on testimony at trial. *Eagle*, 343 F.R.D. at 574 ("In other words, if a jury does not believe the witness testimony about the policy, the 'certified class can go down in flames on the merits.'"); *Chalmers v. City of New York*, 2022 WL 4330119, at *14-16, *18 (S.D.N.Y. Sep. 19, 2022) (finding commonality where plaintiffs' evidence was "plausibl[e]" that two jobs were substantively similar—an essential premise of plaintiffs' alleged common practice—and leaving resolution of this question of fact for trial); *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1166 n.5 (9th Cir. 2014) (defendant's argument that an alleged policy "does not exist" was "appropriately made at trial or at the summary judgment stage, as it goes to the merits of the plaintiffs' claim").

As these cases make clear, establishing "significant proof" for commonality means only that the Court confirms the evidence in the record will permit the jury to decide for the class as a whole whether the alleged common practice exists. As explained below, Plaintiff has offered such proof of a common discriminatory policy—the decision-making of Deputy Editor-in-Chief Reto Gregori—and thus has met her burden at the class certification stage. Even if the R&R had been permitted to resolve the factual disputes it tackled, its analytical missteps require correction. The R&R ignores substantial evidence in the record supporting the relevance of Cost Center to the statistical analysis. It wrongly disregarded analyses supporting the statistical significance of U.S. Class pay disparities. The R&R also adopts an unsupported legal standard for determining whether there was a single decisionmaker, leading to incorrect analysis of the evidence of such a common practice applicable to both classes at issue here.

4

A.    Statistical Evidence Adequately Establishes Discrimination for Both Classes

Plaintiff relies on the findings of her expert labor economist, Dr. David Neumark, because statistical evidence is key to establishing both disparate impact and pattern-or-practice disparate treatment claims. *See, e.g.*, *Chen-Oster v. Goldman, Sachs & Co.*, 325 F.R.D. 55, 81-82 (S.D.N.Y. 2018) (statistics establish a prima facie case of disparate impact); *Kassman v. KPMG LLP*, 416 F.Supp.3d 252, 281 (S.D.N.Y. 2018) (statistics alone can establish a prima facie case of a pattern or practice of discrimination). And her statistics are sound. After controlling for appropriate variables—including available budget or "Cost Center"—the pay gap for the New York class is significant at the level the R&R expects. Legal authority does not demand this bright line, though. The smaller sample size of employees in the U.S. class, combined with additional evidence, together show that significant pay gaps across the country are also certifiable.

1.    *Cost Center Was a Proper Control*

The R&R errs in rejecting Dr. Neumark's analyses on the ground that he controlled for "Cost Center." R&R at 35-38. Whether it was proper for Dr. Neumark to control for "Cost Center" is a common question "capable of classwide resolution" by the fact-finder. *Dukes*, 564 U.S. at 350; *see also Stockwell v. City & Cnty. of S.F.*, 749 F.3d 1107, 1111-16 (9th Cir. 2014) (where statistical evidence would either succeed or fail for class as a whole, disputes over statistical evidence presented common questions); *Eagle*, 343 F.R.D. at 574 ("[A] jury does not have to find [the expert's] numbers convincing, and . . . can weigh this evidence and decide whether all of the plaintiffs win or lose."); *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 524 (N.D. Cal. 2012) (finding disputes over competing regression variables "are precisely the sorts of arguments subject to classwide resolution" and supportive of commonality). Under labor economic theory and basic common sense, the amount of money available for compensation is relevant to analyzing potential pay disparities. As even BLP's expert conceded, where budgets may vary, that factor should be

5

controlled for.[3]

> a.        There Is a Theoretical Rationale to Control for Cost Center

The R&R suggests that Dr. Neumark admitted Cost Center played no role in compensation guidelines. R&R at 19. Not so. Dr. Neumark testified only that policies did not vary by Cost Center, so there was no reason to analyze each separately; he maintained that Cost Center is relevant to include because it represented the budget available for class members' annual compensation increases.[4] Ample evidence underlies this variable's inclusion. "Cost Centers" indicated the profit and loss statement that a particular position was reported on.[5] Some positions in News were actually paid for by a Cost Center associated with Media.[6] Thus, when the percentage available for pay increases for Cost Centers associated with News versus Media differed, positions assigned to different Cost Centers had different budgets.

The R&R overlooks crucial testimony from Compensation Team Leader Krista Sullivan that Cost Center identifies the budget covering the compensation for each employee:

> Q. [W]as that typical that there can be different budgets set for different parts of editorial and research? A. Yes, there could be. There could be different budgets for the different areas of News and Research. **Q. And in identifying, sort of, which individuals are going to be covered by which budget, specifically distinguishing between media and news and news editorial; would you be identifying those -- or would one identify those by looking to the cost center and seeing which of the people who report up to editorial and research are on a media cost center? A. Yes. The way we break out news and editorial is by cost centers**, they both roll up to [Editor-in-Chief] John Micklethwait, but the cost center that is attached to the employee is what breaks them out between news and

---

[3] Ex. 1 to Declaration of Christine E. Webber ("Webber Decl.") ("Ex. 1"), Martin Dep. 88:12-89:14; *see also id.* at 71:11-13 ("Labor economic theory . . . can inform a regression model.").

[4] Ex. 2 to Webber Decl., Neumark Dep. 132:22-133:23; Dkt. 419-19, Neumark Rep. ¶ 30.

[5] Dkt. 440-5, Gregori Dep. 184:11-15.

[6] *Id.* at 103:18-104:16 ██████████████████████████████████████████████████ ██████████████; Dkt. 440-1, Sullivan Dep. 18:17-19:19 (█████████████████████████████); Dkt. 418-26, 30(b)(6) Dep. 190:14-25 (██████████████████████████████████████ ████████████████████████); *see also* Dkt. 420-53, Martin Dep. 150:7-10 ████████████████████████████████████

editorial and media news.[7]

Despite submitting a subsequent declaration, Sullivan in no way walked back this testimony or limited it to one year. *Contra* R&R at 37. Rather, her declaration further confirms that funding is identified by Cost Center.[8]

Several memoranda also confirm that Cost Centers show the budgets for compensation.[9] The R&R rejects controlling for this variable because the memoranda do not mention every possible Cost Center. R&R at 36, 37. There are numerous Cost Centers within News and Media. R&R at 37 (citing Dkt. 419-19, Neumark Rep. at 37-38). The implication that an analysis should only control for the Cost Centers that are associated with Media, and not the variable more generally, is not a statistically valid approach to determine whether to include a particular variable. The theoretical basis for including Cost Center—that it reflects the funding available for the positions carried on it—is not limited to only a subset of Cost Centers; it is the definition of all Cost Centers. Thus, Dr. Neumark appropriately controlled for the variable as a whole.[10]

---

[7] Dkt. 440-1, Sullivan Dep. 18:21-19:19 (emphases added); *see also* Dkt. 420-53, Martin Dep. 164:21-165:8

[8] *See* Dkt. 419-53, Decl. of Krista Sullivan ¶¶ 4-5.

*Id.*

*Id.*

[9] *See, e.g.*, Dkt. 419-55 (providing for employees whose Cost Centers were associated with News a ▮ increase in funding for total compensation, but a ▮ increase for those whose Cost Centers were associated with Media); Dkt. 419-56 (

);
*see also* Dkt. 418-26, 30(b)(6) Dep. 191:2-20 ("Q. It looks like even though these individuals had a reporting relationship up to Mr. Micklethwait, that because they were in a different cost center, that made more money available to give raises to them; is that right? A. That is how it appears in the memo, that they were getting the full ▮ funding. Q. Okay. So, . . . cost center . . . could impact the amount of funding available for salary increases and bonuses at yearend? A. So, it seems that's the case for 2017, the way the funding was distributed.").

[10] Moreover, BLP presented no analysis showing that controlling for a more limited number of Cost Centers, rather than all or none, would yield results that differed from Dr. Neumark's analysis controlling for all Cost Centers. Such argument based on such rank speculation should have been rejected. *See Bazemore v. Friday*, 478 U.S. 385, 399-400, 403 n.14 (1986) (rejecting defendant's argument that plaintiffs' analysis was unsound, finding that defendant

The R&R also dismisses other relevant memoranda because Dr. Neumark did not specifically cite them in his report. R&R at 37-38 & n.7. But Dr. Neumark clearly testified that the cites in his report were not exhaustive; he "just cite[d] enough to make the case."[11] The decision then disregards another memorandum for covering *salaries* that took effect after the relevant class periods, even though it also applied to *bonuses* from *during* the relevant class periods. R&R at 36-37. That the memorandum provides different compensation budgets by Cost Center, without differences for bonuses specifically, is irrelevant; the memorandum still shows that budgets for Total Compensation require reference to each employee's Cost Center.[12] Even if it *only* discussed compensation beyond the class periods, that would still be probative of what the Cost Center variable means—including within class period—as there is no evidence that BLP's definition and use of Cost Center changed for compensation beginning in 2022. *See, e.g.*, *Ndugga v. Bloomberg L.P.*, 2023 WL 4744184, at *4 (S.D.N.Y. July 25, 2023) (Woods, J.) (evidence from outside the limitations period can support timely claims).

b.       <u>Statistical Results Further Support Cost Center's Inclusion</u>

Dr. Neumark had not only theoretical reasons for controlling for Cost Center (the differing budgets), but also statistical proof supporting its inclusion.[13] The R&R insists that controlling for "Cost Center" was inappropriate since Dr. Neumark already controlled for the separate variable of "Business Unit." R&R at 35, 36, 37. But these variables are distinct: unlike Cost Centers, defined

---

"made no attempt . . . to demonstrate that" when the analysis was done as they suggested "there was no significant disparity"); *Sobel v. Yeshiva Univ.*, 839 F.2d 18, 36 (2d Cir. 1988) (plaintiffs' regression should not be discounted due to omission of a variable absent defendant showing, rather than assuming, that the missing variable biased the results).

[11] Dkt. 420-54, Neumark Dep. 134:7-17.

[12] Dkt. 419-56. The R&R mistakenly finds this memorandum did not distinguish based on Cost Center, ignoring the testimony that Cost Center was used to identify who was covered by which budget. *See* Section III.A.1.a *supra*.

[13] Even BLP's expert agreed that "if you have a theoretical justification for including a variable," statistical tests "can be done to evaluate whether that variable adds enough to the explanatory power of the model that it's -- inclusion is also statistically justified." Ex. 1, Martin Dep. 45:4-10; *see also id.* at 46:3-9.

8

above, "Business Units" distinguished an employee's work based on topical or geographic subject matter.[14] These different categories do not map onto each other; employees can work in the same Business Unit, yet have positions paid for by different Cost Centers, as even BLP's expert averred.[15] As a result, controlling for Business Unit would *not* effectively control for Cost Center.

Statistical evidence also shows that Business Unit and Cost Center are not measuring the same information. The results of a regression analysis report the magnitude and direction of gender's impact on compensation by providing a coefficient for the gender variable. They also calculate the standard deviation for the coefficient, which shows how confident one can be that the impact is due to gender and not chance. Regression analyses provide these same two results for every variable employed as a control, including Cost Center.[16] The R&R casts aspersions on the inclusion of Cost Center, characterizing it as an obfuscation to gin up statistical significance for the finding of gender's impact on pay (the gender variable). R&R at 38.[17] But if Cost Center were not relevant to explaining compensation, it would not change the regression results—or in statistical terms, the coefficient for the Cost Center variable would be zero, and the standard deviations would not be significant.[18] That is not the case, though. Dr. Neumark tested the joint significance of Cost Center as an explanatory variable, and it was statistically significant.[19] This

---

[14] Dkt. 418-26, 30(b)(6) Dep. 47:8-25; *see also* Dkt. 419-19, Neumark Rep., App. A, Table A-4 at 38-39 (Business Units include "NEW39 Americas," "NEW23 Breaking News & Markets," etc.).

[15] Dkt. 419-51, Decl. of Stephanie Plancich ¶ 2 ▬▬▬▬▬▬; *id.* (▬▬▬▬▬▬).

[16] *See* Dkt. 419-19, Neumark Rep. ¶¶ 17, 21, 44, Table A-4.

[17] Inexplicably, the R&R cites a case quoting *Kassman*, 416 F.Supp.3d at 283, which discussed "obfuscation" in criticizing the *omission* of cost center as a control, to criticize Dr. Neumark for *including* it. R&R at 38. In *Kassman*, plaintiffs' expert was found at fault for *failing* to control for cost center, and thus inappropriately treating people with the same job title as if they had the same job, despite working in different "service lines" and having a different cost center (where some cost centers provided for higher pay). *Kassman*, 416 F.Supp.3d at 283.

[18] *See* Dkt. 420-54, Neumark Dep. 151:11-152:12 ("[T]here's no bias from including them. The coefficients might be zero if they don't matter at all, and they clearly aren't. . . . [I]t doesn't generate bias in the estimated gender gap to include a control that's not potentially influenced by discrimination . . . .").

[19] Dkt. 419-20, Neumark Suppl. Tables 1-3 (in column labeled Cost Center Joint Signif. Test P-Val, all are 0.00, so significant not only at the 5% level but less than 1% level); Dkt. 420-54, Neumark Dep. 133:14-23, 161:21-162:15.

inquiry was separate from his original analyses, which controlled for Cost Center and showed a significant gender disparity. The R&R completely ignores this crucial fact.[20]

In sum, Dr. Neumark had ample justification, supported by labor economic theory and BLP's evidence, to control for Cost Center. The statistical significance of this variable further confirms the propriety of its inclusion. The R&R's conclusion to the contrary should be cast aside.

2.       *The Statistical Disparities for the U.S. Class Are Sufficiently Significant*

The R&R critiques Plaintiff's statistical findings for the U.S. class for not meeting a brightline threshold, R&R at 30-35, that it concedes the case law does not require, *id.* at 28. In reaching this conclusion, the decision incorrectly applies cited case law and ignores other governing authority. It also errs in discounting the full scope of Dr. Neumark's analyses.

Dr. Neumark found that for the proposed U.S. class, which covers only one year (2021), women's underpayment was statistically significant at the 10% level, or by 1.64 standard deviations ("sd").[21] While he noted that the 5% level is often used as the measure of significance, he maintained that the 10% level of significance is also relevant and accepted in labor economics.[22] Dr. Neumark noted his other analyses only strengthened the significance of the U.S. class results.

---

[20] Dkt. 420-54, Neumark Dep. 162:7-10 ("Again, if [Business Unit and Cost Center] were truly redundant, I would not find strong significant effects of cost center, and I do. That's the bottom line that is -- I don't know how you ignore that evidence[.]").

[21] Dkt. 419-20, Neumark Suppl. Table 2.

[22] Dkt. 382-1, Neumark Dep. 29:9-30:15; *see also id.* at 58:25-62:18 ("5 percent significance is stronger than 10 percent significance, but we don't ignore results significant at the 10 percent level."); Dkt. 419-19, Neumark Rep. ¶ 22 n.54 (citing courts accepting evidence at the 10% significance level as well as those relying on 5% level of significance); *id.* ¶ 56 (opining "to a reasonable degree of expert certainty that women reporters, editors, and producers at Bloomberg News were paid less than similarly-situated men during the analyzed periods," including the U.S. class). Thus, Dr. Neumark's testimony was substantially different from that of the plaintiffs' expert in *Boyd v. Interstate Brands Corp.* R&R at 31 (citing 256 F.R.D. 340 (E.D.N.Y. 2009)). There, the expert did not opine that his results were significant at the 10% level. 256 F.R.D. at 360 & n.24. By contrast, Dr. Neumark expressed his expert opinion that the U.S. class results were statistically significant, even though not at the modal 5% benchmark. The R&R grossly misstates Dr. Neumark's statements in implying he admitted only results at the 5% level can be called statistically significant. R&R at 32. *Contra* Dkt. 419-19, Neumark Rep. ¶¶ 22, 56.

Adding peer group[23]—available for nearly all in the U.S. class, unlike the New York class—increased the pay differential in both magnitude and certainty, to just shy of the 5% level of significance (1.86 sd). [24] Looking at salary alone, without bonus, Dr. Neumark's analysis controlling for peer group was significant at the 5% level (2.22 sd).[25] Dr. Neumark also presented analyses for U.S. class members over longer time periods—including 2017-21 (the time period covered by the New York class) and 2020-21 (the relevant time period if Plaintiff's first EEOC charge had been accepted as the basis of the class period).[26] These broader looks resulted in statistically significant gender pay gaps at the 1% (2.66 sd) and 5% (2.46 sd) levels respectively.[27] Dr. Neumark testified that he considered all of his results in concluding that statistical evidence established that women were underpaid in the U.S. class, just as in the New York class.[28]

The R&R attempts to distinguish two Second Circuit cases that held statistical disparities below two standard deviations can still provide sufficient evidence of discrimination. R&R at 31-33 (citing *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 144, 153 (2d Cir. 2012); and *Waisome v. Port Auth. of N.Y. & N.J.*, 948 F.2d 1370, 1376, 1379 (2d Cir. 1991)). Neither distinction holds.

To start, contrary to the R&R's characterization, R&R at 30-33, the sample sizes at issue in *Chin* and *Waisome* are comparable to the U.S. class data in this case. In *Waisome*, 617 individuals competed for 75 promotions; in *Chin*, 271 eligible candidates competed for 36

---

[23] Dr. Neumark explained that while peer group was relevant it was missing from most of the data overall, so he did not use it in his main analysis. Dkt. 339-7, Neumark Dep. 114:16-115:10. He did, however, always present an alternative analyses controlling for peer group, and in the U.S. class period, peer group was nearly always available. Dkt. 419-19, Neumark Rep., App. A, Table A-3; Dkt. 419-20, Neumark Suppl. Table 3.

[24] Dkt. 419-20, Neumark Suppl. Table 3, Panel D, Model 4; Dkt. 339-7, Neumark Dep. 216:19-219:8 ("[I]n every single case . . . , the gender gap is bigger when I include peer group, . . . pretty strongly confirming evidence.").

[25] Dkt. 419-20, Neumark Suppl. Table 3, Panel D, Model 4.

[26] Dkt. 419-20, Neumark Suppl. Table 3, Panels B and C (showing 2-3 or more standard deviations for his base model and all variations).

[27] Dkt. 419-20, Neumark Suppl. Table 3, Panels B and C; Dkt. 419-19, Neumark Rep. ¶¶ 51-52, Table 4.

[28] Dkt. 382-1, Neumark Dep. 57:23-62:18 ("[A]ny reasonable labor economist would say there's a robust relationship here of low pay for women."); Dkt. 419-19, Neumark Rep. ¶ 56.

promotions; and here, 750 individuals in U.S. class positions (both men and women) were reviewed for pay changes.[29] *Waisome*, 948 F.2d at 1372-73, 1377-79; *Chin*, 685 F.3d at 143-44. Just as assessing the impact of Bloomberg's pay practices here requires analyzing all 750 individuals in the data, assessing the impact of promotion practices in the other cases required analyzing records of all individuals who *could have been* promoted.[30] The R&R misconstrues *Waisome* to pertain only to those 75 employees selected for promotions. R&R at 32. But nothing about the decision is so limited. The sizes of the data sets to be analyzed are comparable.

Next, the R&R contrasts *Chin* and *Waisome*, which had other indicia of discrimination, only by disregarding comparable indicia here. R&R at 31-32. There is no dispute that every analysis Dr. Neumark presented that included pre-U.S. class period data showed statistically significant disparities, (whether looking at 2020-21 or 2017-21). The Second Circuit has held that "statistical studies may include data from outside the statute of limitations to prove timely discriminatory acts." *Chin*, 685 F.3d at 150. This principle is not limited to cases in which restricting the data to the class period would yield a particularly small sample size. Even prior to *Chin*, the Second Circuit reprimanded a district court, in a case with a sufficiently robust sample size, that had devalued plaintiff's statistical findings for incorporating pre-limitations data. *Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590, 604 n.5 (2d Cir. 1986). Indeed, the Supreme Court has made quite clear that "evidence of pre-Act[31] discrimination is quite probative" on the issue of post-

---

[29] Dkt. 419-20, Neumark Suppl. Table 2, Panel D.

[30] For example, in *Waisome* there were 617 people who took the written test, and 316 who made it to the Eligibility List, ranked in order of their composite scores, and promoted in that order. *Waisome,* 948 F.2d at 1372-73, 1377-79. To discern any disparity in passing the written test, all 617 observations must be considered, and to identify disparities in the rank ordering, all 316 observations of those ranked must be studied.

[31] While the circumstances in *Bazemore* involved statistics from before the applicability of Title VII to public employers, the Supreme Court has made clear that pre-limitations period conduct is analogous to pre-Act conduct, in that it is relevant to proving post-limitations discrimination, even if no relief may be granted for the earlier conduct. *See United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977).

Act disparities. *See Bazemore*, 478 U.S. at 401-02 & n.13 (Brennan, J., for a unanimous Court, concurring in part). Given the Supreme Court's imprimatur, it should be no surprise that courts routinely consider pre-limitations statistics. *E.g.*, *Ellis*, 285 F.R.D. at 528-29 ("[P]re-statute of limitations data is generally both relevant and frequently used in such matters as evidence of the alleged discriminatory practice, even when a plaintiff may not directly recover as to events occurring outside the applicable time period."); *Paige v. California*, 291 F.3d 1141, 1149 (9th Cir. 2002), *as amended on denial of reh'g and reh'g en banc* (July 18, 2002) ("[I]t is appropriate to admit pre-liability data into evidence in a disparate impact case if promotional practices remain similar over a long period of time."); *see also Ellis*, 285 F.R.D. at 528-29 (dispute about the use of pre-limitations data was common to the class and supported granting certification).[32]

Pre-limitations data is not only a permissible basis for showing discrimination, but it can be particularly probative, as it does not reflect a desire to avoid liability or limit damages, as post-notice conduct may. *See, e.g.*, *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1277 n.14 (11th Cir. 2000); *Ellis*, 285 F.R.D. at 529-30. In this case, the timing of notice is important to consider. BLP had notice of the pay discrimination allegations in November 2020, *see* Dkt. 24, even though the Title VII claims only cover a time period beginning in early 2021, *see* Dkt. 170 ¶ 48. Accordingly, during the entire U.S. class period, BLP was on notice and motivated to improve compensation figures. Far from being irrelevant, the statistical results from before the U.S. class period—including time before this litigation was initiated—are due particular weight.

---

[32] In addition, *Segar v. Smith*, while not addressing the combination of pre-limitations and post-limitations data in one analysis, as in *Chin*, *Paige*, *Ellis*, and here, does something very similar. 738 F.2d 1249, 1283-84 (D.C. Cir. 1984). In *Segar*, statistical analysis of initial assignments, evaluations, and discipline all showed disparities, as did promotions to a certain level. Because those were all inputs determining the likelihood of promotion above that level, the court held it was appropriate to rely on evidence like initial assignments decided at the outset of workers' careers to draw an inference of discrimination in higher-level promotions, even though those promotion results were not statistically significant on their own.

Despite this wealth of cases, the R&R refuses to consider pre-limitations data in conjunction with class period data for the U.S. class. R&R at 33 (citing *Eagle*, 343 F.R.D. at 573). The authority that the R&R invokes comes with a key qualification, however: evidence outside the class period "alone" does not suffice, but "[c]ombined with other within-class-period testimony, testimony about a policy that began before the class members' claims accrued and persisted throughout the class period is relevant." *Eagle*, 343 F.R.D. at 573. Likewise, Dr. Neumark's analyses for 2017-21 and 2020-21 combine evidence from the pre-U.S. limitations period with evidence from within the U.S. class period to establish a disparity that began pre-limitations and persisted throughout the class period. Such evidence is unquestionably relevant.

Plaintiff also provided non-statistical indicia of discrimination that provide assurances that disparities significant at the 10% level are indeed evidence of discrimination, not random chance. Evidence shows that Gregori: had been made aware of gender pay gaps;[33] bemoaned even the small steps taken to address disparities;[34] and failed to entirely cure pay gaps by intentionally taking an incremental approach rather than fully fixing problems at once.[35] The R&R dismisses

---

[33] *See, e.g.*, Dkt. 419-2 (recognizing that pay changes were going to "underpaid non-males or diverse people"); Dkt. 419-15 (████ ████ ████ ████████ ████████ ████████ ████████); Dkt. 419-16 (████████████████████████████████████████); Dkt. 418-7 (███████████████ ████████████████████████████████████████); Dkt. 420-37, Massucci Dep. 98:6-22 (Plaintiff's supervisor made Gregori aware of pay discrepancies between men and women).

[34] *See, e.g.*, Dkt. 419-9 (complaining of having to potentially "take a handful of dollars back from [the] men, *deserving as they are*"—language the R&R omits from its description, R&R at 34—when prompted that a team's "females are underpaid vs[.] the males" (emphasis added)); Dkt. 419-6 (██████████████ ██████████████████████████████ promising to look for a solution, so long as it was "outside of cutting the men's salaries by ███"); Dkt. 418-51 (conceding the bad optics of giving a male employee a large raise to a total far above his female counterparts, yet still giving that raise).

[35] *See, e.g.*, Dkt. 419-5 (after finding pay disparities affecting four women on one team, instructing that they did not "have to go to parity in one go" because the "gap is rather wide"); Dkt. 419-3 █████████████████ ████████████); Dkt. 419-15 at 15863 (████████████████████ ████████████████████████████████████████); Dkt. 420-37, Massucci Dep. 119:4-22 (███████████ ████████████████). ████████████████████████████████ Dkt. 418-26, 30(b)(6) Dep. 227:8-231:6 (████████████████ ████████████████).

some of these examples because they were outside the class period or about non-class members. R&R at 34. But there is no evidentiary basis to conclude (nor has BLP asserted) that Gregori exercised his authority differently over time or across News. *See* Section III.B.i *infra* (discussing how Gregori's compensation changes spanned the gamut of News). Gregori's increasing women's pay in some of these communications also proves too little. Unlike hiring or promotion decisions, pay discrimination is not binary: paying an employee 1% less than men, after paying her 3% less, does not eliminate the statutory violation. And while the R&R notes that a defendant's awareness of a pay gap that was not completely eradicated was not "significant proof" of a "general policy of discrimination," R&R at 34, Plaintiff never made such an assertion. She only argued that this record, along with the statistical evidence that looked at pre- and post-class data, in addition to the statistical analysis limited to the class period, all *combined* to provide significant proof.

The R&R errs by rejecting statistics at the 10% significance level, *considered in isolation*. It should not have overlooked supportive pre-class period data and class period analyses incorporating peer group, or rejected non-statistical evidence of Gregori's indifference to fully correcting known gender pay gaps for not *alone* constituting "significant proof." Correctly considering the record in full, it provides significant proof of discrimination against the U.S. class.

B.   The Other Elements of Class Certification Are Also Satisfied

In support of her disparate impact claims, Plaintiff challenges a common mode of exercising discretion for which she has presented significant proof: Deputy Editor-in-Chief Reto Gregori played an active and regular role in pay at a systemic and individual level. Because BLP's compensation system cannot be broken out into subcomponents, the inference that the statistical

---

[redacted]); Dkt. 418-29 at slide marked 3 ([redacted]

[redacted]).

disparities described above are traceable to Gregori's role is proper at this procedural stage. Relatedly, this evidence establishes for Plaintiff's disparate treatment claims that Gregori is the relevant decisionmaker. With the decisionmaker identified, Plaintiff's statistics alone can satisfy commonality for her pattern or practice claims. *E.g.*, *Chen-Oster*, 325 F.R.D. at 75; *Kassman*, 416 F. Supp. 3d at 282.

### 1. Decisionmaking by an Individual or Small Group, as Present Here, Is a Common Mode of Exercising Discretion

The R&R correctly states the overarching question on commonality for Plaintiff's disparate impact claims: did Plaintiff identify a class-wide common mode of exercising discretion? R&R at 27. And it accurately articulates that decisionmaking by an individual or small group can constitute such a common practice. *Id.* at 41. But the R&R then misapplies these governing standards to the record in concluding that Gregori's role in compensation was insufficiently pervasive. *Id.* at 42. In addition to fabricating a numerical legal standard without a basis in authority, the decision ignores evidence or divides it piecemeal so the parts are lesser than their sum.

First, the R&R only examines the evidence by looking at each category and example in a vacuum, then criticizing each for not occurring at a sufficient regularity. R&R at 42-50. This approach is like separately considering tree after tree, faulting each for not being a forest, while missing the forest in which they are growing. Plaintiff alleges, and the record supports, that Gregori held sway at every stage of the BLP pay process. He had to review and approve all starting offers.[36] He set and revised "algo rules," which impacted the pay recommendations across members of News.[37] He directly or through others made an unrecorded number of changes to the algorithm's

---

[36] Dkt. 418-27, Siegel Dep. 68:13-20 (all starting offers must be approved by Gregori); *id.* at 236:3-23 (same, even if indirectly through his Chief of Staff); Dkt. 418-26, 30(b)(6) Dep. 175:16-176:5 (same); *see, e.g.*, Dkt. 418-38; Dkt. 418-45; Dkt. 418-49; Dkt. 418-54; Dkt. 418-56; Dkt. 418-55; Dkt. 419-4; Dkt. 419-7; Dkt. 419-1 at 13019.

[37] Dkt. 440-1, Sullivan Dep. 97:14-98:20 (Gregori set the algo rules for News); *id.* at 109:21-110:6 (his guidance

recommendations before those outputs were uploaded into Bloomberg's Online Compensation System (BOCS)[38]—meaning before his edits could be captured.[39] He then logged onto BOCS and personally made over 675 changes (for only part of the New York proposed class period) to employees at all seniority and salary levels.[40] And he directed others to input alterations on his behalf.[41] That Gregori engaged in dialogue with management when making decisions about middle managers' direct reports does not undermine his common role; it simply shows a respectful management style. At the end of the day, though, he was their boss, and as he testified, "normally . . . managers do what I tell them to do."[42] Taking this evidence together[43] plainly raises a question—did Gregori exercise discretion over all class members' compensation?—that can be answered for the reporters, editors, and producers in the classes as a whole based upon common

---

to the Compensation Team was implemented); Dkt. 418-26, 30(b)(6) Dep. 272:7-273:16 ▮▮▮▮▮▮ ▮▮▮▮▮▮). The R&R concedes Gregori modified the rules by "exercising his own discretion." R&R at 46.

[38] Dkt. 418-48 at 12712 (▮▮▮▮▮▮▮▮▮▮▮▮); Dkt. 419-12 (▮▮▮▮▮▮▮▮▮ Dkt. 440-1, Sullivan Dep. 51:23-52:6 (he asked to change individual algorithm recommendations before they were loaded into BOCS).

[39] Dkt. 418-26, 30(b)(6) Dep. 274:11-275:23; Dkt. 440-1, Sullivan Dep. 117:24-119:16.

[40] Dkt. 419-18, Martin Rep. ¶ 48(e); Dkt. 419-36, Webber Decl. ¶ 3 (37% of Gregori's changes in the compensation logs were for employees in the bottom half of the salary range); see also Dkt. 440-1, Sullivan Dep. 164:9-168:5 & Dkt. 418-10 (▮▮▮▮▮▮▮▮▮▮.

[41] Dkt. 418-50 (Gregori directed changes to 12 employees' compensation); Dkt. 418-47 at 12206 (he directed alterations to four people's pay); Dkt. 419-11 (Gregori flagged adjusting one employee's compensation ); see also Dkt. 440-1, Sullivan Dep. 169:19-170:10 (discussing how changes made at Gregori's behest appear as if they were made by the managers implementing his instructions).

[42] Dkt. 440-5, Gregori Dep. 84:8-22. It was no secret that compensation decisions rolled up, and lower-level managers did not have final authority. BLP even provided explicit guidance to managers delivering year-end evaluations to not "[b]lame the managers above you due to ratings and compensation that might have changed after [the manager] submitted EVAL/BOCS." Dkt. 418-43 at 10364.

[43] Further illustrating the permeating nature of Gregori's influence, he also set the expected distribution for performance ratings and pushed to keep managers close to his curve. Dkt. 440-5, Gregori Dep. 72:5-11 (Gregori reviewed ratings for everyone in News); Dkt. 418-53 (he rejected ratings for not conforming to the distribution and made changes for individuals); Dkt. 419-8 (same); Dkt. 418-57 (he sent back skewed ratings); Dkt. 418-52 (he directed a change an employee's rating); see also Dkt. 420-37, Massucci Dep. 92:11-93:4 (Plaintiff's manager confirmed Gregori "approved or changed" her ratings). Performance ratings influenced compensation recommendations. See, e.g., Dkt. 440-5, Gregori Dep. 67:16-68:8; Dkt. 419-14 at 15803; see also Dkt. 418-29 at slide marked 3 (▮▮ ▮▮▮▮▮▮▮▮); Dkt. 440-1, Sullivan Dep. 144:20-146:2 (historical ratings were considered when deciding whether to approve increases above the algorithm's recommendation).

evidence.[44] Pulling apart each piece of evidence, the R&R acts as if "there is no sandwich" after separating the ham, cheese, and bread. This effort to deconstruct obscures the clearly substantive, active, and comprehensive nature of Gregori's review.

In another misstep, the R&R refuses to credit Gregori's decisionmaking with respect to individual compensation decisions except when he made modifications. This approach misses that Gregori made a *decision* every time he reviewed an individual compensation determination and either elected to change *or* accept it.[45] Even BLP admits that approval is an affirmative exercise of discretion, stating that managers below Gregori "*exercised their own discretion as to whether to approve* or modify" pay proposals. Dkt. 440-6 at 10 (emphasis added); *see also id.* at 5, 6 ("[M]anagers reviewed the ratings and *used their discretion to either approve*, reject or change them as they deemed appropriate[.]" (emphasis added)). Neither BLP, nor the R&R, offer any explanation for why approving counts as an exercise of discretion for lower-level decisionmakers (managers) but not a higher-up one (Gregori). That Gregori more commonly approved, rather than modified, recommendations for final total compensation, R&R at 44-45 (and starting pay, *id.* at 43), in no way detracts from the substantive nature of his review. An alternative scenario, where he is more often than not *rejecting* the proposals of his managers (or staff and recruiters) would reflect their bad judgment and thus a deeply flawed business model. Moreover, the hundreds of overt instances where Gregori *does* choose to alter pay reveal that he is not simply doing an overall budget check, or examining pay for just his direct reports or other senior individuals; he is considering the particularities of each circumstance before him. Neither BLP nor the R&R proffer

---

[44] His alterations outside of the class period and for non-class members are all background evidence supporting his regular participation in the compensation process. *See also* Section III.A.2 *supra*. *Contra* R&R at 45.

[45] Moreover, an increase in pay that did not achieve parity is a *decision* to continue underpayment. *See, e.g.*, *Ndugga*, 2023 WL 4744184, at *5 (allegation that "Ms. Ndugga's 2021 salary increase still left her below the starting salary of male counterparts" was actionable); *id.* at *7 (appreciating that a raise could be "evidence of BLP's failure to remedy the ongoing impact of [leadership's] compensation decision making"); *see also* Section III.A.2 *supra*.

any rationalization for why Gregori's thinking about *departures* from recommendations was substantive but his thinking on *approvals* was perfunctory. Accordingly, all putative class members—whether impacted by the 12% of compensation changes Gregori explicitly[46] and individually made during the process's final stage, or part of the remainder—had their final pay personally considered and greenlit by Gregori.

It is true that a mere rubberstamp, without consideration, does not suffice to establish a common mode of exercising discretion. R&R at 41, 44 n.8. But the R&R even acknowledges that Gregori's role "amounted to more" than such perfunctory approval. *Id.* at 50. The R&R repeatedly plucks a single word from two decisions (only one in District) that state in *dicta* one could find a common practice where a single decisionmaker or small group "vetted" pay decisions. R&R at 41, 44, 49, 50 (citing *Kassman*, 416 F.Supp.3d at 280; *Jones v. Nat'l Council of Y.M.C.A. of the U.S.A.*, 34 F.Supp.3d 896, 908 (N.D. Ill. 2014)). Yet neither *Kassman*, *Jones*, nor the R&R explain what constitutes "vetting," or how one distinguishes it from actionable decisionmaking or inactionable rubberstamping. The holdings of *Kassman* and *Jones* provide no help, as the R&R concedes the facts of those cases are distinguishable.[47] R&R at 50; *see also Kassman*, 416 F.Supp.3d at 261, 280 (plaintiffs "provide[d] *no evidence*" that senior management checked lower-level managers'

---

[46] To start, these compensation logs were not available for 2017, a year encompassed in the putative New York class period, so the over 675 alterations is an undercount. Second the logs from which the 12% figure was derived do not capture where managers entered the changes that Gregori had personally requested by email. *See, e.g.*, Dkt. 418-47; Dkt. 418-50; Dkt. 419-11; Dkt. 419-12; *see also* Dkt. 440-1, Sullivan Dep. 169:19-170:10 (changes made at Gregori's behest would appear in logs as being made by the managers who he had instructed). And where Gregori orally conveyed directions, no document would capture those instructions.

[47] The R&R also compares the facts here to *Ross v. Lockheed Martin Corp.* R&R at 47 (citing 267 F.Supp.3d 174, 198 (D.D.C. 2017)). But there, the plaintiffs never alleged a "centralized performance evaluation process," and instead challenged a process involving an untold number of managers. *Id.* at 182, 200. The R&R additionally attempts a comparison to *Moussouris v. Microsoft Corp.*, where plaintiffs only challenged the exercise of discretion by individual decisionmakers at every stage, but not a single or small group of centralized decisionmakers. R&R at 46 (citing 2018 WL 3328418, at *198 [*sic*] (W.D. Wash. June 25, 2018)). But *Moussouris* notably flagged that its holding likely would have been different had plaintiffs shown "the involvement of top management in the discretionary decision-making." 2018 WL 3328418, at *17. Notably, a hypothetical evaluation process where "different lower-level decision-makers may have injected some subjectivity" but the process still "ended with one individual," the court posited, would "provide[] the necessary 'common contention' capable of class-wide resolution." *Id.*

19

individual decisions beyond confirming they stayed in the aggregate within budget totals (emphasis added)); *Jones*, 34 F.Supp.3d at 908 & n.14 ("plaintiffs point to *no evidence*" that senior management changed individual compensation or performance ratings "with *any frequency*," as they were merely confirming decisions overall stayed within budget (emphases added)); *id.* at 908 n.14 (citing evidence which showed only two individual changes total by senior management).

The R&R does not even bother to address Plaintiff's solo decisionmaker cases from the Second Circuit. *E.g.*, *Cronas v. Willis Grp. Holdings, Ltd.*, 2011 WL 5007976, at *3 (S.D.N.Y. Oct. 18, 2011) (distinguishing *Dukes* from the "class of 317 officer-level women" who "were all employed at a single location, where pay and promotion decisions were subject to a single ultimate decision-maker"); *Hnot v. Willis Grp. Holdings Ltd.*, 228 F.R.D. 476, 482-83 (S.D.N.Y. 2005) (finding to be "common policy" or "common practice" both "vesting regional and local officers with unfettered discretion in making promotion and compensation decisions" and, alternatively, the review and oversight of such decisions "by human resources and a top level officer"); *Woods-Early v. Corning Inc.*, 330 F.R.D. 117, 124 (W.D.N.Y. 2019) ("an executive 'brain trust' has unfettered discretion to determine each employee's final rating" after lower-level managers and then supervisors first reviewed and could change ratings). The R&R also does not engage with the facts of *Ellis*, where the court found commonality based on a small group of senior managers who accepted *or* rejected promotion recommendations from lower-level managers. 285 F.R.D. at 512-13, 518 ("[T]he decisions must be *approved* all the way up the chain of command." (emphasis added)). "Top management's involvement" was sufficiently pervasive in *Ellis* even though lower-level managers were "the primary sources of candidate recommendations" *and* stayed involved in "ongoing dialogue" about promotions. *Id.* at 512-13. The record here is more similar to these cases, and supports by at least a preponderance Gregori's active role in assessing putative class members'

20

pay. While he also helped set up the structure for the compensation process, R&R at 45, his involvement in deciding outcomes themselves was pervasive and regular.

None of these decisions from the Second Circuit and elsewhere articulate any numerical benchmark for the numbers of changes that must be made to find a common mode of exercising discretion. The R&R overreads an outlier case to manufacture its legal standard. R&R at 44 (citing *Valerino v. Holder*, 283 F.R.D. 302 (E.D. Va. 2012)). *Valerino* involved a multistage promotion process, culminating in final promotion selections by the organization's Director, where the plaintiffs scattershot challenged every level of review without a clear theory of liability. 283 F.R.D. at 312. Importantly, the language invoked by the R&R pertained to the ruling on commonality only to the extent that analysis merged with its analysis on typicality.[48] *Id.* at 317. Helpfully to Plaintiff here, *Valerino confirmed* that a challenge to the decisionmaking by the Director, a position held by the same person throughout the class period, would constitute "significant proof of commonality." *Id.* at 316; *see also Sughrim v. New York*, 690 F.Supp.3d 355, 393 (S.D.N.Y. 2023) (commonality is satisfied because "Plaintiffs' class claims challenge the same set of practices carried out by the same personnel, and they raise common questions about the legality of Defendants' practices"). Furthermore, *Valerino* acknowledged that adopting a lower-level recommendation is *itself* an exercise of discretion. 283 F.R.D. at 315 ("That the Career Board may often agree with the recommendation of the [prior recommender], does not mean the Board's discretion is limited or restricted. It is not."). In sum, *Valerino* does not stand for the proposition for which the R&R invokes it: that a final, single decisionmaker must reverse over 20% of final decisions to establish a common mode of exercising discretion sufficient for commonality.

---

[48] *Valerino* only referenced that the Director affirmed prior recommendations 80% of the time to explain that some class members might seek to challenge earlier parts of the promotion process. 283 F.R.D. at 317. Again, this failure to establish typicality was largely due to the plaintiffs' failure to articulate a singular, clear theory of liability. *Id.* at 312. Not so here.

One more piece of the R&R requires addressing. The decision demands that Gregori have the ability to influence compensation decisions, and that he actually and regularly does so. R&R at 42. Fair enough (and Plaintiff has demonstrated this). But the R&R abandons this requirement by speculating about the possible involvement of Micklethwait and BLP's overall management committee. The R&R claims that "plaintiff must show that [Gregori] *alone* 'vetted' the pay proposals that came across his desk." R&R at 49 (emphasis added). It then hypothesizes that BLP's overall management committee "may . . . review" pay decisions. *Id.* at 49-50. Such rank conjecture—not even suggested by BLP—should not be given any weight. The R&R also emphasizes that as a formal matter, the buck stopped with Gregori *and* Editor-in-Chief John Micklethwait. *Id.* Plaintiff flagged this in her Motion, Mot. at 3, 15-16, but there is no evidence that Micklethwait *actually* engaged in any substantive review. In contrast to Gregori's hundreds of logged pay changes, Micklethwait made none.[49] In any event, two individuals jointly deciding on compensation would also constitute a sufficiently small and cohesive group whose exercise of discretion could establish commonality. *See, e.g.*, *Ndugga*, 2023 WL 4744184, at *6-8 (allowing class disparate treatment and disparate impact claims to proceed based on Plaintiff's allegations related to the singular control by the multi-member Editorial Management Committee over compensation). By the same token, the fact that Gregori worked with HR or Compensation Team representatives, *see* R&R at 48 n.9, does not alter the commonality analysis.

Ultimately, Plaintiff has established that Gregori served as the glue to hold together the pay disparities she challenges.

---

[49] Dkt. 418-11 (BOCS data log filtered to show only every instance of Gregori, in column Updated By (Name), himself making changes directly in BOCS); *see also* Dkt. 419-36, Webber Decl. ¶ 3(d) (offering to provide full data); Dkt. 440-1, Sullivan Dep. 97:14-98:20, 99:12-23 (only Gregori, and not anyone else on the Editorial Management Committee, which included Micklethwait, handled pay-related rules for News or reviewed pay recommendations).

> 2.      *The Statistical Disparities Are Traceable to the Identified Common Mode*
> *of Exercising Discretion*

The R&R misapplies the law in two regards in finding Plaintiff had not established the disparate impact in pay was traceable to the actions of Gregori, "[e]ven if . . . '[he] had his hands in all aspects of compensation decision-making.'" R&R at 38-39.

First, the R&R appears to demand a heightened, but not fully explained, standard to establish causation based on *Gregori's* role rather than actions by lower-level managers. But statistically significant pay gaps are sufficient to create "an inference of causation" supporting disparate impact claims. *See Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 994 (1988) ("Once the employment practice at issue has been identified . . . statistical disparities must be sufficiently substantial that they raise [] an inference of causation."); *see also Wright v. Stern*, 450 F.Supp.2d 335, 367 (S.D.N.Y. 2006) (in disparate impact *and* "pattern or practice disparate treatment cases," significant statistics "give rise to an inference of causation"). Sufficiently significant statistical findings assure a court that the disparity is not attributable to chance. *See E.E.O.C. v. Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus.*, 186 F.3d 110, 117 (2d Cir. 1999); *Waisome*, 948 F.2d at 1375. As discussed, *see* Section III.A *supra*, the results for both classes establish this inference of causation. No further analysis on traceability is required.

Second, the R&R premises its conclusion on the idea that Plaintiff had not shown "the elements of [BLP's] decisionmaking process are not capable of separation for analysis," such that the "decisionmaking process may be analyzed as one employment practice." 42 U.S.C. § 2000e-2(k)(1)(B)(i). The R&R properly recognizes that "[w]hether a particular decisionmaking process is capable of separation for analysis largely turns on the details of the specific process and its implementation in a given case." R&R at 40 (citing *Chin*, 685 F.3d at 154). Yet it does not give Plaintiff the benefit of this legal standard for shaky reasons. To start, it claims Dr. Neumark did

23

not isolate the impact, if any, of performance ratings. R&R at 40; *see also id.* at 48 (citing *Chen-Oster*, 325 F.R.D. at 75). However, Plaintiff does not focus her challenge on BLP's evaluation process. She thus did not need to justify excluding evaluation scores from her analyses as needed in the cited case of *Chen-Oster*. Moreover, Plaintiff's statistical analyses *controlled for* performance ratings.[50] These tests revealed that ratings did not explain pay differences.

Next, the R&R faults Plaintiff for not analyzing whether there were disparities in the algorithm's initial compensation recommendations. R&R at 40. But as she already explained, Mot. at 12-13, 32-33 n.109, BLP only produced BOCS logs reflecting the algorithm's recommendations *after* Gregori *already* made changes to those recommendations.[51] Those adjustments included alterations to the algo rules, which impacted multiple employees at once,[52] and overriding individual compensation recommendations.[53] These changes were unrecorded and thus undisclosed, making it impossible to separate out the algorithm's initial recommendations; ergo, analyzing the process's overall impact is appropriate. *See, e.g., Port Auth. Police Asian Jade Soc'y of N.Y. & N.J. Inc. v. Port Auth. of N.Y. & N.J.*, 681 F.Supp.2d 456, 464 (S.D.N.Y. 2010) (analyzing the steps of defendant's promotion process on the whole because "records do not exist for every step" and "the causal role of each step is called into doubt by the records that do exist").

---

[50] Dkt. 419-19, Neumark Rep. ¶¶ 37(m), 14; *see also* Dkt. 420-54, Neumark Dep. 49:20-22.

[51] Dkt. 418-26, 30(b)(6) Dep. 274:11-19 ( ▮▮▮ *id.* at 275:15-23 ( ▮▮▮ ; Dkt. 440-1, Sullivan Dep. 117:24-119:16 ▮▮▮ . Moreover, following Plaintiff's motion to compel the underlying algorithm code, the Magistrate Judge decided that BLP would not be able to rely on the algorithm as a nondiscriminatory determinant of employees' pay. July 2, 2024 Status Conference Tr. at 10:8-16, 11:4-7, 12:2-10; *see also* Dkt. 284 at 2-3.

[52] Dkt. 418-26, 30(b)(6) Dep. 272:7-273:16, 274:20-275:4 ( ▮▮▮ ); *see, e.g.,* Dkt. 440-5, Gregori Dep. 116:9-118:17 ( ▮▮▮ ); Dkt. 418-48 at 12712 ▮▮▮

[53] *See, e.g.,* Dkt. 418-26, 30(b)(6) Dep. 275:5-14 ( ▮▮▮ ); *see also* Dkt. 440-5, Gregori Dep. 120:23-121:12.

This case is analogous to *Chin*, which involved a three-step promotion process. There, following an officer recommendation of a candidate, a board considered the proposal and then a single supervisor selected who was promoted. 685 F.3d at 154-55. The Second Circuit confirmed that the challenged process was not capable of disaggregation because the first two stages played an "indeterminate role." *Id.* ("[T]he weight it carried in the process was both unclear and variable."). Likewise at BLP, the intermediate influence of starting pay, the algorithm, and lower-level manager review (each of which Gregori weighed in on) cannot be disentangled from the ultimate salary and bonus decisions, which ultimately reflect Gregori's imprimatur regardless of whether his final stamp was of approval or alteration. *See* Section III.B.1 *supra*. Where a decisionmaker's influence is found not only in the final decision but in most every step along the way, it is nonsensical to think that any step of the process can be analyzed free of Gregori's influence. *See Port Auth. Police Asian Jade Soc'y of N.Y. & N.J. Inc.*, 681 F.Supp.2d at 464 ("Because the role of each step cannot be determined, the steps cannot be examined separately to discover whether a particular step causes a disparate impact."); *see also Munoz v. Orr*, 200 F.3d 291, 304 (5th Cir. 2000) ("[T]he overlap between the secret algorithm used by [Defendant] with individual subjective decisions such as awards during service and selection [for promotions] among a list of candidates would make it difficult to separate out the statistical impact of each portion of the promotion decision."). It was "the *process*, not the individual steps, that determine[d] whether someone receive[d] a" raise or bonus. *See Chen-Oster*, 2022 WL 814074, at *7-8 (emphasis added; finding the "subcomponents" of the promotion process were "interwoven steps of one singular" practice to be evaluated as one).

## IV.   CONCLUSION

For the foregoing reasons, the Court should reject the R&R in its entirety and grant Plaintiff's Motion for Class Certification.

25

Dated: April 30, 2026                                   Respectfully submitted,


                                                        /s/ Christine E. Webber
                                                        Christine E. Webber (*pro hac vice*)
                                                        Rebecca A. Ojserkis
                                                        Dana Busgang (*pro hac vice*)
                                                        Cohen Milstein Sellers & Toll PLLC
                                                        1100 New York Ave. NW, Suite 800
                                                        Washington, DC 20005
                                                        (t) (202) 408-4600
                                                        (f) (202) 408-4699
                                                        cwebber@cohenmilstein.com
                                                        rojserkis@cohenmilstein.com
                                                        dbusgang@cohenmilstein.com

                                                        Donna H. Clancy
                                                        The Clancy Law Firm, P.C.
                                                        40 Wall Street, 61st Floor
                                                        New York, New York 10005
                                                        (t) (212) 747-1744
                                                        (f) (646) 693-7229
                                                        dhc@dhclancylaw.com

                                                        *Counsel for Plaintiff Naula Ndugga and other*
                                                        *similarly situated women*

**LOCAL RULE 7.1(c) CERTIFICATE OF WORD COUNT**

I hereby certify that this brief was prepared with a computer and complies with Local Rules 72.1(b)(2), 6.3, and 7.1(b) of the United States District Court for the Southern District of New York, which affirm that an objection to the report and recommendation of a magistrate judge may exceed 3,500 words if length limitations are "otherwise provided by the court." Section 3.H of the Individual Practices of Judge Gregory H. Woods states that "objections to reports and recommendations by, and appeals from orders of, magistrate judges are limited to 25 pages." Consistent with Local Rule 72.1(b)(2), Local Rule 6.3, Local Rule 7.1(b), and Judge Gregory H. Woods' Individual Practices, this brief is limited to 25 pages, excluding the caption, table of contents, table of authorities, signature blocks, and the required certificates.

Dated:     April 30, 2026                              */s/ Christine E. Webber*
                                                      Christine E. Webber

27

**CERTIFICATE OF SERVICE**

I hereby certify that on April 30, 2026, I electronically filed Plaintiff's Objections to Report

and Recommendation with the Clerk of the Court using CM/ECF, which in turn sent notice to the

following:


Elise M. Bloom
Rachel S. Philion
Noa Baddish
Eleven Times Square
New York, New York 10036
(t) 212-969-3000
(f) 212-969-2900
ebloom@proskauer.com
rphilion@proskauer.com
nbaddish@proskauer.com

Mark W. Batten (*pro hac vice*)
One International Place
Boston, Massachusetts 02110
(t) 617-526-9850
(f) 617-526-9899
mbatten@proskauer.com

*Counsel for Defendant Bloomberg L.P.*


Dated:     April 30, 2026                          */s/ Christine E. Webber*
                                                    Christine E. Webber


28